## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SAREPTA THERAPEUTICS, INC. SECURITIES LITIGATION | Civil Action No. 1:25-cv-13530 <br><br> **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 2

II.   JURISDICTION AND VENUE................................................................ 14

III.  PARTIES.................................................................................. 14

    A.    PLAINTIFFS....................................................................... 14

    B.    DEFENDANTS..................................................................... 15

IV.   SUMMARY OF THE FRAUD............................................................ 15

    A.    SAREPTA'S GENE AND EXON-SKIPPING THERAPIES WERE THE TWIN PILLARS OF SAREPTA'S BUSINESS DURING THE CLASS PERIOD ......................... 15

        1.    Sarepta Hailed Its Gene Therapies as the Company's Single Most Important Growth Driver............................................... 16

        2.    Sarepta's Gene Therapies Were Critical to the Company's Success and a Key Driver of the Company's Soaring Stock Price........................................................................ 19

        3.    The Safety of Sarepta's Gene Therapies Was Critical to Their Success and a Focus of Market Concern During the Class Period.................................................................. 24

        4.    Investors Were Also Focused on the Key Confirmatory Trial of Sarepta's "Exon-Skipping" Drugs, Which Generated the Bulk of the Company's Revenue During the Class Period ................... 26

    B.    DEFENDANTS MISLED INVESTORS ABOUT THE SAFETY OF SAREPTA'S GENE THERAPIES................................................................. 30

        1.    Under Pressure to Rush Elevidys to Market, Sarepta Flouted Regulatory Requirements for Preclinical Safety Validation of rh74.......................................................................... 35

        2.    Prior to the Start of the Class Period, Sarepta's Own Senior Scientists and Expert Consultants, Privately Raised Serious Concerns About rh74's Liver Toxicity.................................. 42

        3.    During the Class Period, Sarepta's Rapidly Accumulating Safety Data Further Demonstrated that rh74 Posed a Far Greater Risk of Liver Injury Than Other Approved Gene Therapies and

Competing DMD Treatments, Particularly in Non-Ambulatory Patients........................................................................................................ 51

C. DEFENDANTS MISLED INVESTORS ABOUT THE PROGRESS OF SAREPTA'S LGMD GENE THERAPY PROGRAM.................................................................... 60

1. In Truth, Sarepta's LGMD Program Was Plagued by Major Development Problems and Stuck at the Starting Gate ......................... 62

D. DEFENDANTS MISLED INVESTORS ABOUT SAREPTA'S KEY CONFIRMATORY TRIAL FOR ITS CRITICAL EXON-SKIPPING THERAPIES.......................................... 67

1. As Defendants Ultimately *Admitted*, They Knew Before the Class Period Even Started That ESSENCE Failed to Amass Enough Patient Data to Demonstrate a Benefit...................................... 67

E. DURING THE CLASS PERIOD, DEFENDANTS LEVERAGED SAREPTA'S COMMERCIAL SUCCESS TO GAIN ACCESS TO CRITICAL FINANCING AND TO ACQUIRE ASSETS FROM A COMPETING BIOTECH COMPANY .................. 72

F. THE TRUTH GRADUALLY EMERGES, CAUSING SAREPTA'S STOCK TO LOSE MORE THAN 80 PERCENT OF ITS VALUE.................................................... 75

1. On March 18, 2025, Sarepta Was Forced to Disclose That a Patient Taking Elevidys Died from Liver Failure .................................. 75

2. On April 3 and 4, 2025, Investors Learned That the European Health Authority Froze Elevidys' Confirmatory Clinical Trial Because of Concerns About rh74's Safety ........................................... 77

3. On May 6, 2025, Sarepta Slashed Its Earnings Guidance, Revealing That Concerns About rh74's Safety Significantly Impacted Physician Adoption of Elevidys............................................ 79

4. On June 15, 2025, Sarepta Disclosed a Second rh74-Related Patient Death from Acute Liver Failure (While Falsely Denying Further Cases of Liver Failure Associated with rh74)........................... 82

5. On July 18, 2025, Sarepta Was Forced to Confirm Media Reports That a Third Patient Treated with the Company's rh74-based Gene Therapy Had Died from Liver Failure................................................... 86

6. On November 3, 2025, Sarepta Revealed That Its Exon-Skippers Failed to Show Any Efficacy Benefit in the ESSENCE Study .............. 91

V. ADDITIONAL ALLEGATIONS OF SCIENTER ...................................................... 93

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS ................................................................................ 107

      A.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
            TOUTING THE SAFETY OF SAREPTA'S RH74 GENE THERAPY PLATFORM ............ 108

            1.    Defendants' False and Misleading Statements During the
                  Second Quarter of 2023 ...................................................... 108

            2.    Defendants' False and Misleading Statements During the
                  Third Quarter of 2023 ........................................................ 108

            3.    Defendants' False and Misleading Statements During the
                  Fourth Quarter of 2023 ....................................................... 110

            4.    Defendants' False and Misleading Statements During the
                  First Quarter of 2024........................................................... 113

            5.    Defendants' False and Misleading Statements During the
                  Second Quarter of 2024 ...................................................... 116

            6.    Defendants' False and Misleading Statements During the
                  Third Quarter of 2024 ........................................................ 117

            7.    Defendants' False and Misleading Statements During the
                  Fourth Quarter of 2024 ....................................................... 119

            8.    Defendants' False and Misleading Statements During the
                  First Quarter of 2025........................................................... 121

            9.    Defendants' False and Misleading Statements During the
                  Second Quarter of 2025 ...................................................... 126

            10.   Defendants' False and Misleading Statements During the
                  Third Quarter of 2025 ........................................................ 132

      B.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
            TOUTING THE PROGRESS OF SAREPTA'S LGMD PROGRAM.............................. 133

            1.    Defendants' False and Misleading Statements During the
                  Third Quarter of 2023 ........................................................ 133

            2.    Defendants' False and Misleading Statements During the
                  Fourth Quarter of 2023 ....................................................... 135

            3.    Defendants' False and Misleading Statements During the
                  Third Quarter of 2024........................................................... 136

4.     Defendants' False and Misleading Statements During the Fourth Quarter of 2024 ....................................................... 138

5.     Defendants' False and Misleading Statements During the First Quarter of 2025 ............................................................. 140

C.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING THE STATUS OF THE ESSENCE TRIAL .......................................... 141

1.     Defendants' False and Misleading Statements Repeated in SEC Filings Throughout the Class Period ............................. 141

2.     Defendants' False and Misleading Statements on Investor Conference Calls Throughout the Class Period ................... 143

VII.     LOSS CAUSATION ........................................................................ 143

VIII.     CLASS ACTION ALLEGATIONS ................................................ 148

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................ 150

X.     PRESUMPTION OF RELIANCE ................................................... 150

XI.     CLAIMS FOR RELIEF .................................................................. 151

COUNT I
For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants) ............................................................. 151

COUNT II ............................................................................................. 154
For Violations of Section 20(a) of the Exchange (Against the Individual Defendants) ......................................................................... 154

XII.     PRAYER FOR RELIEF .................................................................. 155

XIII.     JURY DEMAND ............................................................................ 156

Plaintiffs Anthony Defilippis, Nicholas Barrass, William Wrede and Robert Feldstein and additional Plaintiff City of Pontiac Reestablished General Employees' Retirement System (together "Plaintiffs"), by and through their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly-situated persons who purchased or otherwise acquired the securities of Sarepta Therapeutics, Inc. ("Sarepta" or the "Company") during the period from June 22, 2023 until November 3, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class").

Plaintiffs allege the following upon information and belief, except as to allegations concerning themselves and their own acts. Plaintiffs' information and beliefs are based upon, among other things, the independent investigation of Court-appointed Lead Counsel. This investigation included, among other things, review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by, or concerning, Sarepta; (ii) research reports issued by securities and financial analysts concerning the Company; (iii) reports filed publicly by Sarepta with the SEC; (iv) interviews with former Sarepta employees and others; (v) clinical trial and commercial patient data relating to Sarepta therapies and competing or related products; (vi) information obtained from the United States Food and Drug Administration ("FDA") through requests made pursuant to the Freedom of Information Act ("FOIA"); and (vii) other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## I.  PRELIMINARY STATEMENT

1.      This case arises from materially false and misleading statements made to investors by Sarepta, a specialty drug company, and its most senior executives concerning the Company's two most important products, by far: (1) Sarepta's line of gene therapies, which Defendants and analysts hailed as "ushering in a new era" of dramatic revenue growth; and (2) the Company's line of "exon-skipping" RNA therapies, a bulwark of Sarepta's business that generated more than half of its Company-wide revenue during the Class Period.

2.      Throughout the Class Period, Defendants trumpeted Sarepta's gene therapies as game-changing for the Company's business, and credited its first commercialized gene therapy, a treatment for Duchenne Muscular Dystrophy ("DMD") called Elevidys, as single-handedly responsible for turning Sarepta profitable.  While safety is a critical driver of success for any drug product, this is particularly true for gene therapies, as such therapies fail, or suffer regulatory or adoption setbacks, most often because of safety concerns. Defendants, however, assured investors that Sarepta's proprietary rAAVrh74 ("rh74") viral vector platform – the heart of all the Company's gene therapy products – had an "extraordinarily positive" and "particularly laudable" safety profile, including relative to other commercialized gene therapies and competing treatments for muscular dystrophy, that differentiated the Company's products and gave Sarepta a powerful competitive advantage.  Defendants told investors that rh74 had "*a laudable safety profile not shared by other programs for Duchenne*," a "*very good safety profile relative to other [gene therapy] programs*," and that it had "*one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed*."  Moreover, Defendants specifically assured investors that Sarepta's safety claims were supported by an unusually large and robust body of evidence, and that this "enormous" body of evidence showed rh74 was safe for all kinds of patients – that it was "*laudable across many studies, across ages and across ambulatory status*."  Further,

2

Defendants told investors that Sarepta was successfully developing a portfolio of additional rh74-based gene therapies for the treatment of Limb-Girdle Muscular Dystrophy ("LGMD"). Defendants stated that this lucrative portfolio was "***rapidly progressing***" towards commercialization and was "***relatively late stage***," and that Sarepta was "***moving rapidly with our LGMD platform***" as a follow-on to Elevidys' apparent success.

3.    None of these statements was true.  Sarepta, facing enormous financial and competitive pressures that threatened the Company's very solvency, rushed Elevidys, its most lucrative gene therapy, to market.  In that rush, Sarepta management ignored warnings from independent consultants and senior personnel that the Company utterly failed to properly validate the safety of the rh74 vector at the heart of Sarepta's gene therapies before proceeding to in-human clinical trials.  Sarepta ignored these warnings and proceeded to clinical trials, but as data from those trials began to accumulate in the run-up to the Class Period, the Company's expert consultants, and even its own senior scientists, warned Defendants that troubling signals of rh74's serious liver safety risks were already emerging.  By no later than October 2023, shortly after Sarepta began commercial treatment with Elevidys, Sarepta's data showed that – far from having "one of the most impressive safety profiles" of any gene therapy "that has ever existed," as Defendants claimed – rh74's liver safety risk was ***many times*** greater than that of competing treatments and, moreover, posed a particularly high risk of liver injury in the heavier, non-ambulatory patients that comprised at least half of the patient population at which Sarepta's gene therapies were targeted.

4.    Meanwhile, Sarepta's LGMD program was going nowhere.  The program's key assets were beset by major manufacturing problems that prevented Sarepta from developing a safe, viable infusion.  As a result, Sarepta slow-rolled clinical studies and diverted resources away from

the program.   By mid-2024, even as Defendants ramped up their reassurances about the LGMD program's progress in response to growing investor anxiety, Sarepta had essentially abandoned the program and, shortly thereafter, terminated most of its senior personnel without bothering to replace them.

5.    Tragedy finally forced Defendants to come clean.  Beginning in March 2025, news that *three patients* had died from acute liver failure caused by rh74 in just *three months* – deaths that were entirely foreseeable to Sarepta and a direct result of the misconduct alleged herein – stunned investors.  Astonishingly, Defendants ultimately admitted that as rh74's death toll was mounting, they had flatly *lied* to investors by falsely denying that the gene therapy had caused fatal liver failure, not only in Elevidys patients, but in LGMD patients as well; in truth, Defendants not only knew this had occurred but had even discussed it with the FDA. With the news of these patient deaths, and ensuing regulatory and financial fallout that included the withdrawal of Elevidys in half the target patient population, investors finally learned the truth: rh74's core design and manufacturing made it dangerously hepatotoxic, and these safety risks entailed severely limited adoption for any gene therapies based on it.

6.    Just a few months later, in November 2025, investors received another shock when they learned that Sarepta had lied about the status of the ESSENCE trial – a trial on which the FDA had conditioned continued marketing of the exon-skipping drugs that contributed to half the Company's revenue.   Investors learned that ESSENCE had failed, by a wide margin, because, unbeknownst to investors, severe "operational challenges" *years earlier* prevented Sarepta from collecting enough patient data. Defendants admitted that the amount of missing data was *huge*, with "nearly all patients missing doses and approaching half of whom missed substantial consecutive doses."   Defendants knew, by no later than 2021, that there was little chance

ESSENCE would succeed. Nevertheless, they repeatedly assured investors that the trial was "**fully enrolled**" and "**on track**."

7.     In all, disclosure of the truth concealed by Defendants' misleading statements wiped out more than 80% of Sarepta's market value, erasing billions of dollars in shareholder value. Sarepta's story is a shameful one, but, as media and market commentators later observed, one that is all too common in early-stage biotech: executives, myopically focused on speeding drugs to the marketplace, rely on misleading hype and a "fake it 'til you make it" approach that diverts investor capital away from truly promising therapies and prevents patients – many of whom have just one shot at picking the right treatment – from getting the care they deserve.

8.     Sarepta is a specialty pharmaceutical company that develops and sells high-cost treatments for rare conditions, particularly muscular dystrophy. At the start of the Class Period, Sarepta had a single line of revenue producing of products: a group of related RNA-based treatments for DMD called "exon-skippers." Years earlier, the FDA had given Sarepta "conditional approval" to sell these exon-skippers to patients with DMD, *provided* the Company conducted a large clinical trial that confirmed the treatments' efficacy and safety; Sarepta's key confirmatory trial was called the ESSENCE study, and it remained, at least ostensibly, ongoing throughout the Class Period.

9.     Just a few years prior to the start of the Class Period, however, Sarepta decided to break into the multi-billion-dollar market for gene therapies, a complex field that was wholly unfamiliar territory for the Company. Sarepta launched what it referred to internally as "Project Moonshot," a mandate to rapidly develop these gene therapies for the treatment of DMD and other forms of muscular dystrophy, despite the fact that, as Defendant CEO Doug Ingram acknowledged, there was not "a single person in Sarepta really that knew anything about gene therapy" at the time.

"Rapid" commercialization was a critical component of this plan, notwithstanding Sarepta's inexperience. In the run-up to the Class Period, Sarepta faced significant commercial and competitive pressure to bring its gene therapies to market as quickly as possible. First, Sarepta needed cash. The Company reported hundreds of millions of dollars in annual losses, but had an enormous debt load, with significant portions of that debt coming due in the near term. Second, Sarepta's competitors were nipping at its heels, with several drug-makers, including well-resourced behemoths like Pfizer, developing promising gene therapies for muscular dystrophy, including DMD.

10.    Sarepta, however, told investors that it had a key competitive advantage over its more experienced rivals. The heart of any gene therapy is its "viral vector," the enabling technology that delivers healthy genetic material to cells and drives both the therapy's safety and efficacy. Sarepta told investors that it had developed a proprietary viral vector, rh74, that was safer and more efficient than the standard vector platforms used in most commercialized gene therapies. Safety is critically important in gene therapies and is often what separates a successful treatment from a failed one. In failed therapies, the vector causes an overwhelming and toxic immune response, particularly in the liver, that can result in serious, and even fatal, organ damage. Accordingly, Defendants' statements touting rh74's superior safety profile drove enormous enthusiasm about the commercial potential of Sarepta's gene therapy platform. Indeed, analysts projected that, by 2027, Sarepta would generate *$6 billion in annual sales* from Elevidys, alone, with billions of dollars of additional revenue potential tied to other rh74-based therapies.

11.    When the FDA approved Elevidys in June 2023, at the start of the Class Period, Sarepta became profitable almost overnight, and ***doubled*** its product revenue in just three quarters. Indeed, Ingram characterized Elevidys as "the single most successful gene therapy that has ever

been launched." And to investors, it appeared as though Sarepta had pulled off "one of the most memorable corporate turnarounds in recent history," as one securities analyst put it. Indeed, other securities analysts hailed Elevidys' approval as "ushering in a new era for Sarepta," specifically highlighting the supposedly sterling safety profile of the rh74 platform as a key differentiator that would drive the success of both Elevidys and the LGMD portfolio.

12.     Importantly, however, the FDA's approval of Elevidys, like its earlier approval of Sarepta's exon-skipping therapies, was *conditional*. Sarepta would have to demonstrate in larger studies that rh74 was not only effective, but also, critically, confirm that it was safe – an issue that, as discussed, was of utmost importance to investors. Knowing the market was deeply focused on rh74's safety, Defendants continually assured investors that Sarepta had amassed an "enormous" body of evidence demonstrating that its gene therapy platform had an "extraordinarily positive" and "particularly laudable" safety profile, including compared with competing gene therapies and DMD treatments. Defendants stated that rh74 had a "very good safety profile relative to other [gene therapy] programs," "one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed," and "a laudable safety profile not shared by other programs for Duchenne." Moreover, as Sarepta sought to expand Elevidys' (conditional) label to cover the heavier, non-ambulatory patients comprising roughly half the DMD population, Defendants assured investors that Sarepta's data showed that rh74 was just as safe in those patients, notwithstanding the higher doses of Elevidys required to treat them. Defendants stated that rh74's "safety and tolerability has been stable and laudable across many studies, across ages and across ambulatory status" and that "we've seen no difference in the safety profile" in non-ambulatory patients. Further, Defendants assured investors that Sarepta was successfully, and rapidly, commercializing its lucrative portfolio of rh74-based gene therapies for LGMD – a market almost

as large as DMD's – that would build on Elevidys' success.  Defendants told investors that Sarepta's LGMD program was "*rapidly progressing*," was "*relatively late stage*," and that the Company was "*mov[ing] fast on our limb-girdle portfolio*" and "*moving rapidly with our LGMD platform*."  Defendants' statements touting Sarepta's gene therapy program persuaded investors that Sarepta had developed a highly-differentiated and powerfully competitive platform that would drive dramatic revenue growth for the Company.

13.    Unfortunately, these statements, and others like them discussed further below, were materially false and misleading.  Far from demonstrating that rh74 had a "laudable" safety profile, let alone that it was superior to competing gene therapies, the evidence available to Sarepta raised clear red flags that rh74 posed unique and dangerous liver safety risks, and that these risks, particularly when weighed against the treatment's marginal efficacy, seriously undermined the commercial viability of Sarepta's gene therapy platform.

14.    Rh74's safety woes began at the very inception of Sarepta's gene therapy program.  Even before the start of the Class Period, Defendants were well aware that Sarepta failed to adequately perform FDA-mandated "preclinical" validation of rh74's safety and toxicology.  As a former leader of this preclinical program explained, he and others responsible for overseeing the program repeatedly warned Defendants that Sarepta was utterly and extensively failing to comply with core regulatory requirements governing preclinical testing, and, indeed, that the manner in which Sarepta was running the program was "*illegal*."  Sarepta's preclinical program failed to establish required quality assurance oversight and controls; concocted arbitrary testing protocols and then ignored them; failed to perform tests in accordance with required parameters; and, incredibly, generated "voodoo" safety data, by re-running failed safety tests again and again until passing results were achieved – an improper practice known as "testing into compliance."  But

Sarepta management, hell-bent on speeding Elevidys to market, ignored these warnings, telling preclinical leadership that the Company would "assume the risk to push" its key product through. Nevertheless, without foundational preclinical validation of rh74's safety, Defendants' public safety claims never had legitimate scientific support.

15.    Despite the Company's failure to properly validate rh74's safety, Sarepta rushed Elevidys into in-human clinical trials. But even as the early clinical data began to accumulate, deeply troubling signals of rh74's unusual and significant hepatotoxicity emerged. First, in the fall of 2021, senior scientists in Sarepta's Pharmacovigilance unit – the team responsible for monitoring product safety – observed, and an outside expert hepatologist confirmed, that rh74 had caused a kind of liver injury so severe that the FDA considers even a single occurrence in a sample of **thousands of patients** to be "**an ominous indicator**" of the treatment's liver toxicity. In Elevidys' case, this serious injury, called a Hy's Law event, had been observed after only a few dozen patients had been dosed with rh74. As a former senior Pharmacovigilance scientist explained, the Company's safety and regulatory leadership understood that this case of serious liver injury was a "big deal," and were "very concerned about its implications," but rather than come clean, pressured safety personnel to reevaluate the case. Second, around the same time, a panel of independent experts that included prominent hepatologists privately warned Sarepta, including in meetings attended by Sarepta's Chief Scientific Officer Defendant Rodino-Klapac, that rh74's extremely high viral load, exacerbated by poor manufacturing quality, posed a uniquely dangerous risk of liver toxicity, particularly in heavier non-ambulatory patients who required larger doses, and that highly aggressive measures would likely be required to manage that risk, if it could be managed at all.

16.    By no later than October 2023, shortly after the start of the Class Period and just a few weeks after the Company began "real world" dosing of Elevidys in commercial patients, Sarepta's data showed that – far from having "one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed" and a "a laudable safety profile not shared by other programs for Duchenne," as Defendants claimed – the risk of liver injury associated with rh74 was *many times* that of competing gene therapies and DMD treatments. Sarepta's clinical and commercial safety data, which both Defendants Ingram and Rodino-Klapac repeatedly assured investors they were closely monitoring, was shared with Sarepta management in regular reports prepared by both the Company's Pharmacovigilance and Medical Affairs units, and was available to senior executives in real time through Sarepta's electronic "dashboards." Indeed, documents Plaintiffs obtained from the FDA show that Sarepta specifically corresponded with the agency about individual cases of serious liver injury caused by rh74, including numerous patients hospitalized with rh74-induced hepatitis. Notably, in those communications, Sarepta acknowledged that the risk of pathological liver injury evinced by these adverse events was "unlabeled in the USPI of Elevidys," i.e., was not publicly disclosed in the treatment's label. Moreover – and totally contrary to Defendants' assurances that Elevidys posed no increased safety risks in the non-ambulatory patients comprising half the treatment's target population – Sarepta's data showed that, just as the Company's expert panel had privately warned years earlier in 2021, rh74 *did* pose a substantially greater risk of liver toxicity in non-ambulatory patients, and, indeed, the Company could not rule out that the risk of hepatotoxicity as much as *doubled* in these patients.

17.    In the meantime, Defendants told investors that Sarepta would follow on Elevidys' success with its supposedly lucrative LGMD portfolio, which Defendants repeatedly assured the market was "*rapidly progressing*" towards commercialization. In truth, however, the program was

dead in the water.  Numerous former Sarepta employees all independently reported that the LGMD program's key assets – those representing the vast majority of the program's value – were beset by severe manufacturing difficulties.  These challenges were so grave that it was unclear whether Sarepta would be able to even *produce* a safe and viable infusion, and, at a minimum, would have to entirely redo preclinical work for the two most significant LGMD therapies.  Stymied by these fundamental problems, Sarepta made virtually no clinical progress in its LGMD program throughout the Class Period.  Instead, as numerous former Sarepta employees reported, Sarepta management kept LGMD clinical development in "a loop of study design," refusing to initiate trials in earnest to avoid incurring meaningful trial-related expenses.  By the start of the Class Period, Sarepta had essentially frozen patient outreach and clinical trial enrollment across much of the portfolio, and never bothered to replace the senior program personnel leaving the Company in droves. By the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites, and freezing grant funding for LGMD, even as Defendants assured investors that Sarepta was "***moving rapidly with our LGMD platform***."

18.     Investors finally learned the truth about rh74's unfavorable risk/benefit profile, its fundamentally flawed design and manufacturing, and the severely limited commercial value of Sarepta's gene therapy program through a series of disclosures beginning on March 18, 2025.  On that day, Sarepta was forced to disclose that a 16-year-old non-ambulatory DMD patient had died from acute liver failure after treatment with Elevidys.  In response to this news, Sarepta's stock fell by 27%, as investors began to understand that rh74's risk/benefit profile was not as favorable as Defendants had claimed in their public statements.  The truth continued to emerge over the next three months with: (1) news on April 2, 2025 that safety concerns had prompted the European health authority to halt all shipments of Elevidys and pause all ongoing trials, which caused a 13%

decline in Sarepta's stock price; (2) news on May 6, 2025 that health care providers' concerns about the safety of rh74 had driven a massive decline in Elevidys sales and forced Sarepta to dramatically cut its revenue guidance, which caused a 21.5% drop in Sarepta's stock price; and (3) news on June 15, 2025, that a *second* non-ambulatory DMD patient had died from liver failure after treatment with Elevidys and, as a result, Sarepta would have to suspend shipments of Elevidys for treatment of all non-ambulatory DMD patients and was discussing with the FDA further warnings and restrictions to add to Elevidys' label – news that caused a further *42% decline* in Sarepta's stock price.   These disclosures allowed investors to understand more about the magnitude of rh74's liver toxicity, particularly in the key non-ambulatory population, and to appreciate that the LGMD program was simply not viable, particularly as LGMD's more mild disease state made the safety risks associated with rh74 untenable in that population.  At each turn, however, Defendants issued a host of misleading "soothing" statements, designed to assuage investor concern and temper the market's reaction.

19.    The full truth about Sarepta's gene therapy program was revealed to investors on July 18, 2025, when Sarepta was forced to confirm rumors that, a month earlier, rh74 had caused a *third* death from acute liver failure, this time in a non-ambulatory LGMD patient.  This news was particularly shocking to investors, as just a few weeks earlier, and in direct response to securities analysts' questions, Defendants had specifically assured investors that "*We have not seen a signal of ALF* [i.e., liver failure] *in this [LGMD] population*."  Defendants did not deny that they had known about this patient death all along.  Instead, they appallingly claimed they had not needed to disclose that rh74 had killed yet another patient because, in their view, this fact was not "material."  With the emergence of *yet another* serious liver injury caused by rh74 in *yet another* patient population, investors finally understood that rh74 was inherently dangerously

hepatotoxic, as a function of its core design and manufacturing, and that adoption of Sarepta's gene therapy platform would be far more limited than Defendants' statements during the Class Period led investors to believe. In response to this news, Sarepta's stock price fell *an additional 36%*. Moreover, investors were incredulous at Defendants' efforts to hide the truth about rh74's safety risks. Analysts, for instance, said they were "***appalled by the lack of transparency around*** " rh74's safety and "with ***management's lack of transparency/declining credibility***, we don't know if we can fully trust what they are saying or not."

20.     The Class Period ends on November 3, 2025, when Sarepta disclosed that the ESSENCE study – the key confirmatory trial on which the FDA's continuing marketing approval for the Company's exon-skipping drugs turned – had failed, by a wide margin, to show that these drugs provided any meaningful clinical benefit for DMD patients. Sarepta revealed that the trial had failed because COVID-19-related "operational" problems – problems Defendants had known about *for years* – prevented the Company from collecting sufficient patient data to meet the study's "primary endpoint," i.e., the key clinical measure determining a trial's success or failure. Indeed, Defendants admitted that *years earlier*, "[d]uring the pandemic, the rate of missed doses was *unusually high* with nearly all patients missing doses and approaching half of whom missed substantial consecutive doses." Nevertheless, Defendants assured investors throughout the Class Period that ESSENCE was "***fully enrolled***" and "***on track***," even as they repeatedly, and suspiciously, delayed releasing the trial's results for years on end. In response to this news, shares of Sarepta stock dropped *an additional 34%*.

21.     In all, disclosure of the truth concealed by Defendants' misstatements erased ***more than 80%*** of Sarepta's stock price and wiped out billions of dollars in shareholder value. Plaintiffs and the Class now seek redress for Defendants' misconduct.

13

## II.  **JURISDICTION AND VENUE**

22.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.    Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Sarepta maintains its headquarters in Cambridge, Massachusetts, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

25.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  **PARTIES**

### A.  **PLAINTIFFS**

26.    Lead Plaintiffs Anthony Defilippis, Nicholas Barrass, William Wrede and Robert Feldstein are investors who purchased Sarepta securities during the Class Period, as set forth in Exhibit A hereto, and were damaged as a result of Defendants' conduct as alleged in this Complaint.

27.    Additional Plaintiff City of Pontiac Reestablished General Employees' Retirement System ("PGERS") is a pension fund based in Auburn Hills, Michigan. PGERS' purchases of Sarepta common stock are detailed at ECF No. 47.  PGERS was damaged as a result of Defendants' conduct as alleged in this Complaint.

### B. DEFENDANTS

28.     Defendant Sarepta is a Delaware corporation with principal executive offices located in Cambridge, Massachusetts.  Sarepta common stock trades on the Nasdaq under the ticker symbol "SRPT."

29.     Defendant Douglas S. Ingram ("Ingram") served as Sarepta's President and Chief Executive Officer from June 2017 until July 2025.  Ingram's role as President ended in July 2025, as the truth concerning Sarepta was emerging, but he remains the Company's CEO.  After the end of the Class Period, *STAT News*, a prominent healthcare and biotechnology publication, rated Ingram the "Worst Biopharma CEO of 2025."

30.     Defendant Louise Rodino-Klapac ("Rodino-Klapac") has served as Sarepta's Executive Vice President, Chief Scientific Officer and Head of Research & Development since December 2020.  Prior to joining Sarepta, Rodino-Klapac had never conducted a single clinical trial; at Sarepta, she oversaw multiple clinical trials across several gene therapy programs.

31.     Defendant Ian M. Estepan ("Estepan") has been Sarepta's President and Chief Operating Officer since July 2025. Between December 2018 and July 2025, Estepan was the Executive Vice President and CFO of Sarepta.

32.     Defendants Ingram, Rodino-Klapac, and Estepan are collectively referred to herein as the "Individual Defendants."

## IV. SUMMARY OF THE FRAUD

### A. SAREPTA'S GENE AND EXON-SKIPPING THERAPIES WERE THE TWIN PILLARS OF SAREPTA'S BUSINESS DURING THE CLASS PERIOD

33.     Sarepta is a biopharmaceutical company that develops and markets treatments for rare neuromuscular diseases, particularly, muscular dystrophy.  During the Class Period, Sarepta's business was driven almost entirely by two key product lines: (1) its rh74-based gene therapies,

which Defendants hailed as Sarepta's single most important growth driver; and (2) its RNA, or "exon-skipping" therapies, the mainstay of Sarepta's business, which accounted for the bulk of all Company-wide revenue during the Class Period. These twin pillars of Sarepta's business were the focus of market attention and concern during the Class Period, and Defendants assured investors that they were carefully monitoring every detail of these programs. Indeed, Defendants discussed, and securities analysts asked questions about, these products on *every* earnings call and at *every* investor conference during the Class Period.

### 1. Sarepta Hailed Its Gene Therapies as the Company's Single Most Important Growth Driver

34. Gene therapy is a well-established approach to the treatment of disease caused by mutated or missing genes that works by introducing a normal copy of the affected genetic material into the body's cells in order to repair or replace the patient's malfunctioning genes. Genes inserted directly into the body do not usually function. Accordingly, gene therapies use a "vector," often a benign virus, to introduce the healthy genetic material into a patient's cells. *See* Figure 1, below.



**Figure 1.** Gene therapy uses vectors, such as a benign adenovirus, to deliver healthy genetic material to cells, in order to replace or repair mutated or missing genes.

