**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE SAREPTA THERAPEUTICS<br><br>SECURITIES LITIGATION | Civil Action No.: 1:25-cv-13530-BEM |

**<u>DEFENDANTS SAREPTA THERAPEUTICS, INC., DOUGLAS S. INGRAM, IAN M.
ESTEPAN, AND LOUISE RODINO-KLAPAC'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................1

II.   BACKGROUND ..................................................................................2

    A.    Legal Background ........................................................................2

    B.    Factual Background......................................................................4

        1.    Sarepta Pioneers A New Gene Therapy, ELEVIDYS, To Treat DMD......................................................................4

        2.    Sarepta Works To Develop A Gene Therapy To Treat LGMD ................................................................10

        3.    Sarepta Conducts The Essence Trial During The COVID-19 Pandemic................................................................11

III.  LEGAL STANDARD ........................................................................12

IV.   ARGUMENT........................................................................................13

    A.    The AC Should Be Dismissed As An Impermissible Puzzle Pleading ........................................................................14

    B.    The Allegations About ELEVIDYS And The rh74 Vector Fail........................................................................15

        1.    Plaintiffs Fail To Plead A False Or Misleading Statement................................................................15

        2.    Plaintiffs Fail To Plead Loss Causation..................................20

    C.    The Allegations About The LGMD Program Must Be Dismissed ........................................................................21

        1.    Plaintiffs Fail To Plead Loss Causation..................................21

        2.    Plaintiffs Fail To Plead A False Or Misleading Statement................................................................22

    D.    The Allegations About The ESSENCE Trial Must Be Dismissed ........................................................................25

        1.    Plaintiffs Fail To Plead A False Or Misleading Statement................................................................25

        2.    Plaintiffs Fail To Plead Loss Causation..................................26

    E.    Plaintiffs Fail To Plead A Strong Inference of Scienter ...................27

1.    This Case Lacks Crucial Indicia Of Fraudulent Intent ..................................................................................27

2.    No Set Of Allegations Raises A Strong Inference Of Scienter .........................................................................28

F.    This Case Should Be Dismissed With Prejudice ..............................30

V.    CONCLUSION...........................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ACA Financial Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)............................................................................30

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................2

*Brennan v. Zafgen*,
199 F. Supp. 3d 444 (D. Mass. 2016)......................................................3, 17, 23

*Celano v. Fulcrom Therapeutics, Inc.*,
No. 23-cv-11125, Dkt. 36-1 (D. Mass. Nov. 28, 2023)....................................16

*Celano v. Fulcrum Therapeutics, Inc.*,
2025 WL 928783 (D. Mass. Mar. 27, 2025) .........................................18, 23, 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011)...........................................................................28

*Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*,
228 F.3d 24 (1st Cir. 2000)............................................................................25

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014)..............................................................24, 29

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017)...........................................................................3, 4

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .........................................................................14

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013).............................................................21

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................2, 4

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015)..................................................24, 28, 29, 30

*Fogel v. Wal-Mart de Mexico SAB de CV*,
  2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ......................................16

*Ganem v. InVivo Therapeutics Holdings Corp.*,
  845 F.3d 447 (1st Cir. 2017).....................................................2, 17, 20

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) .......................................................23

*Guerra v. Teradyne Inc.*,
  2004 WL 1467065 (D. Mass. Jan. 16, 2004).....................................27

*Harrington v. Tetraphase Pharms. Inc.*,
  2017 WL 1946305 (D. Mass. May 9, 2017).......................................16

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings,
  Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..............................................23

*Humana Inc. v. Biogen, Inc.*,
  126 F.4th 94 (1st Cir. 2025)........................................................13, 20

*In re Adolor Corp. Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009)................................................26

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ..............................................25

*In re Bos. Sci. Corp. Sec. Litig.*,
  646 F. Supp. 3d 249 (D. Mass. 2022)........................................3, 4, 23

*In re Bos. Sci. Corp. Sec. Litig.*,
  686 F.3d 21 (1st Cir. 2012)............................................................2, 3

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).............................................................13

*In re Cytyc Corp. Sec. Litig.*,
  2005 WL 3801468 (D. Mass. Mar. 2, 2005) .....................................18

*In re Eventbrite, Inc. Sec. Litig.*,
  2020 WL 2042078 (N.D. Cal. Apr. 28, 2020)....................................23

*In re Fed Ex Corp. Sec. Litig.*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021) ...................................................................23

*In re iRobot Corp. Sec. Litig.*,
    527 F. Supp. 3d 124 (D. Mass. 2021)...................................................................23

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
    552 F. Supp. 3d 77 (D. Mass. July 21, 2021) .................................................13, 16

*In re Lernout & Hauspie Sec. Litig.*,
    230 F. Supp. 2d 152 (D. Mass. 2002)...................................................................14

*In Re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) .........................................................3, 16, 20, 23

*In re Sonus Networks, Inc. Sec. Litig.*,
    2006 WL 1308165 (D. Mass. May 10, 2006).......................................................14

*In re Stone & Webster, Inc. Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003)...................................................................23

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009)...................................................................14

*In re Wayfair, Inc. Sec. Litig.*,
    471 F. Supp. 3d 332 (D. Mass. 2020)...................................................................23

*Kader v. Sarepta Therapeutics, Inc.*,
    887 F.3d 48 (1st Cir. 2018).................................................................................28

*Leavitt v. Alnylam Pharms., Inc.*,
    451 F. Supp. 3d 176 (D. Mass. 2020)..............................................................3, 16

*Leung v. bluebird bio, Inc.*,
    599 F. Supp. 3d 49 (D. Mass 2022).........................................................18, 21, 27

*Lewakowski v. Aquestive Therapeutics, Inc.*,
    2023 WL 2496504 (D.N.J. Mar. 14, 2023) .........................................................26

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    305 F. Supp. 3d 181 (D. Mass. 2018).............................................................17, 26

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)...........................................................................17, 24

*Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*,
66 F. Supp. 3d 711 (E.D. Va. 2014) ................................................................. 26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ............................................................................................ 3

*Paice v. Aldeyra Therapeutics, Inc.*,
No. 23-cv-11737, Dkt. 32-1 (D. Mass. Mar. 4, 2024) ....................................... 16

*Pizzuto v. Homology Medicines, Inc.*,
2024 WL 1436025 (D. Mass. Mar. 31, 2024) ............................................ *passim*

*Ponsa-Rabell v. Santander Sec. LLC*,
35 F.4th 26 (1st Cir. 2022) .......................................................................... 13, 17

*Premca Extra Income Fund LP v. iRobot Corp.*,
763 F. Supp. 3d 121 (D. Mass 2025) ................................................................ 30

*Primo v. Pac. Biosci. of Cal., Inc.*,
940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...................................................... 14, 15

*Quinones v. Frequency Therapeutics, Inc.*,
665 F. Supp. 3d 156 (D. Mass. 2023) ............................................................... 27

*Rice v. Intercept Pharms., Inc.*,
2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) .................................................... 29

*Shash v. Biogen*,
84 F.4th 1 (1st Cir. 2023) .............................................................................. 4, 22

*Sousa v. Sonus Networks, Inc.*,
261 F. Supp. 3d 112 (D. Mass. 2017) ............................................................... 27

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
775 F. Supp. 2d 227 (D. Mass. 2011) ............................................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................... 3, 13

*Thant v. Karyopharm Therapeutics Inc.*,
43 F.4th 214 (1st Cir. 2022) .......................................................................... 3, 18

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
2024 WL 863709 (D. Ariz. Feb. 29, 2024) ...................................................... 15

*Urman v. Novelos Therapeutics,*
   867 F. Supp. 2d 190 (D. Mass. 2012) ................................................................. 4, 22

*Wasson v. LogMeIn, Inc.,*
   496 F. Supp. 3d 612 (D. Mass. 2020) ...................................................................... 18

*Wilson v. MicroFinancial, Inc.,*
   2006 WL 1650971 (D. Mass. June 13, 2006) .......................................................... 14

*Wochos v. Tesla, Inc.,*
   985 F.3d 1180 (9th Cir. 2021) ................................................................................. 26

*Yan v. ReWalk Robotics Ltd.,*
   973 F.3d 22 (1st Cir. 2020) ...................................................................................... 18

*Zhou v. Desktop Metal, Inc.,*
   120 F.4th 278 (1st Cir. 2024) ................................................................................... 13

## STATUTES

15 U.S.C.
   § 78u-4(b)(1)(B) ........................................................................................................ 13
   § 78u-4(b)(2)(A) .................................................................................................. 13, 27
   § 78u-5(i)(1)(B) ......................................................................................................... 23
   § 78u-5(i)(1)(D) ......................................................................................................... 23
   § 78u-5(i)(l) ................................................................................................................. 3
   § 78u-5(c) ......................................................................................................... 3, 24, 26

## RULES

Fed. R. Civ. P. 9(b) ......................................................................................................... 13

## REGULATIONS

17 CFR § 240.10b-5(b) ...................................................................................................... 3

21 CFR § 314.510 .............................................................................................................. 6

## I.    INTRODUCTION

This is exactly the sort of securities fraud case that the Private Securities Litigation Reform Act ("PSLRA") was enacted to stop in its tracks. Plaintiffs work backwards from declines in the stock price for Sarepta Therapeutics, Inc. ("Sarepta") following the tragic deaths of three patients, to implausibly accuse Sarepta and its officers of callously concealing fatal safety risks in a (motiveless) effort to mislead investors. This opportunistic lawsuit lacks merit.

