# EXHIBIT 8

**S&P Global**
Market Intelligence

# Sarepta Therapeutics, Inc.
# NasdaqGS:SRPT
# Special Call
## Monday, October 30, 2023 8:30 PM GMT

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants ...................................................................... 3

Presentation ...................................................................... 4

Question and Answer ...................................................................... 7

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Call Participants

**EXECUTIVES**

**Douglas S. Ingram**
*President, CEO & Director*

**Ian Michael Estepan**
*Executive VP & CFO*

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

**ANALYSTS**

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

**Brian Peter Skorney**
*Robert W. Baird & Co. Incorporated, Research Division*

**Colin Nigel Bristow**
*UBS Investment Bank, Research Division*

**Gavin Clark-Gartner**
*Evercore ISI Institutional Equities, Research Division*

**Gil Joseph Blum**
*Needham & Company, LLC, Research Division*

**Hartaj Singh**
*Oppenheimer & Co. Inc., Research Division*

**Huidong Wang**
*Barclays Bank PLC, Research Division*

**Joseph Patrick Schwartz**
*Leerink Partners LLC, Research Division*

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

**Michael Eric Ulz**
*Morgan Stanley, Research Division*

**Ritu Subhalaksmi Baral**
*TD Cowen, Research Division*

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

**Tazeen Ahmad**
*BofA Securities, Research Division*

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

**Uy Sieng Ear**
*Mizuho Securities USA LLC, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, and thank you for standing by. Welcome to the Sarepta Therapeutics Update Conference Call. [Operator Instructions] Please be advised that today's conference is being recorded. I would now like to hand the conference over to your speaker today, Douglas Ingram, President and CEO.

**Douglas S. Ingram**
*President, CEO & Director*

Thank you, Josh. Good afternoon, everyone, and thank you for joining Sarepta Therapeutics call to review the top line results for EMBARK. Our double-blind, placebo-controlled study intended to confirm the benefits of ELEVIDYS in children with Duchenne. Next slide, please. We will very likely make some predictions about the future or other forward-looking statements this evening. I would ask you to please review our public filings for the various risks and uncertainties that come with those sort of forward-looking statements.

Next slide. In a moment, Dr. Rodino-Klapac will review the results and our path forward. But let me summarize at least our perspective on them now. Our perspective is that the EMBARK results have met the standard for substantial evidence of effectiveness confirming the mechanism of action of ELEVIDYS and showing that it alters the course of disease in Duchenne patients.

The evidence is also clear that ELEVIDYS benefits Duchenne patients across the AGES studies. And there are no new safety signals that have emerged confirming the laudable profile upon which ELEVIDYS was approved in June. Importantly, we have already shared the top line EMBARK results with FDA leadership and have had encouraging early discussions with them. And on that basis, we are pursuing an application to expand the label of ELEVIDYS and they have confirmed they are open to evaluating an application to expand the label.

Our goal is to expand the label to cover all amenable Duchenne patients without regard to age or ambulatory status. FDA leadership has also confirmed their goal of moving swiftly to review this new data and conclude its review on the label expansion. Hence, we will be moving rapidly to make a formal submission even as the FDA already has our top line to commence its evaluation now. And with that, let me turn the call to Dr. Rodino-Klapac, who will lead us through the top line down, Louise?

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Thank you, Doug. I'm very pleased to share the results of our PMR study EMBARK. The data strongly supports the conclusion that ELEVIDYS demonstrates the treatment benefit that is clinically meaningful and similar regardless of age. Next slide, please. I'd like to briefly remind you of the EMBARK study design. Next slide. EMBARK is a Phase III double-blind randomized controlled trial with 1:1 randomization with 125 patients enrolled.

Crossover occurs at 52 weeks, maintaining the blind to both the study teams and the patients. Biopsies are at 12 weeks at a subset of patients for an end of 31 of the 125 enrolled. The primary endpoint is change in NSAA from baseline to week 52. Key secondary endpoints are SRP-9001 dystrophin protein expression, time to rise and 10-meter walk run. The other secondary endpoints were also time performance test. The SV95C, which is measured using a wearable device, the 100-meter walk test and the ascending 4 stairs test. There were no dropouts to the study.

Next slide, please. This slide demonstrates that this treated and placebo group demographics were very well matched at baseline. Next slide, please. Similarly, on this slide, treated and placebo group functional abilities were well matched at baseline. As you will recall, our stratification factors for this study were age and baseline NSAA and you can see the groups were well balanced at baseline.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Next slide, please. I will now review the EMBARK top line results. Next slide, please. While it's not on the slide, I'd like to note that as expected, ELEVIDYS protein expression was highly significant [ a key ] is less than 0.0001, as the first key secondary endpoint. We look forward to presenting the full data set at a future medical meeting. Today, I will focus on the functional endpoints. And so first, I'm showing you this for slide and to allow you to digest it for just 1 minute. I'm sure you can see the compelling data that we see. All endpoints favor ELEVIDYS. We acknowledge that the primary endpoint of NSAA at 52 weeks did not reach statistical significance, although it favored ELEVIDYS, and I'll discuss this in more detail.

