# EXHIBIT 27

**S&P Global**
Market Intelligence

# Sarepta Therapeutics, Inc.
# NasdaqGS:SRPT
# Company Conference Presentation

**Monday, January 08, 2024 5:00 PM GMT**

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ..................................................................... | 3 |
| Presentation | ..................................................................... | 4 |
| Question and Answer | ..................................................................... | 9 |

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Dallan Murray**
*Executive VP & Chief Customer Officer*

**Douglas S. Ingram**
*President, CEO & Director*

**Ian Michael Estepan**
*Executive VP & CFO*

**ANALYSTS**

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

**ATTENDEES**

**Unknown Attendee**

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

All right. Let's get started. Welcome everyone to the 42nd Annual JPMorgan Healthcare Conference. My name is Anupam Rama. I'm one of the senior biotech analysts here at JPMorgan. I'm joined by my squad, Priyanka Grover, [ LaRhea Hall ] and Malcolm Kuno. Our next presenting company is Sarepta, and presenting on behalf of the company, we have CEO, Doug Ingram. Doug?

**Douglas S. Ingram**
*President, CEO & Director*

Thank you. Thank you, Anupam, and thank you all, both in the room and on the Internet for joining us today. Appreciate that. We will be making some forward-looking statements, so please look to our public filings for the various risks and uncertainties that come whenever one makes predictions about the future. There's a lot one can say about Sarepta. We set for ourselves very big goals always with the patient as our North Star. We lead from our perspective.

We challenge convention when necessary, we execute. And what I'd like to do in the short time we have together today is 3 things. First, I'm going to talk a bit about the progress we've made over the last 7 years to get to the beginning of 2024. And then I want to talk about all of the milestones that are happening in 2024. And then if we are successful in '24, I do want to touch on where we might go from there.

But to do that, we have to start back in 2017 and talk a bit about the strategy that we created in 2017, and it was an ambitious one. Our goal in 2017 was to be one of the leaders in the use of genetic medicine to treat rare disease and in addition to our expertise in RNA to become one of the world's leaders in the use of gene therapy to bring a better life to patients. And to understand how brazen in a sense that ambition was, you need to understand where we were as we entered 2017.

To remind you, when we entered 2017, we had one approved therapy and we had about $5 million in sales as we entered 2017. We had a modest amount of cash on our balance sheet in a fairly short runway, we had a very modest pipeline. We had about 200 employees in the company. And while there was no doubt, this small cadre of mission-driven zealot at Sarepta, we had enormous gaps in expertise that we would need to figure out to make our vision a reality. And then finally, with respect to gene therapy, there were enormous aspects of gene therapy, we knew next to nothing about.

But we had some things going for us. In addition to our science, the things that made us confident that we were going to be successful first and foremost is the fact, and it's real for us that we are a very mission-driven company, that we have a motivating mission to help patients that drives us and gets us out of bed every day. Second, we had a well-articulated strategy from 2017 that would guide us along the way. We have the will and the ability to hire like-minded professionals who would focus both on great science and on patients. And we have this very unique Sarepta culture. It is a culture where when necessary, challenges tradition, where necessary challenges convention and gets things done.

And to remind you, we got a lot done over the last 7 years. As we track into 2024, I will remind you that we have 4 approved therapies today. From that $5 million as we entered in 2017, we have grown our revenue over the last 7 years at a compounded annual growth rate of about 115%. We ended 2023 with well over $1 billion in revenue when we'll talk about that.

We have a deep pipeline. We are on a non-GAAP basis profitable today, and we will be cash flow positive very soon. I'm very proud to say we have 1500 or so of what I believe to be some of the most passionate, dedicated expert professionals in all of biotech about whom and with whom I am extraordinarily proud to work. And then most importantly, we've done a lot of good for a lot of patients over the last 7 years. And we have an opportunity to do a lot more in the future.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And if we talk about patients, we have to start with what is core to our mission right now, which is bringing a better life to patients with Duchenne muscular dystrophy. So apologies for those folks who know Duchenne well.