35.     The vector is a central feature of any gene therapy: it is not just a "delivery system"; it is the therapy's enabling technology, determining where the gene goes (i.e., whether it effectively and efficiently reaches the target cells) and how long it works (i.e., gene persistence). Accordingly, the choice of vector is not just critical to the efficacy of the gene therapy, it is an overwhelming driver of its safety and tolerability. Among other things, an inefficient vector – one that fails to narrowly target the cells of interest or that requires delivery of a substantial viral load – can cause significant toxicity, organ damage, and even death. Particularly in the liver, inefficient vectors can trigger an immune response in non-target tissue or, because of sheer viral volume, can simply overwhelm the liver, causing inflammation, damage, dysfunction, and failure. Indeed, both before and during the Class Period, gene therapies principally faced clinical, commercial, and regulatory

17

setbacks, not because the gene was wrong, but because the vector triggered a toxic immune response, compromising patient safety.

36.    For instance, in 2020, the FDA imposed a clinical hold on trials of Astellas Pharma's AT132 after two patients died from serious liver injury; the Company ultimately abandoned the therapy after a third liver-related death.  Likewise, as discussed below, Pfizer abandoned a gene therapy it was developing for DMD following a combination of disappointing trial results and a patient death from heart failure.  Indeed, even gene therapies with far more mild safety risks – several hemophilia therapies for instance – have experienced disappointing physician/patient adoption because even modest immunogenicity-related safety risks can impose significant costs and burdens, including restrictive labeling, prolonged steroid prophylaxis, lengthy monitoring requirements, and onerous post-marketing commitments.  Accordingly, as discussed further below, the market was deeply concerned about the safety of Sarepta's gene therapies and Defendants repeatedly assured investors that they were laser focused on this issue.

37.    At the start of the Class Period, most approved gene therapies relied on a small set of well-characterized, non-proprietary adeno-associated virus, or "AAV," vectors, including AAV2, AAV8, and AAV9.  These vectors are widely used by different companies to treat an array of conditions.  Sarepta, however, claimed it had developed a proprietary vector, called rAAVrh74 ("rh74"), that was safer and more efficient than these standard platforms.  According to Sarepta, rh74 was "optimized" to target muscle tissue, providing higher muscle tropism (i.e., tissue affinity) and lower immunogenicity (i.e., a drug's propensity to activate a harmful immune response) – and, therefore, resulted in a meaningfully improved safety profile – relative to competing vectors.

38.    Accordingly, Sarepta touted rh74 as ideal for the treatment of neuromuscular diseases, like muscular dystrophy – diseases the Company was already focused on treating with

18

its approved exon-skipping drugs. So, in 2017 and 2018, Sarepta announced that it was developing a gene therapy for DMD, as well as therapies for the five most prevalent (by far) subtypes of LGMD, all using the Company's supposedly highly-differentiated rh74 vector.

        **2.    Sarepta's Gene Therapies Were Critical to the Company's Success and a Key Driver of the Company's Soaring Stock Price**

    39.    Prior to and during the Class Period, Sarepta trumpeted the blockbuster value of its gene therapies. Importantly, because these treatments target rare diseases, they receive "orphan drug" status from the FDA, which confers significant and highly lucrative exclusivity rights. Moreover, orphan drugs are exempt from the Medicaid mandatory discount pricing established by the Affordable Care Act. Indeed, the average annual cost of orphan drug treatment exceeds "mainstream" drug treatment by nearly 1,400%.

    40.    Defendants touted Sarepta's DMD gene therapy, called Elevidys, as having in excess of ***$38 billion*** in revenue potential. Defendants told investors that the "addressable market" for Elevidys was approximately 12,000 of the 15,000 DMD patients in the U.S. alone. While the total addressable patient population is small in relative terms, Defendants told investors that Elevidys' orphan drug status would allow Sarepta to charge ***$3.2 million per treatment***. While Elevidys' price tag was shocking, Defendants' statements trumpeting the treatment's efficacy and safety profile (rooted in the Company's proprietary rh74 vector) reassured investors that doctors would readily adopt, and insurers would readily cover, this supposedly breakthrough treatment. Based on Defendants' statements, analysts projected that Elevidys alone would generate billions of dollars in annual sales for the Company. For instance, in their June 21, 2024 report, Needham analysts projected that Sarepta would generate ***$6 billion*** in annual Elevidys sales by 2027.

    41.    Sarepta similarly characterized the LGMD franchise as one of its two "key" pipeline programs, and told investors that, like Elevidys, the LGMD gene therapy treatments had

multi-billion-dollar market potential. On investor calls and conferences prior to and throughout the Class Period, for instance, Ingram repeatedly told investors that Sarepta's LGMD drugs represented a whopping 70% of Elevidys' already enormous market opportunity.

42.     Sarepta emphasized that because the LGMD therapies also used the same core rh74 platform as Elevidys, the Company would be positioned to drive even more value out of this supposedly rapidly progressing franchise. First, Sarepta would lower the cost of commercializing the LGMD portfolio by leveraging the investments in development and manufacturing it had already made with respect to Elevidys. As Ingram explained to investors on Sarepta's February 2025 earnings call, the LGMD program "stands on the shoulders of all of the work that we've done" with Elevidys. Second, Defendants assured investors that the supposedly highly positive safety and efficacy data generated in its clinical and commercial experience with Elevidys "significantly de-risked" the Company's LGMD portfolio from a clinical trial and regulatory perspective. As Ingram explained on a November 2024 earnings call, "I would remind folks that these limb-girdle programs that we're talking about *share the same capsid* [i.e., the same viral vector] *so they will really be standing on the shoulders of the safety profile of Elevidys*." Rodino-Klapac likewise explained on a February 2025 earnings call, "We're using rh74 across that platform, so not only are we leveraging the [Elevidys] data, but then also the other [LGMD therapies]. So we're in good position in terms of the outcomes of these studies and the outcome of the BLA," i.e., the Biologics License Application submitted to the FDA for approval to market the LGMD therapies.

43.     In June 2023, at the start of the Class Period, Sarepta received FDA approval to market Elevidys in "ambulatory" patients, i.e., those patients still able to walk, aged four to five years old. Elevidys' lightning-fast commercialization timeline – just *six years* from "proof of

concept" testing to market – was remarkable.  Sarepta's rapid development of Elevidys is even more striking in light of the fact that, as Ingram later acknowledged, at the time Sarepta launched its gene therapy program, there was not "a single person in Sarepta really that knew anything about gene therapy," and that "we had enormous gaps in expertise that we would need to figure out."  By contrast, other approved gene therapies developed by experienced manufacturers, like Roche's Luxturna or BioMarin's Roctavian, took close to a decade to develop before commercialization.

44.    But, for Sarepta, the launch of Elevidys appeared to come just in time.  Prior to the start of the Class Period, Sarepta was unprofitable and was saddled with significant, rapidly-maturing debt.  In its February 2023 Form 10-K filed with the SEC, Sarepta reported a full-year 2022 net loss of $700 million, but more than $1.5 billion in debt, with close to half a billion dollars of that debt coming due the following year.[1]  Sarepta was one of the most highly leveraged companies on the Nasdaq, with a debt-to-equity ratio larger than more than 90% of all companies traded on the exchange.  Moreover, Sarepta was facing stiff competition from multiple other drug companies that were developing promising gene therapies for the treatment of muscular dystrophy (and DMD, in particular), including Pfizer, Solid Biosciences, and Regenxbio.

45.    With the launch of Elevidys at the start of the Class Period, Sarepta became massively profitable and firmly entrenched itself in the lead position in the lucrative gene therapy market for neuromuscular disease, causing the Company's stock price to soar.  While, for the quarter just prior to the start of the Class Period and the launch of Elevidys, Sarepta reported an operating *loss* of more than $130 million, by the following year (2Q2024), Sarepta reported that it

---

[1] With its back up against the wall, Sarepta retired $313.5 million of this debt in March 2023 by providing noteholders with close to $700 million worth of Sarepta stock (*twice* the aggregate principal amount of the notes) – a transaction that not only diluted Sarepta shareholders, but forced the Company to report a $387.3 million loss on debt extinguishment.

had almost **doubled** its product revenue and generated $35 million in operating income. Ingram credited Sarepta's gene therapy program and the launch of Elevidys with turning Sarepta cash-flow-positive for the first time in its history. On a February 2025 earnings call, Ingram stated that, thanks to Elevidys, Sarepta had become "sustainably profitable and cash flow positive in 2024." Indeed, at a September 2023 investor conference, Ingram characterized Elevidys as "the most significant in vivo gene therapy so far," and at a JPMorgan Healthcare conference in January 2025 as "the single most successful gene therapy that has ever been launched."

46.    Sarepta's stock continued to skyrocket throughout the Class Period when, as discussed further below: (1) Elevidys' label expanded in 2024 to cover patients of all ages, regardless of ambulatory status, and sales continued to grow; and (2) Defendants continued to tout the significant progress of its lucrative LGMD program.

47.    Throughout the Class Period, investors viewed Sarepta's gene therapies as transformational for the Company and critical to its commercial prospects. For instance, in a June 2023 report, William Blair analysts characterized Elevidys' approval as "ushering in a new era for Sarepta," specifically highlighting the supposedly sterling safety profile of the rh74 platform as a key differentiator that would drive the success of both Elevidys and the LGMD portfolio. The analysts stated:

> We believe that the approval of [Elevidys] is a significant opportunity for Sarepta. **Competing programs have faced safety concerns** that have led to the halting of trials, and we believe **the potential for SAEs** [i.e., serious adverse safety events] **seems like a nonstarter** and may limit these competing therapies to only holding a niche if either is approved. Beyond [Elevidys], we believe that Sarepta has a deep pipeline of gene therapy products, including [the LGMD therapies] that offer significant upside to its existing commercial portfolio of PMO exon-skipping products.

TD Cowen analysts similarly credited Sarepta with "execut[ing] one of the most memorable corporate turnarounds in recent history maturing into a vertically integrated biotechnology

company with a diversified technology platform." And, following Elevidys' approval, Leerink analysts, citing the apparently remarkable success Sarepta achieved with its gene therapies, made it a top stock pick for investors: "After a somewhat turbulent 2023, we are making SRPT a top pick again for 2024, primarily based on our favorable view of Elevidys' regulatory prospects and commercial opportunity."

48.     Following Elevidys' initial approval in June 2023, investors were focused on the expansion of its label to cover a broader segment of the DMD population, underscoring the importance of Sarepta's gene therapies to the market. For instance, in a January 2024 report, JPMorgan analysts stated that "near-term focus for Sarepta is on the Elevidys regulatory process" for label expansion. Likewise, in a May 2024 report, Cantor Fitzgerald analysts noted that "All eyes are on the upcoming BLA supplement for ELEVIDYS (gene therapy for DMD)," i.e., the regulatory process through which Sarepta sought the label expansion. These analysts also noted in a November 2023 report that investors were focused on the implications of the label expansion not just for Elevidys' success, but for the LGMD program's as well. These analysts explained, "although the regulatory talks about ELEVIDYS are the key focus, LGMD could lead to more value in the name if the data are positive."

49.     And after Sarepta secured that expanded label in June 2024, investors continued to focus on Sarepta's gene therapies as critically important to the Company's success. In a June 2024 report, for instance, William Blair analysts stated, "With the label significantly expanded, we expect rapid Elevidys uptake in the near term and a significant bolus of revenue for Sarepta over the next few years as the company works through the now indicated population."

### 3.    The Safety of Sarepta's Gene Therapies Was Critical to Their Success and a Focus of Market Concern During the Class Period

50.    Just as Sarepta's gene therapies were critical to Sarepta's success, the safety profile of the Company's key rh74 vector was critical to the commercial prospects of those gene therapies. From the very start of the Class Period, investors had been particularly concerned about the safety profile of Sarepta's gene therapies, as safety had historically been a significant stumbling block for otherwise promising gene therapies.  When Elevidys was approved at the start of the Class Period, investors were comforted by the fact that the treatment's label was "clean," as analysts and investors put it, and carried standard safety warnings common to the gene therapy class.  In particular, while Elevidys' label carried standard gene therapy warnings regarding the potential for liver-related adverse events, these warnings were no more severe or proscriptive than rh74's competing vectors and, indeed, even *more* benign than some, further bolstering investor confidence in the safety of Sarepta's proprietary vector.  As the Class Period progressed, investors' already keen focus on rh74's safety sharpened significantly.

51.    First, in September 2023, Sarepta announced the disappointing results of the EMBARK study, the Company's first confirmatory trial of Elevidys, which indicated that the treatment's efficacy was likely marginal.  Elevidys had failed to show any statistically significant improvement in DMD patients' motor function versus placebo on the study's primary endpoint – the key measure of success or failure in a clinical trial – despite the fact that Sarepta had repeatedly stated that the study had been designed to detect even the smallest benefit on that endpoint.  While Sarepta stressed that Elevidys had demonstrated some benefit on certain of the study's secondary endpoints, both Sarepta and its investors understood that Elevidys' apparently modest efficacy made the therapy's supposedly particularly clean safety profile all the more important.  Doctors would simply not view moderate improvement in motor function as worth the risk of serious,

24

potentially fatal, adverse side effects.  For instance, in a November 20, 2023 report, Wedbush analysts acknowledged Elevidys' suboptimal efficacy performance in EMBARK but stressed that this was counterbalanced by the treatment's apparently stellar safety profile, stating, "Importantly, ELEVIDYS continued to show a favorable safety profile that was consistent with what has been previously observed with most TEAEs [treatment-emergent adverse events] being non-serious (96.8%) and the most common TEAEs being GI events and [fever]."  Likewise, in a November 9, 2023 report, JPMorgan analysts also noted that while the therapy failed to show a clear and meaningful efficacy benefit in EMBARK, "Importantly, there are no major safety concerns with Elevidys."  Accordingly, knowing that the safety of Sarepta's gene therapies had taken on even greater significance in light of the EMBARK results, Defendants doubled down on their statements touting Elevidys' safety, as discussed further below.

52.    Second, in June 2024, Pfizer announced that it was halting development of a competing gene therapy for treatment of DMD following a clinical trial patient's death from cardiac arrest the previous month.  As securities analysts reported, this tragic event heightened investor focus on the supposedly sterling safety profile of Sarepta's gene therapy platform as a key differentiator that would allow it to dominate market share.  For instance, in a May 2024 report, RBC analysts noted that the Pfizer patient's death "likely *emphasizes the importance of selecting a gene therapy with the cleanest safety track record*, which we believe will help Elevidys ultimately succeed in the commercial marketplace."  Similarly, in a June 2024 report, these same analysts noted that Pfizer's decision to discontinue development of its DMD gene therapy was prudent as serious safety concerns would have likely severely hampered physician adoption and insurer coverage *regardless* of efficacy: "even if [Pfizer's] gene therapy had hit on its primary endpoint, the major safety concerns would likely have precluded approval or commercial uptake

anyway." Accordingly, this event put an even brighter spotlight on the safety of Sarepta's rh74 platform. In response, Defendants continued to tout the safety of its gene therapies to assuage market concern that those therapies might meet the same fate as Pfizer's.

53. Third, as discussed above, at the start of the Class Period, Elevidys received limited, conditional approval for treatment in a subset of DMD patients, namely, ambulatory patients aged between four and five years old. Sarepta immediately vowed to seek an expanded label to cover nearly *all* patients, including, most critically, the older, heavier non-ambulatory patients, who comprise approximately half of the DMD population. Accordingly, investors were deeply focused on evidence of rh74's safety in this broader population, particularly as the vector's safety in this older, heavier cohort was also critical to Sarepta's ability to market rh74 broadly for treatment in the generally older and heavier LGMD population. Again, as discussed below, Defendants repeatedly assured investors that Sarepta had amassed copious data establishing rh74's safety regardless of age or ambulatory status.

### 4. Investors Were Also Focused on the Key Confirmatory Trial of Sarepta's "Exon-Skipping" Drugs, Which Generated Bulk of the Company's Revenue During the Class Period

54. In addition to its gene therapies, Sarepta principally derived its revenue from its three commercialized "exon-skipping" therapies, also referred to as "PMOs"[2] which it marketed for the treatment of DMD. These therapies use synthetic molecules to skip faulty sections of messenger RNA, called "exons," that prevent cells from carrying out instructions to produce essential proteins. In DMD patients, Sarepta's exon-skippers, just like its DMD gene therapy, are supposed to allow the body to produce shortened versions of naturally-occurring dystrophin, a

---

[2] "PMO" stands for phosphorodiamidate morpholino oligomers.

protein that is essential for muscle function.[3]  *See* Figure 2, below. Sarepta commercialized the

first of its exon-skippers, Exondys, in 2016, followed by Amondys in 2019 and Vyondis in 2021.[4]



**Figure 2.**  In DMD patients, a missing exon disrupts the RNA "reading" process, causing the body to synthesize non-functional or unstable dystrophin proteins.   Exon-skipping therapies skip problematic exons and allow the "reading" process to continue, generating a shortened, but at least partially functional protein.

55.    By the start of the Class Period, Sarepta generated close to $850 million in annual

revenue from its exon-skippers, accounting for ***more than 90%*** of the Company's total revenue

and ***all*** of its product revenue.  Throughout the Class Period, Sarepta continued to depend heavily

on revenue from its exon-skipping drugs even after Elevidys was approved in June 2023.  In 2023,

for instance, Sarepta generated over $1 billion in revenue from its exon-skipping therapies,

---

[3] While Sarepta's DMD gene therapy (Elevidys) is supposed to allow the body to produce somewhat more of this shortened dystrophin protein than its exon-skippers, the functional premise behind both treatments is that producing relatively small amounts of this shortened protein is enough to achieve actual clinical improvements in muscle function and patient outcomes.

[4] Each of these treatments skips a different faulty exon and, so, is prescribed to patients based on the location of their particular faulty exon.

accounting for close to 90% of the Company's product revenue. In 2024, the exon-skippers generated close to $1 billion in revenue, amounting to 54% of the Company's product revenue.

56.    Sarepta's management repeatedly touted the performance of the Company's exon-skippers throughout the Class Period. For instance, on a November 2023 earnings call, Sarepta COO Dallan Murray attributed Sarepta's "most successful quarter ever" to the performance of the Company's "established PMO franchise." A few months later, on a February 2024 earnings call, Ingram crowed that Amondys and Vyondys were "still growing at double digits . . . . So we feel very good about where we are with our RNA-based therapies in 2024." And on the Company's November 2024 earnings call, Murray trumpeted the Company's "impressive results in the third quarter," with "[t]he PMO's representing a healthy and solid segment of our Duchenne franchise."

57.    The market also viewed the performance and prospects of Sarepta's exon-skipping franchise as critical to the Company's success. For example, in a September 2023 report, TD Cowen securities analysts explained that Sarepta had "a solid revenue base with Exondys-51, Vyondys-53 and Amondys-45, which have consistently demonstrated strong q/q growth." Likewise, in a November 2023 report, Leerink analysts told investors that Sarepta's "PMO franchise remains strong and provides a nice floor value" for the Company's stock price. In a January 2024 report, Needham analysts similarly underscored that Sarepta's revenue performance was "led by Sarepta's PMO Franchise." And repeatedly during the Class Period, TD Cowen analysts explained that one of their "base case" assumptions in recommending Sarepta stock to investors was the "[c]ontinuing positive launch trajectory of Exondys, Vyondys and Amondys in the US."

58.    Importantly, however, Sarepta had obtained only *conditional* approval for its exon-skippers from the FDA. The FDA had allowed Sarepta to market these drugs based on indirect

signals of efficacy (called "surrogate endpoints") rather than on proof of a tangible clinical benefit. As part of this conditional approval, Sarepta had to agree to conduct a larger study that was aimed at evaluating the drugs' impact on *actual* clinical outcomes – *e.g.*, patient mobility. At the FDA's direction, Sarepta initiated this study, called the ESSENCE trial, in 2016. The primary endpoint of the 96-week study – i.e., the outcome measure on which success or failure would be determined – was performance on the "Six Minute Walk Test" or "6MWT," which assesses how far a patient can walk in six minutes. ESSENCE compared the performance of patients treated with Exondys and Vyondys on this primary endpoint with the performance of patients taking placebo.[5] If patients taking Exondys and Vyondys showed statistically significant improvement in the 6MWT versus patients assigned to the study's placebo arm, the study would be a success for Sarepta; if not, it would be a failure.[6]

59.    Both Sarepta and investors understood that the outcome of the ESSENCE study would not only figure significantly in continuing FDA approval to market its exon-skippers, but would have a substantial impact on health care providers' willingness to prescribe, and insurers' willingness to cover, those therapies. For instance, in SEC filings, Sarepta acknowledged that "[f]ailure to meet post-approval commitments and requirements, including completion of enrollment and in particular, any failure to obtain safety and efficacy data that supports clinical

---

[5] The double-blind, placebo-controlled portion of the study was 96 weeks, followed by a 48-week, open-label (i.e., unblinded) "extension" period. The primary endpoint of the study was based on results during the 96-week blinded period. Again, the length of the required study had been set by the FDA.

[6] Although ESSENCE did not enroll patients on Amondys, the outcome of the study clearly implicated the efficacy of that drug as well, since its supposed effectiveness was likewise premised on Sarepta's assertion that the production of small amounts of shortened dystrophin would yield clinically meaningful benefits – the very assertion ESSENCE was supposed to evaluate.

benefits . . . could lead to negative regulatory action from the FDA and/or withdrawal of regulatory approval of EXONDYS 51, VYONDYS 53, AMONDYS 45."

60.    Investors likewise viewed ESSENCE results as critically important to Sarepta's exon-skipping franchise.  For instance, in a November 3, 2025 report, Cantor Fitzgerald analysts explained how a negative outcome for ESSENCE gives rise to "genuine concerns about the future commercialization of the PMO therapies (which are an important recurring revenue stream for the company)."  In line with this, and as discussed further below, investors were greatly comforted by Defendants' statements assuring them that ESSENCE was "fully enrolled" and "on track."  For instance, in a February 2025 report, TD Cowen analysts, expressly relying on Defendants' statements, reported that Sarepta has "an excellent chance of also generating evidence of clinical benefit in ESSENCE."

61.    As discussed below, Defendants made materially false and misleading statements to investors about each of these critically important issues: the safety of Sarepta's rh74 gene therapy platform, the progress of the Company's LGMD portfolio, and the status of the ESSENCE trial.

## B.    DEFENDANTS MISLED INVESTORS ABOUT THE SAFETY OF SAREPTA'S GENE THERAPIES

62.    Throughout the Class Period, Defendants assured investors that, unlike other promising gene therapies that had stumbled due to concerns over their safety, ample clinical and scientific evidence clearly demonstrated that Sarepta's gene therapies had an "extraordinarily positive" and "particularly laudable" safety profile, particularly relative to both other commercialized gene therapies and competing treatments for muscular dystrophy.  Moreover, Defendants repeatedly told investors that their safety claims were supported by an unusually large and robust body of evidence.  For example:

- On Sarepta's November 1, 2023 earnings call, Ingram stated, "Elevidys stabilizes muscles, slows or entirely arrest decline, does so across the ages, *and does so with a laudable safety profile not shared by other programs for Duchenne*."

- On that same earnings call, Ingram stated, "with the benefit of many years of experience, we are exceptionally proud of. And frankly, nothing less than thrilled with *the particular capsid and construct that we have*. It's shown not only [that] it is able to intervene, protect these muscles of these children and arrest the decline that *it can do that with a particularly laudable safety profile* . . . *rh74 has been a standout*."

- Further, on Sarepta's November 1, 2023 earnings call, an analyst asked Defendants point blank whether "there are any additional safety events [related to immunogenicity] that occurred in the study or any other SAEs leading to hospitalization?" Rodino-Klapac stated that the totality of Sarepta's significant body of safety data demonstrated rh74's safety: "one of the most reassuring things about EMBARK was *the continued safety profile* and now taken together all of the previous trials, *we have a large safety data base that's consistent on those trials*."

- At a March 11, 2024 investor conference, in direct response to an analyst question about safety and product quality, Ingram stated, "We are thrilled with the *product quality* of ELEVIDYS, the amount of expression, the functional results, *the safety profile relative to other AAVs that have been used*."

- At that same March 2024 conference, and again in direct response to analyst questions, Ingram further touted rh74's safety, assuring investors that the empirical evidence available to Sarepta had vindicated it as superior to standard gene therapy vector platforms, specifically, the commonly used AAV9 platform. Ingram stated, "I think we now have learned empirically that *AAV9 has significant issues from a safety perspective* [and so] *we are very pleased that we chose rh74* with the benefit of scientific hindsight."[7]

- At a September 6, 2024 investor conference, Ingram stated, "Elevidys has had a *very good safety profile relative to other [gene therapy] programs*."

- On a February 26, 2025 earnings call (at the same time that, as discussed below, an Elevidys patient was already dying of acute liver failure), Ingram, in response to an analyst question, assured investors that Sarepta's safety claims were based on a significant and comprehensive body of evidence. Ingram stated, "*We understand . . . the safety profile*, and we understand the power of our constructs and our promoter [i.e., the rh74 platform] to get really good expression and *get it safely*."

---

[7] FE 2, discussed below, explained that Ingram, a former lawyer, privately boasted that he could immunize his clear factual assertions to investors using talismanic phrases, such as "I think," asserting (incorrectly) that they would allow him to speak with impunity and immunize him from the securities laws.

- On Sarepta's May 6, 2025 earnings call, Ingram stated, "***Elevidys has one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed***."

63.    Further, as discussed above, the FDA initially approved Elevidys in 2023 only for use in a narrow subgroup of the DMD population: ambulatory patients aged four to five years old. After receiving this limited approval, Sarepta vowed to seek an expansion of Elevidys' label to cover virtually ***all*** DMD patients, including the non-ambulatory patients who make up at least 50% of the DMD population. To assuage concern about Elevidys' safety profile in the older and heavier non-ambulatory DMD population, an issue that was *also* critical to Sarepta's ability to market rh74 broadly for LGMD treatment, Defendants assured investors that Sarepta had amassed copious scientific evidence demonstrating that rh74 was safe regardless of age or ambulatory status. For instance:

- At a January 8, 2024 investor conference, in response to a direct question from analysts about rh74's safety in the broader non-ambulatory population, Ingram stated, that rh74's "***safety and tolerability has been stable and laudable across many studies, across ages and across ambulatory status***."

- At a March 12, 2024 investor conference, an analyst asked Defendants about Sarepta's prospects for getting "non-ambulatory patient[s] in the [Elevidys] label." Ingram responded that an enormous body of evidence showed that rh74 was safe regardless of ambulatory status. Ingram stated, "We have dosed a number of non-ambulant patients. [We have] dosed patients that are very old, 26 years old and [who have been] non-ambulant for a very long time. We dosed very large patients. 80 kgs I believe the largest patient and the most gene therapy ever received. ***We have not to date seen any differences in the AE rates***."

- At the same March 12, 2024 investor conference, an analyst *again* asked "how many like non-ambulatory patient safety data [sic]" Sarepta had amassed and submitted to the FDA. Again, Ingram assured investors that copious data demonstrated that there was no difference in safety profile based on ambulatory status. Ingram stated, "So a ***pretty significant amount of data*** and data that relates to some of the most potentially compromised patients, and they've done very well. And as I've said before, ***some of the largest patients, which from a viral load perspective, are probably the greatest viral load that perhaps anyone has ever received with the gene therapy. And again, I would repeat, so far, we've seen no difference in the safety profile***."

- On Sarepta's November 6, 2024 earnings call, Rodino-Klapac likewise assured investors that Sarepta had amassed a significant body of evidence establishing rh74's

32

safety in the critical non-ambulatory population. She stated, "As at the end of October 2024, we have dosed over 80 late ambulatory and non-ambulatory patients within our clinical program and ***continue to see a consistent safety profile***."

- On that same earnings call, Ingram further touted the significant empirical support for rh74's safety across the DMD population. Ingram stated, "I think that as more information comes out about the number of patients that have been dosed in the late-ambulatory, non-ambulatory setting and ***the safety profile that we're seeing there, which is the same as the ambulatory patients***, it's only going to increase that awareness and excitement."

64. Moreover, and as discussed further below, even as the truth began to emerge regarding rh74's exceptionally dangerous liver toxicity, Defendants continued to reassure investors that adverse events – including fatal events leaked to the public by the families of grieving Sarepta patients – were anomalous and signaled no broader concern about rh74's safety. Indeed, on a June 16, 2025 investor call, analysts directly asked Defendants whether these reported adverse events also had broader implications for rh74's safety, including for the LGMD program. For instance:

- On that June 16, 2025 investor call, and in direct response to analyst questions about rh74's safety in the LGMD program, Rodino-Klapac stated, "For LGMD, I think it's important to remind that the disease progression is different and unique in LGMD as compared to DMD. ***We have not seen a signal of ALF in this population***." Instead, Rodino-Klapac assured investors that Sarepta had *only* seen benign transient elevations in liver enzymes in that population.[8]

This statement was a lie. As Defendants later ***admitted***, at the time they made this statement, they ***already knew an LGMD patient had died of liver failure***, the third rh74-related liver death in as many months. When analysts learned the truth, they were incredulous. Cantor Fitzgerald analysts, for instance, were "***appalled by the lack of transparency around***" rh74's safety and "with ***management's lack of transparency/declining credibility***, we don't know if we can fully trust

---

[8] As discussed below, elevations in liver enzymes, or "aminotransferase," are transient, common in gene (and many other) therapies, generally benign, and do not entail actual liver injury. Defendants hid clear signals of *actual* liver injury that went far beyond these transient elevations in aminotransferase laboratory values.

what they are saying or not." Likewise, Deutsche Bank analysts characterized Defendants' efforts to evade responsibility for their misleading statements as "***purely semantics***" and stated that "this series of events and ***lack of transparency*** will have seriously damaged patient demand, ***taking perhaps years to rebuild trust*** of the DMD community."

65.    During the Class Period, however, investors were greatly comforted by Defendants' repeated assurances regarding rh74's safety.  For instance, Leerink analysts, echoing Defendants' statements, wrote, "We believe SRP-9001's ***strong tolerability profile*** and accelerated approval offers ***a competitive advantage***" against rival gene therapy programs.  TD Cowen analysts likewise touted Elevidys' "***best-in-class safety profile***" and credited Defendants' statements assuring investors that Sarepta's supposed "successful dosing of both younger and older/larger patients further supports Elevidys' safety profile" across the ambulatory and non-ambulatory DMD population.

66.    Unfortunately for investors, Defendants' statements touting rh74's safety – critical to the success of Sarepta's growth-driving gene therapies – were materially false and misleading. ***First***, Sarepta failed to validate rh74's safety profile at the very outset of its gene therapy program. The FDA required Sarepta to perform preclinical testing of rh74's safety before proceeding to human trials, but leaders of this preclinical program warned Sarepta executives that it was rife with egregious violations of core regulatory requirements, and, in particular, that Company personnel were generating "voodoo data" by improperly repeating failed tests until passing results were obtained.  But Defendants, under significant pressure to rush Elevidys to market, ignored these warnings. ***Second***, even prior to the start of the Class Period, Sarepta's own senior scientists and consultants warned Defendants about deeply troubling signals of rh74's unusual and significant liver toxicity.  ***Third***, far from having "one of the most impressive safety profiles" of any gene

therapy "that has ever existed" or "a laudable safety profile not shared by other programs for Duchenne," Sarepta's accumulating patient data showed by no later than October 2023 that rh74 was associated with a significant risk of liver injury *many times greater than the risk associated with competing gene therapies and DMD treatments*.  Moreover, and totally contrary to Defendants' statements that rh74's safety was "laudable . . . across ambulatory status," Sarepta's data showed, with 95% certainty, that non-ambulatory patients *were* at a substantially greater risk of liver injury.