Sarepta specializes in developing treatments for rare, debilitating, and in some cases fatal genetic diseases. Among them is a revolutionary gene therapy called ELEVIDYS. In clinical studies, ELEVIDYS showed promise in treating a devastating childhood disease called Duchenne muscular dystrophy ("DMD")—but also certain risks. As both Sarepta and the Food and Drug Administration ("FDA") warned, acute serious liver injury is a common side effect of gene therapies, and had occurred in patients treated with ELEVIDYS. While no one died from liver-related complications from ELEVIDYS during clinical trials, Sarepta emphasized that adverse events, including death, could occur in the future. That risk ultimately came to pass, when two of the now 1200+ patients treated with ELEVIDYS died of acute liver failure, followed shortly by a third patient suffering from a different disease and dosed with a different gene therapy.

Based on this sequence of events, Plaintiffs attempt to plead—albeit in an impermissible "puzzle pleading" style—three theories of fraud. *First*, Plaintiffs allege that Defendants misled investors by touting ELEVIDYS's safety profile. But those statements were scientific opinions, expressed by Defendants (and FDA) based on then-existing clinical data, and are immune from liability because, among other reasons, they were sincerely held and reasonable at the time. Like the materially similar allegations in *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025 (D. Mass. Mar. 31, 2024), Plaintiffs' ELEVIDYS-based claims are meritless. *Second*, Plaintiffs claim that, contrary to Defendants' statements, Sarepta's drug-development programs for various

subtypes of limb-girdle muscular dystrophy ("LGMD") made no progress for years. But Plaintiffs plead no facts to support that theory. And in any event, Sarepta's stock price *went up* after announcing a halt to much of the LGMD program, so Plaintiffs cannot plead cognizable loss. *Third*, Plaintiffs accuse Defendants of concealing pandemic-related disruptions to a clinical trial (ESSENCE). But Sarepta unequivocally disclosed those disruptions and their potential impact.

Permeating all three theories, Plaintiffs fail to allege that each Defendant acted with scienter—i.e., an intent to defraud. Plaintiffs do not allege *any* plausible motive for Defendants to lie to or mislead investors, and Defendants' repeated risk disclosures foreclose any suggestion that they intended to hide safety risks. The innocent inference—which this Court must consider under the stringent standard for pleading scienter—is far more compelling. Sarepta worked tirelessly to develop revolutionary new treatments that could give hope to thousands of patients fighting DMD and LGMD, before experiencing setbacks. This case should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Legal Background

Section 10(b) and Rule 10b-5 are meant "to protect investors against manipulation of stock prices" by company insiders, *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988), "not to provide investors with broad insurance against market losses," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). To separate investors who were wrongly misled from those merely trying to recoup investment losses, securities fraud plaintiffs must prove: "(1) a material misrepresentation or omission [*i.e.*, falsity]; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 454 (1st Cir. 2017). Plaintiffs' allegations fail on three of those elements.

**Falsity.** Companies "do not have to disclose immediately all information that might conceivably affect stock prices." *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27 (1st Cir. 2012).

Instead, Section 10(b) and Rule 10b-5 prohibit only "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5(b). To be untrue, a statement must include an "objective assessment[]" that was "demonstrably false" when it was made. *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 278, 275 (D. Mass. 2022). To be misleading, a statement must omit facts in a way that makes what was said "so incomplete as to mislead." *In re Bos. Sci.*, 686 F.3d at 27. A plaintiff may not "plead[] fraud by hindsight" by "making general allegations" based on the mere fact that something "later turned out badly." *Brennan v. Zafgen*, 199 F. Supp. 3d 444, 451 (D. Mass. 2016).

As a matter of law, "upbeat statements of optimism and puffing about a company's prospects" "cannot constitute material misstatements." *Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 223 (1st Cir. 2022). Opinions are likewise "subjective and uncertain assessments" that cannot support a claim, save in rare circumstances, like where "the speaker did not hold the belief she professed." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Salient here, statements about "the proper interpretation of [clinical] data" are opinions. *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023); *accord Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020). In addition, the PSLRA shields forward-looking statements (and present assumptions underlying such statements), 15 U.S.C. § 78u-5(i)(l), so long as the defendant *either* (1) included "meaningful cautionary statements" *or* (2) lacked "actual knowledge" of falsity, *id.* § 78u-5(c).

**Scienter.** Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Each Defendant must have acted either intentionally or "with a high degree of recklessness" in making each challenged statement. *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 37 (1st Cir. 2017). To plead

3

intentional conduct, Plaintiffs must allege facts showing that each defendant "consciously intended to defraud" investors, not merely knew certain facts. *Id.* And deliberate recklessness requires "an extreme departure from the standards of ordinary care" that creates "a danger of misleading [investors] that is either known" or "obvious." *Shash v. Biogen*, 84 F.4th 1, 13 (1st Cir. 2023).

**Loss Causation.** Loss causation is the "causal connection between the [alleged] material misrepresentation and the [economic] loss" suffered by Plaintiffs. *Dura Pharms.*, 544 U.S. at 342. Said another way, the "market must have reacted to the subsequent disclosure of the misconduct." *In re Bos. Sci.*, 646 F. Supp. 3d at 291. This standard typically requires a "corrective disclosure"— i.e., "a release of information that reveals to the market the pertinent truth that was previously concealed"—followed by a stock price decline "soon after." *Shash*, 84 F.4th at 20. A corrective disclosure must "reveal[] new information," *id.*, that "relate[s] back to the misrepresentation" alleged, *Urman v. Novelos Therapeutics*, Inc., 867 F. Supp. 2d 190, 198 (D. Mass. 2012).

### B.    Factual Background

Sarepta is a commercial-stage biopharmaceutical company dedicated to developing treatments for rare and devastating neuromuscular diseases, such as DMD and LGMD, caused by genetic mutations. ¶ 33.[1] This case concerns three aspects of Sarepta's drug development.

### 1.    Sarepta Pioneers A New Gene Therapy, ELEVIDYS, To Treat DMD

DMD is a rare genetic condition causing irreversible muscle degeneration over time, killing most patients by their 20s or 30s. Ex. 1 at 1.[2] So, for DMD patients, "time is muscle." Ex. 2 at 7.

Over twenty years ago, Defendant Louise Rodino-Klapac—then a research scientist at Nationwide Children's Hospital ("NCH")—began developing a new gene therapy to treat DMD. *Id.* at 6. After a decade-plus at NCH, Dr. Rodino-Klapac joined Sarepta. ¶ 30. For the next several

---

[1]  All "¶" references are to Plaintiffs' Consolidated Class Action Complaint ("AC"). *See* Dkt. 133.
[2]  All "Ex." references are to exhibits attached to the Tomkowiak declaration.

years, Sarepta continued her long-running efforts to fight DMD, culminating in the submission of a Biologics License Application for ELEVIDYS on September 28, 2022. Ex. 3 at 1. On May 12, 2023, FDA convened an "Advisory Committee" of medical experts to assess whether clinical data supported granting ELEVIDYS accelerated approval—a special pathway reserved for treatments aimed at serious or life-threatening diseases with an urgent, unmet medical need. Ex. 4.

The Advisory Committee vigorously debated whether the clinical data supported approval. During that public debate, the Committee acknowledged that "acute liver injury" was among the "most common adverse reactions" of ELEVIDYS. Ex. 4 at 129. It further noted that, as with many gene therapies, "adverse events" related to "hepatotoxicity"—i.e., liver toxicity—had "occurred in the clinical trials for [ELEVIDYS]." *Id.* But unlike other gene therapies that had fatalities during clinical trials, ¶ 36, there had been no deaths from ELEVIDYS. Ex. 4 at 129. Even so, the Committee emphasized some incidents were "life-threatening" or required hospitalization. *Id.* The Committee further understood that DMD patients have elevated liver enzymes due to "leakage from damaged muscles," making it "difficult" to assess liver injury using traditional markers— such as Hy's Law—that rely on enzyme levels. *Id.* at 53. The Committee thus accepted Sarepta's DMD-specific definition for "acute liver injury." *Id.* After a public debate, the Committee recommended accelerated approval of ELEVIDYS by an 8-6 vote. *Id.* at 202.