However, there was a robust and clinically meaningful treatment benefit demonstrated across the secondary endpoints of physical function. All 3 key secondary endpoints strongly reached the systolic significance in all times secondary endpoints favored ELEVIDYS. The consistency demonstrated across these objective measures is strongly supportive of the treatment effect that it was simply not detected by the NSAA score at this 52-week time point.

Next slide, please. Now let's look at the 4 spots broken out by age subgroup. The mechanism of action and totality of evidence supports the treatment effect that is independent of age across the breadth of the secondary endpoint. Even though we did not power the age subgroups, they were strongly significant for the key secondaries for each subgroup. In addition, there is consistency across all the secondary outcomes. We note the inconsistency in NSAA results for the 6 to 7 year olds, which was not present in the performance on the time function test.

Next slide, please. Now I will show you each of the key secondary measures individually, starting with time to rise. On this slide, we see the time to rise by visit where the values or lease square means plus or minus standard error. The treated groups in purple demonstrate stability or improvement in their time to rise. In contrast, placebo patients in gold demonstrate increasing time to perform this skill in both age groups. We see significance in not only the overall population with P to 0.0025 but also in each of the age subgroups.

Next slide, please. Now for the 10-meter walk run. Similar to the previous slide, the treated patients in purple demonstrate stability or improvement in performance. While the placebo patients in gold demonstrate more modest improvement or worsening in their function. Again, both the overall population and age subgroups are significant. Next slide, please. Here, we see the NSAA by visit with increasing scores indicating improved performance. As expected, ELEVIDYS treaty groups were stable or improved. However, despite the decline in performance evident on the time function test, the placebo group in gold showed stable to improved NSAA scores.

This incongruity is particularly evident in the 6- to 7-year-olds and suggests the NSAA scores are masking meaningful decline as the time tests are able to detect. Thus, we were unable to detect a significant difference of 52 weeks. We expect we would detect a difference over a longer time period. Next slide, please. I'll now talk about the safety profile. Next slide. Regarding safety, Importantly, no new safety signals were identified with a profile consistent with our previous studies. Benefit risk is favorable and strengthened by this additional data from EMBARK.

Next slide, now I'd like to discuss the clinical significance of these results. Next slide. Time tests are responsive to disease change and time derive was intentionally selected as the first functional key secondary endpoint. The time function tests are lost sequentially as DMD progresses. We know both from the existing literature and an analysis of our own clinical data preceding 301 that lengthening time to rise is the earliest sign of disease progression and the clearest marker of decline in the 4- to 7-year-old population.

Lengthening time to rise is classically followed by increasing times in the 4-step climb and then the 10-meter walk run. The selection of time to rise and 10-meter walk run are key secondary endpoints in the 301 trial reflects the responsiveness to disease change in this population as demonstrated by natural history data. Time to rise, 4-step climb, 10-meter walk run and 100-meter run are all accepted registrational endpoints of global regulators and our primary outcomes in a number of contemporary DMD trials.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Next slide. I'd like to take a minute to pause here. This slide is important to understand, as I will describe. The strong prognostic power of time to rise and the particular importance of the 5 second milestone is clearly demonstrated in its recently published natural history study drawn largely from the U.K. North Star Network. Here, patients are grouped by their baseline time to rise and then followed over time until they lose ambulation. Patients with a time to rise of greater than 5 seconds at baseline are seen to have a subsequently aggressive disease trajectory with early loss of ambulation. A rise time of less than 5 seconds was an inclusion criteria in our trial. We made this decision based on observations from our 9001-102 study, where a number of patients with a baseline of greater than 5 seconds deteriorated rapidly on the NSAA irrespective of treatment.

While we still believe patients can gain benefit from treatment, we concluded that their exclusion would create a more homogeneous population for investigation over 1 year. Next slide, please. Understanding that all patients in EMBARK started with a time to rise of under 5 seconds, we looked at the impact of ELEVIDYS treatment on preventing progress to this important disease milestone. As you can see from this table, treatment with ELEVIDYS reduced the odds of progressing to a rise time of greater than 5 seconds by 91%, a hugely clinically meaningful treatment effect, driven, as you might expect, by the population were likely to decline to 6- to 7- year olds.

Next slide, please. I'll next talk about our path forward and summarize. Next slide. As we have communicated, we are moving with urgency to provide these results to FDA as a BLA supplement to seek label expansion. We have provided this top line summary of the results to FDA and have engaged in productive and encouraging conversations with CBER on the data. In terms of next steps, we plan to submit an efficacy supplement to CBER as soon as possible, seeking label expansion to treat all DMD patients, and we'll submit a post-marketing requirement or PMR seeking transition from accelerated approval to traditional approval.