Let me talk about it very briefly. Duchenne muscular dystrophy is an X-linked recessive disorder that results in children with Duchenne missing the shock-absorbing protein in their muscles called dystrophin. And while the course of this disease might vary, the results never vary.

As a result of missing the shock absorber in their muscles every time these boys move, they're damaged and damaged in a reparable way. That means they're going to end up in a wheelchair. It means they're going to struggle to move their upper limbs.

It means they're then going to struggle even to breathe and then they are going to die and they're going to die young. In fact, over the great majority of history, families had little reason for any hope. A common refrain when a physician diagnose the family was to tell their parents to go home and love your child because over the next 15 to 20 years, this disease is going to steal your child from you and there's nothing we can do about it.

Today, the world is very different. We have an enormous amount of potential hope today. The dialogue that can occur between physicians and patients is very different today. And I'm really proud of the role that Sarepta has played in changing that dynamic and that future for kids. So talking about that, in 2023, you'll know all four of our therapies are dedicated to bringing a better life to patients with Duchenne muscular dystrophy.

Our team did, in my view, a brilliant job of serving this community. And if we boil that service down to numbers as we must, here are the numbers. In the fourth quarter of 2023 for our PMO EXONDYS, VYONDYS and AMONDYS. We did $234 million, which means our PMO revenue last year stood at $945 million against the guidance of $925 million for the year.

You will also know that in June of last year, we launched the first gene therapy for Duchenne muscular dystrophy ELEVIDYS and in the fourth quarter, we did $131 million which brings our full year number from June until the end of the year at over $200 million, which far exceeds analyst consensus.

And so if you pull all of that together, from the $5 million we had as we entered 2017, we did almost $1.15 billion in revenue across our 4 therapies last year, which represented about a 30% -- 36% growth over the prior year. And as exciting as 2023 will be, and I'll talk a bit about this in a moment, 2024 offers the opportunity to be even more exciting.

Now with that said, I will tell you, we can't provide you with guidance yet on 2024. And the simple reason for that is both the ELEVIDYS revenue as well as the PMO revenue will be informed by the breadth of the eventual ELEVIDYS label and the timing of that label. But nevertheless, it is quite clear that 2024 is an enormously important year for us and we're really excited about it.

As you may recall, last year -- in May of last year, we won an Advisory Committee on ELEVIDYS and then in June of last year, we've launched -- we got approval in June, and we launched ELEVIDYS to treat Duchenne boys who were 4 and 5 years old. When we got that approval, we had 2 big goals. The first goal was to do a brilliant job serving this community and launching this first gene therapy for Duchenne muscular dystrophy. And I would hope you'll agree with me that given the numbers that I just showed you, we are in the process of doing exactly that.

The second goal we had was to move as rapidly as possible to remove the age and ambulation restrictions that currently exist in that label so that more boys and young men can benefit from ELEVIDYS. And if we're successful in 2024, and we'll talk about this, we have an opportunity to get to that second goal, not in years, but in months this year if we're successful. And the reason for that is in the fall of last year, our confirmatory trial EMBARK readout. Shortly thereafter December of last year, we submitted our BLA supplement asking the agency to remove what we see as unnecessary agent ambulation restrictions from the ELEVIDYS label.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And so what I'm going to do right now is briefly discuss the top line for EMBARK. I do this a little cautiously because I'm going to do a far less expert job of this than our Head of R&D, Louise Rodino-Klapac, but you'll forgive me for that.

So the first thing to recall, of course, is that we didn't hit statistical significance on our primary endpoint, which is NSA or North Star Ambulatory assessment. But what is also quite clear is that, that did not result from the performance of ELEVIDYS which did exactly what we had hoped it would do which is a resting decline and stabilizing the muscle in boys that have Duchenne muscular dystrophy and stopping the decline. It had everything to do with the fact that the tool was not sufficiently sensitive to detect the decline in the untreated patients, particularly in the 6- to 7-year-olds.