### 1.    Under Pressure to Rush Elevidys to Market, Sarepta Flouted Regulatory Requirements for Preclinical Safety Validation of rh74

67.    Even before the start of the Class Period, and by no later than the start of 2022, Defendants knew that rh74's safety was not supported by adequate empirical data.  From the outset, Sarepta failed to conduct a regulatory-compliant "preclinical" testing program to validate rh74's safety.  In particular, and astonishingly, Sarepta used its preclinical program to generate what a former leader of that program characterized as "*voodoo data*," by "testing into compliance," *i.e.*, repeatedly running laboratory tests until results were generated that would satisfy FDA requirements – a well-known form of data fraud and one that is severely punished by the FDA. The directors of the preclinical program repeatedly warned Sarepta management that the Company's program was not only unreliable, but that the way it was operating was "illegal."  But Sarepta's senior executives ignored these warnings, telling preclinical leadership that the Company just needed to "go quicker . . . . We're going to assume the risk to push [Elevidys]."  Significantly, in their review of the Elevidys BLA, FDA scientists noted that Sarepta had reported preclinical results that appeared inconsistent with the actual underlying data, but, apparently unaware of the true scope and significance of Sarepta's fraud, an agency head unilaterally overruled these concerns and allowed Sarepta's application for Elevidys' approval to proceed.

35

68.     Before any therapy can proceed to in-human clinical trials, FDA regulations require that its safety be rigorously validated in preclinical studies that comply with stringent requirements known as "Good Laboratory Practices" or "GLP."[9]  As these regulations explain, GLP-compliance is "***intended to assure the quality and integrity of the safety data filed***" with the FDA.  Preclinical data is particularly critical in the development of orphan drugs, like Sarepta's rh74 gene therapies, where accelerated approvals (like Elevidys' approval) are granted in reliance on (supposedly) sound and convincing preclinical data.[10]   Sarepta was well-aware of these requirements and specifically referred to them in the Company's SEC filings.  For instance, in the Forms 10-K Sarepta filed during the Class Period, the Company acknowledged, "The steps required before a drug may be approved for marketing in the U.S. generally include the following: completion of pre-clinical laboratory tests and animal toxicity testing, including ***studies conducted in accordance with good laboratory practice requirements***."

69.     Former Employee ("FE") 1 was an independent expert consultant who oversaw Sarepta's rh74 preclinical testing program until 2023.[11]  FE 1 was responsible for overseeing virtually all aspects of the rh74 preclinical safety program and had "100% transparency [with respect to its] facilities, programs, infrastructures, protocol, strategy, regulatory, [and]

---

[9] *See, e.g.*, 21 C.F.R. §58.

[10] While *some* very early-stage preclinical studies, specifically so-called "proof of concept" studies, need not comply with GLP, drug makers must still conduct GLP compliant safety studies as a predicate to conducting in-human trials and, ultimately, receiving marketing approval.

[11] To preserve anonymity, all FEs are referred to using male pronouns, regardless of actual gender. In addition, for convenience, these confidential witnesses are referred to as "FEs" whether they are formally employees of Sarepta or independent contractors hired by Sarepta (though each FE's relationship to Sarepta will be described in the text).

operations."[12]  FE 1 had routine contact with Sarepta management, including Rodino-Klapac and

Sarepta's former Executive Director of Research and Clinical Development Quality Assurance,

Mark Lepowski.  At the time Sarepta retained him to oversee its preclinical safety program, FE 1

had decades of experience in designing, developing, and running preclinical programs for

numerous drug manufacturers, with particular expertise in cell and gene therapies.  FE 1 reported

that in his considerable experience, he had never seen a manufacturer flout regulatory requirements

as brazenly as Sarepta.

70.      FE 1 reported that the regulatory failures pervading Sarepta's preclinical program

were not arcane or technical, they were foundational.  Preclinical safety programs are comprised

of multiple individual toxicology studies, which, as FDA regulations make clear, must be overseen

by an Independent Quality Assurance Unit.  As these regulations explain, "For any given study,

the quality assurance unit *shall be entirely separate from and independent of* the personnel

engaged in the direction and conduct of that study."[13]  Moreover, FDA regulations require that, for

each such study, the drug maker appoint a "study director" that maintains "overall responsibility

for the technical conduct of the study, as well as for the interpretation, analysis, documentation,

and reporting of results, and represents the single point of study control."[14]  Again, these

requirements are not mere minutiae; instead, the FDA regards these requirements as critical

safeguards to ensuring the integrity, objectivity, and reliability of complex laboratory data, which

is often highly susceptible to manipulation.

---

[12] To be clear, FE 1 helped oversee Sarepta's preclinical safety/toxicology program for rh74,
testing post-dating the early "proof of concept" studies that were not required to comply with GLP
requirements.  The preclinical work described by FE 1 *was* required to comply with the FDA's
GLP regulations, but egregiously failed to do so.

[13] 21 C.F.R. § 58.35.

[14] 21 C.F.R. § 58.33

71.    FE 1 reported that, in direct contravention of these requirements, Sarepta failed to establish and maintain an Independent Quality Assurance Unit or to install an independent study director for its rh74 preclinical safety program.  FE 1 along with Sarepta's Director of Quality Assurance and its Director of GLP repeatedly raised these issues with senior management – warnings that were delivered to Ingram and Rodino-Klapac – but were told to push ahead with the program regardless.[15]  According to FE 1, these fundamental oversight failures helped promote widespread noncompliance and data manipulation across the rh74 preclinical safety program.  As FE 1 explained, "If you remove [these safeguards] at the beginning, your data is already invalid."

72.    In addition, FE 1 explained that protocols for preclinical laboratory testing must be developed with specific regard to the laboratory equipment and systems that investigators are *actually* using to perform the testing.  Test parameters are, and must be, calibrated to the *specific machinery actually used* in the study.[16]  By way of analogy, FE 1 explained that one cannot detail a recipe for making cookies without specific reference to the appliance used to bake them: "What if I'm going to use an EZ Bake oven, versus a convection oven or a microwave? What if I need to increase the temperature from 350 to 500? [My recipe] is not going to produce the same results," if the tools used to make it change.  FE 1 reported that Sarepta, in its rush to speed through development, instructed personnel to finalize testing protocols before the Company had even **acquired** the laboratory systems on which the tests were to be run and, in some cases, before the laboratory facilities were even constructed.  Again, these compliance failures severely undermined

---

[15] FE 1 was contractually required to prepare information for dissemination at the executive level and Ingram and Rodino-Klapac were both within the scope of that contractual distribution chain.

[16] Parameters must be calibrated to the *exact* equipment used, not just the *kind*, or brand, of equipment, given the sensitive nature of the required safety testing.

the integrity of Sarepta's preclinical safety results for rh74.  And, again, FE 1 and others flagged these issues repeatedly with Sarepta senior management, but were told to push ahead regardless.

73.    Further, FE 1 explained that he and other senior quality assurance personnel had established regulatory-compliant testing protocols and assays for these critical safety studies, but that Sarepta personnel routinely disregarded these protocols in the rush to speed through development.  In particular, FE 1 stated that he warned Sarepta senior management (warnings that were, again, delivered to Ingram and Rodino-Klapac) that Company personnel were "testing into compliance," a highly improper practice, specifically proscribed by FDA guidance, that involves successively re-testing samples that fail to satisfy prespecified safety parameters until a passing result is achieved.  FE 1 explained that by testing into compliance, Sarepta was flouting FDA regulations and prespecified protocols in order to generate "voodoo data" that would satisfy regulatory requirements and ensure that development of the Company's gene therapies could proceed.  As FE 1 stated, "You're not getting the results you want, so you re-run it . . . . They keep on testing, so it meets spec . . . . Testing into compliance, to get the result you want. That's what you're relaying to stockholders, to the institutional review board, to the agency."

74.    Once again, FE 1 confirmed that these serious compliance failures "were raised, by me and by peers, and decisions were made, to expedite . . . . I raised it with executive management, and senior directors they hired. All were very aware."  But again, FE 1 reported that Sarepta management ignored these warnings, responding in substance, "'We don't care, we have to go quicker . . . We're going to assume the risk, to push this.' While *we were telling them, 'This is illegal.'*"  Indeed, the preclinical program's grave deficiencies were so numerous and pervasive that, as the program was winding down, FE 1 spent weeks detailing those deficiencies in "deviation reports" that were delivered to Sarepta's clinical leadership, including Rodino-Klapac.

75.    Significantly, the FDA's own observations corroborate FE 1's report. In particular, FDA toxicologists noted that at least some of the preclinical animal toxicology data reported in Sarepta's BLA for Elevidys was "not consistent" with the actual data recorded by computerized lab equipment, that there were "discrepancies in the parameters" reported by Sarepta, and that Sarepta failed to include a "number of animal data" in its regulatory submission, particularly with respect to control parameters. However, apparently unaware of the scope and seriousness of Sarepta's regulatory failures, the former head of the FDA's Center for Biologics Evaluation and Research ("CBER"), Dr. Peter Marks, overruled the Agency scientists' concerns and credited Defendants' statements falsely dismissing these issues as isolated and inconsequential,[17] soothing any public anxiety those concerns might have otherwise engendered.

76.    Notably, at the end of the Class Period, experts further questioned whether Sarepta misleadingly presented its Elevidys laboratory data regarding "dystrophin expression," one of the efficacy datapoints on which Sarepta heavily relied in arguing its therapy should be approved. In an August 2025 letter to the medical journal *Neurology*, researchers raised concerns about opaque adjustments Sarepta made to the way it measured dystophin expression both in patients taking Elevidys *and* in the placebo patients to which Elevidys patients were compared. The researchers raised concerns that Sarepta's methodology for reporting these laboratory data was potentially "misleading," could "introduce bias and inflate the level of reported microdystrophin," and might "overestimate the treatment effect" of Elevidys.[18] At a minimum, these additional concerns underscore how susceptible laboratory data are to manipulation, why it was critical that Sarepta

---

[17] Specifically, FDA memoranda suggests that Sarepta falsely told the agency that such issues were confined to "proof of concept" studies, where GLP compliance was not required.

[18] This letter to the editor was not authored by jealous competitors or overzealous cranks. Indeed, and remarkably, two of the authors had financial ties to Sarepta as consultants.

strictly adhere to regulatory requirements to ensure data integrity, and why the Company's abject failure to adhere to core regulatory standards so significantly undermines Defendants' safety claims.

77. Importantly, and consistent with Sarepta's improper approach to preclinical testing, FE 1 reported that he was struck by Sarepta's lightning-fast development timeline for Elevidys, which included little more than 18 months for preclinical testing and manufacturing: "I'd be hard-pressed, based on my experience, that you could traverse everything, from preclinical, clinical, manufacturing, in a year and a half. That's near impossible."

78. But Defendants' own statements demonstrate that Sarepta was myopically focused on getting Elevidys to the market with blazing speed in order to beat its competitors and ease its crushing debt load. Internally, Sarepta dubbed its gene therapy program "***Project Moonshot***" because, as Ingram later acknowledged, the strategic plan's mandate to develop a blockbuster gene therapy in just a few short years was "so ambitious," particularly for a company that had no experience with complex gene therapies and, as Ingram further acknowledged, "knew next to nothing about" developing them. Nevertheless, Ingram admitted that Sarepta's internal plan "said we were going to develop that therapy ***as fast as possible***."

2.    **Prior to the Start of the Class Period, Sarepta's Own Senior Scientists and Expert Consultants, Privately Raised Serious Concerns About rh74's Liver Toxicity**

79.    Prior to the start of the Class Period, Sarepta's own senior scientists and outside consultants warned Defendants that, even in the Company's early clinical data, deeply troubling signals of rh74's unusual and significant liver toxicity had already emerged. First, in 2021, Sarepta's senior scientists, concerned about the safety risks associated with rh74's extremely high viral load, convened a panel of eminent independent experts that confirmed these concerns and warned that highly aggressive measures would likely be required to manage rh74's unusual hepatotoxicity, if it could be managed at all. At the same time, Sarepta's senior Pharmacovigilance scientists observed, and an outside expert hepatologist confirmed, that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "***an ominous indicator***" of serious liver toxicity. As a former senior safety scientist at Sarepta explained, the Company's safety and regulatory leadership understood that this serious case of liver injury was a "big deal," and were "very concerned about the implications of the case," but rather than come clean, pressured safety personnel to "reevaluate" the adverse event.

80.    In order to market its rh74 gene therapies, Sarepta needed to scale up the "small batch" process it used to make the Elevidys infusion used in its early-stage studies. But, even prior to the start of the Class Period, Sarepta's rushed efforts to develop a scaled-up commercial formulation of rh74 ran into serious difficulties. In particular, in the hastily constructed commercialized formulation of Elevidys, ***half*** of all the viral particles, or "capsids," in the infusion were empty – in other words, did not contain the healthy gene cassette. Gene therapy experts have long explained that empty capsids included in an infusion are associated with increased safety risks. For instance, a 2024 study published in *Nature* explained that "Empty capsids contribute to the overall viral load during clinical dosing and higher viral loads have the potential to exacerbate

42

capsid-triggered immune responses. There is an observed correlation between adverse events and increased viral load in clinical trials for AAV-based therapeutics . . . . *[I]t is imperative* that intermediate and empty capsid impurities are identified, quantified, and controlled in clinical preparations."[19] Earlier studies reiterated this same message.[20] For its part, the FDA considers empty capsids to be an "impurity" and admonishes manufacturers to "use purification methods that reduce empty capsids."

81.    The *50%* ratio of full to empty capsids in Sarepta's commercialized rh74-based therapies represented an extraordinary level of impurity. Unsurprisingly, gene therapy manufacturers target a 100% full capsid rate, with optimized large-scale manufacturing processes in use at the start of the Class Period achieving ratios in excess of 80% and, often, in excess of 90%. In the context of cell therapies, FDA guidance provides that the "minimum acceptable" ratio of viable to non-viable cells for any product is 70%. By no later than the start of the Class Period, many gene therapy experts and industry groups applied this same standard to gene therapies, given the analogous character of the respective therapies and the consequences of impurity.

82.    Inside Sarepta, but unbeknownst to investors, senior scientists and outside experts privately expressed grave concerns about the significant impurity of Sarepta's commercial rh74 material and the substantial safety risk it posed, particularly in non-ambulatory patients who are generally substantially heavier, given that they are both wheelchair-bound and also routinely treated with steroids. This risk was greatly exacerbated by the fact that Sarepta's rh74-based gene

---

[19] Notably, this study was authored by scientists employed by gene therapy manufacturers, one of whom assumed a senior role at Sarepta in October 2023.

[20] For instance, a 2022 scholarly article published the medical journal *Gene Therapy* explains that "A capsid dose of 1E14 vg/kg represents a dose of over a quadrillion viral particles (not including empty capsids) in a young child, which is far greater than the total number of cells in the body . . . . Increasing the ratio of full:empty capsids and reducing CpG content provide an immediately actionable strategy to improve safety."

therapies generally required patients to receive an enormous viral load, even apart from the empty capsids. Sarepta's commercial rh74 infusion required children under 70 kg, to receive $1.33 \times 10^{14}$ vector genomes – or more than *130 trillion* viral particles – for *each* kilogram of body weight. For an average five-year-old DMD patient, with a weight of about 20 kg, Elevidys' viral load is more than *150 times* the number of cells, on average, in the child's body, *not even counting* the enormous number of empty capsids the child's body must absorb. For heavier, non-ambulatory patients the viral load imposed by Sarepta's commercial rh74 material is staggering. According to the CDC, by age 15, the average steroid-treated non-ambulatory DMD patient already weighs approximately 70 kg, which would require them to receive an Elevidys infusion comprised of 9.31 *quadrillion* vector genomes, *more than a thousand times* the number of cells in that child's body, again, not even counting the astronomical number of empty capsids the child would have to absorb as a result of Sarepta's flawed and rushed manufacturing process.

83. As several Former Employees reported, the senior Sarepta scientists and doctors working on the Company's gene therapies repeatedly raised serious concerns about the safety, and particularly the liver safety, of Sarepta's commercial rh74 vector based on these issues, including in meetings attended by Ingram and Rodino-Klapac. For instance, FE 2, a Medical Director at Sarepta from 2020 until 2022,[21] reported that senior Sarepta scientists repeatedly raised concerns with Sarepta management that rh74 carried a significant risk of hepatotoxicity "just on total capsid load alone, there was a concern," even putting aside the infusion's extremely poor full-to-empty capsid ratio. As FE 2 explained, "If you get to e-15, e-16 total vector loads, in a product that is not pure, you're getting billions more capsids than we have cells in our body. What's a body going

---

[21] FE 2 served as a member of the Duchenne safety committee and was responsible for designing protocol, strategy, and safety oversight for Sarepta's LGMD program. FE 2 reported to Teji Singh, Sarepta's Vice President of Clinical Development.

to do to that?"  FE 2 stated that he and his senior medical and scientific colleagues repeatedly raised this issue with Teji Singh, Sarepta's Vice President of Clinical Development beginning no later than 2021 and throughout the remainder of his tenure.  Indeed, FE 2 reported that this concern was so widespread among Sarepta scientists working on the Company's gene therapies that it was raised repeatedly in Governance meetings and Research and Development Committee meetings, attended by both Ingram and Rodino-Klapac.  As FE 2 explained, "They [Sarepta's senior executives, including Defendants] had smart people telling them the concerns.  [Those executives] knew it, and didn't implement" anything to address the safety concerns for fear it would slow down the Company's progress towards monetizing Elevidys.

84.    As a result of widespread concerns shared internally among Sarepta's senior medical and scientific personnel about rh74's liver safety, multiple Former Employees confirmed that, in the fall of 2021, Sarepta privately convened a panel of outside experts, which FE 3, a Director of Clinical Development at Sarepta until mid-2022 with oversight responsibilities across drug programs, characterized as "real big hitters" in hepatology and gene therapy, to review rh74's safety in light of these issues.[22]  FEs 2, 3, and 4, a senior executive in Sarepta's Medical Science Liaison unit[23] from before the start of the Class Period until early 2024,  all independently confirmed that this panel of experts expressed significant concerns about rh74's potential hepatotoxicity in light of its enormous viral load, particularly in the heavier non-ambulatory patients who would need to receive a maximal dose, but would also have significant comorbidities that would exacerbate the seriousness of, and complicate recovery from, liver injury.  As FE 3

---

[22] FE 3 reported to Navid Kahn, former Executive Director and Head of Gene Therapy Global Medical Affairs and Teji Singh.

[23] Given his seniority, disclosure of FE 4's exact title would likely compromise his anonymity. Should the Court desire, Plaintiffs will provide that title for *in camera* review.

explained, these experts "100%" told Sarepta that "because of [rh74's] particularly high viral load there was a real risk in the non-ambulatory population."

85.    FE 4 reported that while, during these panels, certain members of Sarepta management tried to insist that the Company could manage rh74's liver toxicity with steroids, Dr. Sidney Barritt, a prominent hepatologist who was recruited to Sarepta's private panel, and others warned that steroids would not be adequate to manage the potential magnitude of rh74's hepatoxicity, and, instead, highly aggressive immunosuppression therapy (e.g., treatment with sirolimus or rituximab, drugs used to prevent organ rejection in connection with transplantation), coupled with prolonged rigorous physician monitoring (requiring patients to temporarily relocate near infusion centers for months at a time) would be required to manage rh74's significant liver toxicity risk, assuming it could be acceptably managed at all.[24] Sarepta management failed to heed these warnings.  This was unfortunate, but not surprising, as aggressive immunosuppressants like sirolimus carry "black box" warnings – the FDA's most serious warning reserved for the most dangerous side effects – for, among other things, fatal infection risk.  The use of such drugs in DMD patients, for whom even the flu can be life-threatening given their weakened respiratory and cardiac muscles, would be particularly dangerous.   Accordingly, the need for aggressive immunosuppression and months-long patient monitoring would likely create serious regulatory barriers for rh74-based gene therapies and negatively impact physician adoption, patient demand, and payor coverage.[25]

---

[24] Unfortunately, the public has only belatedly learned just how right Dr. Barritt and his colleagues were, as following disclosure of the truth regarding the treatment's liver toxicity, Sarepta, left with no alternative, finally proposed mandating concomitant sirolimus therapy alongside Elevidys treatment.

[25] As indeed it now has with respect to Elevidys.  The FDA is now requiring Sarepta to conduct additional study and testing before it will permit Sarepta to proceed with its Hail Mary proposal to

86.     FE 3 reported that Rodino-Klapac attended several of the panel's meetings personally, and that Singh "and some others" kept minutes and slide decks from the meetings that "would've gone up the chain" to Rodino-Klapac, particularly records reflecting the expert panel's liver safety concerns, which were "certainly passed up the chain" to Sarepta's most senior executives, including Rodino-Klapac and Ingram.

87.     Notably, FDA staff reviewing Sarepta's application for Elevidys' approval later expressed concerns about the impurity of Sarepta's commercial rh74 product. But – apparently unaware of the true scope of rh74's significant deficiencies (including Sarepta's failure to perform FDA-compliant preclinical safety testing on its rh74 material) and Sarepta's own scientists' and experts' grave concerns based on a fulsome review of the Company's internal data – CBER Director Peter Marks again dismissed questions raised by his staff and ordered Elevidys' approval, assuaging any public concern these issues might have otherwise engendered.

88.     In 2021, around the same time that Sarepta convened a panel of expert scientists who expressed grave safety concerns, Sarepta received yet *another* glaring warning that rh74 was associated with unusually dangerous liver toxicity. By this time, Sarepta had begun to accumulate patient safety data from the larger, later stage clinical trials of Elevidys that would form the basis of its marketing application to the FDA. As Elevidys safety data from these trials started to come in, Sarepta's Pharmacovigilance unit – the scientific and medical team responsible for monitoring and assessing patient safety data – made a shocking and deeply concerning discovery.

89.     FE 5 was an Executive Medical Director in Sarepta's Pharmacovigilance unit from before the start of the Class Period until 2021.[26] FE 5 explained that his team was responsible for

_____

add concomitant sirolimus treatment alongside Elevidys, in order to evaluate the risk/benefit of this approach, which remains very much in doubt.

[26] FE 5 reported to Sarepta's Head of Safety, Sam Yonren.

"put[ting] together the [Elevidys] safety profile" by poring over the details of patients' adverse events. FE 5 reported that he and other Sarepta safety scientists, including Mark Vivien, Sarepta's Gene Therapy Safety Lead, were deeply alarmed to see that an Elevidys patient in these trials had experienced an extremely severe, life-threatening, case of hepatocellular injury and drug-induced hepatitis known as a "Hy's Law" event. A Hy's Law event involves drug-induced damage to liver cells so severe that it significantly impairs bilirubin excretion, preventing the liver from filtering toxins from the patient's body. As FDA guidance explains, "Because the liver has a large excess of bilirubin-excreting capacity, injury to hepatocytes [i.e., liver cells] sufficient to cause jaundice or even mild hyperbilirubinemia (i.e., a bilirubin >2xULN) represents an extent of liver injury so great that recovery may not be possible in some patients." Accordingly, FDA guidance explains that observation of *even one* Hy's Law event in a typical clinical trial database of 1,000 to 3,000 subjects is "***an ominous indicator of the potential for a drug to cause serious liver injury***." FDA guidance further explains:

> Finding one Hy's Law case in the clinical trial database is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe DILI [liver injury ***causing death or requiring transplant***] when given to a larger population. Clinical trials of the beta blocker dilevalol . . . showed two such cases in about 1,000 exposures. The drug was not approved in the United States, and examination of a postmarketing study in Portugal revealed fatal liver injury. Clinical trials of tasosartan, an angiotensin II blocking agent, ***showed a single Hy's Law case. This led to a request for a much larger premarketing database and the drug was abandoned***.

Accordingly, a single Hy's Law event in even a *large* patient database (i.e., a relatively low incidence rate) can have seriously negative consequences from both a regulatory and commercial standpoint. Even if the drug is approved, a Hy's Law event could mean that the drug will be saddled with a restrictive label and onerous post-marketing commitments (e.g., to conduct additional expensive studies), and that health care providers will be more reluctant to adopt, and insurers more reluctant to cover, the drug.

48

90.     Given that regulators and health care providers view even a single Hy's Law event in a sample of 3,000 patients as "an ominous indicator" of a drug's liver toxicity, FE 5, Dr. Vivien, and the rest of Sarepta's Pharmacovigilance team assessing the case were deeply concerned that such a serious signal of unusually severe liver toxicity would have emerged so quickly, after just a few dozen patients had been treated with Elevidys.[27]  As FE 5 succinctly put it, "*it was a big deal*."  Accordingly, FE 5 reported that the Pharmacovigilance team engaged an outside expert hepatologist with decades of experience, including as a consultant for myriad other drug manufacturers to evaluate the case.  Just like Sarepta's own senior safety scientists, this outside expert independently concluded that the patient had, indeed, suffered a dangerous Elevidys-induced Hy's Law event, with blood bilirubin well over twice normal levels (indicating that the liver's ability to process bilirubin had been seriously damaged, jaundicing the patient).  As FE 5 explained, the expert highlighted the fact that the "hepatocellular liver damage, and the rise of bilirubin, appeared to be from the extent of liver damage" caused by Elevidys.  The conclusion reached by both Sarepta's Pharmacovigilance team – comprised of several experienced safety scientists, including senior safety experts FE 5 and Dr. Vivien – and an eminent outside expert hepatologist who had performed an independent assessment was unanimous: unfortunately, Sarepta had observed in rh74 the same "ominous indicator" of severe liver toxicity that had seriously hampered, and even doomed, so many other development drugs.

---

[27] As FDA guidance explains, "a finding of ALT elevation, usually substantial, seen concurrently with bilirubin >2xULN," *i.e.* a Hy's Law case, "identifies a drug likely to cause severe DILI (fatal or requiring transplant) at a rate roughly 1/10 the rate of Hy's Law cases."  In other words, if a clinical trial database shows a Hy's Law incidence of 1 in 40 patients, it is expected that the drug will either kill one out of every 400 patients or cause such severe injury that they will require a liver transplant.

91.    With the expert hepatologist's assessment in hand, Dr. Vivien and FE 5 went directly to Sam Yonren, Sarepta's Vice President, Global Pharmacovigilance and overall head of safety at the Company, to report the bad news.  Dr. Vivien and FE 5 discussed the details of the case with Yonren, presented the independent expert's assessment, and explained the Pharmacovigilance team's own concurring conclusion that Elevidys had, in fact, caused a dangerous Hy's Law event, even though so few patients had even been exposed to the treatment. FE 5 reported that at this meeting, Yonren accepted the Pharmacovigilance team's assessment and directed that the Hy's Law case be forwarded to Sarepta's regulatory personnel for reporting to the FDA.

92.    Then, however, Sarepta management intervened.  FE 5 explained that "when regulatory saw [the Hy's Law event], they were very concerned about the implications of the case. So regulatory called Sam [Yonren], and Sam called us, and he was very upset."  Under pressure from Sarepta's regulatory leadership, Yonren did an about-face and said that the Hy's Law event, which had already been assessed by multiple senior Sarepta safety personnel, as well as an eminent independent hepatologist, "had been assessed incorrectly, and we needed to reassess it."  FE 5 explained that neither Yonren nor the senior regulatory executives identified any meaningful scientific or empirical deficiencies in either the Pharmacovigilance team's, or the independent expert's, assessments.  Instead, "we went through the same explanation we already had [provided to Yonren and with which he had previously agreed].  But he did not want to hear it. He just wanted to yell that [the Pharmacovigilance team] needed to reassess" the case.  According to FE 5, "[a]t the earlier meeting, the focus was on hepatic analysis," but, after Sarepta's regulatory affairs management intervened, "Sam did not show any interest in what the actual safety profile was.  His interest was in managing our deliverables, so that management was happy."  FE 5 stated that he

believed (though he could not remember with absolute certainty) that the assessment of the case

was ultimately changed under pressure from Sarepta management to avoid characterizing it as a

Hy's Law case.[28]

### 3. During the Class Period, Sarepta's Rapidly Accumulating Safety Data Further Demonstrated that rh74 Posed a Far Greater Risk of Liver Injury Than Other Approved Gene Therapies and Competing DMD Treatments, Particularly in Non-Ambulatory Patients

93. By no later than October 2023, Sarepta's accumulating patient data showed that

rh74 was associated with an unusually profound risk of clinically significant liver injury, totally

contrary to Defendants' statements touting rh74's "particularly laudable safety profile." Far from

having "one of the most impressive safety profiles" of any gene therapy "that has ever existed" or

"a laudable safety profile not shared by other programs for Duchenne," Sarepta's accumulating

patient data showed that the risk of liver injury associated with rh74 was *many times* that of

competing gene therapies and DMD treatments. Moreover, and totally contrary to Defendants'

statements that rh74's safety was "laudable . . . across ambulatory status," Sarepta's data showed,

with 95% certainty, that non-ambulatory patients faced a particularly significant risk of liver

injury, as much as *double* the treatment's already-significant risk in ambulatory patients.

94. At the start of the Class Period, Sarepta received a significant volume of patient

safety data. The first source of these data came from larger, late-stage clinical trials Sarepta was

conducting at the time, pursuant to FDA requirements, including the EMBARK and ENDEAVOR

studies. As discussed above, the FDA had conditionally approved Elevidys in June 2023 for

treatment in the narrow subgroup of ambulatory patients aged between four and five. The FDA

had told Sarepta that in order to retain this marketing approval, and to expand Elevidys' label

---

[28] Specifically, FE 5 stated, "I'm pretty sure it was changed – that it was not Hy's Law. But I don't remember 100%."

beyond this limited subgroup, it would need to test its therapy in a substantially larger and more diverse cohort of DMD patients. Accordingly, Sarepta enrolled a relatively greater number of non-ambulatory patients in the ENDEAVOR study in order to expand Elevidys' label and capture this substantial patient population. The second source of this bolus of patient safety data came from "real world" use of Elevidys, as within weeks of receiving its June 2023 approval, Sarepta began infusing paying patients in the commercial setting (charging, as discussed, $3.2 million per infusion).

95.    Notably, as discussed, rh74 safety and pharmacovigilance data was shared broadly with, and readily accessible to, Sarepta management, including Ingram, Rodino-Klapac, Head of Clinical Development Singh, Head of Safety Yonren, Chief Medical Officer Jake Elkins, and Chief Regulatory Officer Sharon Standerwick. FEs 5 and 6, a Patient Affairs Manager from long before the start of the Class Period until 2025, explained that Sarepta's Pharmacovigilance department not only generated routine adverse event reports (at least monthly) across clinical and commercial datasets, but also maintained a live adverse event "dashboard" that was "openly available" across Sarepta senior management. FE 6 further noted that adverse event data would also be compiled and reported to Sarepta management in quarterly reports prepared by Medical Affairs personnel.

96.    Moreover, both Ingram and Rodino-Klapac assured investors that they were closely monitoring rh74's liver safety, and, consistent with those assurances, repeatedly made detailed, data-laden statements on the subject – including as part of off-the-cuff responses to questions posed by securities analysts seeking technical particulars. Defendants' statements thus evinced an intimate and current knowledge of Sarepta's clinical and commercial safety data. Throughout the Class Period, in impromptu responses to analyst questions, Defendants repeatedly cited precise enrollment and treatment figures from ongoing trials and commercial dosing; demographic details

about dosed patients (e.g., "children as young as two years old"; "We've dosed very light children, 26 pounds"; "We dosed literally men that are almost 300 pounds"); spoke in detail about the kinds of adverse events observed in both clinical and commercial settings on rh74 and their resolution (e.g., the percentage of patients who experienced LFT elevations or were hospitalized); laboratory values (e.g., regarding dystrophin expression); and subgroup data (e.g., adverse event data by age, weight, and ambulatory status).