Faced with that closely divided recommendation, an FDA agency review team initially concluded that ELEVIDYS should *not* receive accelerated approval. Ex. 3 at 26-28. But FDA overrode that determination on June 22, 2023, announcing accelerated approval of ELEVIDYS for use in four- and five-year-old ambulatory DMD patients (i.e., kids still able to walk). *Id*. at 4. FDA justified that decision based on the "urgent unmet medical need" for these children, despite the potential risks associated with the drug. *Id*. Like all accelerated approvals—which are based on limited preliminary data—FDA's decision accepted greater "uncertainty" about ELEVIDYS's

efficacy and safety. 21 CFR § 314.510. So, in line with standard procedure, FDA required as a post marketing commitment that Sarepta complete a confirmatory trial. Ex. 3 at 4. Sarepta's "global," "randomized," and "double-blind" study, "EMBARK," would serve as that trial. Ex. 5 at 1. And since this initial approval, ELEVIDYS's label has always included explicit warnings about liver-related risks. *Id*. at 2-3; *e.g.*, Ex. 6 at 1, 6-7.

The day ELEVIDYS was approved, Sarepta issued a press release announcing the milestone. Ex. 5 at 1. The company reiterated the liver-related risks associated with ELEVIDYS, warning that some patients had experienced "[a]cute serious liver injury," *id*. at 1, and that clinicians should carefully "monitor liver function." *Id.* at 2. With those caveats, Defendant Douglas Ingram expressed a goal of extending ELEVIDYS's approval to older, non-ambulatory patients "before more damage is done" by DMD. Ex. 2 at 15. For the next several quarters, Sarepta remained optimistic about ELEVIDYS, while reiterating warnings about the treatment's liver-related risks. For instance, on August 2, 2023, Ingram remarked on an earnings call that, "[a]ssuming that EMBARK is successful," FDA would likely approve ELEVIDYS for ambulatory and non-ambulatory patients of all ages. Ex. 28 at 14. Based on the available evidence at the time, he saw no "logical basis to assume that ambulation status would be a reason to limit access." *Id.* That said, Sarepta's Form 10-Q warned that treatment with ELEVIDYS could cause "unforeseen adverse events"—"including death," as had happened in other "gene therapy trials," but not yet with ELEVIDYS. Ex. 7 at 40. Sarepta's Form 10-Q further warned that "serious adverse events" could cause, among other challenges, "increased government regulation," "unfavorable public perception," "stricter labeling requirements," and "a decrease in demand" for ELEVIDYS. *Id.*

Three months later, Sarepta announced the one-year topline results for EMBARK. Ex. 8. Rodino-Klapac explained that although the primary endpoint "did not reach statistical significance," she believed the "data strongly supports the conclusion" that ELEVIDYS has a

"robust" and "clinically meaningful" treatment benefit. *Id.* at 4-5. Ingram noted that "no new safety signals" had emerged during EMBARK, confirming in his view "the laudable profile upon which ELEVIDYS was approved" by the FDA. ¶ 218. Rodino-Klapac cautioned that patients had experienced adverse events, including in the liver, but opined that the data was "very encouraging" overall because it suggested the "same" safety profile as before. Ex. 8 at 14. A company press release expressed a similar view. Ex. 9 at 1-2. Defendants repeated similar warnings over the ensuing months. On November 9, 2023, Defendant Ian Estepan emphasized that it is "very important" for clinicians to "monitor [DMD] patients" dosed with ELEVIDYS "for a long time" to "make sure that the liver enzymes are well managed," given the risk of "death" involved. Ex. 10 at 11. In addition, he emphasized that Sarepta was analyzing the "nonambulant patient population" from "a safety perspective" in a separate study (ENVISION). *Id.* Sarepta also reiterated—over and over again—earlier warnings about risks of "acute serious liver injury," Ex. 11 at 1-2, and "unforeseen adverse events," Ex. 12 at 36; *see also* Ex. 13 at 36 (similar).

On June 20, 2024, FDA expanded the approval of ELEVIDYS. Ex. 14 at 1-2. FDA acknowledged the EMBARK data confirming that "acute liver injury" was one of ELEVIDYS's "most commonly reported side effects." *Id.* at 4. And it further acknowledged that the EMBARK study "failed to meet its statistical primary endpoint." *Id.* at 3. But FDA granted ELEVIDYS "traditional approval" in ambulatory DMD patients over four years of age based on what the agency believed were "compelling … observations regarding the secondary endpoints." *Id.* at 3. The FDA also granted ELEVIDYS "accelerated approval in non-ambulatory individuals" in the same expanded age group based on the EMBARK data. *Id.* at 3. Although the "safety data in non-ambulatory individuals" remained "limited," FDA saw enough "evidence of effectiveness to support accelerated approval"—and believed that ELEVIDYS's "mechanism of action" was "similar for ambulatory and non-ambulatory populations" alike. *Id.* at 3-4. With this decision, FDA

7

again publicly overrode an internal review team's recommendation against expanded approval. Ex. 15 at 95. And while that team's opinion was driven by skepticism about ELEVIDYS's clinical "effectiveness," they too believed the data showed "[n]o clear difference in occurrence of adverse events" between non-ambulatory patients and ambulatory patients. *Id.* at 4.

While discussing FDA's expanded approval, Ingram reiterated that the EMBARK data suggested a "similar safety profile between nonambulatory and ambulatory patients," with "early indications for nonambulatory patients" looking "very exciting." Ex. 16 at 20. A few months later, he told investors that the "data that we have that supports bringing [ELEVIDYS] to a broad group of [DMD] patients is great." ¶ 236. And Rodino-Klapac again noted that the data demonstrated a "consistent safety profile" across ambulatory and non-ambulatory patients. ¶ 237.

By January 27, 2025, Sarepta had "dosed over 600 patients" across ages and ambulatory status without any fatalities. ¶ 241. Then tragedy struck. On March 18, 2025, Sarepta announced "that a young man with [DMD] ha[d] passed away following treatment with [ELEVIDYS], having suffered acute liver failure"—or ALF. Ex. 17 at 1. Despite believing that the "benefit-risk" calculus "remain[ed] positive," Sarepta acknowledged that the patient's "death represents a severity of acute liver injury not previously reported." *Id.*

Six weeks later, on May 6, 2025, Ingram again repeated that "there is always a risk of elevated liver enzymes" with ELEVIDYS—and that the earlier death was "the only exception" to date where a patient could not be brought "back down to baseline." ¶ 248. In his view, ELEVIDYS still had "one of the most impressive safety profiles" that had "ever existed" for a "gene therapy," despite this "rare" fatality. ¶¶ 252, 260. Rodino-Klapac agreed, adding that, by this time, "data in over 800 patients support [ELEVIDYS's] safety" regardless of ambulatory status. ¶ 249.

Tragedy struck again that summer. ¶ 153. On June 15, 2025, Sarepta disclosed a second reported case of ALF resulting in death in a non-ambulatory ELEVIDYS patient. Ex. 18 at 1.

Sarepta announced proactive steps in response, including "temporarily suspending shipments of ELEVIDYS for non-ambulatory patients." *Id.* Sarepta kept ELEVIDYS on the market for ambulatory patients because acute liver failure "ha[d] only emerged in the non-ambulatory patient population." ¶ 262. Even that appeared "exceptionally rare." Ex. 19 at 1. After dosing "over 900 patients" across "7 years," Sarepta had seen only these two treatment-related fatalities. *Id.* Shortly thereafter, on June 26, 2025, this lawsuit was filed. *See* Dkt. 1 (31-page complaint).

A month later, on July 16, 2025, Sarepta announced that it agreed to FDA's request that Sarepta include a Black Box warning about liver-related risk on ELEVIDYS's label. ¶ 163; Ex. 20 at 1. Two days later, on July 18, Sarepta publicly confirmed another patient death, though not one involving ELEVIDYS. ¶ 164. This third fatality had occurred just weeks earlier in a 51-year-old patient enrolled in a Phase 1 clinical trial for a gene therapy for a different condition, LGMD Type 2D. Ex. 21 at 1. Although that gene therapy used the same delivery system as ELEVIDYS, a viral vector called AAVrh74, it was a different therapy administered using a different dose and was manufactured using a different process than ELEVIDYS. *Id.* Sarepta had reported this ALF event as a life-threatening case to FDA on June 20, 2025, and then notified FDA about the death on July 3. Ex. 21 at 1. The same day as Sarepta's July 18 announcement, FDA asked Sarepta to halt shipments of ELEVIDYS to all DMD patients (not just non-ambulatory ones), and Sarepta agreed "[w]ithin days," after initially resisting that drastic step. ¶ 165 & n.46.

On July 27, 2025, the Editorial Board of the Wall Street Journal ("WSJ") criticized FDA for demanding that Sarepta stop shipping ELEVIDYS for "all patients," even though ambulatory patients are "in better health" than non-ambulatory patients, "receive a lower weighted dose," "have more to gain from prompt treatment," and had not yet experienced any fatalities. Ex. 22 at 2. After outcry from the DMD community, FDA "thought better of yanking a gene therapy for boys with a rare and devastating muscular condition" and the next day recommended that Sarepta

9

resume shipments of ELEVIDYS for ambulatory patients. Ex. 23 at 1; Ex. 24 at 1.