Next slide. To summarize, the data from EMBARK exceeded thresholds for substantial evidence of effectiveness and the risk benefit of ELEVIDYS remains favorable. We are pleased with the consistency, the magnitude of response and the clinical meaningfulness of the results for EMBARK and from the body of evidence supporting ELEVIDYS. The data show ELEVIDYS is a disease-modifying therapy. And therefore, we believe all patients condition can benefit from treatment with ELEVIDYS. Following positive discussions with FDA leadership, they are committed to evaluating a labeling expansion to the full extent possible based on a review of the data and will do so rapidly. I will now turn the call back over to Doug to open up for Q&A.

**Douglas S. Ingram**
*President, CEO & Director*
Well, thank you very much, Dr. Rodino-Klapac. Before I open up the call for Q&A, I would remind everyone that we have an earnings call on Wednesday, and we'll talk about quarterly performance and any other issues there. So with respect, it would be great if people would limit their questions to this data and the EMBARK readout in our path forward. And with that, Josh, let's open up the call for questions.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Brian Abrahams with RBC Capital Markets.

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

I guess, first, I'm wondering if you saw any predictors of a better or worse response here. I noticed that in the baseline characteristics, you had more patients with large genetic mutations in the ELEVIDYS arm and then secondarily, can you talk about the biopsy results here relative to the prior studies? Did the biopsy data here support the potential for dystrophin expression to predict function across all age ranges. And to what degree has the FDA indicated that this would be important for confirmatory evidence to support full approval?

**Douglas S. Ingram**
*President, CEO & Director*

Great. I'm going to turn both of these questions over to Louise, but just to remember, Brian, the biopsy results we have right now are a small subset in EMBARK given that we did only a small sampling. We have to get the Part 2 as well. But as Louise said, not only were they strongly statistically significant and very robust, they're in the range of what we've seen previously. So it's all very consistent. But with that, Louise, perhaps she can answer both of those 2 questions better than I could.

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Sure. Just starting the first question about any predictors, looking at mutations. So far, just looking at the baseline characteristics, they're well matched. We didn't see any things like mutation leading to prediction of the responses that we saw. With that said, the team is continuing to work on the data. This is the top line data and the team is continuing to do analysis. But I think so far, the data was very clear, and we were very pleased with the execution of the study and how well matched the 2 arms were at baseline.

With regards to expression, as Doug mentioned, this was a subset of the biopsies. The expression data was consistent with what we've seen. Global regulators do not want us to biopsy every single patient. And so there was a subset in Part 1 as well as the subset in Part 2, and we will share this data at a future medical meeting along with the entire data set for the study.

**Douglas S. Ingram**
*President, CEO & Director*

One final thing to note is the lack of something you asked about any better or worse. Remember the significant open question in EMBARK was whether this therapy would work better for instance, in the 4 to 5 than in older patients, in this case, the 6 to 7s. And what we were very pleased with is that consistent with prior data and our hypothesis, there was no difference. And in fact, while we have not powered the key secondary endpoints for statistical significance in the subgroup analysis by age. As Dr. Rodino-Klapac noted in her presentation, we saw them strong statistically significant in both of the age groups in both of the key secondaries and almost identical in their statistical significance and in the clinical meaningfulness of both of those results. So it's very, very comforting that this therapy is working well across the ages and as one would expect it will, from our perspective, work across all of the agents into non-ambulatory as well.

**Operator**

Our next question comes from Tazeen Ahmad with Bank of America.

**Tazeen Ahmad**
*BofA Securities, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Doug, is there any way you can provide any color about the specifics of the conversation you had with FDA as it relates to the 4- to 5-year olds. Is the topic of whether the data that you've collected thus far to meet the criteria at least for the 4- to 5-year old to have permanent approval for the market? And then secondly, I just wanted to ask you, what in that conversation did you find encouraging to give you the view that a broad label here is something that the FDA is seriously going to consider?

**Douglas S. Ingram**
*President, CEO & Director*

Yes, thank you very much for your questions, Tazeen. I'm going to answer these very broadly, of course. First of all, the meetings we had was with, as we've said, senior representatives for the FDA, including but not limited to the Center Director, Dr. Peter Marks. We were not discussing whether we need the standards of the 4s and 5 staying on. I think that is an obvious win on that issue. And what we were really discussing was looking at the totality of this evidence, the ability to expand this label and from our perspective to expand it by removing artificial age limitations and removing the artificial restriction to ambulation as we don't think that's consistent with the mechanism of action or the data.

And I would broadly say without going into a lot of detail, I would say everything about that meeting was encouraging. It was a very productive, very positive meeting. I want to be very clear. We still have a submission to have and a review to go through, but I was very encouraged by the discussions with the agency. They were very clear that they are very committed to moving rapidly, and they were very clear that they are very open to reviewing this application to look to expand the label, of course, supported by a full review. So it was a very, very encouraging meeting.