Now you might say to yourself, in fact, let's be very clear, what NSA would have suggested is in those 6- to 7-year-old boys, they were doing just fine. They weren't declining at all. But that isn't true. That's an artifact that the tool these kids were beginning what ultimately becomes the ferocious decline associated with Duchenne muscular dystrophy.

And for those who might think that I'm speculating or guessing at that, the good news is that we're not. All of our key secondaries, which were much more sensitive time test showed exactly what was going on, which is ELEVIDYS with stabilizing the boys on therapy but the kids that were not on therapy began ferociously declining. In fact, with respect to time to rise, if you were on ELEVIDYS, it reduced the odds of early loss of ambulation in those children by about 90%.

So let's look at the entire forest plot. So what we're looking at right here, the arrow at you is the forest plot of our primary endpoint are all of our key secondary endpoints and all of our timed secondaries. That vertical line that you can see in the left, everything to the right of that favors therapy, meaning the therapy is working and helping kids. If there were measures that were to the left, that would suggest that therapy may not be working. And as you can see with your own eyes, the therapy is clearly working. Everything is obviously significantly to the right of that line. In fact, on our key secondaries, we strongly hit statistical significance on forced decline, which is the other time to measure strongly associated with early loss of ambulation, we strongly hit statistical significance. We hit statistical significance on the wearable, something called SEC 95 C.

So if you look at this with your own eyes, you can quite clearly see this forest plot that ELEVIDYS is doing an enormous amount of good. Now the good news as well is we can do the math on what you're seeing clearly with your eyes because we had a pre-specified global statistical analysis, and that does exactly what you're doing. It looks at all of these measures together, it corrects for any multiplicities and ask whether the therapy is benefiting, kids or not. And the p-value on that global statistical analysis was literally 0.0044.

Beyond that, you will recall last year, one of the alleged open questions was whether consistent with its mechanism of action, ELEVIDYS would benefit muscle and children across ages or whether in some way that we can't fully explain by science, the protein would stop working when the kid blow out the candles on his sixth birthday. Well, here's the answer to that. These are all the pre-specified age-related results across all of the measures, and you can see the therapy is working equally well across ages just as one would expect.

So from our perspective, the summary conclusion is pretty straightforward. First thing is ELEVIDYS is a resting decline in boys with Duchenne muscular dystrophy and stabilizing their muscle. And I do want to remind you that is the most ambition treatment goal for a therapy like this. It is working equally well across ages as its mechanism of action would have suggested. It's safety and tolerability has been stable and laudable across many studies, across ages and across ambulatory status. So what we've asked for then is that the FDA removed the age and ambulation restrictions associated with ELEVIDYS.

And to remind you, what we're asking for is not unprecedented. In fact, every single other therapy ever approved in history for Duchenne muscular dystrophy doesn't have these sorts of limitations. So that's what we're asking the FDA for. Now as I said before, and as many of you probably already know, we submitted our BLA supplement in December 21 of last year. There are 2 things that we've asked for.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The first, as you know, is we asked to remove the age and ambulation restrictions for the label. And then second of all, in light of the fact that EMBARK, which is our confirmatory trial is now complete and from our perspective, has confirmed the benefits of ELEVIDYS, we've asked the agency to transform this approval from an accelerated approval to a traditional approval. We submitted on December 21. Let's talk a bit about timing.

So pursuant to the regulations, the FDA has 2 months to review that file before it accepts it. And then assuming we got an expedited review, that would be a 6-month review, which means that our PDUFA date could be out as far as August of this year. However, with that said, let me remind you of 2 things. The first thing is that while this BLA supplement is monumentally important to families living with Duchenne, it is relatively straightforward. It is certainly more straightforward in many ways than our original BLA, the majority of which dealt with very technical CMC and manufacturing issues. And of course, the second thing we have to all recall and remember is that families with Duchenne muscular dystrophy are waiting, and they are on a daily basis being [ harmed ] as they wait. So we are hopeful that we can do this much sooner than the official regulatory time lines.