97.     By no later than October 2023, just two months after Sarepta began commercial distribution of Elevidys, Sarepta's safety data, including safety data from that "real world" use, showed that Elevidys posed a far greater risk of liver injury than any other approved gene therapy in mainstream use, totally contrary to Defendants' repeated statements that "Elevidys has had a ***very good safety profile relative to other [gene therapy] programs***," that rh74 had "***a particularly laudable safety profile . . . rh74 has been a standout***," and that "***Elevidys has one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed***." As just one example: Defendants repeatedly made misleading statements favorably comparing rh74's safety with Zolgensma, an AAV9-based gene therapy that carried significant liver toxicity warnings. By October 2023, the safety data available to Sarepta showed that Elevidys' liver safety risk was at ***least two, and as much as three, times*** Zolgensma's. *See* Figure 3, below.



**Figure 3.** Sarepta's clinical and commercial Elevidys data showed that rh74 was far more hepatotoxic than competing gene therapy vectors. Figure 3 presents Proportional Reporting Ratios ("PRR") for hepatobiliary adverse events – that is, adverse events involving *actual* liver injury – in the combined clinical and commercial datasets as they were available to Sarepta throughout the Class Period, with Elevidys' PRR as the solid black line. The FDA considers a PRR of 2 to represent a safety signal; almost immediately after approval, Sarepta's data showed that Elevidys had a PRR of 10, *i.e.*, a rate of reported liver injury 10 times the expected rate.

98. As illustrated in Figure 3, the methodology Sarepta's former Pharmacovigilance personnel reported the Company **internally** used to evaluate Elevidys'/rh74's liver toxicity showed, almost immediately following approval and throughout the remainder of the Class Period, that Elevidys was associated with a reporting ratio for "hepatobiliary adverse events" far exceeding

that of other approved gene therapies.[29] "Hepatobiliary disorders" refers to a class of adverse events defined in "MedDRA" (the Medical Dictionary for Regulatory Activities), the internationally-standardized adverse event classification system used across the biopharmaceutical industry, including by the FDA and other regulators, drug makers, and researchers. The "hepatobiliary disorders" class is particularly important because it is reserved for cases of *actual* pathologic liver injury or dysfunction – such as hepatitis, hepatocellular injury, hepatic steatosis, cholestasis, cirrhosis, jaundice, etc. – diagnoses that represent *clinical harm*. FE 5 reported that, internally, Sarepta, following standard industry practice, evaluated Elevidys' liver risk specifically with reference to the MedDRA hepatobiliary adverse event class.

99.     By contrast, Sarepta's ***public*** reporting of Elevidys safety data used bespoke endpoints created by Sarepta that combined reports of actual liver injury with common surveillance findings – such as transient elevations in liver enzymes – that reflect laboratory measurements, not disease states; often occur without underlying hepatocellular injury; frequently normalize without intervention; and are, therefore, standardly coded under a separate MedDRA class called "Investigations." Such transient elevations in laboratory values are common with gene therapies, as well as many other drugs, that do not impair or damage the liver and are not considered hepatotoxic. Accordingly, Sarepta's bespoke endpoints would be expected to, and did, wash out signals of *actual* liver injury associated with the Company's rh74 gene therapies.[30]

---

[29] "Hepatobiliary adverse events" were identified by reviewing patient-level reports for MedDRA "preferred terms" included in the hepatobiliary adverse event class (using "Standardised MedDRA Queries," or "SMQs," also published by MedDRA) across combined patient-level clinical and commercial Elevidys data obtained from the FDA, including through FOIA requests.

[30] FE 2 explained that this was no accident: in order to obscure safety signals, Sarepta avoided standardized medical terms and, instead, sought to use "Sarepta-specific terms" and endpoints. Indeed, in a June 2025 report, Cowen securities analysts reported their conversation with a leading hepatologist, in which the hepatologist explained that "multiple Elevidys pts have presented with

100.    The FDA relies on Proportional Reporting Ratio as a "foundational" statistical tool for pharmacovigilance, and considers a PRR of two to represent a safety signal.[31]  By October 2023, just weeks after the first bolus of commercial Elevidys patients had been infused and clinical data from ongoing studies had rapidly accumulated, Elevidys data showed that the therapy had a **PRR of 10** for hepatobiliary adverse events.  In other words, the ratio of liver injury reported on Elevidys was **10 times** higher than would be expected in the absence of a signal.  Throughout the remainder of the Class Period, Elevidys' PRR for hepatobiliary adverse events remained between five and six, far higher than any competing vector.  Indeed, Elevidys' PRR was between two and five times higher than Zolgensma's, the only other gene therapy that, with a PRR just under three, evinced an appreciable signal for liver injury.[32]

101.    Moreover, while Defendants assured investors that Elevidys had a "***laudable safety profile not shared by other programs for Duchenne***," in reality, Sarepta's safety data showed by no later than October 2023, that Elevidys was significantly more hepatotoxic than competing treatments for DMD.  *See* Figure 4, below.  Sarepta's data showed that Elevidys posed ***five to ten*** times greater risk of liver injury than the most-widely prescribed DMD treatments.

---

the necessary serum biomarkers for ALF [acute liver failure]" as defined by both regulators and clinicians, but that Sarepta never reported those patients' adverse events as ALF because they did not meet Sarepta's non-standard criteria for the term.

[31] As the FDA recognizes, PRRs allow for the analysis of combined commercial (which is not randomized) and clinical data (which is randomized) collected in post-marketing pharmacovigilance databases. FE 5 again reported that Sarepta *internally* generated and analyzed relative reporting ratios for adverse events in its post-marketing pharmacovigilance databases (which included commercial data).

[32] In addition to a PRR of 2, the FDA's threshold criteria for a safety signal also requires: (a) 3 or more adverse events; and (b) an increase in the subject drug's risk (i.e. Elevidys' risk) relative to expected risk so extreme that the difference yields a chi-square of at least four.  ***Immediately*** after commercial dosing began in 2023, Sarepta's data showed Elevidys ***far exceeded*** these additional FDA safety signaling thresholds.



**Figure 4.** Sarepta's safety data also showed that, contrary to Defendants' public statements, Elevidys was far more hepatotoxic than competing DMD treatments. Again, Elevidys' PRR for hepatobiliary adverse events is represented by the solid black line.

102. Details of the hepatobiliary adverse events associated with rh74 show that almost all were deemed "serious" by treating physicians, the FDA, and by Sarepta itself – with a number of cases mirroring the Hy's Law event that FE 5 explained had caused Sarepta executives to be "very concerned." Notably, in correspondence with the FDA, Sarepta acknowledged that the risk of *actual liver injury* of rh74 evinced by these events was ***not*** reflected in Elevidys' label. Nevertheless, Defendants continued to assure the public that rh74 was safer than competing gene therapy platforms, and that its liver side-effects were limited to transient and mild elevations in liver enzymes. As just a few examples:

- In April 2024, a patient was hospitalized with rh74-induced liver disorder, "highlighted by the reporter as serious." The patient presented with both elevated liver enzymes and was visibly jaundiced, indicating substantially elevated bilirubin levels and qualifying as a Hy's Law case. In contemporaneous correspondence with the FDA, Sarepta acknowledged that the "serious adverse [event] of Liver Disorder [is] unlabeled in the USPI [the prescriber information]" for Elevidys.

- In October 2024, a patient was hospitalized with rh74-induced hepatitis – i.e., damaging inflammation of the liver caused by a toxic reaction to rh74. Again, this event was deemed "serious" and, again, Sarepta acknowledged that "the serious adverse event of immune-mediated hepatitis is unlabeled in the USPI of Elevidys."

- Also in October 2024, a patient was hospitalized for serious drug-induced liver injury that **again** met Hy's Law criteria. The patient was visibly jaundiced, with liver enzymes ten to twenty times normal and, most troublingly, bilirubin levels close to **five times** normal.

- In November 2024, another patient – this one non-ambulatory – was hospitalized with "serious" rh74-induced hepatitis and significantly impaired liver function.

- In December 2024, an rh74 patient was hospitalized with "serious" DILI ("drug-induced liver injury") and severely impaired liver function with serum levels twenty times normal. Following rh74 treatment, this patient was re-hospitalized numerous times for impaired liver function, notwithstanding significant courses of steroid treatment. Again, Sarepta admitted to the FDA that "the serious adverse event of Drug-induced liver injury is unlabeled in the USPI of Elevidys."

103.    In addition, Sarepta's accumulating Elevidys safety data further underscored the serious concerns privately expressed by both Sarepta scientists and expert consultants that heavier, non-ambulatory patients treated with rh74-based gene therapies faced a particularly grave risk of serious liver injury. At the end of the Class Period, Sarepta disclosed safety data confirming that non-ambulatory patients treated with Elevidys are at **40% higher risk** of "acute liver injury" than ambulatory patients (who, as discussed above, already faced significantly more risk of liver injury than patients taking other gene therapies or DMD treatments); this difference is statistically significant, with a p-value of 0.03.[33] But this risk signal was almost certainly apparent in Sarepta's safety data at least a year earlier.

---

[33] "Acute liver injury" is a bespoke, non-standard safety endpoint reported by Sarepta for its gene therapies and, as discussed, obscures the magnitude of the risk of *actual* liver injury associated with rh74 by, among other things, (selectively) including transient elevations in (certain) liver

104.    Specifically, Sarepta's safety data disclosed at the end of the Class Period demonstrate with 95% certainty that by no later than June 2024, Elevidys safety data showed that non-ambulatory rh74 patients faced increased liver safety risk (qua Sarepta's ALI endpoint) – most likely *a 56% or greater* increase in risk – on top of the already significantly elevated risk in ambulatory patients.  Moreover, these data show that Defendants could not rule out *a doubling* (specifically, a 2.23-fold increase) in liver risk in non-ambulatory patients as compared with the already significantly elevated risk in ambulatory patients.[34]

---

enzymes.  Because demographic data regarding patients' ambulatory status was not consistently reported to the FDA, Plaintiffs, at this stage, must rely on Sarepta's reported ALI data, and cannot ascertain rates of actual hepatobiliary injury in these respective subgroups.  But, even Sarepta's "noisy" endpoint shows that non-ambulatory rh74 patients face a substantially greater risk of liver toxicity than ambulatory patients.

[34] Plaintiffs reviewed Sarepta's public statements regarding the number of ambulatory versus non-ambulatory patients dosed at particular points in time throughout the Class Period.  For instance, Sarepta publicly stated that by the end of June 2024, the Company had dosed more than 400 patients, more than 60 of whom were either non-ambulatory or late-stage ambulatory; in January 2025, Sarepta said it had dosed 600 patients, more than 100 of whom were non-ambulatory.  Using the ALI subgroup data Sarepta reported in August 2025 (under pressure from patient advocacy groups and the FDA), Plaintiffs reconstructed odds ratios for "ALI" risk in ambulatory versus non-ambulatory patients, given the size of the sample of each subgroup at different time points during the Class Period.  Plaintiffs used a standard statistical model (with likelihood defined by the hypergeometric distribution) to determine, with 95% likelihood, what Sarepta's data would have shown at these timepoints.  The common-sense intuition behind this analysis is that data – here, adverse "ALI" events – are distributed at random across a sample.  For instance, given a bowl of 100 marbles – 80 of which are blue and 20 of which are red – it is highly unlikely one would select exclusively blue marbles for the first 80 turns, followed by all red marbles for the last 20.  For the same reason, it is unlikely that Sarepta would observe only "positive" data for hundreds of patients and then observe all adverse events clustered together in the last batch of patients treated.  Indeed, a securities analyst made this very observation on Sarepta's June 2025 investor call, as patient deaths from liver failure forced Defendants to come clean about Elevidys' liver toxicity.  The analyst, apparently skeptical that Defendants had seen no signal of elevated liver risk in the non-ambulatory subgroup prior to the two patient deaths announced weeks apart, noted that "*it feels quite unusual* to not have seen this [i.e., any increased liver safety signal] in 100-plus [non-ambulatory] patients [previously dosed], [and then, suddenly,] within three months, [to observe fatal liver failure] two patients."

105.    By late 2024, when the Company had dosed a total of 600 patients, Sarepta's data would have shown (with 95% certainty) that non-ambulatory patients faced ***at least*** (i.e., no *less than*) a 22% increase in liver risk versus ambulatory patients and that the Company *still* could not rule out ***a doubling*** in liver risk in non-ambulatory patients.  And by May of 2025, when Sarepta had dosed a total of 800 patients, Sarepta's data showed (with 95% certainty) that non-ambulatory patients faced ***at least*** a ***34%*** increase in liver risk versus ambulatory patients and that the Company could not rule out as much as a 78% increase in liver risk in the non-ambulatory population.

106.    At the same time, Defendants nevertheless misleadingly reassured the public that, "***the safety profile that we're seeing there*** [in the non-ambulatory population] ***is the same as the ambulatory patients***."

### C.    DEFENDANTS MISLED INVESTORS ABOUT THE PROGRESS OF SAREPTA'S LGMD GENE THERAPY PROGRAM

107.    Throughout the Class Period, Defendants repeatedly touted to investors the progress of Sarepta's highly lucrative LGMD gene therapy program, which Defendants highlighted would yield the "most successful gene therapy launches" in history.  Defendants assured investors that the LGMD program was "***making good progress***," "***rapidly progressing***," "***relatively late stage***," and that Sarepta was "***mov[ing] fast on our limb-girdle portfolio***" and "***moving rapidly with our LGMD platform***."  Defendants further highlighted milestones Sarepta claimed to have achieved as part of this supposedly "rapid progress" to commercialization, including: (1) successful development of a "dual-vector" formulation of rh74 to accommodate the larger genes needed to treat many LGMD patients; and (2) the supposedly rapid clinical progress of therapies developed for the LGMD subtypes with the largest addressable patient population and, therefore, the most significant economic potential.  For example:

- On Sarepta's August 2, 2023 earnings call, Defendants touted to investors the Company's supposed successful development of a "dual" rh74 vector that would

allow it to treat Type 2B LGMD, a subtype that accounts for as much as 25% of the overall LGMD population.  Rodino-Klapac stated that Sarepta's, "innovative dual vector strategy **allows us** to deliver the full length dysferlin gene, the sole cause of LGMD 2B."

- At a November 9, 2023 investor conference an analyst asked Defendants for "updates" on "the limb-girdle program."  Estepan responded, "**So limb-girdle, obviously making good progress** . . . very pleased with the way that's progressing."

- On Sarepta's August 7, 2024 earnings call, Rodino-Klapac stated, "**we are also rapidly progressing our program for SRP-9005 for the treatment of limb-girdle muscular dystrophy type 2C** . . . . **[W]e are very pleased with the progress of our LGMD portfolio**, and expect to have three of our LGMDs in the clinic in less than nine months."

- On Sarepta's November 16, 2024 earnings call, Ingram stated that the Company's LGMD program was "**really beginning to accelerate and we're very, very excited about that. That's what we're focused on as an organization right now**."  Ingram highlighted, "the commencement of our trials for SRP-9005 to treat LGMD type 2C in early 2025."

- On that same November 16, 2024 earnings call, an analyst asked Defendants to explain "the time of these [LGMD] launches and how we should be thinking about that market opportunity."  Ingram responded, "It's a particularly poignant question now because **we're really starting to make traction and move fast on our limb-girdle portfolio**."

- At a January 2025 investor conference, Ingram told investors that Sarepta's LGMD therapies were "significantly derisked, and they are **relatively late stage**."

108.    Investors were encouraged by Defendants' reports that Sarepta was making significant and "rapid" progress in its lucrative LGMD program.  For instance, on November 1, 2023, TD Cowen reported that Sarepta's LGMD "programs are poised for multiple clinical data readouts over the next 24 months and drive further value."  Likewise, following Defendants' statements touting the LGMD program's progress, these TD Cowen analysts issued a June 2024 report explaining that they had adjusted their model to "increase[] the probably [sic] of success for SRPT's LGMD programs and added $1B in platform value for both its AAV GTx portfolio."  In November 2024, Needham analysts reported that Sarepta's "[p]ipeline focus beyond DMD has now shifted to LGMD."  And in February 2025, UBS analysts reported that LGMD "programs

progressing in the clinic potentially setting up for multiple launches in the next ~3-5 years. We see high likelihood of clinical success in LGMD & a meaningful opp'y."

109.    Unbeknownst to investors, Defendants' statements touting the LGMD program's "rapid" progress were materially false and misleading.

### 1.    In Truth, Sarepta's LGMD Program Was Plagued by Major Development Problems and Stuck at the Starting Gate

110.    Numerous Former Employees all independently corroborated that, totally contrary to Defendants' statements touting the LGMD program's progress towards commercialization, the program had significantly stalled by the start of the Class Period. The LGMD program's key assets were plagued by intractable development issues, Sarepta was slow-rolling clinical studies, and the Company was increasingly diverting resources away from the program. By mid-2024, even as Defendants ramped up their reassurances about the LGMD program in response to growing investor anxiety about its progress, Sarepta had essentially abandoned the program and, shortly thereafter, terminated most of its senior personnel. Nevertheless, desperate to avoid publicly betraying any doubt or lack of confidence in the key rh74 platform on which Elevidys – Sarepta's lifeline – relied, Defendants continued to conceal these facts from investors.

111.    As discussed above, LGMD is comprised of various subtypes distinguished by the particular defective gene (and, therefore, the missing functional protein) responsible for causing the disease in each subgroup. LGMD type 2A and 2B are, by far, the most common LGMD subtypes, accounting for as much 65% of all LGMD patients. Type 2C is the next most common, accounting for roughly 7% of all LGMD cases; Types 2D and 2E each comprise approximately 5% of the LGMD population.[35] Accordingly, while Defendants told investors that the LGMD

---

[35] The remainder of the LGMD population is comprised of patients suffering from ultra-rare subtypes of the diseases.

program represented in excess of 70% of Elevidys' blockbuster potential, much of that economic opportunity depended heavily on the success of the type 2A, 2B, and 2C therapies.

112.    FE 6, along with FEs 2 and 3, both of whom had oversight responsibilities with respect to the LGMD program, all independently confirmed that from the outset, Sarepta's 2A, 2B, and 2C LGMD therapies – those representing the vast majority of the program's value – were beset by severe manufacturing difficulties such that it was unclear Sarepta would be able to produce a safe and viable infusion in the first instance.  As FEs 4 and 6 explained, at least some of those serious manufacturing problems stemmed from the fact that LGMD patients are typically older and heavier than DMD patients, exacerbating the safety risks arising from the enormous viral load required by the rh74 platform and the excessive empty capsid load resulting from poor manufacturing.

113.    In addition, FEs 2, 3, and 6 also independently confirmed that Sarepta's 2B LGMD therapy faced further serious manufacturing challenges.  Specifically, in order to be even potentially effective, the 2B therapy needed to efficiently deliver a gene called dysferlin to host cells.  But dysferlin is too large to fit into Sarepta's standard rh74 capsid.  Accordingly, the Company had to develop a "dual vector" that would deliver different parts of the gene to the same cell, akin to splitting a large grocery order between two delivery trucks.  Throughout the Class Period, Defendants claimed that they had successfully developed this technology and that Sarepta's "dual vector strategy **_allows us_** to deliver the full length dysferlin gene."  But as FEs 2, 3, and 6 all independently confirmed, these statements were untrue.  Sarepta was **_never_** able to manufacture a viable dual rh74 vector.  As FE 3 explained, Sarepta simply "never got that together."

114.    FE 6 explained that, by the start of the Class Period, Sarepta recognized these manufacturing challenges meant Sarepta would have to "redo" preclinical work for, at a minimum, the two most significant LGMD therapies – 2A and 2B – but were struggling to do so.  FE 6 reported that by 2023, Sarepta management had privately instructed personnel to suspend patient outreach and related work for the LGMD 2A and 2B programs.  By the summer of 2023, FE 6 reported that a number of senior LGMD personnel, frustrated with the lack of progress, left Sarepta; but Sarepta never "backfill[ed] those positions."

115.    Operating under financial pressure compounded by the nascent Elevidys launch and stymied by debilitating manufacturing problems, Sarepta made virtually no clinical progress in its LGMD program throughout the Class Period, outside of the 2E program, which contributed just a tiny fraction of the program's overall value.  FEs 2, 3, 6, and 7, a Director on the commercial side of Sarepta's business from prior to the start of the Class Period until mid-2024,[36] explained that Sarepta management kept LGMD clinical trial development stuck in "a loop of study design," refusing to issue approvals that would move those trials to the next phase, wherein the Company would begin to incur meaningful clinical-trial-related expenses.  Leaders of the LGMD program presented clinical trial designs and protocols at meetings attended by Sarepta's most senior executives, including Ingram, Rodino-Klapac, Yonren, Elkins, and Standerwick; these same leaders would approve trial designs in these meetings, only to rescind those approvals when it was time to finalize a budget and spend the money needed to actually start the trial.  FE 2 explained that trial designs and protocols "would be approved, cancelled, approved, cancelled" for years on end, keeping the LGMD program "in a "loop of study design."  FE 3 likewise explained that "we

---

[36] FE 7 was responsible for collecting, synthesizing, and distributing competitive intelligence for Sarepta's therapies.

probably went through 20 different variations of a [given] study plan," but the LGMD program made no real clinical progress.

116.    As a consequence of this stalled clinical progress, and as further corroboration of these Former Employee reports, patient outreach across almost the entire LGMD portfolio ground to a halt by the beginning of 2024. FE 6 reported that the Directors of Patient Affairs in the LGMD program "essentially did no work" from the beginning of 2024 until the termination of the program in mid-2025. By the summer of 2024, FE 6 reported, Sarepta was pulling back on existing clinical trial enrollment commitments (for instance, with respect to a key "natural history" study that would serve as a control for LGMD studies), dropping study sites (at which patients were to be observed), and freezing grant funding for LGMD, notwithstanding Defendants contemporaneous public assurances that the program was "really beginning to *accelerate*." On October 1, 2024, Sarepta terminated the LGMD program's head of patient recruitment – the employee responsible for actually enrolling patients into the supposedly "rapidly progressing" clinical trials – without replacement.[37]

117.    Nevertheless, as discussed above, Defendants assured investors, throughout the Class Period, that Sarepta "remain[ed] committed to advancing our LGMD portfolio across a variety of subtypes" – statements FE 3 characterized as "disingenuous." Even more bluntly, FE 7 stated that Defendants' assurances regarding the LGMD program's progress were "*deceitful*" and "*the biggest myth*." He reported that he and the head of Sarepta's LGMD program would "listen

---

[37] Notably, just a month later, Sarepta announced that it had acquired (for an exorbitant sum) an entirely new type of RNA-based therapy from Arrowhead Pharmaceuticals. However, rather than come clean about the significant problems plaguing rh74 that motivated this acquisition, Ingram reassured investors that "we are very committed to [the rh74 gene therapy] programs in front of us, and we're as well very, very committed to driving our limb-girdle programs . . . . I don't want anyone to get the false impression that this [Arrowhead acquisition] is a deprioritization of programs like our limb-girdle gene therapy programs, which it isn't."

to [Sarepta's] earnings [calls]" together in the head of the program's office "and [the head of the LGMD program] would be like, '***What in the hell are you talking about***?'" in reaction to Defendants' statements.

118.    Moreover, while Defendants publicly claimed that the LGMD program was meeting particular milestones, the Former Employees reported that these statements were highly misleading, at best.  For instance, while Rodino-Klapac told investors in August 2024 that Sarepta was "rapidly progressing our program for SRP-9005 for the treatment of limb-girdle muscular dystrophy type 2C," FE 7 characterized this statement as "bullshit," explaining "never, in a clinical setting, did I see anything that would classify as progress, much less rapid progress."  Likewise, FE 6 independently characterized this statement as "completely false . . . . There was no rev-up to recruit patients for a 2C clinical trial by Sarepta at this time.  There were no internal plans to start a 2C study at this point."  FE 6 further explained that when, a few months later, Rodino-Klapac claimed that Sarepta "initiated our registration study for SRP-9005 to treat LGMD type 2C," Defendants were misleadingly attempting to pass off no more than preliminary paperwork filed with a registration database as meaningful clinical progress and that, indeed, Sarepta had not even made clinical recruitment efforts at this point, let alone truly "initiated" a trial.

119.    Similarly, while in November 2023, Rodino-Klapac told investors that "we completed dosing in our systemic pilot study, NAVIGENE for SRP-6004 dual vector rh74-mediated gene therapy" in 2B patients, FE 6 explained that this statement was likewise misleading because Sarepta recognized it would have to redo its preclinical work for this entire program in light of the serious manufacturing problems associated with the rh74 dual vector; indeed, FE 6 stated that he "is not aware of a 2B patient being dosed" with viable material.

### D.    DEFENDANTS MISLED INVESTORS ABOUT SAREPTA'S KEY CONFIRMATORY TRIAL FOR ITS CRITICAL EXON-SKIPPING THERAPIES

120.    While Defendants touted Sarepta's gene therapies as the Company's key growth drivers, Sarepta's exon-skipping therapies remained the bulwark of its business, reliably delivering the lion's share of Sarepta's product revenue.  As discussed above, however, the FDA had conditioned Sarepta's continued approval to market its exon-skippers on the Company's agreement to conduct a large pivotal trial of those treatments, which Sarepta called the ESSENCE study.  Again, the primary objective of the ESSENCE study was to demonstrate that, even though Sarepta's exon-skippers only allowed the body to produce a small amount of a shorter-than-normal dystrophin protein, this was sufficient to improve *clinical* outcomes – i.e., mobility – for DMD patients.

121.    On investor calls and in press releases issued throughout the Class Period, Defendants told investors that the all-important ESSENCE study was "***fully enrolled***" and "***remain[ed] on track***."  Unfortunately for investors, these statements were also materially false and misleading when made.

#### 1.    As Defendants Ultimately *Admitted*, They Knew Before the Class Period Even Started That ESSENCE Failed to Amass Enough Patient Data to Demonstrate a Benefit

122.    As Defendants ***admitted*** at the end of the Class Period, they knew, ***before the Class Period even started***, that the ESSENCE study was unable to collect enough patient data to succeed – totally contrary to their statements that the trial was "fully enrolled" and "on track."

123.    Any clinical study must accumulate sufficient patient data – in other words, must have adequate "statistical power" – to be able detect a difference of a particular magnitude in patient outcomes like ESSENCE's primary endpoint (improvement in 6MWT), with statistical

67

significance.[38]  If a study does not have adequate statistical power, the experimenter cannot detect the hypothesized difference in between-group patient outcomes with statistical significance.  In short, without enough patient data – without enough "power" – the study is doomed to fail; there is no way the trial can succeed in meeting its primary endpoint.

124.    Defendants were intimately familiar with this concept.  When Sarepta designed ESSENCE in 2017, it performed a "power calculation" to determine the minimum number of patients it needed to enroll (99 patients) in order to see the degree of between-arm difference in the primary endpoint the FDA told the Company it needed to show for its exon-skippers to stay on the market.  Moreover, Defendants' own statements before and during the Class Period show that Sarepta, and *specifically the Defendants themselves*, closely tracked the accumulation of patient data in the Company's ongoing trials in order to ensure that the studies remained sufficiently powered, such that they would continue to have a shot at succeeding on their primary endpoints. As just one example, on Sarepta's August 2023 earnings call, Rodino-Klapac boasted that Sarepta had expanded patient enrollment in the EMBARK study of Elevidys in order to increase the study's "power" to reliably detect with statistical significance even the smallest benefit associated with the primary endpoint.[39]  Rodino-Klapac stated, "We also increased the target sample size to 120 to increase power and enrolled 125 patients. All of these measures result in a study powered well

---

[38] Roughly, a "statistically significant" difference between groups is one that is sufficiently large, such that one can conclude with an acceptable degree of certainty that it represents a "real effect" and is not the product of random chance.  ESSENCE's prespecified clinical trial protocol, consistent with an accepted and foundational axiom of medical science, provided that Sarepta could not declare "success" on the study's primary endpoint unless the Company's exon -skippers showed a statistically significant improvement versus placebo.

[39] Of course, EMBARK failed to detect even this small benefit, notwithstanding the study's high degree of statistical power.  Empirically, this increases the confidence that Elevidys provides no such benefit, as the increased statistical power lowers the Type II (or false negative) rate associated with the study.

over 90%." Indeed, Defendants were well-aware that investors were also concerned about study power and even received questions from securities analysts on the subject. Given the importance of accumulating enough data to allow a study to succeed, it is unsurprising that, as their own statements make clear, Defendants closely tracked statistical power in Sarepta's studies.[40]

125.   On November 3, 2025, Sarepta finally announced that the ESSENCE trial had failed spectacularly; the Company's exon-skipping therapies had shown no statistically significant benefit on the study's primary endpoint (again, improvement in patient mobility). Indeed, with a p-value of 0.23, the difference between taking a multi-million-dollar exon-skipper and nothing at all was *not even close* to statistically significant. Defendants, however, told investors that Sarepta's exon-skippers had missed the mark, not because they were ineffective, but because, as a result of the COVID-19 pandemic, ESSENCE failed – by a *wide margin* – to collect enough patient data to detect the hypothesized improvement with statistical significance. For instance, on Sarepta's November 3, 2025 earnings call, Ingram admitted that "[d]uring the pandemic, the rate of missed doses was *unusually high* with nearly all patients missing doses and approaching half of whom missed substantial consecutive doses." On that same call, Rodino-Klapac likewise admitted that ESSENCE "was challenged operationally during the COVID period with twice as many consecutively missed doses during COVID versus COVID-free patients and compressed clinical evaluation schedule." These admissions of serious "operational challenges" and huge swaths of missing patient data ran totally contrary to Defendants' repeated assurances during the Class Period that ESSENCE was "fully enrolled" and "on track." But the fact that the COVID-19 pandemic decimated ESSENCE's statistical power could not have been new news to Defendants

---

[40] To be clear, it is not necessary to "unblind" a study in order to evaluate its power, which is why Defendants issued updates on the power of Sarepta's studies, at least when they felt it beneficial to do so.

in the fall of 2025. As discussed above, Defendants' statements make clear that they closely monitored statistical power in Sarepta's studies in real time and even answered detailed analyst questions regarding the power of ongoing studies (when it suited their purposes to do so).

126. Former Sarepta employee reports further demonstrate that, even prior to the start of the Class Period, Defendants were well aware that ESSENCE investigators were unable to amass enough patient data to ensure the study maintained adequate statistical power. FE 2 confirmed that even before the Class Period began, both the COVID-19 pandemic and the Russia-Ukraine conflict prevented Sarepta from collecting enough patient data to power the ESSENCE study. As a clear indication that Sarepta was well aware of these power problems, FE 2 reported that the Company scrambled to enroll additional sites, going to great expense to do so. However, because of the global nature of the pandemic, Sarepta's efforts to expand enrollment and collect an adequate mass of patient data were largely unsuccessful.

127. Tellingly, Sarepta repeatedly delayed releasing the ESSENCE results in ways that avoided disclosure of its negative outcome during the pendency of the Company's critical applications for approval of Elevidys. For instance, as of February 2020, one month prior to the COVID-19 pandemic, ESSENCE was slated to be fully completed by May 2023; on this timeline, disclosure of the results would have roughly coincided with Sarepta's submission of its application seeking FDA approval of Elevidys. By August 2021, Sarepta revised ESSENCE's completion date to mid-2024, ensuring that disclosure of any negative outcome would come *after* the FDA had already acted on the initial Elevidys BLA. By February 2023, around the time Sarepta acknowledged it might need to file a second Elevidys BLA once the EMBARK results were available, the Company again postponed ESSENCE's completion date – this time, to October 2025, long after the FDA would have acted on that second application. Indeed, the FDA had

expressed frustration with Sarepta for continually delaying the release of confirmatory study results for its exon-skippers.[41]

128.    In addition, just a year before the October 2025 readout of the study, Sarepta took the highly unusual step of suddenly changing ESSENCE's primary endpoint from 6MWT to a new primary endpoint called 4-step ascend velocity, which the Company characterized as particularly "sensitive," i.e., likely to pick up smaller improvements in mobility.   Sarepta's eleventh-hour switch to an endpoint it hoped would be more "sensitive" further indicates that the Company knew that the ESSENCE study had substantial power problems.