On November 11, 2025, FDA announced that it had approved a label update including a Boxed Warning for ELEVIDYS, ensuring that the treatment would remain accessible for ambulatory DMD patients four years of age and older. Ex. 25 at 1. Then, on January 26, 2026, Sarepta announced EMBARK's three-year results, which "demonstrated statistically significant, clinically meaningful and durable efficacy across all key motor function measures." Ex. 26 at 1. To date, ELEVIDYS has been administered "to over 1,200 patients globally." *Id.*

### 2.    Sarepta Works To Develop A Gene Therapy To Treat LGMD

LGMD is an umbrella term for a collection of distinct muscular dystrophies that are degenerative and sometimes life-threatening—and, like DMD, have no available cure. Ex. 27 at 7. The subtypes of the disease (including Types 2A-E) are distinguished by the genetic mutation that causes them. ¶ 111. The LGMD patient population is fortunately relatively small—somewhere between "one in every 14,500 to one in every 123,000 individuals." Ex. 13 at 39. Sarepta sought to develop an "LGMD portfolio" of gene therapies with the goal of treating LGMD "across a variety of subtypes." Ex. 28 at 7. Sarepta intended to "first" focus on treatment for Type 2E— which was furthest along in development when Sarepta acquired most of its LGMD portfolio in 2019—and then "apply that thinking across all of [its other] LGMD portfolios." Ex. 29 at 8.

On an August 2, 2023 earnings call, Ingram told investors that Sarepta "remain[ed] committed to advancing our LGMD portfolio." Ex. 28 at 7. Specifically, he was "pleased to report" that Sarepta: (1) had "fully enrolled" a three-year "natural history" study called JOURNEY for Types 2C, 2D, and 2E; (2) had "made excellent progress" enrolling a "Phase I study" called VOYAGENE for a gene Type 2E treatment; and (3) had "commenced dosing" a third study, NAVIGENE, for a Type 2B treatment. *Id.* Ingram added that Sarepta "continue[d] to make progress" and "look[ed] forward to initiating clinical studies as rapidly as possible." *Id.*

10

The following year, Sarepta reported more positive news. For starters, the company expanded the JOURNEY study to include LGMD patients suffering from Type 2A. Ex. 30 at 1. Then, on August 7, 2024, Rodino-Klapac announced that FDA had granted Sarepta "Fast Track Designation" for its Type 2E treatment, a crucial step towards accelerated approval. Ex. 31 at 8. Other LGMD treatments, she continued, were "rapidly progressing." *Id.* at 9. Sarepta "expected" to have three LGMD treatments in clinical trials within nine months. *Id.* Indeed, the company was using its experience with ELEVIDYS "to help accelerate the LGMD platform" and "pulling on every lever possible with FDA." *Id.* at 21.

Between December 2024 and April 2025, Sarepta announced several clinical development milestones across its LGMD portfolio, including the completion of enrollment and dosing in a Phase 3 clinical trial for Sarepta's Type 2E treatment, completion of enrollment and dosing in a clinical study for its Type 2D treatment, and clearance from FDA to proceed with dosing in a clinical study for its Type 2C treatment. *See* Ex. 32 at 2-3; Ex. 33 at 1. But on July 16, 2025, following the suspension of shipments of ELEVIDYS to non-ambulatory patients, Sarepta announced a plan to achieve approximately $400 million in annual cost savings, including by reducing its workforce by 36%. Ex. 20 at 1. "[A]s a result of this reprioritization," Sarepta decided that it would continue with only its LGMD 2E treatment. *Id.* at 2. Ingram remarked that this was a "painful decision[]." Ex. 34 at 22. He explained that "considering all the costs" and the small "ultimate opportunity," Sarepta "couldn't justify continuing with the [full LGMD] program." *Id.* On this news, Sarepta's stock price *increased* by 22%. Ex. 35.

### 3. Sarepta Conducts The Essence Trial During The COVID-19 Pandemic

Before the putative Class Period, Sarepta commercialized three "exon-skipping" therapies (EXONDYS 51, AMONDYS 45, and VYONDYS 53). ¶ 54. These therapies are designed to treat, by different means, DMD patients with specific genetic mutations. *Id.* Unlike the one-time dosing

of ELEVIDYS, the exon-skipping therapies are weekly injections. As part of the FDA accelerated approval process for AMONDYS 45 and VYONDYS 53, Sarepta conducted a long-term confirmatory trial called ESSENCE, enrolling patients starting in 2016. ¶ 58.[3]

Years later, the long-running ESSENCE trial experienced disruption during the COVID-19 pandemic. Sarepta told investors as much. On May 6, 2020, Ingram emphasized that the pandemic had caused even "more disruption" to "confirmatory trials" for Sarepta's exon-skipping treatments as compared to other activities, in large part because those trials were being conducted overseas. Ex. 36. Sarepta's Form 10-Q for Q1 2020 likewise disclosed that "COVID-19 *has caused*, and may continue to cause, delays and disruptions in some of our clinical trials," including by "delay[ing] site initiation, slow[ing] down enrollment, and mak[ing] the ongoing collection of data for patients enrolled in studies more difficult or intermittent." Ex. 37 at 45 (emphasis added). It further warned that such problems could lead to an "inability to complete" trials successfully. *Id.* From then on, Sarepta's SEC filings repeated similar warnings. *E.g.*, Ex. 38 at 47; Ex. 12 at 59.

On November 3, 2025, Ingram announced ESSENCE's completion. Ex. 39 at 4. Although the study narrowly missed statistical significance on its primary endpoint, "the data demonstrated a consistent and clinically favorable trend." *Id.* at 5. Ingram attributed the lack of statistical significance in part to, as Sarepta had warned, an "unusually high" rate of missed doses due to COVID-19. *Id.* Rodino-Klapac further explained that a "post-hoc analysis" of trial "participants not impacted by COVID" noticeably "improved study results," indicating that the study "would have reached statistical significance" if not for the disclosed pandemic-related disruptions. *Id.* at 6.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 9(b) and the PSLRA impose uniquely "rigorous standards

---

[3]  Although not material to this Motion, Plaintiffs are flat wrong to claim that ESSENCE involved EXONDYS 51 (which is the subject of its own confirmatory trial called MIS5ION), as opposed to AMONDYS 45.  *See* ¶ 58 & n.6.

for pleading securities fraud." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002). These stringent standards are designed "to curb frivolous, lawyer-driven litigation," which is widespread in securities cases. *Ponsa-Rabell v. Santander Sec. LLC*, 35 F.4th 26, 33 (1st Cir. 2022).

Under Rule 9(b), Plaintiffs "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), by detailing "the 'who,' 'what,' 'where,' and 'when'" of the alleged fraud, *Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 104 (1st Cir. 2025). The PSLRA further requires "specify[ing] each statement alleged to have been misleading" and the "reasons why." 15 U.S.C. § 78u-4(b)(1)(B). Allegations thus must be analyzed "statement-by-statement." *Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 295 (1st Cir. 2024). Plaintiffs must also "state with particularity facts giving rise to a strong inference that [each] defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2)(A). Unlike in most cases, this Court must conduct "a comparative inquiry" that weighs the inference of scienter against "plausible opposing inferences." *Tellabs*, 551 U.S. at 323. Only where the inference of scienter is "at least as compelling" can the complaint survive dismissal. *Id.* at 34.

In applying these standards, this Court "must consider" not just "the complaint," but also "documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice." *Id.* at 322. As explained in Defendants' concurrently filed request for judicial notice, such documents include SEC filings, earnings call transcripts, press releases, and other public documents, as they show "what the market knew" at relevant times. *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 552 F. Supp. 3d 77, 91 n.1 (D. Mass. 2021).

## IV.    ARGUMENT

This case should be dismissed with prejudice. As a threshold matter, Plaintiffs' complaint is an impermissible puzzle pleading. More importantly, all three sets of allegations fail on both falsity and loss causation grounds—and there is no strong inference of scienter anywhere.

## A.      The AC Should Be Dismissed As An Impermissible Puzzle Pleading

Plaintiffs' 156-page, 333-paragraph AC should be dismissed out of the gate as a "classic example" of "'puzzle' pleading." *Wilson v. MicroFinancial, Inc.*, 2006 WL 1650971, at *3 (D. Mass. June 13, 2006) (100-page, 204-paragraph complaint). Plaintiffs' blunderbuss of allegations "significantly increases the burden to both the defendants and the court in evaluating" whether the AC satisfies "the PSLRA pleading requirements" and may be dismissed for that reason alone. *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 154 (D. Mass. 2009).

The AC asks "the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." *Primo v. Pac. Biosci. of Cal., Inc.*, 940 F. Supp. 2d 1105, 1111-12 (N.D. Cal. 2013). The AC challenges at least (by Defendants' count) 59 statements—without explaining why each was purportedly false or misleading when made, and instead offers only conclusory, boilerplate characterizations. *E.g.*, ¶¶ 217, 223, 228, 232, 235, 239, 242, (ELEVIDYS-related statements); ¶¶ 271, 274, 278, 284, 287 (LGMD-related statements); ¶¶ 291, 295 (ESSENCE-related statements).