**Operator**

Our next question comes from Gena Wang with Barclays.

**Huidong Wang**
*Barclays Bank PLC, Research Division*

I'll just follow Tazeen's questions. How soon will the FD get back to you regarding the next step? And also, what was the FDA's feedback regarding, if we look at the Slide 14, you do have at the North Star, we do see 6, 2 years to 7 years old, the p-value is 0.9378. Any comments on that, I think everything else looks like very consistent only this one, we saw not much expiration there. And then also, what is the FDA comments on 2-year studies? Is there any way you can conduct 2-year study to prove the longer follow-up, you can see the North Star further separation?

**Douglas S. Ingram**
*President, CEO & Director*

There's a lot in there to unpack, Gena. So first of all, to be clear, there was no discussion about additional studies necessary nor do we envision that there would be the need. Again, without assuming in advance that they fully accept the exact analysis, I think everyone is tracking to the analysis of this data, so I'm going backwards in your questioning. And what that means is look very good. I'm glad you raised that. If you look at the 6- to 7-year-olds, you don't see separation between the treated children and the untreated children as it relates to NSAA. Then interestingly enough, if you look at the time to rise, the much more objective it turns out with the benefit of hindsight time test or you look at the 10-meter walk run, again, a very objective time test, you see that in the 6- to 7-year-olds, the treated kids are stable, which remember, is that long-term therapeutic goal here.

In fact, that is a massive win. When you look at the secondary end points, what you see is that the untreated kids are unfortunately becoming much slower, both on time to rise and on the 10-meter walk run. And I would also notice that the same answer for the 4-step time. It's the same answer for the wearable as well, the SB-95. And I say, well, what's inconsistent about it. What's inconsistent is that we're not guessing. We're not looking at other data. We know that those untreated children are degenerating. We see it. We see it in time tests. We see that time to rise. We see it in the 10-meter walk run, we see in the 4-step time. We see it on the wearable but you don't see it on NSAA.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

And the reason for that with the benefit of hindsight is pretty obvious. It's not that somehow they're magically not degenerating in one measure versus another. It's that in a 52-week period in this population, NSAA is too course an insensitive a tool to detect the decline in the untreated kids that you see everywhere else. And I think when you look at the data together, it becomes really clear that, that is the case. Not to suggest that NSAA in the long run wouldn't show it. It just doesn't show it in this population in 52 weeks. And then on the timing of things, the short answer is they already have the top line data, and they are committed to moving as fast as possible.

We are working on the formal submission part of this. It is my impression that they intend to begin to review the data even in advance of that submission. So we are very committed to moving as fast as possible. And I believe that our regulators are equally committing to moving as rapidly as possible, and that's extraordinarily important for patients. I would remind you, as Dr. Rodino-Klapac mentioned, when we look at time to rise, the single most predictive metric for early loss of ambulation is a child going over 5 seconds on time to rise. And in EMBARK, this therapy reduced the odds of that occurring by over 90%. So it is compelling that we need to move as fast as possible. This therapy was approved in June. By the end of this year, 200 kids who have lost ambulation that are not treated with ELEVIDYS. So we need to move as fast as possible.

I am quite confident that our colleagues at the FDA are equally committed to rapidly reviewing this file and looking to, if they agree that the data supports it broadening this label and removing unnecessary restrictions in kids getting it.

**Operator**

Our next question comes from Gil Blum with Needham & Company.

**Gil Joseph Blum**
*Needham & Company, LLC, Research Division*

So, maybe just on TTR in 10-minute to 10-MWR. Was any of this discussed in the earlier filing to the agency? And I want to give you confidence that the FDA will maybe reevaluate the tools for assessment here? I mean NSAA seems further established.

**Douglas S. Ingram**
*President, CEO & Director*

NSAA is an established metric as is time to rise as this 10-meter walk run, those other secondary endpoints have been used as primary endpoints in other studies. In fact, [indiscernible] is quite clear that particularly time to rise over 5 seconds is the single most important prognostic tool for determining if the kid will have an early loss of ambulation.

And generally, what gives us confidence that we're confident because of 2 things. One, we're confident because of the comprehensive evidence in front of us; and two, we have confidence based on the fact that we've had very positive and encouraging interactions so far with FDA leadership.

**Operator**

Our next question comes from Ritu Baral with TD Cowen.

**Ritu Subhalaksmi Baral**
*TD Cowen, Research Division*

Doug, you mentioned something about the nature of the NSAA data in the older patients masking the benefits seen and the time to rise and the 10-meter walk. Looking at the 17 components of the NSAA, I'm sure you and Louise have looked at some of this aspect, like what in particular about some of these movements may be more difficult for the older boys independent of dystrophin and muscle function?