Now if we're successful with ELEVIDYS and its expansion this year, this is going to be a monumentally important moment, certainly for the Duchenne community and even for Sarepta and for our investors. And, in my opinion, for the entire field of gene therapy, but we still have other things to do in 2024. So I'll briefly talk about some of the other things we're doing this year.

The first thing, of course, is we have 4 approved therapies. We're going to continue to serve the community with all 4 of our therapies, and we're in the process already of doing that. We have a really important readout on our next-generation chronic therapy, the PPMO, that's our P5051. That will read out this quarter. We'll release that information to everybody and then we'll talk to the agency thereafter.

We're advancing the entire field of gene therapy this year through suspension manufacturing, which we're aggressively working on through this novel new capsid about which we have an enormous amount of excitement and about multiple lines of inquiry to knock down pre-existing neutralizing antibodies and allow gene therapy -- more gene therapy patients to benefit. Beyond that, as you know, we have a very deep pipeline. We have about 40-plus programs in our pipeline. Time doesn't permit me to go into detail on all of it. There's a lot we're doing this year. But I'm going to touch on 1 program in particular. It's within our limb-girdle portfolio, limb-girdle muscular dystrophy is a collection of muscular dystrophies that are like Duchenne degenerative and often result in life-limiting or life-ending disease in patients.

Our lead program is SRP-9003 and it treats limb-girdle Type 2E, and that's an ultra-rare disease. I'm happy to tell you that our pivotal trial for 9003 has already been initiated. In fact, we'll be screening patients for our pivotal trial this year. And that's extraordinarily important. It is extraordinarily important for families living with limb-girdle Type 2E, and it's important for limb-girdle more generally, but in my view, it's far more important even than that.

With respect to ultra-rare diseases, it's Sarepta's perspective that we have to find viable ways to build programs that can serve ultra-rare disease. It is not acceptable from our perspective that science can stand ready to benefit patients, but that we can't find a way to get there administratively or viably. And I think the approach we're taking here could be a path finder for that.

So what is our pivotal trial? First, we're not using a placebo-controlled trial. We're using external controls. Second of all, we're properly sizing this trial in light of the ultra-rare nature of this disease. We're using lack of the native protein as the primary endpoint in the trial. And then we've got multiple inquiries into the impact of SRP-9003 on the pathophysiology of limb-girdle Type 2E that will form the confirmatory evidence for this.

And if we're successful here, it will be enormously important for 2E patients and for limb-girdle, but I think it could be a blueprint for the way we approach improving the lives of patients with ultrarare disease with sophisticated therapies like gene therapy and cell therapy and the like.

All of which is to say, if we're successful, 2024 is going to be an extraordinarily monumental year for all of us. In fact, if you go back to that vision we created back in 2017, we will have largely fulfilled the vision

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

that we set out to fulfill back in 2017 which we'd asked -- obviously, an important question, which is what do we do next? What happens if we're successful in 2024? One possibility is we're going to have years of very robust growth. We could take a victory lap, right? We could rest on our laurels. But we're not going to do that.

We have to come up with a grander vision for ourselves. And the reason we believe we have to do that is that from our perspective, with a little more than great science and a lot of grit, Sarepta has built an organization and team that knows how to serve patients and do great science and I think we owe it to the community and frankly, the society more generally to make the most of this.

So this is our grand next goal. Our grand next goal, if we are successful in 2024, is by 2030 through a combination of our internal pipeline, but also through external moves and business development and the like and bringing other technologies on, to become the next global big biotech, measured not in incremental growth, but in multiples of growth and measured not an incremental benefit to multiples of benefit. And if you look at that, you might say that seems excessively ambitious.

I would argue, however, given all of the tools available to us today that it is no more ambitious than the ambition we had in 2017 to get where we can get in 2024. In fact, there's a real argument to be had that the only thing that stands in the way of our ability to realize this vision is lack of imagination. And a lot has been said about Sarepta over the years. I don't think anyone has ever said that we lack imagination.