129.    As discussed further below, when Defendants were finally forced to come clean at the end of the Class Period, investors and market commentators – already frustrated by Defendants' efforts to obscure the serious safety issues plaguing Sarepta's rh74-based gene therapies – made clear that Defendants' belated admissions further devastated Sarepta's business and its credibility.  For instance, in a November 2025 report, incredulous HC Wainwright analysts asked, "*do any of Sarepta's DMD drugs actually work?*"   Likewise, *Science*, a prominent publisher of scholarly journals, issued an article entitled, "*Sarepta: Enough, for God's Sake*." Noting that Sarepta had dragged its feet for "*many years*" in revealing the ESSENCE results, *Science* explained that the magnitude of ESSENCE's failure showed Sarepta's exon-skippers simply did not work: "*They never had. They never did. They never will* . . . .  *It's time to stop selling these patients drugs that don't help them and (in the case of Elevidys) are actually harming them*."   Further, widely-read biotech journalist Adam Feuerstein wrote in a November 2025 *StatNews* article, "A *long-delayed* confirmatory clinical trial of two of the company's drugs

---

[41] For instance, UBS analysts noted in a May 2023 report that "FDA not happy with SRPT delaying confirmation trial readouts for PMOs."

for Duchenne muscular dystrophy failed to show benefit for patients," and further explained that the exon-skippers were "important to Sarepta as a financial backstop given the dipping sales of its Elevidys gene therapy." The article continued, excoriating Ingram for both his lack of forthrightness and for his hubris, as Ingram boasted that Sarepta would deploy its formidable political lobbying apparatus to attempt to keep the Company's failed drugs on the market:

> Investors looking for accountability from Sarepta's executives were left wanting. Sarepta CEO Doug Ingram excels at deflecting blame for his company's setbacks. The longer he and his lieutenants spoke to analysts and investors on Monday night — excuses piling up — the deeper Sarepta's stock price fell.

> \*       \*       \*

> The negative outcome of the confirmatory ESSENCE study should prompt the Food and Drug Administration **to withdraw the drugs from the market**. That's how the accelerated approval process is supposed to work. Drugs for rare diseases are fast-tracked to patients in desperate need, but if they later are shown to be ineffective, they're removed . . . . On Monday, Sarepta said it will ask the FDA not only to allow Amondys and Vyondys to remain on the market, but it will ask for the drugs to be granted full approval. Sarepta may prevail. The company has built a formidable political lobby for its Duchenne medicine.

### E. DURING THE CLASS PERIOD, DEFENDANTS LEVERAGED SAREPTA'S COMMERCIAL SUCCESS TO GAIN ACCESS TO CRITICAL FINANCING AND TO ACQUIRE ASSETS FROM A COMPETING BIOTECH COMPANY

130. Propped up by Defendants' misleading statements, Sarepta's drugs enjoyed significant commercial success and the Company maintained its soaring stock price. During the Class Period, Defendants' leveraged this success to gain access to critical financing and to acquire an entirely new suite of RNA-based therapies from Arrowhead Pharmaceuticals, allowing Sarepta to diversify away from the rh74-based gene therapies and exon-skipping treatments that Defendants privately knew were exposed to far more risk than their public misstatements had communicated to the market.

131. On November 25, 2024, Sarepta announced it was paying a hefty price to acquire a number of early-stage developmental "siRNA" therapies from Arrowhead. The deal required

Sarepta to make an upfront payment of $825 million *plus* a combination of near-term installment and milestone-based payments totaling $550 million – an amount roughly equal to all of Sarepta's cash on hand at the time the deal was reached.[42]  On top of these payments, Sarepta would, of course, have to finance the development and commercialization of these drugs, including bearing the cost of running clinical trials across multiple product portfolios.  Notably, Sarepta agreed to the deal's significant price tag, despite the fact that Arrowhead's clinical data for the assets was extremely limited.  In addition, Sarepta was also spending significantly to support the still nascent Elevidys launch (including in the expanded DMD population) – not to mention *supposedly* investing heavily in the commercialization of its LGMD therapies.

132.    Notably, even at the time the deal was announced in November 2024, investors were puzzled by both its timing and price tag.   For instance, on Sarepta's November 26, 2024 investor call to discuss the deal, a Raymond James analyst asked, "I feel like the pushback is going to be why not get a couple of strong quarters of the Elevidys launch under your belt before doing this deal? So Doug [Ingram], maybe you can help us understand why now was the right time?" Indeed, analysts specifically asked whether the deal "suggests that you guys [Sarepta] have a lower interest in gene therapy overall" or whether Sarepta was now "prioritiz[ing] the Arrowhead partner programs over your limb-girdle programs in the pipeline."  Defendants, however, flatly denied that the deal indicated a lack of confidence in Sarepta's extant product lines, and responded to these questions by assuring investors that they wanted to "be clear" that "[w]e have an exciting portfolio of gene therapy programs," and that the acquisition was mostly certainly ***not*** "a deprioritization of programs like our limb-girdle gene therapy programs."   Defendants' misstatements about

---

[42]  The deal also called for Sarepta to make additional unscheduled payments based on programmatic and sales milestones, as well as double-digit royalties, that could reach $10 billion if all milestones are met.

Sarepta's gene therapies and exon-skippers, both those made on that call and throughout the Class Period, soothed investor skepticism and gave the market confidence that Sarepta had the means and runway to execute on what appeared to be an accretive opportunity. As discussed below, it was not until the full truth emerged that the market understood the Arrowhead acquisition for what it was: an expensive backup plan for Sarepta's imperiled core businesses.

133.    Sarepta further leveraged Elevidys' success to obtain the significant financing that would help fund the Arrowhead acquisition. In February 2025, Sarepta used its soaring earnings to take out a $600 million credit facility – very large for a mid-cap biotech company[43] – backed by a deep (and, in fact, oversubscribed) bank syndicate. The terms of this large facility were highly favorable, particularly given the fact that Sarepta had only *just* turned cash flow positive and its R&D spend was accelerating. As Sarepta highlighted, the facility was non-dilutive, imposed no product-specific milestone triggers, had low spreads, and had no borrowing-base or asset-coverage constraints. The favorable terms of this highly significant source of liquidity were a product of Defendants' misstatements discussed above. These terms reflect the lenders' belief that Sarepta's gene therapy franchise, particularly Elevidys, was a durable and scalable source of cash flow; and that belief was fueled by Defendants' misstatements touting rh74's superior safety profile and the rapid progress of Sarepta's LGMD program. Indeed, as discussed below, as the truth began to emerge, investors grew deeply concerned that Sarepta would lose its access to this critical source of liquidity.

---

[43] The size of Sarepta's revolver approximates financing available to large-cap pharmaceutical companies. For mid-cap biotech companies with one or two commercialized products and significant R&D spend, typical revolvers range from $150-$300 million, and even then, include borrowing-base requirements, tighter leverage caps, and significantly higher pricing.

**F.    THE TRUTH GRADUALLY EMERGES, CAUSING SAREPTA'S STOCK TO LOSE MORE THAN 80 PERCENT OF ITS VALUE**

134.    The truth about Sarepta's rh74-based gene therapies' unusually dangerous safety profile; the Company's nonviable LGMD program; and its doomed ESSENCE study were revealed to the market over a series of corrective disclosures, as discussed below.

**1.    On March 18, 2025, Sarepta Was Forced to Disclose That a Patient Taking Elevidys Died from Liver Failure**

135.    Prior to the market open on March 18, 2025, and under pressure from FDA-imposed disclosure obligations, Sarepta issued a press release belatedly disclosing that a 16-year-old non-ambulatory DMD patient died from acute liver failure after taking Elevidys.[44]  The press release acknowledged that the degree of the patient's liver injury was profound, noting it "represent[ed] a severity of acute liver injury not previously reported for ELEVIDYS."

136.    As a result of these disclosures, investors began to appreciate that rh74 was associated with unusually dangerous liver toxicity – both relative to other gene therapies and other DMD treatments – notwithstanding Defendants' statements touting the platform's superior safety during the Class Period.  Coupled with Elevidys' dubious efficacy benefit, this new adverse information about the drug's safety risks caused investors to understand that Elevidys' overall risk/benefit profile was not as favorable as Defendants had claimed in their public statements.

---

[44] This patient was hospitalized *on February 7, 2025*, with serious and life-threatening liver injury, which included astronomically high bilirubin (>*10x* ULN) and liver enzyme values meeting Hy's Law criteria.  But Defendants did not disclose this patient's deeply concerning liver injury until more than a month later when his death triggered FDA disclosure obligations that forced the Company to publicly reveal it.  Instead, while knowing this patient had been hospitalized with life-threatening liver failure after treatment with Elevidys, Defendants continued to issue false and misleading statements touting the therapy's safety.  For instance, on Sarepta's February 26, 2025 earnings call, Ingram misleadingly told investors that Sarepta's huge body of safety data provided it with a comprehensive understanding of rh74's "safety profile . . . we understand the power of our constructs and our promoter to get really good expression *and get it safely*."

Consequently, investors downwardly revised their views concerning Elevidys' adoption, coverage, and revenue potential.

137.    For instance, HC Wainwright analysts issued a March 19, 2025 report stating that, in addition to Elevidys' questionable efficacy, "this patient death [was] another challenge to Elevidys uptake."  In an April 2, 2025 report, these same analysts stated,

> [W]e expect prescribers to either: (1) avoid recommending Elevidys, given the risk of death amid minimal efficacy benefit; or (2) delay treatment for their patients for upcoming quarters/years until conclusive (and favorable) results emerge about the risk profile . . . . The death occurred in an older, non-ambulatory patient; we think doctors may become even more cautious on these subgroups as the Elevidys risk-benefit profile looks more questionable, especially due to lack of convincing efficacy across DMD.

138.    Likewise, Cantor Fitzgerald analysts stated in a March 18, 2025 report that treatment "centers may take extra caution now around treating patients. The protocols may allow for more steps and testing prior to usage, and there could be greater scrutiny around baseline characteristics to deem a patient more appropriate for Elevidys.  Altogether, it's possible this could slow down launch expectations."  These analysts further noted that "investors [were] concerned about 1) cadence of Elevidys launch; and 2) potential near-term competitive threats" in light of these new safety disclosures.

139.    In response to these disclosures, Sarepta stock declined by more than 27%, falling from $101.35 per share at the market close on March 17, 2025 to $73.54 on March 18.

140.    Nevertheless, Defendants issued a steady stream of misleading soothing statements that prevented investors from learning the full truth about rh74's singularly dangerous liver toxicity and its severely limited viability as a gene therapy platform for both DMD and LGMD.  For instance, Sarepta's March 18, 2025 press release reassured investors that Elevidys' safety profile was just as good as any other gene therapy; that the reported liver failure portended nothing worse

than a "known" side effect of all gene therapies; and that the adverse event reported on March 18

did not represent a "new safety signal and the benefit-risk of ELEVIDYS remains positive."

141.     Defendants' misleading soothing statements that Elevidys and its rh74 platform

were no more hepatotoxic than any other gene therapy, and that the reported patient death was an

outlier, successfully moderated investor concerns.  For instance, in a March 18, 2025 report, BMO

analysts stated, "Although this event is very unfortunate and negatively impacts Elevidys' overall

safety profile, we continue to believe that Elevidys' benefit/risk profile is acceptable given DMD's

unmet need."  Likewise, UBS analysts issued a March 18, 2025 report stating, "Patient death after

Elevidys due to liver failure we think could be a unique case, we continue to see an opportunity

for Elevidys in DMD as a severe, fatal disease . . . . When we spoke to mgmt we think they sounded

confident that from talking to sites this will not impact use."

> **2.     On April 3 and 4, 2025, Investors Learned That the European Health Authority Froze Elevidys' Confirmatory Clinical Trial Because of Concerns About rh74's Safety**

142.     After market close on April 2, 2025, Roche, which licensed from Sarepta the right

to ex-U.S. marketing of Elevidys, disclosed that the European Medicines Agency "requested" a

freeze of clinical trial enrollment and all Elevidys dosing in Europe, in light of the safety concerns

raised by the death of the 16-year-old DMD patient from liver failure disclosed two weeks earlier.

On April 4, 2025, Sarepta issued a press release confirming the news.  The press release stated that

"[f]ollowing the safety update on acute liver failure that was issued on March 18," a European

Union public health regulator "requested" that Sarepta halt administration of Elevidys in Europe

in connection with its ongoing confirmatory trials (including ENDEAVOR).

143.     News that regulators viewed this adverse event as evincing a quality and degree of

liver toxicity risk potentially more serious than any "known" risks associated with gene therapies

helped investors begin to appreciate the truth that rh74 was associated with a uniquely dangerous

risk of hepatotoxicity. For instance, in an April 4, 2025 report, H.C. Wainwright analysts stated, "we see the clinical hold on key Elevidys trials in Europe as heightening the uncertainty around the future of the franchise." In an April 2, 2025 report (issued post-market close), UBS analysts likewise stated, "we think this further increases the perceived uncertainty for the future of Elevidys."

144.    On this news, Sarepta's stock price fell nearly 13%, from a closing price of $62.47 per share on April 2, 2025 to a closing price of $54.43 per share on April 4, 2025.

145.    Nevertheless, Defendants continued to issue misleading soothing statements in an effort to assuage growing investor concern. For instance, despite the fact that the Company's Elevidys trials had been paused just days earlier (on March 31, 2025), Sarepta's April 4 press release also announced that safety monitors from all three ongoing trials (hired and paid by Sarepta) had (somehow) already met, fully evaluated the adverse event, and concluded that "the overall benefit-risk profile remains favorable to continue dosing in the paused clinical trials without changes to the study protocols." Likewise, Defendants told UBS analysts that "this is more of an administrative step - the EMA just requested the DMC meet and weigh in on risk benefit & are meeting imminently."

146.    Once again, Defendants' statements tempered investor concern. For instance, Leerink analysts issued an April 4, 2025 report crediting Defendants' statements downplaying the import of the halt and parroting their statements that Sarepta's monitoring committee "concurred that based on the totality of evidence, the overall benefit-risk profile remains favorable to continue dosing in the paused clinical trials without changes to the study protocols. This tracks with our prior thoughts that this safety event has a very low overall incidence."

3.     **On May 6, 2025, Sarepta Slashed Its Earnings Guidance, Revealing That Concerns About rh74's Safety Significantly Impacted Physician Adoption of Elevidys**

147.    On May 6, 2025, Sarepta announced its first quarter 2025 financial results, slashing full-year earnings guidance by $300 million, or more than 13%. On the Company's earnings call that same day, Defendants explained that "the safety event" disclosed on March 18 – i.e., the death of a teenaged DMD patient from Elevidys-induced liver failure – negatively "impacted our [revenue] results late into the quarter" as doctors and patients canceled scheduled treatments, leading the Company to substantially revise its revenue guidance downward. Ingram acknowledged that this significant downward revision was "exclusively really from ELEVIDYS . . . . This is an ELEVIDYS related issue." Indeed, Sarepta was forced to launch an "extensive outreach" to health care providers in order to persuade them that Elevidys was safe and attempt to keep sales on track.

148.    The strong negative reaction of health care providers to the Elevidys-induced liver failure disclosed on March 18, 2025 – the first public warning shots regarding rh74's true liver toxicity – allowed the market to appreciate that doctors and other medical experts viewed the safety risks associated with rh74-based gene therapies as more unique and serious than Defendants had previously claimed. Further, Sarepta's disclosures allowed investors to appreciate that the magnitude of rh74's safety risks substantially undermined the overall risk/benefit profile of Sarepta's gene therapies, with material consequences for physician adoption and, therefore, for the Company's product revenue. For instance, in a May 6, 2025 report, Cantor Fitzgerald analysts stated, "We are lowering our peak sales primarily due to concerns about future adoption, given 1) physicians expressing more concerns on safety; 2) our belief that fewer later-stage/non-ambulatory patients will elect for Elevidys; and 3) near-term competitive threats." In a May 7, 2025 report, TD Cowen analysts likewise stated, "1Q25 Elevidys rev of $375M missed our est/[consensus] of

$444M/$414M on physician/pt hesitation on the recent Elevidys pt death . . . . We adjusted our

Elevidys sales estimates downward on today's updates." In a May 7, 2025 report, H.C. Wainwright

analysts further lowered their price target for Sarepta in light of the Company's disclosures, noting,

> Following the patient death, we believe that there is added risk to the
> Elevidys franchise, with reason to doubt the outlook for the three key
> decision-makers to uptake, (1) patient, (2) prescriber, and (3) payer. Payers
> have previously expressed hesitation, and now the prescribers and patients
> may be doubting the risk-benefit, deciding either to avoid Elevidys or to
> delay treatment for upcoming quarters/years until conclusive (and
> favorable) safety results emerge.

149.    On this news, the price of Sarepta stock declined significantly, falling more than

21%, from a closing price of $46.75 on May 6, 2025 to a closing price of $36.72 on May 7, 2025,

or $10.03 per share.

150.    Again, however, Defendants doubled-down on their misleading statements in an

effort to soothe investor concern.  For instance, on Sarepta's May 6, 2025 earnings call, Ingram

falsely told investors that "Elevidys has **one of the most impressive safety profiles in the context**

**of AAV-mediated gene therapy that has ever existed** . . . . [E]very AAV-mediated gene therapy

comes with a risk of elevated liver enzymes. And in other cases, there have been significant

consequences for that. They are rare. **With respect to us, they are particularly rare**." As discussed

herein, this was false, as Sarepta's own data had shown for years and as Sarepta's own scientists

and expert consultants had warned even before the Class Period began.  Nevertheless, Defendants

further misleadingly assured investors that the March 18, 2025 case of serious liver injury was an

anomaly, stating that it was "so markedly different than *all* other experience with Elevidys" and

"inconsistent with *all* other experience with Elevidys."

151.    In addition, in an effort to allay concern that rh74 might pose a heightened risk in

non-ambulatory patients like the teenager whose death from Elevidys was disclosed in March,

Rodino-Klapac misleadingly told investors that "we see no difference in the rates of adverse events and relationship to age or weight . . . . The totality of our data in over 800 patients support safety of Elevidys weight-based dosing across the label population of patients with Duchenne, regardless of ambulatory status." Ingram likewise misleadingly stated, "Is there something about being ambulatory versus non-ambulatory that plays a role? And the answer to that is no. We looked at all the signals, there is no reason to believe that at all. All of the liver enzyme issues are the same across ambulatory or non-ambulatory is the same."

152. As before, Defendants' misleading soothing statements continued to conceal from investors the full truth regarding rh74's liver toxicity and the implications of that platform's safety risks for both Sarepta's DMD and LGMD gene therapies. For instance, in their May 7, 2025 report, William Blair analysts repeated Defendants' misleading assertion that Elevidys showed "no differences in the rates of adverse events in relationship to patients' age or weight. In addition, the company observed no relationship between liver safety biomarkers and total dose administered." And these analysts took comfort from Defendants' assertions that they were working diligently to share this information with the medical community, writing, "Management noted that it has immediately initiated extensive outreach to treating physicians and the DMD community to keep families and treaters informed on the comprehensive safety and efficacy data for Elevidys." Accordingly, these analysts continued to favorably view both Elevidys and the LGMD portfolio. They wrote, "We continue to view Elevidys as the most transformative therapy in the commercial DMD treatment landscape" and expressed confidence that Sarepta could obtain multiple "approvals across its LGMD platform" in the near term.

### 4. On June 15, 2025, Sarepta Disclosed a Second rh74-Related Patient Death from Acute Liver Failure (While Falsely Denying Further Cases of Liver Failure Associated with rh74)

153. On June 15, 2025, Sarepta disclosed, again belatedly, that *another* non-ambulatory DMD patient had died from liver failure following treatment with Elevidys.[45]  In particular, *Sarepta acknowledged for the first time that both deaths were "likely" caused by the rh74 vector*, the same vector at the heart of both Elevidys and the Company's LGMD therapies – though as discussed below, Defendants continued to assure investors that any safety risks were confined to the subgroup of non-ambulatory DMD patients.  Under pressure from the FDA, Sarepta also announced that it was suspending shipment of Elevidys for all non-ambulatory DMD patients and was discussing with the FDA the inclusion of additional warnings, restrictions, and commitments in the Elevidys label, including the need for aggressive immunosuppression treatment in order to manage rh74's liver toxicity.  However, Sarepta insisted on continuing to ship Elevidys to ambulatory patients, falsely asserting that there was no evidence of safety risk in that population.

154. These disclosures continued to partially reveal to investors the magnitude and severity of rh74's hepatotoxicity, allowing them to reevaluate their understanding of Elevidys' overall risk-benefit profile and to appreciate that its adoption would be even more limited than Defendants' previous disclosures revealed, particularly in the key non-ambulatory population that comprised at least half of all DMD patients.  Further, these disclosures allowed investors to understand that the LGMD program was simply not viable, and that its further development would

---

[45] This patient was first hospitalized with serious liver injury (which, as with the first patient death, included astronomically high bilirubin and liver enzyme values meeting Hy's Law criteria) on *May 7, 202*5 (about 7 weeks after treatment with Elevidys).  Notably, even aggressive treatment with sirolimus failed to save this patient's life.  Again, Sarepta knew about this patient's serious liver injury for more than a month before disclosing it.  In the meantime, as discussed above, Defendants continued to issue misleading statements touting rh74's safety.

be uneconomical, as rh74's safety risks in that older, heavier population would create significant hurdles for approval and severely limit adoption, even if approved, particularly given that LGMD is a milder disease than DMD. Accordingly, with these disclosures, investors also learned the full truth concealed by Defendants' misleading statements touting the LGMD program's progress: that, in truth, the LGMD program was dead in the water.

155. For instance, in a June 16, 2025 report, HC Wainwright noted "we view the risk profile as now heightened for all DMD patients, including ambulatory DMD patients. Given the underwhelming clinical data supporting ELEVIDYS efficacy across DMD subtypes, we anticipate that an increasing number of patients and physicians will opt against treatment unless robust long-term safety data emerges—particularly demonstrating a near-zero risk of treatment-related mortality."

156. Likewise, in a June 16, 2025 report, Deutsche Bank analysts stated that news of rh74's dangerous safety profile "negatively skews the benefit-risk profile of Elevidys and nearly eliminates the likelihood of a near-term rebound in patient/caregiver demand." These analysts further made clear that the newly-public evidence of rh74's toxicity doomed the LGMD program's chances for success, leaving Sarepta with little more than its exon-skippers and whatever cash it had on hand: "We expect the near-term debate will center on the value of SRPT's remaining PMO franchise plus cash." In addition, these analysts noted that Sarepta's Hail Mary attempt to resume marketing Elevidys to non-ambulatory patients by pushing concomitant treatment with aggressive immunosuppressants was dubious at best: "[W]e note that potent immunosuppression with sirolimus introduces its own risks around infection, which is likely to be a point of contention with FDA regarding the overall benefit-risk profile, given Elevidys' clinical efficacy is modest at best." In addition, these analysts highlighted that disclosure of the truth regarding the dangerousness of

Sarepta's gene therapies, including the June 2025 disclosures, had caused "an -83% decline" in Sarepta's stock price over the last several months, "which saw the market cap go from ~$12B to ~$2B, *one of the largest losses of shareholder value for a smid-cap biotech company in recent memory*."

157.    Finally, TD Cowen analysts excoriated Sarepta for its lack of transparency regarding the safety of its gene therapies.  In a June 17, 2025 report, these analysts stated, "*We think SRPT's relationship with the DMD pt community has been significantly impaired on lack of disclosure of real-world safety risk with use* and continuing negative patient anecdotes on social media in both non-ambulatory and ambulatory pts."  And in a June 23, 2025 report, these same analysts stated, "there has been significant, permanent impairment to Elevidys' position in the DMD tx paradigm, peak sales, and terminal asset value, as well as SRPT's reputation in the DMD community."

158.    On this news, Sarepta's stock price crashed, plummeting by more than *42%* from a closing price of $36.18 on June 13, 2025 (the last trading day before the disclosure) to a closing price of $20.94 on June 16, 2025.

159.    Nevertheless, Defendants continued to issue false and misleading statements in an effort to reassure investors that rh74's safety profile was still superior to any competing gene therapy, that the implications of the patient deaths were overblown, and that Elevidys would rebound as the Company "educated" health care providers on the true safety profile of its gene therapies.  For instance, on Sarepta's June 16, 2025 investor call, Ingram stated that whatever liver safety risk *may* be associated with Sarepta, "it's no greater signal, I should note, than other full-body gene therapy infusions that are commercially available today. So this may very well just be a reflection of the rarity of this."  In an effort to underscore the "rarity" of liver injury on Elevidys,

Ingram likewise falsely asserted that Sarepta had never previously seen any evidence of serious liver injury associated with rh74, stating, "At the time of our first approval and our broader approval, we had no signal of this serious ALF concept. We had elevated liver enzymes in a minority of patients. They responded very rapidly to modest increases in steroids."

160.     Most importantly, in order to further reassure investors that the recently disclosed Elevidys safety issues were not intrinsic to the design of Sarepta's rh74 vector – the Company's proprietary platform for all its gene therapies and its key asset – ***Defendants falsely told investors that rh74 had not been associated with any cases of liver failure outside of the subgroup of non-ambulatory DMD patients, and specifically denied that any LGMD patients had experienced such adverse events***.  In response to an analyst question about whether LGMD patients taking Sarepta's rh74-based gene therapies would also need aggressive immunosuppression in order to counteract potential hepatotoxicity, Rodino-Klapac falsely stated: "***We have not seen a signal of ALF in this [LGMD] population***."

161.     Likewise, Ingram assured investors that the recently disclosed safety issues did not implicate rh74's fundamental design: "We've seen no signals that there's anything in manufacturing that would explain this.  Very likely this is the result of the fact that this signal is a very rare one."

162.     On July 16, 2025, just a few weeks after disclosing a second patient death caused by rh74-based gene therapy, Sarepta announced that it was essentially abandoning its LGMD portfolio, confirming investors' understanding based on the Company's earlier disclosures that the LGMD program was not viable.  At the same time Sarepta announced that it was firing 36% of its employees in connection with a "strategic restructuring and pipeline prioritization plan to maintain longer-term, sustainable growth."  According to Sarepta, jettisoning the LGMD portfolio, along

with much of the Company's workforce, would save Sarepta approximately $400 million annually – cash it now desperately needed, given the decimation of its gene therapy program; the threat that loss of revenue posed to Sarepta's ability to access its $600 million credit facility; and looming financial obligations, including hundreds of millions of dollars owed on debt issued to investors and upcoming milestone payments to Arrowhead.

163. That same day, Sarepta also announced that, as predicted, the FDA had instructed Sarepta to include a Black Box warning for acute liver injury and acute liver failure on Elevidys' label.

### 5. On July 18, 2025, Sarepta Was Forced to Confirm Media Reports That a Third Patient Treated with the Company's rh74-based Gene Therapy Had Died from Liver Failure

164. On July 17, 2025, rumors started spreading in the market that *another* patient treated with Sarepta's rh74 vector – this time an LGMD patient – had died from liver failure the previous month, after weeks of hospitalization for life-threatening livery injury. Defendants, forced to come clean, held an investor call the next day, on July 18, and admitted that these rumors were accurate. This disclosure was particularly important to investors because, as before, this patient was a heavier, non-ambulatory patient and, so, had received a higher dose of Sarepta's rh74 vector. This evinced a clear dose-response relationship between rh74 and liver toxicity *independent* of patient population (DMD versus LGMD). Accordingly, and contrary to Defendants' earlier statements (including those made just a few weeks earlier on the June 2025 investor call), investors understood that, given the emergence of this event in *yet another* patient population and the dose-response relationship observed, rh74 was fundamentally dangerously hepatotoxic, as a function of its core design and manufacturing.

165. Consistent with this, that same day, the FDA revoked Sarepta's "platform designation" for rh74, making it more difficult for Sarepta to obtain approval for any future gene

therapies based on the rh74 vector, and **asked Sarepta to withdraw Elevidys entirely from the market** (including in ambulatory patients). Shockingly, Sarepta had the gall to initially refuse to do so.[46]

166.    Sarepta's disclosures concerning this third patient death revealed dose-responsive toxicity that established rh74's excessive viral load as the cause of the injuries (just as Sarepta's own experts and scientists had warned years earlier) and showed that the risk was not isolated to DMD, and certainly not a function of any unique comorbidities in that population. Investors now fully understood that, totally contrary to Defendants' statements throughout the Class Period, rh74 itself was a uniquely dangerous gene therapy platform. For instance, in a July 21, 2025 report, H.C. Wainwright analysts, stated that this "[t]hird death—this time from a LGMD gene therapy— **signals insurmountable safety problem for entire gene therapy pipeline**" and concluded that Sarepta's gene therapy program as a whole now had "**zero intrinsic value**."

167.    Likewise, in a July 18, 2025 report, Cantor Fitzgerald analysts stated that they now had "**very deep concerns around the safety of [all Sarepta's] gene therapies**, and as a result remain on the sidelines with a negative bias . . . . the bottom line is we've seen three drug-related deaths that are likely to strongly dampen patient/caregiver demand and interest." Moreover, these analysts were clear that the news raised fundamental concerns about the design and manufacture of rh74 itself, noting, "We can't rule out factors like **the full/empty capsid ratio (i.e., purity of therapy), level of targeting to liver,** or other factors." Further, in a July 24, 2025 report, H.C. Wainwright analysts stated, "Elevidys now carries a tarnished reputation, and both physicians and patient advocacy groups are increasingly aware of its **questionable efficacy and associated risk of**

---

[46] Within days, Sarepta reversed course, but only because regulators intensified pressure on the Company and major health care providers were refusing to administer Elevidys to *any* patients, regardless of ambulatory status.

*death* . . . . We view this update as a *major blow to Sarepta*, reinforcing the sense that the Elevidys franchise is winding down."

168.    *Bloomberg* also reported comments from an FDA official who told reporters that this third rh74-related death was "*unquestionably relevant*" to Elevidys' safety profile and that "*no one at the FDA*" believed Elevidys "*should be allowed back on the market based on current data*."

169.    In response to this news, Sarepta stock plunged by another *36%*, from a closing price of $21.97 on July 17, 2025 to $14.07 on July 18, 2025.

170.    Significantly, on the same July 18, 2025 earnings call, Defendants admitted that they had known about this third patient's death from rh74-induced liver failure *for at least a month* before they were forced to confirm the rumors that it had occurred. Defendants further admitted that they were also aware of this patient's hospitalization with life-threatening liver injury *weeks* before his death. Specifically, Ingram acknowledged in response to analysts questioning that this third patient death "occurred about a month ago" and that the FDA "has had all of this information [about the patient death] for weeks." Pressed by analysts, Rodino-Klapac likewise admitted that "FDA was made aware of the case as a life-threatening case," which occurred in *mid-May*, "and then followed up with the notification of the death [in mid-June]. *So they have been aware of this throughout our conversations about the label*" – discussions that Sarepta's own statements make clear were ongoing at the same time Defendants falsely denied there had been any cases of liver failure in LGMD patients treated with rh74. Significantly, Defendants did not deny that they had known about the death at the time of their false assurances on the June 2025 investor call; instead, they claimed that the patient death was not "material" under the securities laws – a claim that analysts vigorously derided as disingenuous.

88

171.    Analysts were incensed by Defendants' deceptive conduct.   Unusually, these analysts did not save their outrage for the reports they would later publish, but openly took Defendants to task on the July 18 call itself.   For instance, one analyst dismissed Ingram's preposterous assertion that the patient death was "not material" out of hand, noting "it seems very clearly that this *was* a material event."   The analyst was incredulous that Defendants had failed to disclose the death earlier, particularly in the face of direct questions on the subject, and demanded that Defendants explain their understanding of materiality, since it so clearly differed from the meaning ascribed to it by investors (and, of course, the law): "And my colleague even asked *specifically about the safety of LGMD* on the call the other day.  So I guess the question is, where do you view materiality of safety events right now?"   The analyst, apparently frustrated that he had to make the obvious explicit to Defendants, stated that another patient death "would be a *highly material event* for you.  And *you need to be transparent with that immediately*."