The AC does not even try to allege "facts supporting a strong inference that *each* of the Defendants acted with scienter" when any one of them made a particular statement. *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *8 (D. Mass. May 10, 2006) (emphasis added). Instead, it vaguely alleges what, supposedly, "Defendants knew"—without distinguishing among Ingram, Rodino-Klapac, and Estepan, much less clarifying what specific facts were allegedly known to each of them at a given time. *E.g.*, ¶¶ 209, 322. Such "group pleading" is impermissible. *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 600 (7th Cir. 2019); *accord In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 170 (D. Mass. 2002). Plaintiffs' FE allegations are particularly egregious, attributing knowledge to "the Defendants" or "Sarepta management"— without specifying which Defendant (if any) is being discussed. *E.g.*, ¶¶ 69, 83, 85, 126.

14

Finally, on loss causation, the AC does not specify which of the ~59 challenged statements were corrected by which of the six purportedly corrective disclosures, obscuring "how the [supposed] 'truth' was revealed" in Plaintiffs' view. *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 2024 WL 863709, at *7 (D. Ariz. Feb. 29, 2024); *see* ¶¶ 296-309. Nor does the AC explain how these six events—all of which related to the three patient deaths in 2025—supposedly relate to their theory about the "progress of Sarepta's LGMD portfolio towards commercialization" months and years earlier, ¶ 296—which they obviously do not. Put simply, this Court need not "spend its time rooting around in bloated complaints" like the AC and should dismiss the AC outright. *Primo*, 940 F. Supp. 2d at 1112.

## B. The Allegations About ELEVIDYS And The rh74 Vector Fail

Even putting aside the dispositive puzzle pleading problem, dismissal with prejudice is still warranted. The falsity and loss causation failures with Plaintiffs' first set of allegations, concerning ELEVIDYS and the rh74 viral vector used to deliver this gene therapy treatment, are dispositive. Indeed, this case closely resembles *Homology*, where Judge Kelley dismissed—on falsity and loss causation grounds—a securities fraud suit alleging that Homology "misled investors about the safety and efficacy of [a similar] gene therapy treatment" that was likewise "associated with increased liver toxicity." 2024 WL 1436025, at *1, *4. There was no actionable misstatement in *Homology* because, among other things, the company's reasonable "interpretations of results of clinical studies" were non-actionable "opinions," and the company "warned about the issue of liver toxicity." *Id.* at *9, *12. She also held that there was no loss causation because, given those warnings, FDA's later decision to issue a "clinical hold" on the treatment was merely "the materialization of a [publicly] known risk." *Id.* at *19. The same is true in this case.

### 1. Plaintiffs Fail To Plead A False Or Misleading Statement

Plaintiffs' ELEVIDYS-related allegations challenge some three dozen statements. *See*

15

App. A at 1-13.[4] Those statements: (a) touted ELEVIDYS's safety profile before the first patient death, ¶¶ 212-14, 218-43 (Stmts. 1-2, 4-26); (b) reacted to the deaths of two ELEVIDYS patients and one LGMD patient in the spring and summer of 2025, ¶¶ 245-67 (Stmts. 27-40); and (c) addressed Sarepta's regulatory compliance on the heels of FDA's June 2023 approval, ¶ 215 (Stmt. 3). All of these are subjective interpretations of the "results of clinical studies"—and thus non-actionable "opinions." *Homology*, 2024 WL 1436025, at *9; *see supra* at 3. Plaintiffs' falsity allegations fail as a matter of law for additional reasons as well.

**ELEVIDYS's safety profile.** As "interpretations of results of clinical studies," the challenged statements touting the safety of ELEVIDYS and the rh74 vector are all "opinions" that are immune from liability because they were sincerely held and reasonable at the time. *Homology*, 2024 WL 1436025, at *9. Plaintiffs do not and cannot allege, for example, that Ingram lacked a belief that EMBARK's results confirm ELEVIDYS's "laudable safety profile." ¶ 220 (Stmt. 8). And FDA *agreed* with Defendants' interpretation of the data: despite known liver-related risks, after a heated public debate, FDA approved ELEVIDYS in June 2023, and then expanded this approval a year later, rendering Sarepta's interpretation of ELEVIDYS's safety profile "per se '[]reasonable'" twice over. *Philip Morris*, 89 F.4th at 421; *accord Leavitt*, 451 F. Supp. 3d at 185. Indeed, the whole premise of Sarepta's statement that "ELEVIDYS has met the full statutory standards for safety," ¶ 212 (Stmt. 1), was that FDA had approved the treatment on that basis, Ex. 1 at 1. Defendants did not have to disclose (widely known) differing views or contrary facts. *E.g.*, *Homology*, 2024 WL 1436025, at *8-10; *Karyopharm*, 552 F. Supp. 3d at 89; *Harrington v.*

---

[4]  To assist the Court in its review, a chart cataloguing the challenged statements (each referred to herein as "Stmt.") and the reasons why they are not false or misleading is attached Appendix A. Similar charts are routinely filed in this District. *E.g.*, *Paice v. Aldeyra Therapeutics, Inc.*, No. 23-cv-11737, Dkt. 32-1 (D. Mass. Mar. 4, 2024); *Celano v. Fulcrom Therapeutics, Inc.*, No. 23-cv-11125, Dkt. 36-1 (D. Mass. Nov. 28, 2023). And they are appropriate "organizational tools." *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017).

*Tetraphase Pharms. Inc.*, 2017 WL 1946305, at \*5 (D. Mass. May 9, 2017).

Even under the non-opinion standard for falsity, Plaintiffs fail to plead particularized facts showing that statements touting ELEVIDYS's laudable safety profile were false or misleading "when made." *Ganem*, 845 F.3d at 456. Unlike other gene therapies (including one for DMD) that had caused fatalities during clinical trials, ¶ 36, no fatal events had been reportedly caused by ELEVIDYS. Based on this then-existing information, it was true to say, for example, that ELEVIDYS had "a laudable safety profile not shared by other [DMD] programs," ¶ 220 (Stmt. 8)—and fair to tout the treatment's favorable "benefit risk" calculus, ¶ 218 (Stmt. 6), particularly given the grim prospects for DMD patients. So too with seeing "no logical basis" for denying non-ambulatory patients access to this potentially life-extending treatment. ¶ 214 (Stmt. 2). Moreover, none of Plaintiffs' allegations contradicts the fact that, before the first death in early 2025, Sarepta had "not *to date* seen any differences in the [adverse event] rates" across patient populations. ¶ 226 (Stmt. 13) (emphasis added); *see Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 207 (D. Mass. 2018) (claims failed because plaintiffs had "not provided any data that contradicts defendants' statements"). Plaintiffs cannot leverage subsequent "patient death[s]" as proof in "hindsight" that these statements were somehow false all along. *Brennan*, 853 F.3d at 617; *see N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 48 (1st Cir. 2008).

Moreover, a reasonable investor considers "the entirety of the relevant facts available at the time of the allegedly misleading statement." *Ponsa-Rabell*, 35 F.4th at 33. Throughout the Class Period, both Sarepta and FDA repeatedly warned about hepatotoxicity risks, including serious adverse events during ELEVIDYS clinical trials. *Supra* at 5-8. Sarepta also disclosed (and FDA acknowledged) the need for bespoke measurements for assessing acute liver injury given the company's reasonable view that traditional measures—like Hy's Law—are unreliable for DMD patients. *See* Ex. 4 at 53; *contra* ¶¶ 15, 79, 89-92 (invoking Hy's Law). And it was likewise publicly

17

known that only a "modest amount of safety data on non-ambulatory individuals" with DMD was available. Ex. 14 at 4. Thus, statements about ELEVIDYS made before the first patient death were not misleading because Defendants—and FDA—"disclosed to investors the relevant risk[s] as understood at the time." *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 68 (D. Mass 2022).

Finally, many of the ELEVIDYS-related statements are mere "upbeat statements of optimism and puffing." *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 32 (1st Cir. 2020). Plaintiffs attack assertions that ELEVIDYS's safety was, among other things, "laudable," "favorable," "consistent," "stable," "manageable," "very good," "great," "a standout," and based on an "enormous" amount of data. *E.g.*, ¶¶ 216, 218-25, 227-43 (Stmts. 4-12, 14-26). Such "vague optimism" about the "safety" of a medical treatment—"even when touting 'successful' or 'compelling' clinical support"—"cannot constitute a material misstatement." *Thant*, 43 F.4th at 223; *see Celano v. Fulcrum Therapeutics, Inc.*, 2025 WL 928783, at *13 (D. Mass. Mar. 27, 2025). For example, the First Circuit has rejected challenges to statements by a pharmaceutical company asserting that a treatment's "safety profile was 'predictable' and 'manageable,'" reasoning that "no reasonable investor" would take those buzzy adjectives as assurance that "the drug was benign." *Thant*, 43 F.4th at 223. Other courts in this District have dismissed challenges to materially similar puffery. *E.g.*, *In re Cytyc Corp. Sec. Litig.*, 2005 WL 3801468, at *22 (D. Mass. Mar. 2, 2005) ("consistent"); *Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612, 633 (D. Mass. 2020) ("very good").