**Douglas S. Ingram**
*President, CEO & Director*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I'm going to let Louise' comment on this, I apologize, at least I'm going to comment first and we're probably going to do a better job of it for me. But just so we're very clear, for instance, rise from floor exist in NSAA. It's just simply as one can see from the data that in this 52-week period in the untreated group, the NSAA, while it will work in the long run, in this population in 52 weeks is to course to see, for instance, decline in the untreated group.

As an example, if you look at a subset of kids that are one on the NSAA, remember, there's 0, 1 and 2. So 0 means you can't do it. 2 means you can do it flawlessly, 1 means you do it with some modifications. If you look at the kids that are in 1s, started at 1 and ended in 1s and then you looked at across treated and untreated group, you would see that the untreated group significantly declined versus the treated group, and yet they're both getting ones. Why is that? Is that a failure of NSAA, in a sense, it's not a failure of NSAA, but it is a failure of the tool in 52 weeks in this population. But Louise, you can do a better job than I'll do on the question.

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Actually you took my answer. I think just to make the point that the NSAA, given that it's 0, 1 and 2, we just don't have the sensitivity in those time points like a 1 [indiscernible] for an example, with time to rise from floor doesn't show you the full breadth of the differences that we're seeing between the treated and placebo. But really is just the 52-week time point and this measure over that period, which is much more sensitive in the time test.

**Ritu Subhalaksmi Baral**
*TD Cowen, Research Division*

Have you either in the recent interactions or prior interactions had specific conversations with FDA on the 2-year time point from EMBARK, it's something that KOLs have mentioned repeatedly well before the data revenue?

**Douglas S. Ingram**
*President, CEO & Director*

To the best of my knowledge, the discussions that we had on these topics occurred after EMBARK. Am I correct on that, Louise?

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Correct. We did not talk about the 2-year time frame proactively.

**Douglas S. Ingram**
*President, CEO & Director*

And if someone along the way asked a question about sort of looking at 2 years. It's just so we're very clear, the requirement of a study like EMBARK was that it must be placebo-controlled and blinded. It is nearly impossible consistent with good biomedical ethics to run a placebo-controlled trial for 2 years. We have actually done it in essence, but it is enormously difficult. It is challenged from an ethics perspective, and it wouldn't have been acceptable here. So we're very clear, 52 weeks for a blinded placebo-controlled trial is just about as long as one can do and get through IRBs and frankly, satisfy yourself that you're being ethical.

**Operator**

Our next question comes from Brian Skorney with Baird.

**Brian Peter Skorney**
*Robert W. Baird & Co. Incorporated, Research Division*

I guess as we think about through the FDA, do you think that they are going to call another AdCom to discuss any labeling changes here? And then on the statement around the secondary being statistically

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

significant, I thought under the SAP, we would need to hit on the primary endpoint to evaluate secondaries for statistical significance. So is there something about the protocol that allows for a statistical evaluation of the secondary without adding on the primary as opposed to just a valuation for a nominal significance?

**Douglas S. Ingram**
*President, CEO & Director*

Yes, you can put the word nominal in front of it when you're a hierarchical analysis. But the fact is that we did hit p-value of 0.002. and 0.004 in both of the pre-specified key secondary functional endpoints. And then among all of our endpoints, every single secondary endpoint, favored ELEVIDYS and nearly all of them strongly hit statistical significance if we get statistical significance and time to rise. We had statistical significant in 10-meter walk and we hit statistical significance on the fore stair climb.

We hit statistical significance on the wearable. And if you look at our key pre-specified endpoints, we're more powered to see stats segue in the subgroups of age, but we did. And we saw interestingly stats segue was almost identical between both of those groups and strongly shows. So we feel very good about the data. On the advisory committee, our perspective right now is there is no need for an advisory committee. And certainly, in our early conversations, there's been no discussions on that.

**Operator**

Our next question comes from Salveen Richter with Goldman Sachs.

**Salveen Jaswal Richter**
*Goldman Sachs Group, Inc., Research Division*

Thanks for taking my questions. I just wanted to go back to 2 points that were raised earlier. So with regard to the FDA and the totality of benefit that they want to see, how much was there a discussion around the timed endpoints versus NSAA variability and the focus on the primary versus the inclusion of these secondaries? Just help us understand how they're going to think about this.

And then the second point is you mentioned the confirmatory data that you just saw for the 4- to 5-year-olds. Is that enough to keep the drug on the market for this age group? I'm just trying to understand the discussion around what needed to be seen for that group?

**Douglas S. Ingram**
*President, CEO & Director*

Sure. Let me go to the first one first. So the discussion with the FDA largely mirrored the discussion that we've had today. So there, of course, was an enormous amount of discussion about the time test, the objective time tests, the statistical significance around them, the clinical meaningfulness of them. And the reason that the NSAA did not show statistical significance, which is related to the fact that the 6- to 7-year-olds didn't show the decline that they were, in fact, having.

So it was all of those discussions together. And as we said, we had a very positive meeting with them on those topics. And then from our perspective on the level of evidence to justify confirming for the 4 to 5, the answer to your question is, is that enough? The answer is yes.