So we have a lot to do, a lot to execute in 2024, a lot to imagine for 2030. Let's end with the words of Buddy Cassidy, a leader in Duchenne. If you don't know who Buddy Cassidy is, Google search it, because you should know who he is.
He's a tremendous human being. And what he said is there is more to do. But now let's pause and bask in the glow of our achievement. We'll pause for a second and then we got to get to work. Because we have a ton to do in 2024, and I'm really looking forward to updating you along the way. Thank you.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Thank you, Doug. I just want to remind the audience, there's 3 ways to ask a question, right? So old school, raise your hand. I'll call on you. Two, there's -- I'm holding an iPad where you can submit a question portal. Okay. Here you go. Yes. I forgot the third way to do, oh, you can email me.

All right. So we actually do have a couple of questions in the question portal. I guess the first is, can you provide some color on how time lines for the efficacy supplement that you filed compares to the PMR that you filed? And should we hear about both filings at the same time? And do they go to the same group at the FDA?

**Douglas S. Ingram**
*President, CEO & Director*

Yes. So the short answer is that you should hear about them at the same time. We've submitted a BLA supplement that had both issues in it. So just to remind you, I said this in the presentation, we have both a request to change the label, to remove the limitations associated with age and ambulation. And we also have a request to transform accelerated approval to traditional approval and so the goal is to have these things decided together.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Okay. And then, when are you expecting the full data presentation and/or publication of EMBARK?

**Douglas S. Ingram**
*President, CEO & Director*

We'll be publishing this in sort of in the future. We're working on a publication as we speak.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

And are you expecting priority review and an ADCOM for the regulatory review for ELEVIDYS?

**Douglas S. Ingram**
*President, CEO & Director*

I'm going to met with some folks on this. On priority review, yes, we are expecting expedited review. And as to the ADCOM, no.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Okay. Questions from the audience.

**Douglas S. Ingram**
*President, CEO & Director*

By the way, for those who wonder, we had a bet whether I could answer just no. No, I think I lost the bet.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Questions from the audience? Yes.

**Unknown Attendee**

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I guess, just what happens with the label and the FDA seems like [indiscernible]?

**Douglas S. Ingram**
*President, CEO & Director*

First I'm going to ignore these -- the question about efficacy. With that, I'm going to turn it to Dallan, you can comment on this.

**Dallan Murray**
*Executive VP & Chief Customer Officer*

Yes. We're -- thanks for the question. We're generally pleased with the reaction of the payers, most of the payers, and many of the big plans have already issued policies covering to label. The payers have come a long way in the last 7 years understanding this disease, and they do understand the treatment goals. They understand this data. We're working very closely with them. And so it has been -- and as you saw from the results today, the team has done an incredible job engaging with the payers. And as you said yourself, the payers really have -- really understand the disease and they themselves have helped the payers understand it and are working closely.

**Douglas S. Ingram**
*President, CEO & Director*

I think a lot of payers deserve a lot of credit for what's going on there. Some of the larger payers and most interestingly, issued policies to cover to label fairly rapidly. And what -- we're in an interesting place right now because we have this very age-restricted label right now, you could envision a world in which a bottom line-oriented payer might try to find ways to game it. So a kid ends up over 6 years old and doesn't get therapy. And I'm really pleased to say we have not seen that right now. Payers are actually doing the right thing. So -- and I give a ton of credit to the team. They're doing a brilliant job working with payers and getting to understand the data and the need for this therapy and I give a ton of credit for payers for doing the right thing.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Questions from the audience? Another question in the portal. Are you planning to change your production process for ELEVIDYS from CDMO and doing something in-house? And how long will that process take? And will it require an FDA bridging study?

**Douglas S. Ingram**
*President, CEO & Director*

Well, there's a bunch there. So generally speaking, we used this hybrid model where we own a lot of the expertise around the manufacture of our products, process development, analytical development, assays, that stuff. And then we work with partners in the case of ELEVIDYS right now we work with Catalent and we've been very pleased with our partnership with Catalent. We always think about whether we would do some part of manufacturing in-house, but it won't take the place of this hybrid model more generally.