172.    Likewise, another analyst, in disbelief over Defendants' evasiveness, asked, "You talked about how the limb-girdle patient death has been *known for about a month or so*. Can you outline the thinking and considerations around the disclosure strategy here?"

173.    In reports issued following the call, analysts continued to condemn Sarepta management for its dishonesty.  For instance, in the July 18, 2025 report mentioned above, Cantor Fitzgerald analysts stated:

> Management noted this was not disclosed on the call earlier this week as it was non-material to the topics of that call . . . .  *We are appalled by the lack of transparency around this, and don't agree that it was non-material*.  We believe the company (and frankly, biopharma in general) owes it to the patients, investors, the field, etc. to be more open around very significant AEs that are occurring.

And in a report issued a few days later, on July 20, these same analysts further stated that "*with management's lack of transparency/declining credibility, we don't know if we can fully trust what they are/aren't saying*."

174.    Likewise, Deutsche Bank analysts issued a report on July 18, 2025, noting that the new safety disclosures showed that rh74 was fatally flawed and that Defendants' lack of honesty had seriously undermined confidence in Sarepta:

> Earlier in the day, the company disclosed a patient death due to liver failure in a limb-girdle study, marking the third death to date for patients dosed with therapies utilizing its AAV gene therapy vector. Management deemed the death a non-material event and decided not to disclose this news . . . . *we believe this is purely semantics, given the safety concerns stem from the same AAVrh74 vector used for both DMD (Elevidys) and LGMD2D*. Should Elevidys remain on the market with a black box warning, we anticipate *this series of events and lack of transparency will have seriously damaged patient demand*, taking perhaps years to rebuild trust of the DMD community. As it stands, we believe the FDA has the ammo it needs to pull Elevidys off the market for all patients (both ambulatory and non-ambulatory) in the near-term.

175.    Even months later, prominent news outlets and scientific publications lambasted Sarepta for using obfuscation to rush its unsafe and ineffective gene therapies to market, endangering patients' safety in the near term and depriving them of the opportunity for treatment with genuinely promising therapies in the future.  For instance, *Science* published a November 4, 2025 article stating:

> As mentioned above, [Sarepta] also has some gene therapies in the works. The first of these (Elevidys) was. . . [ellipsis in original] wait for it, rejected by the FDA until that decision was overruled. Unfortunately there have been patient deaths directly linked to this one. The viral vector used for the gene therapy is very hard on the liver, and these events have been designated as treatment-related fatalities. So in this case you'd be waiting years for yet another confirmatory trial that might possibly show some benefit - although there's not really any sign of that in the earlier data - but all the time exposing the Duchenne patients to what appears to be a real, provable risk of liver failure . . . . *It's time to stop selling these patients drugs that don't help them and (in the case of Elevidys) are actually harming them*.

176.    The fallout from the full disclosure of rh74's profound safety risks on July 18, 2025 continued over the next few weeks.  First, on July 24, 2025, the EMA, the European health authority, issued a letter recommending the denial of marketing authorization for Elevidys. Second, on July 28, 2025, Sarepta was forced to liquidate its entire equity stake in Arrowhead

Pharmaceuticals (though it retained the acquired RNA products) in order to access more cash ahead of its first milestone payment to the company, coming due just two months later.

177.    Third, in late August 2025, the cash crunch caused by the collapse of its gene therapy franchise forced Sarepta to attempt to refinance its $1.15 billion in debt due in 2027. Ultimately, holders of $700 million of that debt agreed to refinance on terms highly unfavorable to Sarepta, reflecting the complete erosion in Sarepta's value caused by revelation of the truth Defendants' misstatements had concealed throughout the Class Period. Sarepta paid through the nose to entice holders of $700 million of that debt to extend the maturity of their 1.25% notes due 2027 to 2030. The exchange required Sarepta to now pay *4.85%* on the new notes, *plus* $233 million in cash and so much Sarepta stock that it diluted existing shareholders by 10%. But, in the cold light of the truth, Sarepta's prospects were now so poor that nearly half of the original noteholders – about 40% of them – refused to take even this sweetheart deal and, skeptical that Sarepta would make it to 2030, insisted that the Company pay them back by the original maturity date. As H.C. Wainwright analysts explained in an August 25, 2025 report, "Creditor split and harsher terms flag *skepticism over Sarepta's financial stability to 2030*. More telling than the harsh terms is the split among creditors: we note that roughly 60% of creditors agreed to roll over their debt while $450M remain in the 2027 notes."

### 6.    On November 3, 2025, Sarepta Revealed That Its Exon-Skippers Failed to Show Any Efficacy Benefit in the ESSENCE Study

178.    After the market closed on November 3, 2025, Sarepta announced that the key confirmatory trial of its exon-skippers, the ESSENCE study, had failed.[47] As discussed above, the exon-skippers (Amondys and Vyondys) had missed the study's primary endpoint by a *wide*

---

[47] Sarepta timed this disclosure to coincide with the release of its quarterly earnings results, avoiding a free-standing negative disclosure.

margin, thus failing to show that the drugs provided any meaningful clinical benefit to patients. This news was devastating to Sarepta, as following the collapse of the Company's gene therapy franchise, the exon-skippers were the Company's only remaining ostensibly legitimate treatment franchise. Moreover, as discussed above, the ESSENCE trial was critically important to the future of Sarepta's exon-skipping drugs because the treatments' continuing approval was conditioned on the outcome of the trial.

179.    Further, and as discussed above, on Sarepta's November 3, 2025 earnings call, Defendants *admitted* that the trial's failure was driven by an utter and glaring lack of statistical power, which, in turn was driven by "operational" problems in collecting adequate patient data during the COVID-19 pandemic. As discussed above, these facts, and thus the likely failure of ESSENCE, was well known to Defendants years earlier – at the same time that they were misleadingly assuring investors that ESSENCE was "*fully enrolled and remain[ed] on track*."

180.    Following these disclosures, investors learned for the first time what Defendants had known with virtual certainty, since before the start of the Class Period: Sarepta's exon-skippers had failed to prove their efficacy in the drugs' key confirmatory trial, severely imperiling their future viability and the massive share of Sarepta revenue that was tied to the franchise. For instance, in a November 4, 2025 report, H.C. Wainwright analysts stated:

> *Confirmatory trial failure reignites a core question: do any of Sarepta's DMD drugs actually work?* The confirmatory trial for Vyondys 53 and Amondys 45 failed to achieve statistical significance on its primary endpoint, forcing management to rely on *post-hoc* "COVID-free" trends (p=0.09) [i.e., still not statistically significant]. Sarepta now plans to meet the FDA in 1Q26 and submit the final clinical study report (CSR) in spring 2026, but with every confirmatory study to date failing to show clinical benefit, the franchise's therapeutic validity is again in question . . . . With PMOs driving most of Sarepta's revenue, the confirmatory failure heightens business-continuity risk.

181.    Likewise, in a November 2, 2025 report, Cantor Fitzgerald analysts stated, "After the safety events around Elevidys, which have impacted the commercial launch . . . the miss on

the ESSENCE trial adds further risk to sales." These analysts explained that they "now [had] genuine concerns about the future commercialization of the PMO therapies (which are an important recurring revenue stream for the company)." William Blair analysts similarly stated in a November 4, 2025 report that they "view[ed] the ESSENCE trial's failure to meet its primary endpoint as a negative development" and that "the stock's reaction (down 37% after hours) suggests investors are also concerned about the future of these two products."

182.    The price of Sarepta stock fell sharply on this news, from a closing price of $24.45 on November 3, 2025 to a closing price of $16.20 on November 4, 2025 – a decline of nearly **34%**.

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER

183.    Numerous allegations set forth above, and summarized below, collectively give rise to a strong inference that Defendants knowingly, or at least recklessly, misled investors regarding the safety profile of Sarepta's rh74-based gene therapies, the progress of the Company's LGMD program, and the status of the ESSENCE trial. These allegations include the following:

184.    ***First***, at the end of the Class Period, Defendants ***admitted*** that they knew facts that directly contradicted their public statements to investors. For instance, on Sarepta's July 18, 2025 investor call, Defendants admitted that they had known for over a month – and had even discussed with regulators – that a ***third*** patient treated with rh74 had died from acute liver failure. But rather than disclose this highly material news, Defendants – confident that they would never have to come clean given the imminent termination of the LGMD program – simply ***lied*** to investors. Defendants had assured investors on June 16, 2025, that "***We have not seen a signal of ALF in this [LGMD] population***," when, in truth, they knew a patient had died from liver failure, after being hospitalized for weeks with this life-threatening condition. As discussed above, when pressed by outraged analysts, Defendants did ***not deny*** that they knew this critical fact at the time they made their misleading statements. Instead, they acknowledged they made an affirmative

decision to withhold this information on the grounds that the death was "not material" – an assertion that market participants universally regarded as utterly disingenuous.

185.    Likewise, Sarepta's admissions in private correspondence with the FDA that the risk of hepatotoxicity evinced by the cases of *actual* liver injury reported to the Company were *not* reflected in Elevidys' label further support an inference that Defendants were aware of facts that undermined their public statements regarding rh74's safety profile.

186.    In addition, Defendants' admissions regarding the ESSENCE study make clear that they knew, before the start of the Class Period, that the study was *not* "fully enrolled" and "on track" as they misleadingly claimed, but, instead, was severely underpowered and highly unlikely to meet to its primary endpoint.  As discussed above, Defendants admitted that ESSENCE's dosing and treatment period overlapped substantially with the COVID-19 pandemic and that, as a result Defendants were unable to collect adequate patient data years earlier.   Moreover, Defendants conceded that the volume of missing data was profound, and could not have been written off as likely inconsequential to the study's outcome.  Defendants admitted that "the rate of missed doses was *unusually high* with *nearly all* patients missing doses and *approaching half* of whom missed substantial consecutive doses."  As discussed below, Sarepta's unsuccessful scramble to expand enrollment and repeated efforts to avoid releasing study results at commercially sensitive times further bolsters the inference of scienter.

187.    *Second*, Defendants' statements touting rh74's superior safety profile were directly contradicted by repeated warnings Sarepta received from its expert consultants and even its own scientists.  Prior to the start of the Class Period, FE 1, a highly-experienced expert Sarepta retained to oversee its preclinical program – the program that was supposed to establish the inherent safety of rh74's design and manufacture – warned Sarepta's senior management that the program

fundamentally failed to comply with key FDA regulations and that the way it was being run was "*illegal*." Among other things, FE 1, along with senior Sarepta scientists, warned Company executives, including Ingram and Rodino-Klapac, that the preclinical program failed to meet, on the most basic level, FDA independent oversight requirements; failed to implement compliant and empirically reliable tests and assays; and that Sarepta personnel engaged in rampant "testing into compliance," which generated "voodoo data." FE 1 reported that Sarepta management did not dispute preclinical leadership's assessment, but instead, responded, in substance, that the Company would "assume the risk" because it needed to "go quicker" to get Elevidys to market.

188. Defendants received further warnings from their own experts and scientists regarding rh74's significant hepatotoxicity no later than the fall of 2021. At that time, Sarepta scientists, concerned by rh74's enormous viral load and the highly significant degree of impurity resulting from its poor commercial manufacturing process, convened an expert panel that included prominent hepatologists. These experts confirmed that rh74 was associated with an unusually high potential for liver toxicity relative to competing vector platforms, particularly in the heavier non-ambulatory patients who would receive larger doses. Further, these experts explained that standard steroid prophylaxis would likely be inadequate to manage rh74's liver risk. At the same time, and consistent with the expert panel's conclusions, Sarepta's own senior Pharmacovigilance scientists and medical executives warned the Company that they had observed, and an eminent independent hepatologist had confirmed, a deeply concerning case of serious liver injury meeting Hy's Law criteria – a bright red flag of liver toxicity that, as FE 5 reported, Sarepta internally understood was a "big deal." Indeed, FE 5 reported that Sarepta's regulatory leadership was "very concerned about the implications of the case," but rather than come clean, insisted the case be reevaluated.

189.    *Third*, as multiple Former Employees confirmed, Defendants regularly received reports and had access to information demonstrating that, totally contrary to their public statements, rh74 was associated with highly significant liver safety risk far more than either competing gene therapies or DMD treatments.  As these Former Employees explained, Sarepta's Pharmacovigilance unit monitored and assessed patient safety using the same standard MedDRA adverse event classes and terms used by regulators, drug makers, health care providers, payors, and researchers across the industry, including the hepatobiliary adverse event class, which reflects actual liver *injury* associated with a drug.  As discussed above, these data, which were disseminated via regular reports and "openly available" to senior management through internal Sarepta dashboards, showed by no later than *October 2023*, that rh74 was associated with a risk of liver toxicity *five to ten times* that of competing gene therapy vectors and DMD treatments.  No treatment was *even close* to matching rh74's hepatotoxicity risk.  Likewise, Former Employees explained that meeting minutes, slide decks, and other material reflecting the rh74 safety concerns expressed by Sarepta's 2021 expert panel were all distributed to Sarepta's most senior executives, including Rodino-Klapac at a minimum.  Finally, Sarepta was notified through regulatory channels when rh74 patients suffered liver injury and, in contemporaneous correspondence with the FDA, acknowledged that the true risk of liver injury on rh74 had not been disclosed in Elevidys' prescribing information.

190.    Indeed, as discussed above, Defendants' own detailed and data-laden responses to analyst questions concerning granular patient data corroborate these Former Employee reports and demonstrate that Defendants closely monitored these data.  Defendants repeatedly answered analyst questions regarding both Sarepta's gene therapies and its exon-skippers with precise enrollment figures, power calculations, adverse event data (including the precise character of those

events), laboratory values, and even subgroup results. That Defendants were intimately familiar with even the minutiae of the Company's patient data gives rise to a strong inference that Defendants were certainly aware of glaring liver safety signals in the rh74 data. For the same reason, Defendants' statements detailing the particulars of Sarepta's patient data also give rise to a strong inference that they were aware of a profound *absence* of patient data in the ESSENCE trial.

191.    ***Fourth***, and relatedly, Defendants repeatedly assured investors that they were closely monitoring clinical and commercial patient data, particularly safety data, for Sarepta's drug products. For instance, Defendants told investors that "***certainly, patients are monitored continuously***; and our physicians are ***diligent about that***." Defendants specifically explained that "***certainly***, Hy's Law is monitored," and that Sarepta was also "***looking at all***" other indicia of liver injury as well. Moreover, Defendants ***repeatedly*** touted their deep and intimate knowledge of rh74's safety profile to investors. For instance, Defendants told investors, "we understand the safety and efficacy of Elevidys ***very well***"; and that "***[w]e understand . . . the safety profile***, and we understand the power of our constructs and our promoter [i.e., the rh74 platform] to get really good expression and ***get it safely***." Further, Defendants ***specifically*** told investors that Sarepta would provide real-time updates on patient safety. For instance, Rodino-Klapac assured investors that "[w]e will ***continue to transparently communicate the range of trial experience*** in patients treated with Elevidys." Estepan likewise assured investors that "***we will keep the market abreast along the way*** as we get more [patient safety and efficacy] information, ***our goal is just to be transparent so that people can make informed investment decisions***."

192.    Defendants' assurances further support a strong inference of scienter. Either Defendants performed the close monitoring they said they were performing and had the extensive

personal knowledge of Sarepta's safety and efficacy data that they claimed to have – in which case they knew that their public statements were not supported by the very data they claimed they were monitoring – or else Defendants failed to perform that monitoring, in which case their statements were severely reckless, at a minimum.

193.    *Fifth*, Defendants' statements to investors were contradicted by business decisions and events that could not have occurred without senior management approval.  Contrary to Defendants' statements, and as numerous Former Employees explained, Sarepta's LGMD program made essentially no meaningful progress towards commercialization during the Class Period.  To the contrary, Sarepta failed to approve clinical trial protocols, refused to approve budgets, eliminated funding, and terminated huge swaths of the LGMD program's personnel. These were all major, program-wide, corporate decisions.  The decision to wind down an entire drug portfolio – one that Defendants frequently discussed with investors – could not have been made without Defendants' acquiescence, or at least awareness.

194.    Similarly, Sarepta's failure to amass sufficient patient data in ESSENCE spurred major corporate decisions.  These decisions included: (1) multi-million-dollar efforts to recruit numerous clinical trial sites outside the United States, in the midst of a global pandemic; (2) repeated postponement of the readout of one of Sarepta's most important trials  (suspiciously, in ways that avoided announcing those failed results at commercially sensitive times for Sarepta); and (3) a sudden change in the trial's *primary* endpoint *eight years* after it started.  Again, these decisions, and the impetus behind them (namely, a complete dearth of sufficient patient data and the likely failure of ESSENCE), were so significant that Defendants must have been aware of them, at a minimum.

195.    **Sixth**, that Defendants' misstatements concerned Sarepta's two most important products by far – in fact, its ***only*** revenue producing products – during the Class Period further supports an inference of scienter, particularly as Sarepta was a relatively small company with management deeply focused on the rh74-based gene therapy and exon-skipper franchises.  As discussed above, prior to Elevidys' approval, Sarepta faced significant business pressures: the Company was operating at a loss, straining under a massive debt-load, and facing significant competition in the gene therapy space.  As Ingram acknowledged, Elevidys was Sarepta's life-line.  With the treatment's approval the Company doubled its revenue and became profitable for the first time, virtually overnight.  Indeed, at a September 2023 investor conference, Ingram characterized Elevidys as "the most significant in vivo gene therapy so far" and later, on January 13, 2025, reaffirmed that Elevidys is "the single most successful gene therapy that has ever been launched."  Analysts likewise characterized Elevidys' approval as "ushering in a new era for Sarepta," And Defendants' touted Sarepta's LGMD portfolio as almost equally significant, representing 70% of Elevidys' blockbuster potential.  Accordingly, both before and throughout the Class Period, Sarepta was deeply focused on the development, testing, and success of its rh74-based gene therapies and discussed them on every single earnings call and at every single investor conference during the Class Period.

196.    Moreover, Defendants' misstatements regarding rh74's safety profile did not concern some trivial detail of this important franchise.  Instead, as discussed above, rh74's safety was essential to its success – key to its regulatory approval and labeling and to physician and payor uptake.  Accordingly, the gene therapy platform's safety, particularly its liver safety, received outsized attention from both Defendants and from investors.

197.     As the Company's only other revenue-generating product franchise, Sarepta's exon-skippers were also critically important to its business.  At the start of the Class Period and through the remainder of 2023, the exon-skippers accounted *for 90% of Sarepta's revenue*, and even after Elevidys' approval, the exon-skippers continued to account for approximately half its product revenue.  Accordingly, analysts premised their buy recommendations to investors on the "[c]ontinuing positive launch trajectory of Exondys, Vyondys and Amondys in the US."    The exon-skippers became even more significant to Sarepta as the truth regarding rh74's exceptional hepatotoxicity emerged.  As analysts explained, the commercial success of these treatments was "important to Sarepta as a financial backstop given the dipping sales of its Elevidys gene therapy." Once again, Defendants discussed the performance of its exon-skippers on every investor call during the Class Period.

198.     And, again, Defendants' misstatements did not concern some arcane aspect of the exon-skipper franchise, but rather the fundamental conduct and enrollment status of the ESSENCE study.  Again, ESSENCE was the key confirmatory trial of Sarepta's exon-skipping franchise.  As the trial on which the FDA premised conditional approval of the exon-skippers, ESSENCE's outcome was critical to the Company's ability to market and sell those drugs.

199.     Accordingly, Defendants' misstatements concerning these critically important subjects, at a time when they were the focus of immense investor attention and concern, support an inference of severe recklessness at a minimum, particularly given the magnitude of the adverse facts Defendants' misstatements concealed from the public, as discussed below.

200.     *Seventh*, the scope and magnitude of the adverse facts concealed by Defendants' misstatements to investors further support an inference of scienter.  For instance, while Defendants assured investors that the LGMD program was progressing rapidly, *the exact opposite* was true.

There was no meaningful progress across the program's key assets whatsoever, as monumental manufacturing challenges prevented the Company from even *producing* infusions. The predicates to even *beginning* clinical development, including the approvals of trial protocols and budgets, were completely stalled; patient enrollment and research funding was frozen; and program personnel, including senior leaders, were terminated and not replaced. The fact that virtually an *entire development program* was in free-fall could not have reasonably escaped management's notice.

201.    Likewise, given their magnitude, the problems affecting the ESSENCE study could not have reasonably escaped management's notice. As Defendants' admitted, the study encountered serious "operational challenges" during the COVID-19 pandemic that prevented Sarepta from collecting critical efficacy data – data needed to assess the study's primary endpoint – from **nearly every single patient** in the study; and, in Defendants' own words **nearly half of all patients** "missed **substantial consecutive doses**." Defendants' unsuccessful scramble to enroll *multiple* additional sites – each of which costs millions of dollars to set up – further underscores the significance of the data problems Defendants' misstatements about the progress of the ESSENCE study concealed.

202.    Further, the scope and magnitude of the safety problems concealed by Defendants' statements were highly significant and were widely known and discussed inside the Company. For instance, the deficiencies in Elevidys' preclinical program were not isolated or minor; the entire program was rife with profound failures to adhere to foundational regulatory requirements across multiple dimensions of preclinical operations, including staffing, oversight, study protocol development, and prespecification. Moreover, these regulatory failures included serious data integrity breaches involving "testing into compliance." As discussed above, these grave

deficiencies were so numerous and pervasive that preclinical leadership spent weeks compiling reports documenting them, and repeatedly raised them with numerous members of Sarepta's senior management.

203.    Likewise, Defendants' statements touting rh74's superior safety profile were flatly contradicted by highly significant signals of hepatotoxicity in the Company's patient data, including an extremely serious case of liver injury meeting Hy's Law criteria – an injury so severe that it typically emerges only after thousands of patients have been treated with a drug, but, in rh74's case, emerged after just a few dozen.  This adverse event sparked significant anxiety inside Sarepta and, as FE 5 explained, was a "big deal."  Indeed, Rodino-Klapac specifically assured investors concerned about rh74's liver safety that "*certainly*, Hy's Law is monitored" by Sarepta. Likewise, Defendants' misleading statements touting rh74 as having a superior immunogenic safety profile to competing gene therapy vectors or DMD treatments was also flatly contradicted by Sarepta's *actual* liver injury data, which showed that the risk of real, pathological liver injury on rh74 was *vastly* higher – five to ten times – than these other treatments.  Additionally, the magnitude of the hepatotoxicity signal associated with rh74 was further underscored by repeated warnings from eminent outside experts about the vector's dangerous risks – warnings that were, again, presented directly to Defendants.  Finally, Defendants continued to tout rh74's safety profile even as it knew patients were not only being hospitalized with life-threatening liver injury, but had actually died from drug-induced liver failure.

204.    **Eighth**, questions raised by the FDA either did, or at a minimum should have, prompted further inquiry on Defendants' part that would easily have led them to discover the facts – well known and widely discussed inside Sarepta – that flatly contradicted their public statements. For instance, as discussed above, the FDA raised questions with Sarepta about the integrity of the

Company's preclinical data, noting, among other things inconsistencies between the assay values Sarepta reported to the FDA in their application for Elevidys' approval and those contained in the underlying data. Even a cursory investigation of this issue on Defendants' part would have revealed that regulatory noncompliance pervaded Sarepta's preclinical program and, far from being an anomaly, Sarepta's inaccurate reporting of lab results was the product of widespread "testing into compliance." Likewise, even a cursory investigation into questions the FDA raised about the purity of Sarepta's rh74 vector would have revealed the repeated private warnings by Sarepta's own senior scientists and a panel of eminent experts regarding the serious immunogenic safety risks posed by rh74's enormous viral load, including as a function of the infusion's exceedingly poor full:empty capsid ratio. Defendants' responses to the FDA's questions suggested they *did* in fact diligently investigate the facts surrounding them. Either Defendants truly performed such an investigation, in which case they would have learned the truth, or else they failed to investigate, in which case their public statements on these subjects, including statements dismissing these same concerns, were reckless, at a minimum.

205. ***Ninth***, Defendants had powerful motives to conceal problems with both Sarepta's gene therapies and its exon-skippers. Before and during the Class Period, Sarepta faced unique and highly significant commercial pressures, stemming from a combination of both the Company's enormous debt load and intense competition its key products faced from rival drug makers. First, as discussed above, by the start of the Class Period, Sarepta was one of the most highly-leveraged companies traded on the Nasdaq, but at the same time failed to generate positive cash flow. Elevidys turned Sarepta profitable for the first time, allowing the Company to meet its financial obligations.

206.     Sarepta's dependence on Elevidys and the viability of the rh74 franchise to stay afloat became more acute as the Class Period continued.  Sarepta paid a hefty price to acquire a suite of RNA-based gene therapies from Arrowhead Pharmaceuticals in the fall of 2024.  As discussed above, the deal required Sarepta to make an upfront payment of $825 million *plus* a combination of near-term installment and milestone-based payments totaling $550 million – an amount roughly equal to all of Sarepta's cash on hand at the time the deal was reached.  On top of these payments, Sarepta would have to finance the development and commercialization of these drugs, including bearing the cost of running clinical trials across multiple product portfolios.  In just the first six months of 2025, Sarepta reported close to $600 million in milestone expenses, while its R&D costs *tripled* year-over-year, ballooning to close to $1 billion.  And if Sarepta failed to make scheduled payments or meet its development commitments, the portfolio would revert back to Arrowhead, an outcome that would be catastrophic for Sarepta.  To meet its significant expenses, Sarepta took out a $600 million credit facility in February 2025.  Continued access to the credit facility depended on Sarepta maintaining a debt to EBITDA ratio below 3.5, which would be impossible if Elevidys' commercial success was imperiled.

207.     As analyst commentary makes clear, and as Defendants fully understood, any significant impairment to either Sarepta's gene therapies or its exon-skippers would jeopardize the Company's ability to operate as a going concern.   For instance, as the truth regarding Elevidys' significant hepatotoxicity finally began to emerge, Barclays analysts flagged "[l]iquidity concerns given current cash burn without substantial revenue from Elevidys . . . . We note *repayment* [of Sarepta's significant debt] *may not be achievable* without further drastic changes, if Elevidys won't return to the market."  Likewise, H.C. Wainwright analysts issued a July 29, 2025 report stating, that, in light of the substantial devaluation of the rh74 franchise, Sarepta's "[d]ebt of

$1.15B is still a concern, given ~$750M cash and ~$250M more Arrowhead obligations in 2025." And, indeed, as discussed above, Sarepta was forced to refinance its debt on highly unfavorable terms in August 2025.

208.    Second, both Sarepta's rh74-based gene therapies and its exon-skippers faced stiff competition from drug companies developing what investors now know (but which Defendants knew throughout the Class Period) were vastly superior products.  Even before the Class Period, Pfizer, one of the largest and well-resourced drug companies in the world, was quickly developing a rival DMD gene therapy, putting enormous pressure on Sarepta to rush Elevidys to market.[48] During the Class Period, drug makers Regenxbio and Solid Biosciences continued to report highly-promising efficacy *and* safety data for their respective proprietary AAV-based gene therapies for DMD.  In particular, Deutsche Bank analysts noted in a March 2025 report that both gene therapies not only achieved high marks with respect to efficacy biomarkers, but, critically, "[t]o date, both SLDB and RGNX gene therapies have shown very clean safety, with no concerning immune-mediated AEs."  By the end of the Class Period, analysts noted that the emerging truth regarding rh74's significant hepatotoxicity placed both competing vector-platforms in the pole position to capture market share.[49]  And Sarepta was also facing competition from safe and effective DMD treatments *outside* the gene therapy space, including Dyvyzat, which the FDA approved in March

---

[48] Ironically, while Pfizer abandoned this gene therapy in 2024 because a pivotal trial missed its primary endpoint and a patient in that trial died from heart failure, Elevidy not only failed to meet its primary endpoint in multiple trials, it had a substantially inferior safety profile.  But, as discussed above, Pfizer's decision to abandon its DMD therapy put even more pressure on Sarepta to report positive safety data for Elevidys.

[49] For instance, in a June 17, 2025 report, H.C. Wainwright analysts stated that, while Sarepta was now forced to propose concomitant use of aggressive immunotherapy to manage Elevidys' significant liver toxicity (as a way to keep the drug on the market at least in some form), "SGT-003 [Solid Bioscience's gene therapy] would stand out as the only DMD gene therapy that relies solely on prophylactic corticosteroids—without any additional intensive immunomodulatory agents, such as eculizumab or sirolimus."

2024.  Finally, Sarepta's exon-skippers also faced stiff competition from rival "next-generation exon-skippers" that use cell-penetrating peptides to significantly boost efficacy, including a product developed by Avidity Biosciences that, in mid-2024, reported biomarker data signaling significant improvements over Sarepta's products.[50]  Given this intense competition, Defendants were highly motivated to conceal the truth for as long as possible in order to sell as much product as possible before Sarepta's therapies were forced into obsolescence.

209.    Accordingly, while Plaintiffs need not plead motive to adequately allege scienter, these facts further support a strong inference that Defendants' knew or recklessly disregarded the truth concealed by their misstatements.

210.    **Tenth**, the suspicious circumstances and timing surrounding Sarepta's acquisition of Arrowhead Pharmaceuticals' RNA-based therapies, for which Sarepta paid a hefty price, further supports an inference of scienter.  Notwithstanding the fact that Sarepta was already heavily leveraged and still devoting significant resources to the nascent Elevidys launch (not to mention also *supposedly* devoting significant resources to developing an *entire portfolio* of LGMD therapies), Sarepta agreed to more than $1.3 billion in near-term payments (not including substantial development and clinical costs) to diversify away from the rh74-based gene therapies it had expressed so much confidence in.  Indeed, on Sarepta's investor call announcing the deal, analysts specifically **asked** Defendants if the acquisition was a signal that it was no longer confident in its suite of rh74-based gene therapies, including the LGMD portfolio.  As discussed, Ingram flatly denied this, stating, "I don't want anyone to get the false impression that this [Arrowhead transaction] is a deprioritization of programs like our limb-girdle gene therapy

---

[50] Underscoring its awareness of this competitive threat, Sarepta had tried, unsuccessfully to develop such a "next generation" exon-skipper.

programs, which it isn't." Just over *three months* after the Arrowhead transaction was announced, a cascade of rh74 patient deaths forced Defendants to reveal the truth about rh74's dangerous toxicity and poor product profile. And just a few months later, Defendants finally revealed that the ESSENCE study failed because it was vastly underpowered – a fact Defendants had known for years. Following these disclosures, the treatments Sarepta acquired from Arrowhead now appear to be *the only viable products Sarepta still has*. Indeed, at the end of the Class Period, Guggenheim analysts noted in November 4, 2025 report that "SRPT's future [now] depends on its acquired siRNA programs." Accordingly, the circumstances and timing of the Arrowhead transaction further support an inference of scienter and indicate that Defendants were eager to diversify away from treatment franchises that were in greater jeopardy than their public statements to investors let on.

## VI. **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

211. During the Class Period, Defendants made a host of materially false and misleading statements during Sarepta's earnings calls, at investor conferences, and in the Company's SEC filings and press releases. Defendants' false statements fall roughly into three broad categories: (1) statements touting the safety of Sarepta's proprietary rh74 vector, the platform underlying both the Company's DMD and LGMD gene therapies; (2) statements touting the progress of Sarepta's LGMD program towards commercialization; and (3) statements assuring investors about the status of Sarepta's ESSENCE study – the key confirmatory trial of the Company's exon-skippers – including that the trial was "fully enrolled" and "on track."