**Sarepta's Responses To Patient Deaths.** Nor have Plaintiffs pleaded that Defendants' responses to the deaths of two ELEVIDYS patients and one LGMD patient *after* they occurred were false or misleading. Plaintiffs assail March 2025 remarks after the first death stating a belief that the tragic outcome was "markedly different" from prior experience and "unique." ¶ 247 (Stmt. 28); *see also* ¶ 248 (Stmt. 29) ("exception"). But those optimistic opinions were reasonable. As of January 2025, more than 600 patients had been dosed with ELEVIDYS, and none had died of

liver-related complications attributable to ELEVIDYS. Ex. 40 at 5. It was likewise undisputedly true that "acute liver injury is a known possible side effect of ELEVIDYS and other AAV-mediated gene therapies." ¶ 245 (Stmt. 27); *see* ¶ 248 (Stmt. 29) (similar); ¶ 259 (Stmt. 36). Plaintiffs' own complaint acknowledges that "any gene therapy" using a viral vector "delivery system" may "cause significant toxicity" and "organ damage"—"[p]articularly in the liver." ¶ 35.

Plaintiffs also criticize statements asserting that the "totality of [Sarepta's] data" available still supported treating DMD patients with ELEVIDYS, "regardless of ambulatory status." ¶ 249 (Stmt. 30); *see* ¶¶ 250-55 (Stmts. 31-32, 35). But those too are reasonable opinions about clinical data (which, as of May 2025, consisted of "over 800 patients," ambulatory and non-ambulatory, ¶ 249). So are statements that ELEVIDYS had an "impressive" and "differentiated" safety profile, ¶¶ 252-53 (Stmts. 33-34)—which plainly constitute non-actionable puffery. *See supra* at 18.

After the second DMD patient died, Sarepta disclosed that it was "suspending shipments of ELEVIDYS for non-ambulatory patients" while additional precautions could be assessed. Ex. 18 at 1. Plaintiffs nonetheless fault Ingram for stating that this fatal safety signal remained "very rare," ¶ 260, and "no greater" than with other similar gene therapies, ¶ 259. That is yet another non-actionable interpretation of data (and Plaintiffs plead no facts showing that ALF was *not* "very rare" or *was* "greater" than with other gene therapies). Plaintiffs also fail to plead facts contradicting Ingram's statements that Sarepta knew of no "changes in manufacturing" that could "explain this," Ex. 19 at 13; *see* ¶ 260 (Stmt. 37), and that "[a]t the time of our first approval" (in June 2023), Sarepta "had no signal of this serious ALF concept," ¶ 262 (Stmt. 38).

Finally, Plaintiffs' allegation that Defendants covered up a third fatality in an LGMD patient dosed with a different drug also fails. While Plaintiffs attack Rodino-Klapac for stating on June 16, 2025, in response to an analyst question, that Sarepta had "not seen a signal of ALF in [the LGMD] population" up to that point, ¶ 263, 267 (Stmts. 39-40), Plaintiffs do not allege a

single fact supporting their conclusory assertion that an LGMD patient already "had died from [ALF]" when Rodino-Klapac spoke. ¶ 264. They allege no date of death, violating their duty to plead with particularity the "when" of the alleged fraud. *Humana*, 126 F.4th at 104. And as Sarepta told investors, the company "reported this ALF event as a life-threatening case to FDA on June 20" and then "followed up with notification" about the "death on July 3." Ex. 21 at 1. Plaintiffs thus have not pleaded that Rodino-Klapac's statement was false when made. *See Ganem*, 845 F.3d at 456.[5]

**Statement About Regulatory Compliance.** Finally, Plaintiffs attack an August 2, 2023 risk disclosure stating that Sarepta had "implemented a compliance program" based on "industry best practices" and "designed to ensure that our activities comply with all applicable laws, regulations and industry standards." ¶ 215 (Stmt. 3). But Plaintiffs nowhere allege that Sarepta had *not* implemented such a program. Rather, they claim this statement was misleading by alleging a then-existing risk of "regulatory non-compliance," ¶ 217, based on FE 1's conclusory allegations of "compliance failures" in "preclinical laboratory testing." ¶¶ 69-74. But FE1's baseless accusation about "voodoo data" from years earlier cannot contradict a statement about the design of Sarepta's compliance program as of August 2, 2023. ¶ 73. And like statements interpreting clinical data, Sarepta's statement that its compliance program was based on "best practices" is an opinion. *Philip Morris*, 89 F.4th at 419. Plus, FDA approved ELEVIDYS despite, according to Plaintiffs, *concededly* knowing about some "discrepancies" in preclinical data, ¶ 75, rendering Sarepta's opinion per se reasonable. *See Philip Morris*, 89 F.4th at 419.

### 2.    Plaintiffs Fail To Plead Loss Causation

Plaintiffs' challenges to the ELEVIDYS-related statements also fail because—as in

---

[5] Nor was Ingram's July 16, 2025 statement attributing the company's decision to pause much of its LGMD program to the "costs" outweighing the business "opportunity." ¶¶ 267-68. Plaintiffs plead no particularized facts suggesting that this was something other than a cost-benefit decision.

*Homology*—Plaintiffs cannot show loss causation, given the lack of a viable corrective disclosure. 2024 WL 1436025, at *19. Plaintiffs' five proffered disclosures on this topic suffer from the same dispositive defect: they show only the materialization of a risk that Defendants had disclosed, not the revelation of any "*new*" corrective information. *Id.* Plaintiffs rely on stock drops occurring after: (1) the March 18, 2025 disclosure of the first DMD patient death; (2) an April 2, 2025 announcement that European authorities "requested a halt on [ELEVIDYS] trial recruitment and dosing in light of th[at] patient death"; (3) a May 6, 2025 earnings call reporting that the first patient death had "negatively" affected Sarepta's revenues; (4) the June 15, 2025 disclosure of the second DMD patient death; and (5) the July 18, 2025 disclosure of the LGMD patient death. ¶¶ 297-307. These disclosures relate entirely to the deaths of three patients dosed with gene therapies delivered by the rh74 vector. But Sarepta warned about this "exact risk." *Homology*, 2024 WL 1436025, at *19. The danger of serious liver-related side effects was "repeatedly and regularly disclosed in [Sarepta']s statements, press releases, and filings," as well as by FDA. *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 275 (D. Mass. 2013); *see supra* at 5-8. Because "Defendants did not conceal the risk" that those side effects could prove fatal and ultimately harm Sarepta's business, Plaintiffs have not alleged loss causation. *Leung*, 599 F. Supp. 3d at 70.

## C.    The Allegations About The LGMD Program Must Be Dismissed

Plaintiffs' second set of allegations concerns the progress of Sarepta's LGMD program. *See* ¶¶ 107-19, 269-86 (Stmts. 41-53). Here too, falsity and loss causation provide two independent bases for dismissal—though loss causation is especially straightforward.

### 1.    Plaintiffs Fail To Plead Loss Causation

Plaintiffs' loss causation theory for their LGMD-related allegations has a glaring problem. Rather than fall "significantly after the [supposed] truth became known," *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 244 (D. Mass. 2011), Sarepta's stock

price *went up*. Plaintiffs allege that "Defendants repeatedly touted to investors the progress of Sarepta's" LGMD program, when—or so Plaintiffs claim—"the program had significantly stalled by the start of the Class Period" in June 2023. ¶¶ 107, 110. Then on July 16, 2025, Plaintiffs continue, "Sarepta announced that it was essentially abandoning its LGMD portfolio," revealing to investors that "the LGMD program was not viable." ¶ 162. But immediately afterwards, Sarepta's stock shot up by 22%. Ex. 35. Because the stock rose, rather than "dropped," there can be no loss causation. *Shash*, 84 F.4th at 20.

Aware of this deficiency, Plaintiffs try another theory. They claim that the month-earlier announcement of a second ELEVIDYS patient's death "allowed investors to understand that the LGMD program was simply not viable." ¶ 154. But that disclosure does not "relate back to the misrepresentation[s]" alleged. *Urman*, 867 F. Supp. 2d at 198. Plaintiffs plead no particularized facts showing that the death of a second, non-ambulatory ELEVIDYS patient left the separate LGMD program "dead in the water." ¶ 154; *infra* at 24-25. But regardless, this fatality says nothing about the progress of the LGMD program at the time the challenged statements were made months and years earlier. *See* App. A at 13-16 (listing LGMD challenged statements). In other words, the second patient death did not "reveal[] to the market the pertinent truth that," according to Plaintiffs, "was previously concealed." *Shash*, 84 F.4th at 20.