**Operator**

Our next question comes from Uy Ear with Mizuho.

**Uy Sieng Ear**
*Mizuho Securities USA LLC, Research Division*

I was wondering, first, just a clarification question. Did you say that the p-value for the secondary endpoints, they're nominal. Is that correct? And secondly, just wondering what your thoughts are with respect to payers? Like how would they look at this particular set of data, given that the primary endpoint did not hit statistical significance?

**Douglas S. Ingram**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*President, CEO & Director*

Yes. Thank you for your question. I'll answer the second question, and I'll turn the first question over to Louise. On payers, look, this team has a very good track record of working productively with payers. We have 4 approved therapies right now, and we've done very well, serving the community. So I'm confident, generally in our team's ability to work with payers, I'm specifically confident over the strength of this data. I think that this is about as good at that as we've ever seen in a therapy such as this. And as I've said before, it bears repeating, the literature is quite clear that there are 4 big prognostic indicators of early loss of ambulation, the most prognostic is time to rise in going over 5 seconds and then 10-meter walk run and then the 4-step climb.

The fourth is the 6-minute walk test, the 6-minute walk test wasn't performed in this study. As it relates to all 3 of those, we strongly hit statistical significance, creating a very compelling point that this is very clinically meaningful and will change the course of this disease and keep these kids out of a wheelchair. And as we've mentioned before, on time to rise, the most prognostic being over 5 seconds, those kids on ELEVIDYS reduce their odds of an early loss of angulation by over 90%.

So we will have, I believe, a very good discussion with payers once we've expanded this label. And with that, Louise, you can leave it to comment on the p. value again.

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Sure. Yes, technically, when the primary is not met, then the secondaries used the word novel before it that does not negate the data in any way, and that's certainly not something that was brought up in our discussions with the FDA, who are very encouraged by the data specifically on these objective measures of time tests that was very encouraging and they're encouraged by the data.

**Operator**

Our next question comes from Joseph Schwartz with Leerink Partners.

**Joseph Patrick Schwartz**
*Leerink Partners LLC, Research Division*

So I think it was previously communicated that the FDA would entertain a non-age restricted label of EMBARK "meet its objectives." And so I was wondering, first of all, if that was ever tied to a statistical analysis plan consistent with how you're intending to present these data to the FDA? And then also the 52-week data are provided here. I'm just wondering if you can comment on whether the NSAA curves are widening or narrowing at this point. Did you measure NSAA at other time points, like 3, 6, 9 months, for example? And do you have any sense as to the shape of the NSAA curve?

**Douglas S. Ingram**
*President, CEO & Director*

Thank you, Jeff, for your question. The latter question, I think the curves were shown in the slide that gets set, if I'm not mistaken. And the short answer is that in all of our conversations going back some years, I think it's been understood that evaluating the label is based on the totality of the evidence presented and I think Dr. Marco said that publicly many times. So this is very consistent with the overall concept.

**Operator**

Our next question comes from Anupam Rama with JPMorgan.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

As part of the formal submission, are there any additional key analyses beyond what you presented today here in the top line that we should be considering that you'll be submitting to the FDA?

**Douglas S. Ingram**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

*President, CEO & Director*

Louise, I am turning this to you, the answer to that?

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Yes. The full data, all of the data will be submitted in the package to the FDA for the supplement. These are the key studies that are identified to the top line, but there's additional data that is part of the full CSR that will be submitted to the agency.

**Operator**

Our next question comes from Kristen Kluska with Cantor Fitzgerald.

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

Heading into the study, you had guided potentially to see a 1.3 point difference based off a lot of the powering assumptions, what you would need to hit for static. So given that there were a number of trial updates and other factors that you made, can you talk about how each arm essentially performed relative to what your expectations were with these powering assumptions?

**Douglas S. Ingram**
*President, CEO & Director*

Sure. Louise, do you want to comment on that?

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Sure. You're right. So we presented data that we would need to see a minimum difference based on the assumptions that we had from our previous studies. I think what we saw in this case is the treated aren't performing consistently with what we've seen before in the 6- to 7-year-olds, the placebo arm performed slightly better than what was predicted. But remember, we made the critical decision to include only patients with a time to rise of less than 5 seconds.

And so this population is a milder population than previously studied. And so that, I think everything we're seeing here is that the 6- to 7-year-old, the NSAA difference just did not pick up what we saw in the obviously declining population that was evident from the time test it just wasn't sensitive in this 52-week time point.

**Operator**

Our next question comes from Hartaj Singh with Oppenheimer & Company.

**Hartaj Singh**
*Oppenheimer & Co. Inc., Research Division*

Thanks for the comprehensive presentation. Really appreciate it. Just a question on the safety slide you presented. Can you just give any more color around it? I know you're probably going to be presenting a lot of these data at future medical conferences. And then I know that age and baseline ever stratifications, did you see any differences in any of the AEs or the treatment emergent AEs using those stratification factors?