The real interesting issue from a manufacturing perspective longer term is moving to suspension. And we're working on that right now. In fact, we're in engineering runs at 500 leaders right now for suspension. So we want to move as fast as possible in suspension really to support a lot of the ex U.S. growth that can come in that sort of the next waves of ex-US.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Questions from the audience? Maybe a clarification, Doug, on time lines, a question in the portal. Does -- you noted that the PDUFA in the scenario that you posed would be in August. Does that assume a priority review? I think there's a view that maybe the PDUFA should have been in June?

**Douglas S. Ingram**
*President, CEO & Director*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Remember, we have to -- there's 2 -- they have 2 months to accept this. So it really depends on when they accept the submission. So we submit, then they accept it, then it's filed and then you get the 6-month review.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Got it. Questions from the audience?

**Douglas S. Ingram**
*President, CEO & Director*

But I do want to be clear, those are the regulatory time lines. We are very hopeful that we can move more expeditiously than that.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Questions from the audience?

**Unknown Attendee**

Curious on your thoughts on the next steps of the [indiscernible]. General thoughts regarding that.

**Douglas S. Ingram**
*President, CEO & Director*

Well, let me say we're very excited about the concept of the PPMO. The PPMO conceptually, just so people know, so we have this chronic therapy, the PMO is -- the limitation on the PMOs as great as they are, is that they're not wildly bioavailable. They don't get into the cells brilliantly. And what we've used with the PPMO is a proprietary peptide to draw far more in animal models and early readouts of our studies have suggested that we'll get a lot more PMO at the right place and then more exon skipping and then more dystrophin. So we're very excited about that. And in addition to that, it would be monthly dosing as opposed to weekly dosing.

So the next steps are really straightforward. We need to get the data, collect the data and look at the data, release the data. And then the very next thing we do, and it will take some months is we need to meet with the FDA. So again, as you know, I think, with respect to our PMOs, there is a very well-understood pathway for accelerated approval based on dystrophin production. We need to meet with the agency, show them the data and confirm their view that, that pathway applies for the PPMO as well. And that's what we'll do later this year.

**Ian Michael Estepan**
*Executive VP & CFO*

Yes. Maybe just one thing to add to that, though, is obviously, the data that we've seen from ELEVIDYS have tremendous efficacy. And so the landscape has to evolve with that. And so PPMO, if we're able to achieve 5% to 10%, dystrophin is certainly very significant from a scientific perspective would be a big breakthrough. We also have to think about the landscape in terms of access and reimbursement.

And I think what we've seen from the SMA market is you have not seen a ton of combination use and therefore -- we're going to have to see. Now obviously, we're 1 company who could potentially have both products. But so far, we haven't seen a ton of combination use between the 2. And so we have to take that into consideration. And so obviously, because ELEVIDYS has hit a very, very high bar from an efficacy perspective, I think it is more challenging for other approaches that don't produce as much dystrophy.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Question from the audience?

**Unknown Attendee**

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

I had a quick question in regards to a potential expansion of label. If label [indiscernible] the initial increase in the mix.

**Douglas S. Ingram**
*President, CEO & Director*

We're planning for that. Yes. We've been -- so planning for that. And frankly, we've been planning for that since 2018. So we're ready to serve the community with an expanded label.

**Unknown Attendee**

Okay. So what do you think of the competition situation with the CRISPR gene editing doing the [indiscernible] for DMD, so just like Vertex or some others in that company?

**Douglas S. Ingram**
*President, CEO & Director*

Yes. I mean that's interesting. So just for everyone, the question was particularly relating to CRISPR/Cas9 and gene editing, we think it's areally interesting concept. We actually have a program. We have a gene editing innovation center in Durham, North Carolina. We don't think we're there yet, and we don't think anyone else is there yet. I think Vertex actually is retooling as well. So is there an opportunity in Duchenne muscular dystrophy for gene editing? Yes, possibly. Would it be better than gene therapy today? I don't think that we know the answer to that.