A.  **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS TOUTING THE SAFETY OF SAREPTA'S rh74 GENE THERAPY PLATFORM**

1.  **Defendants' False and Misleading Statements During the Second Quarter of 2023**

212.  On June 22, 2023, Sarepta issued a press release announcing the FDA's approval of Elevidys for treatment of DMD in ambulatory patient aged four to five years old.  That same day, Sarepta issued a press release stating, "***ELEVIDYS has met the full statutory standards for safety*** and effectiveness and as such is not considered investigational or experimental."

213.  Defendants' statement was materially false and misleading when made.  It was misleading for Defendants to assure investors that Elevidys' safety data had been collected, presented, and evaluated consisted with "full statutory standards," while failing to disclose that, in truth, Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and, as Defendants were warned, the Company's preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance" to generate sham safety data.

2.  **Defendants' False and Misleading Statements During the Third Quarter of 2023**

214.  On August 2, 2023, Sarepta held an earnings call with investors to discuss the Company second quarter 2023 results.  On that call, an analyst asked Defendants whether Sarepta's safety and efficacy data currently supported expansion of Elevidys' label to cover the critical non-ambulatory population, or whether, instead, the Company would have to wait until "much later" in order to be in a position to do so.  Ingram assured investors that Sarepta's safety data provided "***no logical basis to assume***" that Elevidys' risk/benefit profile was any less favorable in non-ambulatory patients.  Ingram stated, "As we've said, we've had conversations with the agency about removing all of the age ranges. ***There would be no logical basis to assume that ambulation***

*status would be a reason to limit access*. It's not as if this protein is aware that a patient is in a wheelchair or not. So we feel very confident about that."

215.    Also on August 2, 2023, Sarepta filed its second quarter 2023 results with the SEC on Form 10-Q. In that filing – and in every quarterly and annual SEC filing during the Class Period, Defendants assured investors that it implemented a rigorous regulatory compliance program across its preclinical and clinical programs in order ensure the integrity of the data, including the critical safety data, generated by those important programs. Sarepta's SEC filings stated:

> We have implemented a compliance program, which is ***based on industry best practices and is designed to ensure that our activities comply with all applicable laws, regulations and industry standards***. While our compliance program is intended to detect and prevent potential non-compliance, we ***cannot be certain*** that compliance will be assured. ***If*** our operations are found to be in violation of any of the laws described above or any other laws, rules or regulations that apply to us, we will be subject to penalties, including civil and criminal penalties, damages, fines and the curtailment or restructuring of our operations.

(the "Regulatory Compliance Statement").

216.    On September 11, 2023, Ingram attended Morgan Stanley's Global Healthcare Conference on behalf of Sarepta. At that investor conference, Ingram touted Elevidys' safety profile, acknowledging that it is one of "the most important two metrics for us." Ingram stated that "the safety profile for ELEVIDYS, as it has been for some time now. It's ***a laudable safety profile given its potential benefit***."

217.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that rh74 had a "***laudable safety profile***"; that Sarepta's safety data showed there was "***no logical basis to assume***" that rh74 might pose more significant safety risks for non-ambulatory patients; that Sarepta had "implemented a compliance program" "designed to ensure that our activities comply with all applicable laws, regulations and industry

standards"; and to represent to investors that there was only a future and contingent risk – rather than a present and materialized risk – of regulatory non-compliance affecting the foundational programs responsible for generating critical rh74 safety and toxicology data, while failing to disclose that: (1) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and, as Defendants were warned, the Company's preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance" to generate sham safety data; (2) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity relative to competing vector platforms, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; and (3) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "***an ominous indicator***" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case."

### 3. Defendants' False and Misleading Statements During the Fourth Quarter of 2023

218.    On October 30, 2023, Sarepta held a call with investors to announce results of the EMBARK trial – the Company's phase III trial of Elevidys. On that call Ingram stated, "there are no new safety signals that have emerged confirming the ***laudable profile*** upon which Elevidys was approved in June." Rodino-Klapac likewise assured investors that Sarepta's data showed Elevidys' "***Benefit risk is favorable*** and strengthened by this additional data from EMBARK."

219.    That same day, Sarepta issued a press release announcing the EMBARK results. In that press release, Sarepta stated, "There were no new safety signals in the EMBARK study,

110

reinforcing the *favorable and manageable safety profile observed with ELEVIDYS to date*." The press release further stated that "ELEVIDYS has met the *full statutory standards for safety*."

220.    Two days later, on November 1, 2023, Sarepta held its third quarter 2023 earnings call.  On that call, Ingram touted Elevidys' "laudable" safety profile as *superior* to competing DMD treatments and consistent across age and ambulatory status.  Ingram stated, "[T]he results of EMBARK confirm that ELEVIDYS stabilizes muscles, slows or entirely arrest decline, *does so across the ages* and does so with *a laudable safety profile not shared by other programs for Duchenne*."

221.    On that same call, an analyst asked Defendants whether Sarepta was concerned about competing gene therapies and, in particular, about any "trade-off between efficacy and safety."  In response, Ingram told investors that Sarepta's enormous body of data showed rh74 was "*particularly*" safe relative to competing gene therapies and that, indeed, its safety profile was a "*standout*" in the gene therapy space.  Ingram stated,

> [W]ith the benefit of many years of experience, we are exceptionally proud of [a]nd frankly, nothing less than thrilled with the particular capsid and construct that we have. It's shown not only [that] it is able to intervene, protect these muscles of these children and arrest the decline that *it can do that with a particularly laudable safety profile* given the amount of therapy required here and the fact that it's full body infusions.  *rh74 has been a standout*. And we're quite confident that anyone who is rational who had an opportunity to make a decision today about what capsid they would use and what construct they would develop. I'm sure they would do their best to try to copy us.

222.    During that same call, an analyst asked whether Defendants had observed any signals of immunogenicity-related risk, like myocarditis.  Rodino-Klapac assured investors that Sarepta's "large safety database" continued to show that rh74 had a favorable safety profile and that no worrying signals of immunogenic adverse events had emerged.  Rodino-Klapac responded, "we did not see any differences in the types of SAEs or the frequency of those SAEs that was one

of the most reassuring things about EMBARK was *the continued safety profile* and now taken together all of the previous trials, we have *a large safety data base that's consistent* on those trials."

223.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout rh74's safety profile as superior to competing gene therapies and DMD treatments; to state that Sarepta's considerable experience with rh74 showed it had a "particularly laudable safety profile" and was "a standout" as compared with competing gene therapy platforms; to state that rh74 had a "laudable safety profile not shared by other programs for Duchenne"; and to assure investors that Sarepta's "large safety database" showed rh74 had a "favorable" and "laudable" safety profile, and that the Company's accumulating dataset showed no troubling signs of immunogenic risk, including serious liver injury, while failing to disclose that: (1) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (2) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity relative to competing vector platforms, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; (3) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case"; and that, in truth, (4) Sarepta's safety data showed that rh74 was associated with a

highly significant risk of actual liver injury – many times the risk of hepatobiliary injury associated with competing gene therapies or DMD treatment.

### 4. Defendants' False and Misleading Statements During the First Quarter of 2024

224. On January 8, 2024, Ingram attended the JPMorgan Healthcare investor conference on behalf of Sarepta. At the conference, Ingram addressed investor focus on the expansion of Elevidys' label to cover the critical non-ambulatory population. Ingram told investors that Sarepta had amassed a considerable body of patient data that showed rh74 continued to have a "laudable" safety profile in non-ambulatory patients as well. Ingram stated that Elevidys "is working equally well across ages as its mechanism of action would have suggested. ***It's safety and tolerability has been stable and laudable across many studies, across ages and across ambulatory status*** ."

225. On March 11, 2024, Ingram attended the Leerink Partners Global Biopharma investor conference on behalf of Sarepta. At the conference, an analyst asked Ingram about rh74's competing gene vectors and who Sarepta was "keep[ing] an eye on." In response, Ingram touted rh74's differentiated safety profile, and the product quality that drives safety, relative to those competing vectors, and, in particular, relative to AAV9, the same vector platform used by Zolgensma. Ingram stated:

> We are thrilled with the ***product quality*** of ELEVIDYS, the amount of expression, the functional results, ***the safety profile relative to other AAVs that have been used***. So I'm thrilled where we are.
>
> \*     \*     \*
>
> I think with the benefit of hindsight now, years after the fact, I think we now have learned empirically that ***AAV9 has significant issues from a safety perspective***. So that's – it's not a criticism for the choices made. But ***we are very pleased that we chose rh74*** with the benefit of scientific hindsight.

226. On March 12, 2024, Ingram attended Barclays' Global Healthcare investor conference on behalf of Sarepta. At that conference, an analyst asked Defendants about Sarepta's

prospects for getting "non-ambulatory patients in the [Elevidys] label." Ingram assured investors that Sarepta had thoroughly tested rh74 in non-ambulatory patients, including particularly high-risk patients, and that this robust dataset showed the Company's gene therapy platform posed no greater risk in non-ambulatory patients. Ingram stated, "We have dosed *a number of non-ambulant patients*. [We have] *dosed patients that are very old*, 26 years old, and [have been] non-ambulant for a very long time. *We dosed very large patients*. 80 kgs I believe the largest patient and the most gene therapy ever received. *We have not to date seen any differences in the AE rates*."

227.    At that same conference, analysts continued to press Sarepta about the strength of the empirical support for its assurances that rh74 posed no greater safety risk in non-ambulatory patients. One analyst, for instance, specifically asked "how many non-ambulatory patient safety data" were supporting Sarepta's safety claims. Ingram assured investors that it had amassed a "pretty significant amount" of non-ambulatory patient data, including highly "compromised patients," which all showed that there was no difference in safety profile based on ambulatory status. Ingram stated:

> So a pretty significant amount of data and data that relates to some of the most potentially compromised patients, and they've done very well. And as I've said before, *some of the largest patients, which from a viral load perspective, are probably the greatest viral load that perhaps anyone has ever received with the gene therapy. And again, I would repeat, so far, we've seen no difference in the safety profile*.

228.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Sarepta's "product quality" and "safety profile relative to other AAVs," including the AAV9 vector used in Zolgensma; to assure investors that rh74's safety profile was "laudable across many studies, across ages and across ambulatory status"; and to state that Sarepta had accumulated a "pretty significant amount" of non-ambulatory patient data,

including highly "compromised patients," which all showed that there was no difference in safety profile based on ambulatory status, while failing to disclose that: (1) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (2) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load, greatly exacerbated by rh74's *poor* "product quality," created an unusually high risk of liver toxicity relative to competing vector platforms, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; (3) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case"; (4) that, contrary to Defendants' statements, Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury many times the risk associated with competing gene therapies, and indeed, at the time of Defendants' statements above, *three times the risk* associated with Zolgensma's AAV9 vector to which Ingram misleadingly compared rh74; and (5) contrary to Defendants' statements touting the robustness of Sarepta's safety results in the non-ambulatory patients, including that these claims were based on a "pretty significant amount" of data, at the time of Defendants' statements above, Sarepta's small non-ambulatory dataset showed that rh74 could pose *more than double* the risk of acute liver injury in those patient versus ambulatory patients.

### 5.    Defendants' False and Misleading Statements During the Second Quarter of 2024

229.    On June 21, 2024, Sarepta held a call with investors to discuss the expansion of the Elevidys label to cover patients of all ages and ambulatory status.  On that call, Defendants sought to reassure investors that the expansion was supported by a significant and empirically sound body of evidence confirming Elevidys' safety, including in the non-ambulatory population that was now eligible for commercial treatment.  In fact, an analyst raised questions about Elevidys' overall risk/benefit profile across patient types and asked whether "clinical benefit still looks pretty variable in patients."  In response, Ingram "disagree[d] with that perspective," assuring investors,

> [T]he **amount of data that supports the benefit, the safety**, and the efficacy of this therapy [Elevidys] **is enormous**.  We've dosed hundreds of kids in clinical trials. And now between clinical trials and commercial, we've dosed many hundreds of kids, over 400 kids and young men. We've dosed the broadest range of patients from very, very young to, in the context of Duchenne, very, very old.

230.    On the same call, Ingram further touted the strong and significant empirical evidence confirming all the "preclinical evidence" of rh74's safety.  Ingram stated, "Confirming the strong biological rationale and preclinical evidence for ELEVIDYS are four studies, covering 218 patients spanning the broadest range of both weights and ages of any Duchenne therapy approved to date.  In fact, we have dosed more nonambulatory patients to support our approval than the trials for all other approved Duchenne therapies to date."

231.    Also on that same June 21, 2024 investor call, an analyst **specifically** asked Defendants if Sarepta had "see[n] any meaningful differences in the patient journey for ambulatory versus nonambulatory patients?"  Ingram replied, "**[T]he first big issue is safety.  We see a very similar safety profile between the nonambulatory and ambulatory patients**."

232.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Sarepta's "enormous" body of rh74 safety data and to assure

116

investors that those data confirmed its favorable safety profile in both ambulatory and non-ambulatory patients, while failing to disclose that: (1) in truth, at the time Defendants made the statements above, Sarepta's data showed that, as compared with ambulatory patients, non-ambulatory rh74 patients likely faced *a 56% or greater increase* in the risk of acute liver injury and Sarepta could not rule out more than *a doubling* of that risk in the non-ambulatory population; (2) contrary to Defendants' statements that Sarepta had "confirm[ed]" rh74's positive preclinical safety data, Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (3) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; (4) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case"; and (5) contrary to Defendants' statements, Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury many times the risk associated with competing gene therapies and DMD treatments.

### 6. Defendants' False and Misleading Statements During the Third Quarter of 2024

233.    On August 7, 2024, Sarepta held its second quarter 2024 earnings call with investors. On that call, an analyst asked Defendants to discuss rh74's safety data as commercial

treatment in the expanded DMD population had ramped up over the previous quarter.  Ingram replied, "we're seeing *a very stable safety profile* as well based on that monitoring" in the expanded patient population (including non-ambulatory patients), and asked Rodino-Klapac to confirm, which she did, stating, "That's exactly right, sir. That's it."

234.    On September 6, 2024, Ingram attended the Morgan Stanley Global Healthcare Conference on behalf of Sarepta.  On that call, Ingram again touted Elevidys and its rh74 platform as *superior* to competing gene therapies from a safety perspective (when, in truth, Sarepta's own data showed it was much worse).  Ingram stated, "ELEVIDYS has had *a very good safety profile relative to other programs*."

235.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that rh74 had "a very good safety profile relative to other [gene therapy] programs" and that Elevidys had a "very stable safety profile" in the expanded non-ambulatory population, while failing to disclose that, in truth: (1) Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury many times the risk associated with competing gene therapies and DMD treatments; (2) Sarepta's data showed that, as compared with ambulatory patients, non-ambulatory rh74 patients likely faced *a 56% or greater increase* in the risk of acute liver injury and Sarepta could not rule out more than *a doubling* of that risk in the non-ambulatory population; (3) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (4) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis

would likely be inadequate to manage that risk; and (5) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case."

### 7.    Defendants' False and Misleading Statements During the Fourth Quarter of 2024

236.    On November 6, 2024, Sarepta held its third quarter 2024 earnings call. On that call, Ingram again assured investors that Sarepta's statements touting rh74's safety profile, including in non-ambulatory patients, rested on a large, robust body evidence, which gave the Company a competitive and commercial advantage. Ingram stated, "And one of the things that we're really benefiting [from] right now is [that] *the amount of evidence and data that we have that supports bringing ELEVIDYS to a broad group of Duchenne patients is great* and gives us a lot to talk about." Ingram further touted the "extraordinarily positive safety and efficacy profile that we have today with ELEVIDYS."

237.    On that same call, Rodino-Klapac assured investors that Sarepta's accumulating patient data, which included patients treated in the "real world" commercial setting, continued to show that Elevidys had a consistently favorable safety profile "across ambulatory and non-ambulatory patients." Rodino-Klapac stated:

> In addition to the EMBARK data, we've also presented safety and expression data from Study 103 or ENDEAVOR, *demonstrating consistent safety* and expression *data across ambulatory and non-ambulatory patients*. As at the end of October 2024, we have dosed over 80 late ambulatory and non-ambulatory patients within our clinical program and *continue to see a consistent safety profile*.

238.    Also on that same call, Ingram again touted the enormous body of evidence Sarepta had amassed showing Elevidys was safe in both ambulatory and non-ambulatory patients, including patients at particularly high risk.  Ingram stated:

> We have an extraordinary amount of experience with ELEVIDYS. Louise will have mentioned to you that we've already dosed between clinicals and some commercial 80 or so, probably more than that by now, about 80 patients that are either late ambulatory or non-ambulatory in addition to all of the other patients who dose. And as you know, *we've not seen a difference in any safety metrics*. So the things that look great, *the profile of the therapy looks great*, and the launch is going great.
>
> *         *         *
>
> I think that as more information comes out about the number of patients that have been dosed in the late-ambulatory, non-ambulatory setting and *the safety profile that we're seeing there, which is the same as the ambulatory patients*, it's only going to increase that awareness and excitement. We've already dosed kids in the mid-20s who are obviously non-ambulatory and we have start forms of men in their late 30s, which is very, very advanced for Duchenne muscular dystrophy.

239.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout rh74's "extraordinarily positive safety" profile; to state that the "extraordinary" amount of rh74 safety data Sarepta had amassed showed that rh74 was "consistently" safe "across ambulatory and non-ambulatory patients; that rh74's safety profile in non-ambulatory patients "is the same as the ambulatory patients"; and that "the profile of the therapy looks great," while failing to disclose that, in truth: (1) at the time Defendants made these statements, Sarepta's data showed, with 95% certainty, that, as compared with ambulatory patients, non-ambulatory rh74 patients faced *at least (i.e., no less than) a 22% increase* in liver risk *on top* of the highly significant risk rh74 already presented in ambulatory patients and that the Company *still* could not rule out that rh74 actually *doubled* rh74's liver risk in non-ambulatory patients; (2) Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury many times the risk associated with competing gene therapies and DMD treatments; (3) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program

120

was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (4) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; and (5) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "***an ominous indicator***" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case."

### 8. Defendants' False and Misleading Statements During the First Quarter of 2025

240. On January 13, 2025, Ingram and Rodino-Klapac attended the JPMorgan Healthcare investor conference on behalf of Sarepta. At that conference, Ingram reassured investors that the extensive body of evidence Sarepta had amassed showed was empirically robust, allowed Sarepta to "understand the safety and efficacy of rh74 very well," and showed that rh74 remainder safe in both ambulatory and non-ambulatory patients. Ingram stated:

> Elevidys when it was approved, was approved not only for ambulatory patients, for non-ambulatory patients. At the time of its approval, we had dosed more non-ambulatory patients with Elevidys than any other Duchenne therapy ever approved at the time of its approval. And as we sit here today, we've dosed, going on, 100 non-ambulatory patients . . . .We've dosed children as young as two years old with Elevidys. We've dosed men in their mid-20s with Elevidys. We've dosed children as light as 26 pounds with Elevidys. We've dosed men that are 290-plus pounds with Elevidys. And I did not misspeak, over 290 pounds, and across that entire continuum of ambulatory, non-ambulatory, young, older, lighter, heavier. ***The profile of Elevidys, both from safety and efficacy, remains consistent and the same . . . and we understand the safety and efficacy of Elevidys very well***.

241.    On January 27, 2025, Sarepta held an investor call, attended by Ingram, Rodino-Klapac, and Estepan.  On that call, an analyst asked Defendants about the "competitive landscape for gene therapy" and how Sarepta's rh74 data stacked up and whether it created a "barrier to entry" for those competitors.  In response, Ingram again touted Sarepta's "enormous" body of evidence regarding rh74 and assured investors that this evidence demonstrated that rh74 was safe across the DMD population.

> We've dosed over 600 patients. We've dosed children as young as two years old. We dosed young men in their mid-20s. We've dosed very light children, 26 pounds. We dosed literally men that are almost 300 pounds. We've dosed a significant number of non-ambulatory patients. So *we've got this enormous amount of wealth of data showing the safety and efficacy of this therapy*.

*    *    *

> [T]here is an *enormous amount of data* already supporting the *safe and efficacious use of Elevidys across a very broad patient population* of Duchenne muscular dystrophy.

242.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Sarepta had amassed an "enormous amount of data" demonstrating that rh74 was safe "across a very broad patient population" of ambulatory and non-ambulatory patients, regardless of weight, age, and comorbidity, while failing to disclose that, in truth: (1) at the time Defendants made these statements, Sarepta's data showed, with 95% certainty, that, as compared with ambulatory patients, non-ambulatory rh74 patients faced *at least (i.e., no less than) a 22% increase* in liver risk *on top* of the highly significant risk rh74 already presented in ambulatory patients and that the Company *still* could not rule out that rh74 actually *doubled* rh74's liver risk in non-ambulatory patients; (2) Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury many times the risk associated with competing gene therapies and DMD treatments; (3) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations

122

of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (4) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; and (5) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case."

243. On February 26, 2025, Sarepta held its fourth quarter and full-year 2024 earnings call. In response to an analyst question about the development of Sarepta's rh74 gene therapy platform, and its performance across indications, Ingram assured investors that Sarepta thoroughly understood rh74's risk/benefit profile, given the substantial body of data it had amassed, and that those data showed rh74 could safely deliver substantial efficacy. Ingram stated, "*We understand . . . the safety profile*, and we understand the power, of our [gene therapy] constructs and our promoter [i.e., rh74] to get really good expression and *get it safely*."

244. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Sarepta "under[stood] the safety profile" of its "promoter [i.e., rh74] to . . . . get it safely," while failing to disclose that, in truth: (1) at the time Defendants made these statements, at least one non-ambulatory Elevidys patient had been hospitalized with serious and life-threatening liver failure, which included astronomically high bilirubin (>*10x* ULN) and liver enzyme values meeting Hy's Law criteria; (2) at the time Defendants made these

statements, Sarepta's data showed, with 95% certainty, that, as compared with ambulatory patients, non-ambulatory rh74 patients faced *at least (i.e., no less than) a 22% increase* in liver risk *on top* of the highly significant risk rh74 already presented in ambulatory patients and that the Company *still* could not rule out that rh74 actually *doubled* rh74's liver risk in non-ambulatory patients; (3) Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury many times the risk associated with competing gene therapies and DMD treatments; (4) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data; (5) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; and (6) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case."

245. On March 18, 2025, Sarepta issued a press release belatedly disclosing that an Elevidys patient had died from acute liver failure. In that same press release, Defendants reassured investors that Elevidys' safety profile was just as good as any other gene therapy and, in particular, that its liver toxicity was no worse than the "known" side effect of all gene therapies. Sarepta's press release stated, "acute liver injury is a known possible side effect of ELEVIDYS *and other AAV-mediated gene therapies*." Further, Defendants assured investors that this adverse event did

not represent a "new safety signal [relative to the character and magnitude of the risk that had already been disclosed] and the benefit-risk of ELEVIDYS remains positive." In addition, Defendants assured investors that this life-threatening case of liver injury meeting Hy's Law criteria "represents a severity of acute liver injury not previously reported for Elevidys."

246. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that rh74's risk of serious hepatotoxicity was no worse than the risk associated with any gene therapy; that "the benefit-risk of ELEVIDYS remains positive"; and the life-threatening case of liver injury was inconsistent with prior rh74 experience, while failing to disclose that, in truth: (1) at the time Defendants made these statements Sarepta's safety data showed that rh74 was associated with an unusually significant risk of hepatobiliary injury *many times* the risk associated with the competing gene therapies to which the press release misleading compared rh74; (2) contrary to Defendants' statement that life-threatening liver injury was inconsistent with Sarepta's prior rh74 experience, Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist had, *years earlier*, warned Sarepta executives that Elevidys had caused just such an injury (notwithstanding limited patient exposure) – specifically, that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which the FDA characterizes as an "*an ominous indicator*" of serious liver toxicity; Sarepta executives understood this adverse event was a "big deal," and were "very concerned about the implications of the case"; (3) Sarepta's data showed, with 95% certainty, that, as compared with ambulatory patients, non-ambulatory rh74 patients faced *at least (i.e., no less than) a 22% increase* in liver risk *on top* of the highly significant risk rh74 already presented in ambulatory patients and that the Company *still* could not rule out that rh74 actually *doubled* rh74's liver risk in non-ambulatory patients; (4) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical

program was rife with egregious violations of core GLP requirements, including widespread use

of "testing into compliance," to generate sham safety data; and (5) Sarepta's own senior scientists

and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants

that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-

ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage

that risk.

### 9.    Defendants' False and Misleading Statements During the Second Quarter of 2025

247.    On May 6, 2025, Sarepta held its first quarter 2025 earnings call, attended by

Ingram, Rodino-Klapac, and Estepan.  On that call, Ingram, echoing the March 18, 2025 press

release, assured investors that this earlier case of acute liver failure from Elevidys was an outlier

and inconsistent with all of Sarepta's other rh74 safety data.  Ingram stated that the case of acute

liver failure was "so *markedly different* than all other experience with Elevidys."  Ingram further

stated, "this *one incident is unique*, not only in its outcome, but even in the sort of the course of

it."

248.    On that same call, an analyst asked Defendants about the risk that Elevidys "is

pulled from the market."  In response, Ingram further sought to reassure investors that rh74 posed

no greater risk of hepatotoxicity than any other gene therapy, and that Sarepta's data showed that

other rh74 patients experienced no more than transient elevations in liver enzymes that responded

to treatment no more aggressive than a "modest" increase in steroids.  Ingram responded:

> *[I]n the context of AAV-mediated gene therapy*.  It's in the context of the
> understanding that *there is always a risk of elevated liver enzymes* in the vast
> majority of cases, [a]nd with *this one case being the only exception*, they respond
> very rapidly to a modest increase in steroids and come back down to baseline.

249.    Also on that May 6, 2025 call, Rodino-Klapac likewise sought to reassure investors

that this case of acute liver failure did not indicate any increased risk of hepatotoxicity in non-

126

ambulatory patients and that no signal of any such increased risk was evident in any of Sarepta's data.  Rodino-Klapac stated, "The totality of our data in over 800 patients support safety of ELEVIDYS weight-based dosing across the label population of patients with Duchenne, *regardless of ambulatory status*."

250.    Ingram likewise sought to reassure investors that Sarepta's data showed no increased liver risk in the non-ambulatory population.  On the May 6, 2025 earnings call, an analyst asked whether there had been a "shift . . . . in the ambulatory status of those patients being treated," given that the Elevidys-induced liver failure had been observed in a non-ambulatory patient. Ingram responded, "there is *no difference* between ambulatory and non-ambulatory and for instance, risk of elevated liver enzymes or *liver injury*."

251.    Likewise, an analyst asked if there was any safety data that Sarepta could share with "possibly the older non-ambulatory patients to get more confidence there for them?"  Again, Ingram responded:

> We dosed well over 800 patients. So generally speaking, we know the safety profile of this therapy . . . Is there something about being ambulatory versus non-ambulatory that plays a role? And the answer to that is *no*. We looked at *all the signals*, there is *no reason to believe that at all*.

252.    Further on Sarepta's May 6, 2025 earnings call both Ingram and Rodino-Klapac continued to tout rh74's safety profile as superior to competing gene therapies.  Ingram stated, "Elevidys has *one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed*."

253.    Rodino-Klapac likewise touted rh74's "differentiated" safety profile as a competitive boon to both Elevidys and Sarepta's LGMD therapies.  Rodino-Klapac stated, "We use the same vector, rh74, in both Elevidys and our LGMD programs, which has *a differentiated safety profile* and high transduction efficiency."

254.    Defendants' statements were materially misleading when made.  It was misleading for Defendants to state that rh74 had "one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed"; to tout its "differentiated" safety profile; to state that Sarepta "looked at all the signals" in its data and that "there is *no difference* between ambulatory and non-ambulatory and for instance, risk of elevated liver enzymes or *liver injury*"; and to state that the case of acute liver failure disclosed in March 2025 was a "unique" outlier and "markedly different" from Sarepta's remaining rh74 safety data, while failing to disclose that, in truth: (1) at the time Defendants made these statements, Sarepta's data showed, with 95% certainty, that non-ambulatory patients faced *at least* a *34% increase in liver risk* versus ambulatory patients and that the Company could not rule out as much as a *78% increase in liver risk* in the non-ambulatory population; (2) Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury *many times* the risk associated with competing gene therapies and DMD treatments; (3) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives *years earlier* that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which Sarepta executives understood was a "big deal," and were "very concerned about the implications of the case"; (4) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; and (5) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data.

255.     On May 16, 2025, shortly after the Company's earnings call, Sarepta issued a press release touting that Sarepta's Elevidys data continued to show the treatment was safe.  The press release stated "*no new safety signals were observed* in the EMBARK study over the two-year duration."

256.     Defendants' statements were materially misleading when made.  It was misleading for Defendants to tout rh74's safety profile and, in particular, the results of the EMBARK study as showing "*no new safety signals*" on Elevidys, while failing to disclose that: (1) at the time this statement was made, *two additional* non-ambulatory patients treated with rh74 (an Elevidys patient in the companion ENDEAVOR study and an LGMD patient) had been hospitalized with serious and life-threatening liver failure meeting Hy's Law criteria; (2) Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury *many times* the risk associated with competing gene therapies and DMD treatments; (3) Sarepta's data showed, with 95% certainty, that non-ambulatory patients faced *at least* a *34% increase in liver risk* versus ambulatory patients and that the Company could not rule out as much as a *78% increase in liver risk* in the non-ambulatory population; (4) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; (5) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives *years earlier* that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which Sarepta executives understood was a "big deal," and were "very concerned about the implications of the case"; and (6) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core

GLP requirements, including widespread use of "testing into compliance," to generate sham safety data.

257.    On June 16, 2025, Sarepta held an investor call to discuss the second death of an Elevidys patient from acute liver failure.  As discussed above, although that patient had died more than a month earlier, Sarepta first disclosed this adverse event the previous evening, on June 15, 2025.

258.    On that call, an analyst observed that Sarepta's claim that it had only *just* started seeing a liver toxicity signal was puzzling, particularly given Defendants' repeated assurances throughout the Class Period that they had an "enormous" body of rh74 safety data and "underst[oo]d the safety and efficacy of Elevidys very well."  This analyst asked, "any thoughts on why the signal only started emerging after you've treated 100-plus nonambulatory patients? Any changes in manufacturing or any other factors that you could think of? Because ***it feels quite unusual to not have seen this in 100-plus patients***, [and then, suddenly], within [just] three months, [to see] two patients" not only experience, but die from, serious drug-induced liver injury.

259.    In response, Ingram assured investors that rh74's safety profile was no worse than any other gene therapy platform's, stating, "[i]t's ***no greater signal***, I should note, ***than other full-body gene therapy infusions*** that are commercially available today."

260.    Ingram further responded by assuring investors that these cases of serious DILI were inconsistent with all of Sarepta's remaining rh74 safety data, and that Sarepta was aware of "no signals" that rh74's construction or manufacturing played a role in the treatment's hepatotoxicity:

> [O]n manufacturing. my tech ops team have looked carefully at all of this. ***We've seen no signals that there's anything in manufacturing that would explain this***. Very likely this is the result of the fact that this signal is a ***very rare one***.

261.    Another analyst *specifically asked Defendants* whether they were aware of any other rh74 patients who had been hospitalized for serious liver injury.  That analyst asked, "why should investors feel confident ALF will only be limited to the no ambulatory population? And are you aware of any other patients being hospitalized for serious cases of liver injury right now?"

262.    In response, Ingram *failed* to disclose that, indeed, yet another non-ambulatory rh74 patient had not only been hospitalized for serious DILI, but had died.  To the contrary, Ingram continued to assure investors that these events were totally inconsistent with all of Sarepta's other safety data:

> What we can say is that the signal for ALF is obviously exceptionally rare and has only emerged in the non-ambulatory patient population right now. To remind you, we have dosed well over 900 patients. We've been dosing for seven years. At the time of our first approval and our broader approval, *we had no signal of this serious ALF concept*. We had elevated liver enzymes in a minority of patients. They responded very rapidly to modest increases in steroids.