### 2. Plaintiffs Fail To Plead A False Or Misleading Statement

Plaintiffs' allegations regarding Sarepta's LGMD program also fall far short on falsity. To begin, Plaintiffs challenge a slew of non-actionable puffery. They attack remarks that the LGMD program was "making good progress," ¶ 273 (Stmt. 44), and "moving rapidly," ¶¶ 279, 286 (Stmts. 48, 53). *E.g.*, ¶¶ 269, 293 (Stmts. 41, 56) ("continue to make progress"); ¶¶275, 280 (Stmts. 45, 49) ("pleased with the progress" and "accelerating"); ¶ 276 (Stmt. 46) ("rapidly progressing"); ¶ 277 (Stmt. 47) ("fastest speed possible"); ¶¶ 281-82 (Stmt. 50) ("great traction" and

"accelerate"). Such "vague proclamations of progress," however, are not actionable. *In re Bos. Sci.*, 646 F. Supp. 3d at 275.[6] The same is true of statements like "[w]e remain committed to advancing our LGMD portfolio," ¶ 269 (Stmt. 41); *e.g.*, ¶¶ 272, 283 (Stmts. 43, 51) ("committed"); ¶¶ 281-82 (Stmt. 50) ("focused").[7] So too for boasts that the LGMD program was "maximizing … synergies," ¶¶ 275, 280 (Stmts. 45, 49), and "innovative," ¶ 270 (Stmt. 42).[8]

The LGMD statements are not actionable as a matter of law for additional reasons. For starters, saying that Sarepta was "pleased," ¶¶ 273, 275 (Stmts. 44-45), and "excited," ¶ 281 (Stmts. 50), about the LGMD portfolio are non-actionable opinions. And statements that clinical trials for Sarepta's LGMD portfolio were making "good progress," ¶ 273 (Stmt. 44), were "relatively late stage," ¶ 285 (Stmt. 52), were "fully enrolled," ¶ 269 (Stmt. 41) and had "completed dosing," ¶ 272 (Stmt. 43), concern "the proper interpretation of [interim clinical] data," making them opinions as well. *Philip Morris*, 89 F.4th at 420; *see, e.g., Homology*, 2024 WL 1436025, at *13 ("on track with … dose expansion"). Plaintiffs' "hindsight" pleading fails to show that these opinions were false, let alone unreasonable, when expressed. *Zafgen*, 853 F.3d at 617.

In addition, "statement[s] of the plans and objectives of management for future operations" are protected by the PSLRA's safe harbor, 15 U.S.C. § 78u-5(i)(1)(B), (D), which shields from liability statements that Sarepta was "committed to" and "focused on" the LGMD program, ¶¶ 272, 281-83 (Stmts. 43, 50-51). These statements came with "meaningful cautionary statements," 15

---

[6] *E.g.*, *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 339 (D. Mass. 2020) ("delighted" with "progress"); *Celano*, 2025 WL 928783, at *13-14 ("progress" and "tremendous momentum"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997) ("moving rapidly"); *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 138-139 (D. Mass. 2021) ("really good traction"); *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 236 (S.D.N.Y. 2021) ("accelerating").

[7] *E.g.*, *In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102, 117 (D. Mass. 2003) ("focused"); *Celano*, 2025 WL 928783, at *14 ("committed").

[8] *E.g.*, *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) ("synergies"); *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *14 (N.D. Cal. Apr. 28, 2020) ("innovative").

U.S.C. § 78u-5(c)—*e.g.*, drug "development is lengthy and uncertain," because programs "may be more costly" than "we anticipate," Ex. 7 at 48, and "gene therapies are novel, complex and difficult to manufacture," potentially leading to "production problems" that could result in "delays in commercialization or development" or "harm [to] our business," *id.* at 56. And Plaintiffs plead no facts that Ingram or Rodino-Klapac had "actual knowledge" that Sarepta was *not* committed to the LGMD program when they spoke, 15 U.S.C. § 78u-5(c); *see infra* at 29.

Instead, Plaintiffs rely on conclusory assertions from FE 2, FE 3, FE 4, FE 6, and FE 7 that the LGMD program made no progress. ¶¶ 110-16. FE allegations must be pled "with sufficient particularity to support" the probability that "a person in the[ir] position" would "possess the information alleged." *Biogen IDEC*, 537 F.3d at 51. But here, most of the FEs "did not even work at [Sarepta] during the Class Period." *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015). FE2 and FE3 left in 2022. ¶¶ 83-85. FE 6 was a "Patient Affairs Manager," ¶ 95, FE 7 collected "competitive intelligence" about other market players on the "commercial side" of Sarepta's business, ¶ 115 & n.36, and Plaintiffs refuse to provide any specifics about FE 4's actual role, ¶ 84 & n.23. Plaintiffs thus have not pled with particularity that any FE was "positioned to know the information alleged" about the LGMD program. *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 70 (D. Mass. 2014).

At any rate, these flawed FE allegations concern only a subset of the LGMD program, since even Plaintiffs concede, "the 2E program" *was* progressing. ¶ 115. But as Sarepta told investors from the beginning, the plan was always to develop the Type 2E treatment "first" and then "apply that thinking across all of our LGMD portfolios." Ex. 29 at 8. Plus, Sarepta publicly announced numerous concrete milestones across the rest of its LGMD portfolio. *Supra* at 10-11. Tellingly, Plaintiffs do not claim that *those* specific assertions were false or misleading. Plaintiffs' deeply flawed LGMD-related allegations cannot support a claim.

24

### D.      The Allegations About The ESSENCE Trial Must Be Dismissed

Plaintiffs' third set of allegations attacks a handful of statements regarding the ESSENCE trial, a global confirmatory study involving two of Sarepta's commercial "exon-skipping" therapies for DMD. *See* ¶¶ 120-29, 288-95 (Stmts. 54-59). Plaintiffs allege that Defendants concealed disruption caused by COVID-19, which caused an "unusually high" rate of missed doses that ultimately contributed to the study falling short of "statistically significant" results. ¶ 125. This final salvo of attacks fails to allege falsity and loss causation.

### 1.      Plaintiffs Fail To Plead A False Or Misleading Statement

Plaintiffs first criticize risk disclosures in Sarepta's SEC filings, claiming they warned of "only a future and contingent risk" that the COVID-19 pandemic *could* disrupt the trial, "rather than a present and materialized risk" of ongoing disruption. ¶ 288; *see* ¶ 289 (Stmt. 54) (pandemic "may negatively impact enrollment" in clinical trials); ¶ 290 (Stmt. 55) ("[m]issing data" caused by these disruptions "could undermine" trials). But Plaintiffs omit that the key text disclosed ongoing challenges: "[T]he impact of COVID-19 *has caused* disruptions." *E.g.*, Ex. 41 at 54 (emphasis added). And they ignore that Ingram explicitly told investors that the pandemic had caused especially significant "disruption" in "confirmatory trials" for Sarepta's exon-skipping treatments. Ex. 36 at 5. Plaintiffs may not escape dismissal by "excising an isolated statement" from Sarepta's risk disclosures; rather, this Court must examine their "full text" and surrounding context. *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

Plaintiffs next fault Rodino-Klapac for stating on earnings calls in 2024 and early 2025 that ESSENCE was "on track." ¶ 294 (Stmt. 59). These remarks are not actionable as a matter of law for three reasons. First, saying that a clinical trial is "on track" is puffery. *Celano*, 2025 WL 928783, at *13; *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018). Second, it is an non-actionable opinion concerning the "interpretation of clinical data."

*Homology*, 2024 WL 1436025, at \*13; *e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 727 (E.D. Va. 2014) ("on track"). Third, despite using the present tense, assertions that Sarepta was "'on track' to achieve an announced objective" are protected by the PSLRA's safe harbor for forward-looking statements and their underlying assumptions. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021); *see Metzler*, 305 F. Supp. 3d at 210-211 (PSLRA protected statement that drug was "on track" to achieve a milestone). Those statements were accompanied by specific warnings, and Plaintiffs plead no facts suggesting that Rodino-Klapac had contemporaneous actual knowledge that COVID-19 had doomed the study. 15 U.S.C. § 78u-5(c); *infra* at 29-30. Here too, Plaintiffs are impermissibly using later events—that ESSENCE ultimately "did not achieve … statistical significance"—"to plead fraud by hindsight." *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at \*12 (D.N.J. Mar. 14, 2023).[9]

Finally, Plaintiffs challenge several statements by Rodino-Klapac noting that the ESSENCE trial was "fully enrolled." ¶¶ 292-94 (Stmts. 57-59). As above, whether a clinical study is fully enrolled is a non-actionable opinion about "the proper methodology and conduct of clinical studies." *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 567 (E.D. Pa. 2009); *see supra* at 23. Regardless, Plaintiffs fail to plead particularized facts showing that the ESSENCE trial was *not* fully enrolled when Rodino-Klapac spoke—and in fact the trial was fully enrolled in 2023, as publicly disclosed. *See* Ex. 28 at 7. Indeed, Plaintiffs do not plead that COVID-19 actually impacted enrollment, as opposed to patients "missing doses." ¶ 125.

### 2.     Plaintiffs Fail To Plead Loss Causation

Loss causation provides an independent basis for dismissal. Sarepta "did not conceal the

---

[9]  Plaintiffs also badly exaggerate in asserting that the ESSENCE study "failed spectacularly." ¶ 125. As Sarepta informed investors, the study "demonstrated numerical superiority across the primary and most secondary endpoints"—i.e., the treatment show improved results relative to placebo. Ex. 39 at 6. And for DMD patients who did *not* miss doses due to COVID-19, the study found "an approximately 30% reduction in disease progression over 2 years." *Id*.

risk" that COVID-19 disruptions could negatively impact clinical trials like ESSENCE. *Leung*, 599 F. Supp. 3d at 70. The company repeatedly warned investors that COVID-19 "has caused" disruptions that could cause "delays" and "undermine data integrity and probability of success." *E.g.*, Ex. 41 at 68. Like with the ELEVIDYS-related statements, the later materialization of those publicly disclosed risks cannot support loss causation. *Supra* at 20-21.