**Douglas S. Ingram**
*President, CEO & Director*

Louise?

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. Overall, the data was from safety was completely consistent with what we've seen previously. In terms of AEs, we saw the same nausea and vomiting being the most obvious with some liver enzyme elevation, completely consistent with what we've seen in previous studies. We did not see any age-related adverse events. So it's very encouraging to see the same profile. And now we have an expanded database of safety to summit to FDA to support our previous approval.

**Operator**

Our next question comes from Timothy Lugo with William Blair.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Do you have a sense for how the CK data looks if it's consistent between the age groups? And do you expect to release maybe CK and expression data prior to the FDA weighing in on the expansion?

**Douglas S. Ingram**
*President, CEO & Director*

Yes. Unfortunately, we don't have, Louise, you correct me if I'm incorrect. I don't believe we have even having the CK data in-house yet. This is the part of the press data. So we don't have that yet, we will. There is obviously a lot more interesting data in here that we'll get over time, and then we'll be looking to publish it and present it at a future medical meeting.

**Operator**

Our next question comes from Colin Bristow with UBS.

**Colin Nigel Bristow**
*UBS Investment Bank, Research Division*

So first on time to horizon 10-minute walk, they seem to be trending better in the 6- to 7-year olds, which I think is contrary to what we've seen previously and what would be expected. Any comments on this? And then from a regulatory standpoint, I know this has been asked in the coming ways, but I just want to question this. Like what is your base case expectation? It sounds like it's full approval in 4 to 5, but I just wanted to confirm this. And then from a manufacturing perspective, what will you prepare for in terms of a market size? Will it be this 4- to 5-year old full approval or removal of an age restriction?

**Douglas S. Ingram**
*President, CEO & Director*

Yes. Let me touch on this and then Louise tell me if I have missed anything. So first, on the 10-meter walk run and the time to rise, just so we're clear, from a statistical significance perspective, they're merely identical, like surprisingly over one another on statistical significance as it relates to the 4 to 5s and the 6 to 7s. The fact that, it looks like you're seeing an even greater separation appearing in the 6 to 7s is very likely not because it works better in 6 to 7 than it works in 4 to 5.

It's that by the time you get to 6 to 7, you're now in the normal ferocious decline phase of Duchenne muscular dystrophy. And it's at that point where this disease-modifying therapy that as the shock absorber is going to arrest decline while the ferocious decline is occurring in the untreated group. You can see this even on NSAA when you look at the kids in 101.

By the time they get out to 4 years, the difference between them and where they should be from the generation perspective and where they are is dramatic. So I think it's about that. But what's really encouraging is that from a statistically significant perspective, they are almost exactly with one another. And I think our perspective is that's what you would see across the entire age spectrum, which then gets me to my second answer, which is our goal is very straightforward.

We don't intend to willingly leave any child or young man behind. This therapy is benefiting these kids. It is changing the course of this ferocious disease. And we think that children and men across the spectrum

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

of Duchenne muscular dystrophy deserve this therapy. So we are pursuing a label expansion that includes removal of any age restrictions or any restrictions on the basis of ambulation.

And then finally, let me add for manufacturing, and then Louise will correct me if I've said anything incorrect. On manufacturing, we have been and we continue to plan for the broadest possible label from a manufacturing perspective. Louise?

**Louise R. Rodino-Klapac**
*Executive VP, Chief Scientific Officer and Head of Research & Development*

Nothing to add. Perfect.

**Ian Michael Estepan**
*Executive VP & CFO*

Hey, this is Ian, maybe just one thing to add around the manufacturing. Obviously, previously, we took a very conservative approach to manufacturing weighted for FDA back prior to increasing our capacity and building inventory. As Doug just said, we're taking a very different approach here, and we're going to be building inventory for the entire population.

**Operator**

Our next question comes from Michael Ulz with Morgan Stanley.

**Michael Eric Ulz**
*Morgan Stanley, Research Division*

Maybe just a follow-up on some of the prior questions regarding the path forward. Just under a scenario where the FDA decides not to grant an expanded label, just curious what your thoughts are there, if you would run another study and maybe use a different primary endpoint such as the time to rise time, for example?

**Douglas S. Ingram**
*President, CEO & Director*

I think we're hopefully well known by now to being great executors and certainly these great executors we think about all scenarios. But the scenario in front of us today and the one we are focused on with all of our energy is to move as rapidly as possible to finish the submission, engage with the division and the FDA and expand this label by removing age limitations or artificial ambulation restrictions so that this therapy can be beneficial to children across the spectrum from young to non-ambulatory. And that is what we are single-mindedly focused on as an organization right now.

**Operator**

[Operator Instructions] Our next question comes from Gavin Clark-Gartner with Evercore ISI.