And I don't think there's an immense thesis that would say it could be. But it's an interesting technology. It's just not mature yet from our perspective.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Other questions from the audience? We've got another one in the portal, which is when thinking about the ongoing review of ELEVIDYS, is it the same group of reviewers that is reviewing this time around?

**Douglas S. Ingram**
*President, CEO & Director*

Yes.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Maybe just one quick follow-up to that. There is a big distinct change, though, in terms of the leadership at OTAT with Nicole Verdun, now taking the helm and we start seeing her speak and echo the words of Peter Marks when she's giving presentations. And so we feel confident that he has some more support to effectuate and realize this vision.

**Douglas S. Ingram**
*President, CEO & Director*

Yes, for sure.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

All right. Maybe first question for me. We've seen a couple of headlines over the last couple of days related to REGENX and your ongoing IP situation there. Maybe you could comment on that.

**Douglas S. Ingram**
*President, CEO & Director*

Yes. I'm going to comment very briefly on it. Just for those who may not know, REGENX filed a lawsuit against Sarepta claiming that a particular patent they had covered our product. As we had said repeatedly

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

from the beginning, we were confident that we did not infringe any valid and extent patents for REGENX or anyone else. And the court agreed with us a couple of days ago and granted summary judgment dismissing that case. So we're -- all I'll say to that is we're very pleased with the results, and we think it is a win for innovation.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Questions from the audience?

**Unknown Attendee**

Doug, what do you believe are the most rational arguments for label expansion in 4- to 7-year-olds ambulatory patients or a nonrestrictive label?

**Douglas S. Ingram**
*President, CEO & Director*

Sure. And you know I'm going to end up with nonrestrictive label, right? That's our goal. So let's go through the theoretical choices. Some might say, well, if you're going to expand it, why don't you just expand it to the studied group 4- to 7-year olds. Let me start there. I don't think that would be a rational answer for a host of reasons. One, that just simply isn't the way development goes.

We -- you're not required to study 4 and 5s, and 5s and 6s, and 6s and 7s, and 7s and 8s, and then we'd have to study 9s and 10s, and 11s to 12s. And by the way, there are ambulatory kids that are 18, so 17s and 18s, and 19s to 20. And our grandchildren will pick this up and they'll be doing these studies for us. That isn't the way development works. The -- we had a confirmatory trial. The confirmatory trial was EMBARK.

The goal of EMBARK was to answer the question about whether this therapy would benefit children and whether the signals supported the conclusion that it worked equally well across ages. And so I think practically stopping at 4 to 7s wouldn't be consistent with the approach with the confirmatory trial or good science.

Then we go to the next level is the ambulatory, nonambulatory, right? So what about stopping at the ambulatory and not giving us an approval for the nonambulatory. I would argue that from a mechanism of action perspective, there is simply no good reason for that. And that's because this is a -- what this therapy does is quite straightforward. There's -- I mean, it's complicated, but you can describe it in a straightforward manner, which is it is a shock absorber that protects your muscles when you move. So as long as you have muscle, it should be protective in benefiting these kids. The mere fact that a kid would be in a wheelchair shouldn't stop that therapy for working, in fact it kind of seems like a particularly cruel answer, if a kid can't get out of a wheelchair to not let them get this therapy.

Now there's another argument to be had if I can be more nuanced. So I don't think that stopping at ambulatory would be consistent with the science. That's certainly our perspective. Then there's another question, which is, okay, what about traditional versus accelerated, right? Now I can argue that logically we should get a traditional approval on everyone. There is a way to give us an accelerated approval for nonambulatory and use our ongoing study called ENVISION as the confirmatory trial. So I think that's where maybe the debate could lie with the agency. Do we get approval for the nonambulatory, yes or no? And then the real question is, do you get traditional approval or accelerated approval? And that wouldn't surprise me that, that could be a discussion topic with the FDA.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

Any final questions from the audience? All right. Doug and team, thanks so much.

**Douglas S. Ingram**
*President, CEO & Director*
Thank you very much. Thanks for having us.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.