263.    Similarly, another analyst asked Defendants about rh74's safety in the LGMD program and, specifically, whether aggressive prophylaxis with sirolimus would be required for those treatments as well.  In response, Rodino-Klapac falsely stated, "*We have not seen a signal of ALF in this population*."

264.    Defendants' statements were materially misleading when made.  It was misleading for Defendants to state that rh74's risk of liver toxicity was "no greater" than competing gene therapies; that there were "no signals that there's anything in manufacturing that would explain" the cases of serious DILI observed on Elevidys; that the two reported cases of serious DILI were inconsistent with all of Sarepta's rh74 data; and to deny that there were "any other patients being hospitalized for serious cases of liver injury right now," while failing to disclose that, in truth, (1) at the time this statement was made, a *third* non-ambulatory rh74 patient had not only been hospitalized, but had died from acute liver failure meeting Hy's Law criteria; (2)

Sarepta's safety data showed that rh74 was associated with a significant risk of hepatobiliary injury *many times* the risk associated with competing gene therapies and DMD treatments; (3) Sarepta's data showed, with 95% certainty, that non-ambulatory patients faced *__at least__* a *34% increase in liver risk* versus ambulatory patients and that the Company could not rule out as much as a *78% increase in liver risk* in the non-ambulatory population; (4) Sarepta's own senior scientists and expert consultants, including an expert panel convened in the fall of 2021, warned Defendants that rh74's enormous viral load created an unusually high risk of liver toxicity, particularly in non-ambulatory patients and that standard steroid prophylaxis would likely be inadequate to manage that risk; (5) Sarepta's senior Pharmacovigilance scientists and an outside expert hepatologist warned Sarepta executives *years earlier* that an rh74 patient had experienced a case of serious liver injury meeting Hy's Law criteria, which Sarepta executives understood was a "big deal," and were "very concerned about the implications of the case"; and (6) Sarepta failed to perform FDA-mandated preclinical validation of rh74's safety and its preclinical program was rife with egregious violations of core GLP requirements, including widespread use of "testing into compliance," to generate sham safety data.

265.    For the same reasons, it was materially misleading for Defendants to state that Sarepta had "*not seen a signal of ALF*" in the LGMD population, when, in truth, an LGMD patient taking rh74 had already died from drug-induced liver failure, after being hospitalized for weeks.

### 10.    Defendants' False and Misleading Statements During the Third Quarter of 2025

266.    On July 16, 2025, Sarepta held an investor to discuss, among other things, the discontinuation of much of its LGMD program. On that call, an analyst *specifically* asked whether that decision was motivated in part by safety concerns and whether the Company had seen any safety signals associated with rh74 in the LGMD population. The analyst asked, "was there any

thoughts [sic] on your part about ***AAV safety risk*** in the context of a less severe disease ***motivating this decision***? And is there ***anything you've seen there so far***?"

267.    In response, Ingram denied that Sarepta had seen any concerning safety signals associated with rh74 in the LGMD population, stating instead that the only issue with the program was cost-related.  Ingram stated, "On the first limb-girdle, the process we went through with respect to the strategic plan was to do essentially a risk-adjusted net present value, ***considering all the costs and the ultimate opportunity*** . . . . So it was on -- it was really on the viability issue and ***the cost issue for them***."

268.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to deny that Sarepta had observed any safety signals associated with rh74 in the LGMD population and that the Company's only concerns with the program were related to "the cost and the ultimate opportunity," when, in truth, and as Defendants would be forced to admit to outraged analysts just two days later, an LGMD patient taking rh74 had already died from drug-induced liver failure, after being hospitalized for weeks.

### B.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS TOUTING THE PROGRESS OF SAREPTA'S LGMD PROGRAM

#### 1.    Defendants' False and Misleading Statements During the Third Quarter of 2023

269.    On August 2, 2023, Sarepta held an earnings call with investors to discuss the Company's second quarter 2023 results.   On that call, Rodino-Klapac touted the progress of Sarepta's LGMD program, stating "We remain committed to advancing our LGMD portfolio across a variety of subtypes . . . .  We also continue to make progress in manufacturing for all LGMD candidates in our pipeline."  Rodino-Klapac further told investors, "we have fully enrolled Journey, our LGMD natural history study."

270.    On that same earnings call, Rodino-Klapac touted Sarepta's successful development of the "dual" rh74 vector, allowing the Company to treat Type 2B LGMD, a subtype that accounts for as much as 25% of the overall LGMD population.  Rodino-Klapac stated that Sarepta's, "innovative dual vector strategy ***allows us*** to deliver the full length dysferlin gene, the sole cause of LGMD 2B."

271.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Sarepta was "committed to advancing" its LGMD program; that it was making "progress in manufacturing for all LGMD candidates in our pipeline"; that Sarepta's LGMD "natural history study" had been "fully enrolled"; and that Sarepta had developed a "dual vector" that "allows us to deliver" a full length dysferlin gene, while failing to disclose that, in truth: (1) there was no meaningful progress towards commercialization across the LGMD program's key assets, including for the 2A, 2B, and 2C therapies representing the vast majority of the program's economic opportunity; (2) serious manufacturing challenges prevented the Company from even producing infusions for these key assets, including fundamental issues with the construction of the "dual vector" for Sarepta's 2B therapy; (3) Sarepta's clinical development of its LGMD program was stalled as, among other things, protocols and budgets were never approved; (4) far from "completing enrollment" of Sarepta's "natural history study," Former Employees reported that enrollment had been drawn down below the levels needed to advance the program, sites had been dropped, and funding had been stalled; (5) more generally, Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (6) by the summer of 2023, a number of senior LGMD personnel left Sarepta due to the lack of progress in the program, and those positions were never backfilled.

### 2.    Defendants' False and Misleading Statements During the Fourth Quarter of 2023

272.    On November 1, 2023, Sarepta held an earnings call with investors to discuss the Company's third quarter 2023 results.    On that call, Rodino-Klapac again touted the LGMD program's progress towards commercialization, stating, "First, limb-girdle muscular dystrophy or LGMD.    We remain committed to advancing our LGMD portfolio across a variety of subtypes . . . . *[W]e completed dosing in our systemic pilot study*, NAVIGENE for SRP-6004 dual vector rh74-mediated gene therapy to treat individuals with LGMD2B."

273.    On November 9, 2023, Estepan attended the UBS BioPharma investor conference on behalf of Sarepta.    At that conference, an analyst asked, "What are the next updates we're going to get on the limb-girdle program? Just walk us through those."    Estepan responded, "*So limb-girdle, obviously making good progress*." Indeed, Estepan stated that the Company was already in a position to discuss *post*-marketing commitments for the LGMD program, stating, "we're going to engage with the agency to discuss what would be necessary from a post-marketing commitment that would enable an accelerated approval for the limb-girdle. So *very pleased with the way that's progressing*."

274.    Defendants' statements were materially false and misleading when made.    It was misleading for Defendants to state that Sarepta was "committed to advancing" its LGMD program; that it had "completed dosing in our systemic pilot study" for the dual-vector mediated 2B therapy; and that the LGMD program was "obviously making good progress," and, indeed, so much progress that Sarepta was positioned to discuss post-marketing commitments for LGMD therapies with the FDA, while failing to disclose that: (1) in truth, there was no meaningful progress towards commercialization across the LGMD program's key assets, including for the 2A, 2B, and 2C therapies representing the vast majority of the program's economic opportunity; (2) serious

manufacturing challenges prevented the Company from even producing infusions for these key assets; (3) in particular, and contrary to Defendants' statement that Sarepta had "completed dosing" in its 2B pilot study, the Company recognized it would have to redo its preclinical work for this entire program in light of the serious manufacturing problems associated with the rh74 dual vector and, indeed, as FE 6 explained, had not dosed a single patient with viable material; (4) Sarepta's clinical development of the LGMD program was stalled as, among other things, protocols and budgets were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (5) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled.

### 3. Defendants' False and Misleading Statements During the Third Quarter of 2024

275. On August 7, 2024, Sarepta held an earnings call with investors to discuss the Company second quarter 2024 results. On that call, Rodino-Klapac assured investors that the LGMD program was on track and that Sarepta was committed to rapidly progressing the portfolio towards commercialization. Rodino-Klapac stated, "*we are very pleased with the progress of our LGMD portfolio* . . . . We are *maximizing the synergies* across this platform from both an R&D and manufacturing perspective, and our sights are firmly set on *accelerating the remainder of the LGMD assets to the clinic*."

276. On that earnings call, Rodino-Klapac further highlighted Sarepta's progress in advancing the Type 2C program, stating, "[W]e are also *rapidly progressing* our program for SRP-9005 for the treatment of limb-girdle muscular dystrophy type 2C."

277. On that same earnings call, an analyst asked Defendants to describe the steps Sarepta was taking "to accelerate the development of the LGMD gene therapies." Rodino-Klapac

assured investors that Sarepta was "using the ELEVIDYS experience to help accelerate the LGMD platform," and was "pulling on every lever possible with FDA to *make sure that we're moving in the fastest speed possible*."

278.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Sarepta was "accelerating the remainder of the LGMD assets to the clinic"; was "rapidly progressing" its Type 2C program; and was moving the LGMD program forward at "the fastest possible speed," while failing to disclose that, in truth: (1) there was no meaningful progress towards commercialization across the LGMD program's key assets, including for the 2A, 2B, and 2C therapies representing the vast majority of the program's economic opportunity; (2) serious manufacturing challenges prevented the Company from even producing infusions for these key assets; (3) totally contrary to Defendants statement that Sarepta was "rapidly progressing" its Type 2C program – a statement that Former Employees with oversight responsibilities for the LGMD program independently characterized as "completely false" and "bullshit" – Sarepta had not even approved *plans* for a clinical trial in the 2C program, made no meaningful effort to recruit patients, and, indeed, had not even managed to manufacture a viable infusion with which to dose said patients; (4) by the beginning of 2024, patient outreach across almost the entire LGMD portfolio ground to a halt; (5) by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites (at which patients were to be observed), and freezing grant funding for LGMD; and (6) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled.

### 4. Defendants' False and Misleading Statements During the Fourth Quarter of 2024

279.    On November 6, 2024, Sarepta held an earnings call with investors to discuss the Company second quarter 2024 results.   On that call, Ingram assured investors that Sarepta's LGMD program was "*mov[ing] rapidly into late-stage clinical*," and that the Company was poised to commence trials, including the "commencement of our trials for SRP-9005 to treat LGMD type 2C in early 2025."

280.    Rodino-Klapac likewise told investors that Sarepta was "very pleased with *the progress of our LGMD portfolio* and expect to have three of our LGMDs in the clinic in less than six months. We are *maximizing the synergies* across this platform from both an R&D and *manufacturing perspective*, and our sites are firmly set on *accelerating the remainder of the LGMD assets to the clinic*."   Rodino-Klapac highlighted that "we are also rapidly progressing our program for SRP-9005 for the treatment of limb-girdle muscular dystrophy type 2C" and told investors that this program was "progressing to the clinic."

281.    In response to an analyst's question asking Defendants to provide "more details on your internal pipeline focus here in the near term," Ingram told investors that the LGMD program was "*really beginning to accelerate*" and assured investors that Sarepta was "*focused*" on moving that portfolio swiftly to commercialization:

> The second big effort of this organization right now is advancing our internal pipeline. *We're getting a lot of great traction there* .... But even in the near term, in the late stage, you can see we are in the next few months really will be in clinical trials on three of our limb-girdle program. *So that's really beginning to accelerate and we're very, very excited about that. That's what we're focused on as an organization right now*.

282.    Similarly, an analyst asked Ingram to discuss "the time of these [LGMD] launches and how we should be thinking about that market opportunity."   Ingram again assured investors that the LGMD program was making rapid, and accelerating, progress towards the market.  Ingram

stated, "[I]t's a particularly poignant question now because *we're really starting to make traction and move fast on our limb-girdle portfolio*."

283.    On November 26, 2024, Sarepta held a call with investors to discuss its acquisition of RNA-based therapies from Arrowhead Pharmaceuticals.  On that call, an analyst asked whether the deal meant Sarepta was now "prioritiz[ing] the Arrowhead partner programs over your limb-girdle programs in the pipeline."  Ingram flatly denied this, assuring investors that Sarepta remained "*very, very committed to driving our limb-girdle programs* . . . . I don't want anyone to get the false impression that this [Arrowhead] is a deprioritization of programs like our limb-girdle gene therapy programs, *which it isn't*."

284.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Sarepta's LGMD program was "moving rapidly into late-stage clinical"; that Sarepta was "really starting to make traction and move fast on our limb-girdle portfolio"; that Sarepta's progress on the LGMD program was "really beginning to accelerate" as it leveraged "manufacturing" synergies to advance the program; and that Sarepta remained "very, very committed to driving our limb-girdle programs," which were "what [Sarepta was] focused on as an organization," while failing to disclose that, in truth: (1) there was no meaningful progress towards commercialization across the LGMD program's key assets, including for the 2A, 2B, and 2C therapies representing the vast majority of the program's economic opportunity; (2) serious manufacturing challenges prevented the Company from even producing infusions for these key assets; (3) totally contrary to Defendants statement that Sarepta was "rapidly progressing" its Type 2C program – a statement that Former Employees with oversight responsibilities for the LGMD program independently characterized as "completely false" and "bullshit" – Sarepta had not even approved *plans* for a clinical trial in the 2C program, made no meaningful effort to recruit patients,

and, indeed, had not even managed to manufacture a viable infusion with which to dose said patients; (4) by the beginning of 2024, patient outreach across almost the entire LGMD portfolio ground to a halt; (5) by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites (at which patients were to be observed), and freezing grant funding for LGMD; and (6) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled, including the senior personnel responsible for recruiting patients for the clinical trials Defendants claimed Sarepta were rapidly getting underway.

### 5. Defendants' False and Misleading Statements During the First Quarter of 2025

285.    On January 13, 2025, Ingram and Rodino-Klapac attended the JPMorgan Healthcare investor conference on behalf of Sarepta.   At that investor conference, Ingram touted the significant progress and, therefore low commercial risk, of Sarepta's LGMD assets, including its Type 2C therapy.  Ingram told investors that these therapies were "significantly derisked, and *they are relatively late stage*."

286.    On February 26, 2025, Sarepta held an earnings call with investors to discuss the Company's fourth quarter and full-year 2024 results.   On that call, Ingram touted the "rapid" progress of the LGMD program.  Ingram told investors, "we are now *moving rapidly* with our LGMD platform," and highlighted that Sarepta had supposedly "initiated our registration study for SRP-9005 to treat LGMD type 2C."

287.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Sarepta was "moving rapidly" with its LGMD platform; that its LGMD assets were "relatively late stage"; and that Sarepta had "initiated" its registration study for the Type 2C program, while failing to disclose that: (1) there was no meaningful progress

towards commercialization across the LGMD program's key assets, including for the 2A, 2B, and 2C therapies representing the vast majority of the program's economic opportunity; (2) serious manufacturing challenges prevented the Company from even producing infusions for these key assets; (3) while Defendants stated that Sarepta had "initiated" its registration study for the Type 2C program, the Company had done no more than file preliminary paperwork with a registration database and, in truth, had made no meaningful clinical progress in that program (or in any of the other key LGMD assets); (4) by the beginning of 2024, patient outreach across almost the entire LGMD portfolio ground to a halt; (5) by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites (at which patients were to be observed), and freezing grant funding for LGMD; and (6) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled, including the senior personnel responsible for recruiting patients for the clinical trials Defendants claimed Sarepta were rapidly getting underway.

### C.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING THE STATUS OF THE ESSENCE TRIAL

#### 1.   Defendants' False and Misleading Statements Repeated in SEC Filings Throughout the Class Period

288.   In Sarepta's periodic SEC filings throughout the Class Period – specifically, its 2023 and 2024 Forms 10-K and its 2Q2023 through 2Q2025 Forms 10Q – Sarepta made materially false and misleading statements concerning the impact of the COVID-19 pandemic on the ESSENCE trial.[51]  In each of these SEC filings, Defendants represented to investors that there was

---

[51] Defendants Ingram and Estepan signed each of these false and misleading SEC filings, with the exception of the 2Q2025 (for which they nevertheless remain liable as "controlling persons" under Section 20(a) of the Exchange Act).  Defendant Sarepta is liable as a primary violator for each of these false statements under Section 10(b) of the Exchange Act.

only a future and contingent risk – rather than a present and materialized risk – that the COVID-19 pandemic "*could*" disrupt the enrollment, execution, and the collection of patient data of its clinical trials, including ESSENCE.

289.    In each of its SEC filings identified above, Sarepta stated, "the COVID-19 pandemic may impact patient ability and willingness to travel to clinical trial sites as a result of quarantines and other restrictions, which *may negatively impact enrollment in our clinical trials*."

290.    Moreover, in each of its SEC filings identified above, except its 2024 Form 10-K and its first and second quarter 2025 Forms 10Q, Sarepta stated:

> *Missing data **could** undermine data integrity and probability of success*. The response to COVID-19 by healthcare providers and regulatory agencies **could** . . . make the ongoing collection of data for patients enrolled in studies more difficult or intermittent. In addition, as COVID-19 continues to spread, some participants and clinical investigators **may be** unable or unwilling to *comply with clinical trial protocols*. For example, quarantines or other travel limitations (whether voluntary or required) were implemented in many countries during the pandemic, and *may* impede participant movement, affect sponsor access to study sites, or interrupt healthcare services, which *may* negatively impact the execution of clinical trials.

291.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state merely that the COVID-19 pandemic "*could* . . . impact enrollment in our clinical trials"; "*could* . . . make the ongoing collection of data difficult" in its trials"; that patients "*may be*" unable to comply with clinical trial protocols; and that "[m]issing data *could* undermine" the "probability of success" in Sarepta's trials, when, in truth and as Defendants' own admission make clear, they knew that the COVID-19 pandemic *did* severely impact enrollment in Sarepta's critical ESSENCE trial and *had* made the collection of patient data in that trial extremely "difficult"; that patients *were* unable to "to comply with clinical trial protocols on a massive scale; and that the incredible volume of missing data in ESSENCE *did* severely undermine the trial's "probability of success."

2.    **Defendants' False and Misleading Statements on Investor Conference Calls Throughout the Class Period**

292.    On earnings calls throughout the Class Period, Defendants repeatedly updated investors on the progress of Sarepta's critical ESSENCE trial, assuring investors that the trial was "*fully enrolled*" and "*on track*."

293.    On Sarepta's August 2, 2023, November 1, 2023, and February 28, 2024 earnings calls, Rodino-Klapac made the following (or substantially similar) statement: "Regarding our post-marketing studies for the PMOs as mentioned last quarter, *we completed enrollment in the ESSENCE trial*, a post-marketing requirement for golodirsen [i.e., Vyondys] and casimersen [i.e., Amondys]."

294.    On Sarepta's May 1, 2024, August 7, 2024, November 6, 2024, February 26, 2025, and May 6, 2025 earnings calls, Rodino-Klapac stated, "the ESSENCE trial, our post-marketing requirement for golodirsen and casimersen . . . . [is] *fully enrolled and remain[s] on track*."

295.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that the ESSENCE trial was "*fully enrolled and remain[s] on track*," while failing to disclose that, in truth, ESSENCE was severely underpowered and highly unlikely to meet to its primary endpoint. Indeed, far from being "fully enrolled" and "on track," the study encountered massive "operational difficulties" and the volume of missing data was profound, "with *nearly all* patients missing doses and *approaching half* of whom missed substantial consecutive doses," as Defendants finally admitted after the Class Period.

## VII.    LOSS CAUSATION

296.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Throughout the Class Period, Sarepta's stock price was artificially inflated as a result of Defendants' materially false and misleading

statements and omissions that created the false impression regarding (1) the safety of Sarepta's rh74-based gene therapies; (2) the progress of Sarepta's LGMD portfolio towards commercialization; and (3) the status of the ESSENCE trial, including that it was "fully enrolled" and "on track."

297.    Multiple separate disclosures on these topics revealed to the market the truth concealed by Defendants' false and misleading statements. *First*, on March 18, 2025, Defendants disclosed that a 16-year-old non-ambulatory DMD patient had died from acute liver failure after treatment with Elevidys. This announcement partially revealed the truth concealed by Defendants' misstatements, that rh74 was associated with unusually dangerous liver toxicity – both relative to other gene therapies and other DMD treatments – notwithstanding Defendants' statements touting the platform's superior safety during the Class Period. Coupled with Elevidys' dubious efficacy benefit, this new adverse information about the drug's safety risks caused investors to understand that Elevidys' overall risk/benefit profile was not as favorable as Defendants had claimed in their public statements. Consequently, investors revised their views concerning Elevidys' adoption, coverage, and revenue potential downwards. Accordingly, Sarepta's stock price declined in response to this announcement, and some of the artificial inflation caused by Defendants' materially false and misleading statements and omissions was removed, thereby causing damage to Plaintiffs and other members of the Class. Specifically, Sarepta's stock fell by 27%, from $101.35 per share at the close of trading on March 17, 2025 to $73.54 at the close of trading on March 18, 2025.

298.    However, Sarepta's March 18, 2025 disclosure did not reveal the full truth to investors. In fact, Defendants continued to mislead investors about the safety profile of Sarepta's rh74 vector, thus preventing the market from understanding the full extent to which rh74 posed an

extraordinarily high risk of liver toxicity.  In particular, Defendants attempted to allay investor concern by misleadingly suggesting the patient death was anomalous by stating that it was "markedly different than all other experience with ELEVIDYS" and that the adverse event did not represent a "new safety signal and the benefit-risk of ELEVIDYS remains positive."

299.  **Second**, on April 2, 2025, Sarepta's international marketing partner, Roche, disclosed that the European Medicines Agency requested a halt on Elevidys trial recruitment and dosing in light of the patient death announced in March.  On April 4, 2025, Sarepta confirmed the news via press release, stating that "[f]ollowing the safety update on acute liver failure that was issued on March 18," a European Union public health regulator "requested" that Sarepta halt administration of Elevidys in Europe in connection with its ongoing confirmatory trials (including ENDEAVOR).  News that regulators viewed this adverse event as evincing a quality and degree of liver toxicity risk potentially more serious than any "known" risks associated with gene therapies helped investors begin to appreciate the truth that rh74 presented a uniquely dangerous risk of hepatotoxicity.  In response to this news, Sarepta shares dropped an additional 13%, from $62.47 per share on April 2, 2025 to $54.43 per share on April 4, 2025.

300.  As before, however, Sarepta's disclosure failed to reveal the full truth to investors. In the same April 4, 2025 press release disclosing the clinical hold, Defendants misleadingly assured investors that Elevidys' "overall benefit-risk profile remains favorable to continue dosing in the paused clinical trials without changes to the study protocols."  Defendants also stated that "this is more of an administrative step - the EMA just requested the DMC meet and weigh in on risk benefit & are meeting imminently."

301.  **Third**, on May 6, 2025, Sarepta held a call with analysts and investors to discuss its first quarter FY 2025 financial results during which it announced that the death of the DMD

patient that Sarepta had disclosed on March 18 had negatively "impacted our [revenue] results late into the quarter" as doctors and patients canceled scheduled treatments, forcing the Company to reduce its guidance by $300 million. The strong negative reaction of health care providers to the Elevidys-induced liver failure disclosed on March 18, 2025 allowed the market to appreciate that doctors and other medical experts viewed the safety risks associated with rh74-based gene therapies as more unique and serious than Defendants had previously claimed. Further, Sarepta's disclosures allowed investors to appreciate that the magnitude of rh74's safety risks substantially undermined the overall risk/benefit profile of Sarepta's gene therapies, with material consequences for physician adoption and, therefore, for the Company's product revenue.

302.    In response to this news, Sarepta's stock dropped an additional 21.46% from a closing price of $46.75 on May 6 to $36.72 at the close of trading on May 7, 2025.

303.    These disclosures, however, failed to reveal the full truth to investors. In order to assuage investor concern, Defendants continued to issue false and misleading statements assuring investors that Sarepta's data showed rh74 had "one of the most impressive safety profiles," that the earlier-reported death was anomalous and inconsistent with all other rh74 data, and that non-ambulatory patients faced no safety risks with respect to rh74.

304.    **Fourth**, on June 15, 2025, investors learned that a second non-ambulatory DMD patient had died from liver failure after treatment with Elevidys. In particular, that day, Sarepta disclosed that both deaths were "likely" caused by Sarepta's rh74 viral vector. That same day, Sarepta also disclosed that it was suspending shipments of Elevidys for treatment of all non-ambulatory DMD patients and was discussing with the FDA further warnings and restrictions to add to Elevidys' label. This disclosure partially revealed the truth concealed by Defendants' misstatements, as the market continued to understand more about the magnitude of rh74's

hepatotoxicity, particularly in the key non-ambulatory population that comprised at least half of all DMD patients. Further, these disclosures allowed investors to understand that the LGMD program was simply not viable, and that its further development would be uneconomical, as rh74's safety risks would create significant hurdles for approval and severely limited adoption, even if approved.

305.    In response to this news, Sarepta's stock price plummeted by 42%, from a closing price of $36.18 on June 13, 2025 to a closing price of $20.94 on June 16, 2025.

306.    But Sarepta's June 15 announcement still did not reveal the entire truth to investors. Indeed, Defendants continued to mislead investors regarding the safety profile of rh74. During the June 16, 2025 investor call, Ingram misleadingly stated that rh74's liver safety risk was "no greater signal, I should note, than other full-body gene therapy infusions that are commercially available today. So this may very well just be a reflection of the rarity of this." Additionally, Defendants falsely stated, "We have not seen a signal of ALF in this [LGMD] population," further preventing the full truth about the magnitude of rh74's safety risks from emerging.

307.    **Fifth**, on July 18, 2025, investors learned the full truth about rh74's profound hepatotoxicity. That day, Sarepta was forced to confirm media reports that a **third** non-ambulatory patient treated with an rh74-based gene therapy had died from liver failure. Investors now understood that, given the emergence of this event in *yet* another patient population and the dose-response relationship observed, rh74 was fundamentally dangerously hepatotoxic, as a function of its core design and manufacturing. In response to this news, Sarepta's stock price fell an additional 36%, from a closing price of $21.97 on July 17, 2025 to $14.08 on July 18, 2025.

308.    **Sixth**, at the close of market on November 3, 2025, Sarepta announced that the ESSENCE study had failed by a wide margin. Further, Sarepta revealed that the trial's failure was

driven by an utter and glaring lack of statistical power, which, in turn was driven by "operational" problems in collecting adequate patient data during the COVID-19 pandemic. In response to this news, shares of Sarepta stock dropped an additional 34% from $24.45 at market close on November 3, 2025 to just $16.20 on November 4, 2025.

309.    It was foreseeable that Defendants' materially false and misleading statements and omissions alleged herein would artificially inflate the price of Sarepta's stock. It also was foreseeable to Defendants that the revelation of the truth concerning the safety profile of Sarepta's rh74 vector, the progress of the Company's LGMD pipeline, and the status of the ESSENCE study would cause the price of the Company's stock to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII.    CLASS ACTION ALLEGATIONS

310.    Plaintiffs bring this action as a class action on behalf of a class consisting of all persons who purchased or acquired Sarepta securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

311.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sarepta securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be

identified from records maintained by Sarepta or its transfer agent and may be notified of the pendency of this action by mail and internet, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

312.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

313.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

314.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

   a.  whether Defendants' statements during the Class Period were materially false and misleading;

   b.  whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

   c.  the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

315.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## IX.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

316.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  The specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Sarepta who knew that those statements were false when made.

## X.  PRESUMPTION OF RELIANCE

317.    At all relevant times, the market for Sarepta securities was an efficient market for the following reasons, among others:

     a.  Sarepta's securities met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient and automated market;

     b.  As a regulated issuer, Sarepta filed periodic public reports with the SEC and the Nasdaq;

     c.  Sarepta regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Sarepta was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

318. As a result of the foregoing, the market for Sarepta securities promptly digested current information regarding Sarepta from all publicly available sources and reflected such information in the price of Sarepta securities. Under these circumstances, all purchasers of Sarepta securities during the Class Period suffered similar injury through their purchase of Sarepta securities at artificially inflated prices and the presumption of reliance applies.

319. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material misstatements. Because this action involves Defendants' failure to disclose material adverse information regarding Sarepta's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XI.    CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

320. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

321. This Count is asserted on behalf of all members of the Class against Defendant Sarepta and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

322. During the Class Period, Defendants disseminated or approved the false statements specified below, among others, which Defendants knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

323. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Sarepta securities during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, the safety of Sarepta's gene therapy products and its rh74 platform, the progress of Sarepta's LGMD program towards commercializing its portfolio products, and the status and progress of the ESSENCE trial.

324. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Sarepta securities, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the safety and commercial viability of Sarepta's gene therapy products and its rh74 platform, the progress of Sarepta's LGMD program towards commercializing its portfolio products, and the status and progress of the ESSENCE trial and commercial viability of Sarepta's exon-skipping products; (b) artificially inflate and maintain the market price of Sarepta securities; and (c) cause Plaintiffs and other members of the Class to purchase Sarepta securities at artificially inflated prices and suffer losses when the true facts became known. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

325. As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

326. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sarepta' securities. Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Sarepta's securities had been artificially inflated by Defendants' false and misleading statements.

327.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange
### (Against the Individual Defendants)

328.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

329.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

330.    During their tenures as senior executive officers of Sarepta, the Individual Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as senior executives of Sarepta, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Sarepta during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

331.    In their capacities as senior executive officers of Sarepta, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in, among other things, reviewing and managing the development and testing of Sarepta's gene therapies and exon-skipping products; supervising Sarepta's activities regarding the safety of Sarepta's gene therapies, the progress of Sarepta's LGMD portfolio, and the status of

the ESSENCE trial, including reviewing information on these subjects; and reviewing and approving Sarepta's public statements on these subjects. As a result of the foregoing, the Individual Defendants were controlling persons of Sarepta within the meaning of Section 20(a) of the Exchange Act.

332. As set forth above, Sarepta violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Sarepta and as a result of his own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Sarepta securities.

333. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Sarepta securities.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a. Declaring that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

155

    d.  Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## XIII.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

DATED: January 22, 2026

Respectfully submitted,

*/s/ Abe Alexander*
Karin E. Fisch (*pro hac vice* forthcoming)
Abe Alexander (*pro hac vice*)
Mica A. Cocco (*pro hac vice*)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
kfisch@gelaw.com
aalexander@gelaw.com
mcocco@gelaw.com

Brian J. Schall (*pro hac vice*)
Andrew J. Brown (*pro hac vice*)
William M. Brody (*pro hac vice*)
Adam L. Rosen (*pro hac vice*)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Fax: (310) 388-0192
brian@schallfirm.com
andrew@schallfirm.com
wbrody@schallfirm.com
adam@schallfirm.com

*Counsel for Lead Plaintiffs the Investor Group and Lead Counsel for the Proposed Class*

156

W. Mark Conover
Lucas F. Olts
**ROBBINS GELLER RUDMAN &
DOWD LLP**
Tel.: (619) 231-1058
655 West Broadway Unit 1900
San Diego, CA 92101
mconover@rgrdlaw.com
lolts@rgrdlaw.com

*Counsel for Additional Plaintiff City of
Pontiac Reestablished General
Employees' Retirement System*

Theodore M. Hess-Mahan
**HUTCHINGS BARSAMIAN
MANDELCORN, LLP**
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Tel.: (781) 431-2231
thess-mahan@hutchingsbarsamian.com

*Local Counsel for Lead Plaintiffs the
Investor Group*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 22, 2026.

*/s/ Abe Alexander*
Abe Alexander