###### E.    Plaintiffs Fail To Plead A Strong Inference of Scienter

There is another independent basis for dismissal across all three theories: There is no "strong inference" that any Defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A).

###### 1.    This Case Lacks Crucial Indicia Of Fraudulent Intent

Plaintiffs have "not alleged any of the telltale motives that have been found to strengthen an inference of scienter, such as insider stock sales." *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017). Plaintiffs do not allege that Ingram, Rodino-Klapac, or Estepan sold *any* stock during the Class Period, which "undercuts an inference of scienter" right off the bat. *Quinones v. Frequency Therapeutics, Inc.*, 665 F. Supp. 3d 156, 174 (D. Mass. 2023); *accord Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *28 (D. Mass. Jan. 16, 2004). And especially under the PSLRA, the mere importance of Sarepta's DMD therapies to the company's business cannot on its own establish that corporate officers were motivated to commit fraud. *Homology*, 2024 WL 1436025, at *18; *see Frequency Therapeutics*, 665 F. Supp. 3d at 180.

Plaintiffs thus grasp to plead some motive for Defendants—whose mission at Sarepta is to develop treatments for patients suffering from neuromuscular diseases—to have lied about the safety and progress of Sarepta's DMD and LGMD treatments. Plaintiffs first allege that Sarepta faced "stiff competition" and "significant expenses." ¶¶ 206, 208. The last time Sarepta faced make-weight allegations that it was in "a race" with competitors and struggling "to fund its operations," the First Circuit rejected them as mere "catch-all allegations" regarding "the ever-

27

present desire to improve results." *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 60 (1st Cir. 2018). Plaintiffs also cite "Sarepta's acquisition of Arrowhead Pharmaceuticals' RNA-based therapies," but cannot get their story straight. ¶¶ 206, 210. On the one hand, Plaintiffs claim this was a "suspicious" attempt "to diversify away from the rh74-based gene therapies" like ELEVIDYS that were supposedly doomed to fail. ¶ 210. On the other, Plaintiffs claim that the Arrowhead deal's financial burdens would be "impossible" to satisfy if ELEVIDYS "was imperiled." ¶ 206. Plaintiffs cannot have it both ways.

### 2. No Set Of Allegations Raises A Strong Inference Of Scienter

**ELEVIDYS.** Plaintiffs allege that Defendants "trumpeted" ELEVIDYS's "safety profile" while covering up "serious liver safety risks" that "were already emerging" at the start of the Class Period. ¶¶ 2-3. That theory runs headlong into Defendants' clear and consistent warnings about liver-related risks, including that liver injuries had already occurred, *supra* at 5-8, which "weaken [any] inference of scienter." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 760 (1st Cir. 2011). Plaintiffs next allege that FE 1, FE 2, FE 3, FE 4, FE 5, and FE 6 "warned" about "liver toxicity" risks. ¶ 79. But again, so did Sarepta. *Supra* at 5-8. Repeatedly and forthrightly disclosing liver-related risks "are not the actions of a company bent on deceiving investors" about liver-related risks. *Abiomed Inc.*, 778 F.3d at 243.

At any rate, Plaintiffs' FE allegations are flawed on their own terms. Again, FE 1, FE 2, FE 3, and FE 5 "did not even work at [the company] during the Class Period"—and thus could "not have had firsthand knowledge of the state of mind of" Ingram, Rodino-Klapac, or Estepan "during that period." *Abiomed, Inc.*, 778 F.3d at 245. FE 4's sole allegation about a discussion at Sarepta on how to manage liver-related risks predates the Class Period—and mirrors FDA's public debate. *See* ¶ 85; *supra* at 5-8. Because all FEs "appear to have had relatively little ongoing contact" with Defendants, *Abiomed, Inc.*, 778 F.3d at 245, Plaintiffs' allegations rely on "multi-

layer hearsay" to mask "conclusory assertions of scienter," *Collier*, 9 F. Supp. 3d at 70. For example, FE 1 and FE 2 claim that their pre-Class Period views "were delivered to Ingram and Rodino-Klapac" by other people. ¶ 71; *see* ¶ 83. FE 3 assumes that "minutes" from meetings he did not attend "would've gone up the chain." ¶ 86. FE 5 alleges that he raised his concerns to his supervisor and "Sarepta's regulatory personnel," not to Ingram, Rodino-Klapac, or Estepan. ¶ 91. FE 6 was a low-level employee who alleges only "that adverse event data" was "compiled" in "reports prepared" by other people. ¶ 95. In short, the FEs were "not positioned to know" Ingram, Rodino-Klapac, and Estepan's mental states. *Moduslink*, 9 F. Supp. 3d at 70.[10]

The far more compelling inference is that Defendants spent years and significant resources to develop the first gene therapy for DMD and believed in ELEVIDYS's risk-benefit profile while warning of risks, and unfortunately those risks came to pass. Plaintiffs' allegation that Defendants prioritized Sarepta's stock price over patient safety is baseless—and frankly, offensive.

**LGMD program.** Plaintiffs' story about the LGMD program is equally weak, especially because it depends entirely on fundamentally flawed allegations from FE 2, FE 3, FE 6, and FE 7. *See* ¶¶ 112-19; *supra* at 24. The far more compelling inference is that the LGMD program made progress until environmental changes including the suspension of ELEVIDYS shipments to non-ambulatory patients compelled Sarepta to pause (most of) the program—and that Ingram, Rodino-Klapac, and Estepan were, as Ingram himself reported, "pain[ed]" when it became clear that the broader LGMD program was not financially viable. Ex. 34 at 22.

**ESSENCE trial.** Plaintiffs' scienter theory regarding the ESSENCE trial shares the same core defect as their theory on ELEVIDYS: No one "bent on deceiving investors" about COVID-19

---

[10]   Plaintiffs resort to their *own* convoluted interpretation of ELEVIDYS trial data to suggest Defendants must have known earlier of safety risks. ¶ 104 n.34. But Defendants cannot be faulted for not divining Plaintiffs' made-for-litigation statistical musings—which merely purport to show the risk of liver-related complications that Sarepta repeatedly disclosed. *See Rice v. Intercept Pharms., Inc.*, 2022 WL 837114, at *8 (S.D.N.Y. Mar. 21, 2022) (rejecting similar argument).

disruptions would be as forthright as Defendants were in disclosing them. *Abiomed Inc.*, 778 F.3d at 243. And the fact that the ESSENCE trial ultimately missed statistical significance on its primary end point does not show that any Defendant knew that outcome was a foregone conclusion when they made the challenged statements. Indeed, Plaintiffs concede that Sarepta continued "to recruit numerous clinical trial sites" at "great expense," which would be a complete waste of resources if Sarepta knew the trial could not succeed. ¶¶ 126, 194. The far more compelling inference is that Sarepta did its best to navigate the pandemic and disclosed COVID-19 disruptions in real time.

### F.    This Case Should Be Dismissed With Prejudice

This case should be dismissed in its entirety—and with prejudice. Because Plaintiffs have not pled a primary Section 10(b) violation, their derivative Section 20(a) claim for control-person liability fails too. *See ACA Financial Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 67-68 (1st Cir. 2008). Leave to amend would be "a hopeless quest." *Abiomed, Inc.*, 778 F.3d at 247. Plaintiffs' "complaint has already been amended once" and—despite seven intervening months of investigation—they still fell far short of pleading a viable claim. *Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 164 (D. Mass 2025).[11]

## V.    CONCLUSION

Defendants respectfully request that the Court dismiss this case with prejudice.

---

[11]  *See* Dkt. 1 (complaint filed on June 26, 2025); Dkt. 133 (AC filed on January 22, 2026).

Dated: March 9, 2026

Respectfully submitted,
LATHAM & WATKINS LLP

By: /s/ *Shlomo Fellig*
Shlomo Fellig (BBO# 699643)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Tel: (617) 948-6000
Fax: (617) 948-6001
Email: shlomo.fellig@lw.com

Sarah A. Tomkowiak (pro hac vice)
Susan E. Engel (pro hac vice)
Richard Frohlichstein (pro hac vice)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: sarah.tomkowiak@lw.com
susan.engel@lw.com
richard.frohlichstein@lw.com

Michele D. Johnson (pro hac vice)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: (714) 540-1235
Fax: (714) 755-8290
Email: michele.johnson@lw.com

Nicholas Rosellini (pro hac vice)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600
Fax: (415) 395-8095
Email: nick.rosellini@lw.com

*Attorneys for Defendants*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent on March 9, 2026 to those identified as non-registered participants.

/s/ *Shlomo Fellig*

Shlomo Fellig

32