**Gavin Clark-Gartner**
*Evercore ISI Institutional Equities, Research Division*

So on your FDA discussions to date, were there any different conversations on expanding the label to all ages versus expanding into all ambulation statuses? I'm just trying to get a sense if the FDA used both of these label expansion aspects together or if they may be separate considerations?

**Douglas S. Ingram**
*President, CEO & Director*

Well, I think in one sense, they ought to be interrelated, but in the current label, there is a restriction for ambulation and a restriction for age as well. It is our perspective. And certainly, FDA leadership is well aware of our perspective. We were not timed in discussing it that EMBARK has confirmed the mechanism of action of ELEVIDYS. It has shown that ELEVIDYS is effective in altering the course of this disease across the age study and its mechanism of action, which certainly support the conclusion that it's going to continue to benefit kids across the entire journey of Duchenne.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And that's on the ag side, but on the ambulation side, it is no different. To be snarky, ELEVIDYS doesn't know that you're in a wheelchair versus you're out of a wheelchair. It is a shock absorber that protects your muscles when you move. The point of EMBARK was to prove that this mechanism of action works. And there's nothing unusual about it that would make it work better in 4 to 5s than it would in 6 to 7s or 8 to 9s or 10 to 11s are non-ambulatory.

And so long as a person has muscle that can be protected they can benefit from ELEVIDYS. And on that basis, the conversations we've asked with them is that we believe that the ambulation restrictions and the age restriction should be removed as they do not exist in other Duchenne related therapies that have been approved, and that's been the basis of our discussions.

### Operator

Our next question comes from Gena Wang with Barclays.

### Huidong Wang
*Barclays Bank PLC, Research Division*

I have 2 questions. The first one, I wanted to go back to the 2-year assessment. Doug, you said, I totally understand it's very difficult to do the 2-year assessment giving patient all cross over at 1 year. But is there any possibility or any way to assess, say, with mixed patient population? And then you look at a 1-year patient on treatment versus 2-year patient on treatment and see the separation. Because the core thesis here is all the other measurement, there is an earlier effect or more sensitive and we should see a north star at a delay fashion that we should be able to in the separation of a clinical benefit. So that's the first question.

Second question is actually very important. For the rest of the world, of the EU, have you discussed with Roche? And what would be the feedback there regarding the regulatory path?

### Douglas S. Ingram
*President, CEO & Director*

Yes. So on the first one, look, we're clear, we're going to be tracking the children in the study for years to come. And there are lots of different kinds of assessments one can do over time. But so we're very clear, as we stand through today, our goal is to seek a broad label without restriction to agent ambulation on the basis of the evidence in front of us today because we believe the evidence in front of us today is compelling and justifies that.

And that's what we're going to do. And then as it relates to Rest of World and Roche, I think Roche has issued their press release today. You can see that they are encouraged by these results, and they intend to talk to their regulators about their path forward. So they're proceeding as well.

### Operator

And I'd now like to turn the call back over to Doug Ingram for any closing remarks.

### Douglas S. Ingram
*President, CEO & Director*

Thank you very much. Thanks, everyone, for joining us this evening. Thank you, Dr. Rodino-Klapac for sharing the results with us as well. And by the way, thanks to all of the families and clinical investigators who have participated in our menu settings, including EMBARK, you really are pioneers for the rest of the community. So I'm going to give you our perspective that we've said it a number of times, but I do think at the risk of being repetitive, it bears repeating.

Our perspective on EMBARK in next steps are quite clear. First of all, every EMBARK measure favors this therapy ELEVIDYS. Every key secondary endpoint is strongly statistically significant as are all of the age subgroup analysis in the key secondary end points, even though they were not, in fact, powered to be statistically significant across all of the endpoints that most powerfully predict loss of ambulation to remind us, that's time to rise, 10-meter walk run, 4-stair climb, ELEVIDYS is powerfully statistically significant on

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the issue of clinical meaningfulness, literature notes, a rise time that slows beyond 5 seconds is the single most predictive metric for early loss of ambulation and 11 [indiscernible] those odds by literally over 90%.

While we did not hit statistical significance on NSAA, it is clear. I mean you can look at the curves and see it, that this is because NSAA was simply not as sensitive as the various time tests and indeed too insensitive to pick up the decline in the 6- to 7-year-old age group in 52 weeks that every other time metric detected in these degenerating boys. Fortunately, we have, as you know, a wealth of more sensitive tests that showed the benefits of ELEVIDYS in 52 weeks and across all of the age groups. This is indeed a scientific inquiry and the ELEVIDYS in our perspective, is simply overwhelming subject to that scientific inquiry.

And so we intend to move quickly, and we are confident that our regulators will match us in the rapidity of review and objectively review this application with an eye to expanding this level. With that, I would like to thank everyone and ask you to have a good evening, and I look forward to speaking to all of you again in a near 48 hours on our quarterly earnings conference call. Thank you.

**Operator**
This concludes today's conference call. Thank you for participating. You may now disconnect.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.