# EXHIBIT 34

**S&P Global**
Market Intelligence

# Sarepta Therapeutics, Inc.
# NasdaqGS:SRPT
# Special Call
## Wednesday, July 16, 2025 9:30 PM GMT

COPYRIGHT © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants  ...................................................................................  3

Presentation  ...................................................................................  4

Question and Answer  ...................................................................................  11

COPYRIGHT © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

# Call Participants

## EXECUTIVES

**Douglas S. Ingram**
*President, CEO & Director*

**Ian Estepan**

**Louise Rodino-Klapac**

## ANALYSTS

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

**Biren N. Amin**
*Piper Sandler & Co., Research Division*

**Brandon Richard Frith**
*Wolfe Research, LLC*

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

**Caleb Kawun Stubbs**
*William Blair & Company L.L.C., Research Division*

**Charles Anderson Moore**
*Robert W. Baird & Co. Incorporated, Research Division*

**David Timothy Hoang**
*Deutsche Bank AG, Research Division*

**Eliana Rachel Merle**
*UBS Investment Bank, Research Division*

**Gil Joseph Blum**
*Needham & Company, LLC, Research Division*

**Huidong Wang**
*Barclays Bank PLC, Research Division*

**Lin Tsai**
*Jefferies LLC, Research Division*

**Michael Eric Ulz**
*Morgan Stanley, Research Division*

**Mitchell Swaroop Kapoor**
*H.C. Wainwright & Co, LLC, Research Division*

**Ritu Subhalaksmi Baral**
*TD Cowen, Research Division*

**Tommie M. Reerink**
*Goldman Sachs Group, Inc., Research Division*

**Unknown Analyst**

**Uy Sieng Ear**
*Mizuho Securities USA LLC, Research Division*

**Will Devroe Soghikian**
*Leerink Partners LLC, Research Division*

**Yanan Zhu**
*Wells Fargo Securities, LLC, Research Division*

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good morning, and welcome to Sarepta's Conference Call to discuss the Update on Strategic Restructure and ELEVIDYS Label. As a reminder, today's program is being recorded. At this time, I'll turn the call over to Doug Ingram, CEO. Please go ahead.

**Douglas S. Ingram**
*President, CEO & Director*

Thank you, Lisa. Let's move to Slide 3, please. So first, before I begin, please note that we will be making forward-looking statements today. As always, please refer to our various public filings for the risks and uncertainties that come when making predictions about the future.

Next slide. Also, we will be discussing non-GAAP financial measures on this webcast. Descriptions of these non-GAAP financial measures and reconciliations of GAAP to non-GAAP financial measures are included in today's press release and the slide presentation available on the Investors section of our website.

Let's move to Slide 5, please. All right. With that, let me thank you all for joining Sarepta's call today for an important update on our strategic priorities. Over the course of 2025, Sarepta has been faced with various challenging unexpected and impactful events. Based with these events in such a short period of time, it would be easy and indeed it would be tempting to simply stay the course without making significant change, all in the hope that things will self-correct and be fine. But that complacency would be irresponsible.

We are a mission-driven organization, focused on patients and failure to adapt to current circumstances would risk our long-term viability as an organization and decrease the opportunity to bring the greatest benefit to the greatest number of patients living with rare disease. So we have chosen not to be complacent, but to act.

As you will hear today, we are restructuring and making very significant changes to our strategy to ensure that we remain a vibrant enduring patient-centric organization focused on bringing a better life to those with rare genetic disease. In its broadest strokes, our strategy is threefold. First, we will support our 4 approved therapies and the Duchenne patients that they serve. Our 3 PMOs and our one-of-a-kind gene therapy, ELEVIDYS, are bringing a better life to patients. As for ELEVIDYS, our top priority is to arm our patients and their caregivers with accurate information on the efficacy and safety of this remarkable disease-modifying therapy and to ensure and encourage fact-based discussions between caregivers and patients in desperate need of therapy, not in the future, but right now.

Second, with the proceeds of our performance, we intend to advance a very focused pipeline of high-impact development programs that will serve rare disease patients in desperate need of therapeutic intervention. And third, we will manage our P&L and balance sheet with discipline to ensure even under very conservative estimates of performance, we remain profitable. Cash flow positive and capable of addressing our financial obligations, including the retirement of our 2027 convertible note.

Next slide, please. In today's call, we will discuss the following: First, we will discuss our adapted strategy and our restructuring plan, focused on reducing costs, managing our 2027 liabilities, and realigning our portfolio to sustain our business and fulfill the promise of our mission. Next, we will provide an update on ELEVIDYS, including our current regulatory interactions as well as the outcome of our previously discussed expert panel. Finally, we will discuss the near-term potential of our siRNA assets, including FSHD, DM1, SCA2 and our Huntington's disease program.

Now turning to our restructuring. The goal of our restructuring is to reprioritize our pipeline to those development programs and research that will have the greatest impact and to ensure we have the resources to meet our financial obligations while fully investing in and advancing that pipeline, including our siRNA programs for rare genetic diseases, in need of therapeutic intervention.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

As Ian will discuss in more detail shortly, our restructure will include the following: First, we have reshaped and reduced our portfolio to focus on the following programs. DM1, FSHD, SCA2, IPF and Huntington's disease; also, our limb-girdle Type 2E program, which is SRP-9003; also our ongoing studies for EXONDYS, AMONDYS, VYONDYS and ELEVIDYS, and research programs for SCA1 and 3, third-generation RNA research for Duchenne, and siRNA early research targets to be determined. We have a number of very important programs that by necessity, we can no longer fund. Our goal is to pause those programs and to look for alternative approaches to progressing them such as through partnerships.

Second, we will reduce our ongoing spending by about $900 million through 2027, ensuring that even with very modest estimates of forward sales, we remain profitable and cash flow positive and can meet our financial obligations, including maintaining our revolver and addressing our 2027 convertible debt.

Third, necessarily but very regrettably, this will require a reduction in force or risk by about 36% of our workforce or approximately 500 employees. This risk is personally very painful to me and others as we have an extraordinarily talented team. And with this most more focused portfolio, we will be losing some very talented and very dedicated professionals. But given our refocused pipeline and strategy, it is absolutely necessary. I do want to linger for a moment and thank our departing colleagues for their extraordinary work and for their passion for our mission. Your contributions have brought a better life to countless patients.

Next slide. Finally, in support of our new strategy, I've made some adjustments to the structure of my direct team. I have elected Dr. Louise Rodino-Klapac to President of R&D and Technical Operations. Bringing together the R&D and technical operations functions into a single organization will enable the advancement of our pipeline with speed and scientific rigor by integrating perspectives and expertise that accelerate the pace of innovation. In her expanded role, Louise will oversee technical operations, clinical development, clinical operations, regulatory affairs, research and medical affairs.

We have also made Dr. Rachael Potter, our Chief Scientific Officer. Over the course of Rachael's tenure at Sarepta, she has grown significantly in her role, taking on increasing responsibilities include leading our research efforts. Dr. Potter will report to Dr. Rodino-Klapac.

I have also made Ian Estepan, our President and Chief Operating Officer. In this expanded role, in addition to his current responsibilities, the commercial organization will now report to Ian. Ian will also oversee finance, business development, government affairs and patient affairs and corporate affairs. The integration across our commercial organization, corporate affairs and corporate functions will enhance our execution and create many efficiencies.

I have promoted Dr. Patrick Moss to the role of Executive Vice President and Chief Commercial Officer reporting to Ian. Patrick holds a Doctor of Pharmacy degree and previously served as our Senior Vice President, Head U.S. Market Access and Sales, and he's been integral to each of our 4 product launches. He was responsible for building Sarepta's industry-leading market access, reimbursement and specialty distribution teams and his vast industry experience includes facilitating coverage of some of the most important therapies our industry has developed and commercialized.

Patrick succeeds our Chief Customer Officer, Dallan Murray, who will be departing Sarepta. On behalf of the team and our Board, I would like to sincerely thank Dallan for his very long-term commitment to Sarepta and to the Duchenne community. We all wish Dallan the very best.

We have also elected Ryan Wong, currently Senior Vice President, Strategic Finance, Treasury and Investor Relations to the role of Sarepta's CFO reporting to Ian. Ryan has served as Head of our Financial Planning and Analysis organization. He assumed responsibility for our Investor Relations team last year and has been a trusted partner to Ian.

Next, after Ian discusses the restructuring more detail and comments on current performance, Louise is going to provide an update ELEVIDYS, followed by a discussion of our prioritized siRNA platform. For ELEVIDYS, you will hear that as to the ambulatory population, the FDA has requested a black box warning to which we agree. So our label for the ambulatory patient population appears to be resolved. As to the nonambulatory patient population, more dialogue is required, but having completed our expert panel, we

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

have developed an informed sirolimus immunosuppression protocol about which we have much conviction. Our goal is to work with the FDA to gather the requisite information and to implement it as soon as we are permitted. It barely needs to be said that nonambulatory patients have precious little time to wait. And if we and FDA are dedicated to these patients, we must move quickly.

Now with that, I will turn the call over to Ian, who will provide more information on our restructuring and from there, we will turn the call to Louise, who will discuss our current strategy for ELEVIDYS and our more focused pipeline. Ian?

**Ian Estepan**

Thanks, Doug, and good afternoon, everyone. Building on Doug's message of decisive action, I want to reinforce Sarepta's commitment to remaining a vibrant enduring and patient-centric organization. Today, I'll walk you through the strategic and financial decisions we've made fundamentally informed by our dedication to addressing our 2027 financial obligations and maintaining access to our revolving credit facility. Our overall goal is clear: to position Sarepta for long-term sustainable growth, strengthen our financial foundation, prioritize high-impact innovation and ultimately deliver enduring value to both patients and shareholders.

Next slide, please. Let's begin with a brief outlook at our preliminary second quarter results. We reported total net product revenue of $513 million, comprising of $282 million from ELEVIDYS and $231 million from our PMO franchise. Importantly, we ended the quarter with $850 million in cash and cash equivalents, an increase of $203 million over Q1. Our total combined R&D and SG&A expenses on a GAAP basis were $338 million, and on a non-GAAP basis, were $294 million.

Next slide, please. Before detailing our cost structure changes, I want to emphasize that our Duchenne portfolio continued to deliver a stable and robust revenue stream, firmly supporting our long-term growth strategy. We are not providing specific revenue guidance at this time because we're unable to fully quantify the impact of the second ALF event and lack full visibility into the non-ambulant opportunity. That said, with the ambulant population for ELEVIDYS remaining on the market, we can provide a floor for the opportunity. At a minimum, we expect annual revenues of $500 million from the ambulant ELEVIDYS population. This floor is based on conservative assumptions regarding both the incident population and the prevalent ambulant population, reinforcing our commitment and confidence in this baseline revenue stream.

Our PMO franchise continues to perform well with expected annual revenues of around $900 million. Combining this with the ELEVIDYS ambulant opportunity, our overall Duchenne franchise is expected to generate greater than $1.4 billion annually. To reiterate, this is not formal guidance, but should provide investors confidence in the baseline opportunity ahead.

Next slide, please. Now let's discuss the decisive necessary changes supporting our financial resilience. First, we are prioritizing our siRNA platform which we believe offers a durable growth engine. As part of this shift, we are deprioritizing several programs, including most of our limb-girdle pipeline with the exception of limb-girdle 2E, which we plan to continue supporting. For deprioritized programs, we are actively exploring strategic alternatives to advance them without incurring additional expense. Furthermore, we are undertaking a significant restructuring of our organization, including a 36% workforce reduction. This difficult but essential decision is expected to generate $120 million in annual cash savings starting in 2026.

We also anticipate over $100 million in total cost savings through the end of 2025. This figure is net of estimated severance and other onetime restructuring charges totaling $32 million to $37 million. We also project a substantial $300 million in annualized cost savings from phase-out programs beginning in 2026. These comprehensive actions align our cost structure precisely with our strategic priorities.

Next slide. So these changes aren't merely about cost cutting, they are proactive and aggressive exercise and financial discipline designed to secure our future. Our revised structure is expected to deliver approximately $400 million in annual cost savings. This will significantly reduce our average annual expenses, excluding onetime collaboration milestones to a range of $800 million to $900 million on a go-

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

forward basis starting in 2026. This approach positions us to preserve financial flexibility as we look to proactively manage our 2027 debt obligations.

Next slide, please. More specifically, these cuts are deliberate and aimed at ensuring we continue to meet our minimum EBITDA levels necessary to comfortably maintain access to our $600 million revolving credit facility. To ensure continued access to the facility, we must maintain a minimum trailing 4-quarter EBITDA of $172 million. This threshold is tied to our financial covenants, specifically a maximum secured net leverage ratio of 3.5x and a minimum consolidated interest coverage ratio of 2.5x. Our financial projections based on conservative annual revenue baseline of $1.4 billion indicates that we are well positioned to meet these requirements. This financial discipline is especially critical as we approach the potential launches of FSHD and DM1 later this decade. Maintaining revolver access ensures we have the liquidity and flexibility to execute on our long-term growth initiatives and proactively manage the liabilities.

So to conclude, with a leaner, more focused organization and a clear financial road map, we are confident in our ability to drive sustained operating profit, support future innovation with our potential best-in-class RNA platform and meet all of our future debt obligations, again, reinforcing our commitment to both patients and shareholders.

So with that, I'll turn the call over to Louise, who will provide an update on our promising siRNA programs, including our upcoming data readouts and preclinical data that underscore their best -- their potential to be best-in-class. Next slide. Louise?

**Louise Rodino-Klapac**

Thanks, Ian, and good afternoon, everyone. Next slide, please. I'd like to start with an update on ELEVIDYS labeling settlement. We will agree to include a black box warning for ALI/ALF, alongside additional changes to ensure the communication of important safety information to prescribers and patients. With these changes, we will be resolving any material issues with the ambulant portion of the ELEVIDYS label. Discussion with FDA on the supplement is ongoing, but there appear to be no substantial issues for the ambulant patients to remain on market.

We have also convened an expert committee to discuss ALF and the potential of adding an additional immunosuppression regimen for the non-ambulant population. The committee consisted of hepatologists, pathologists, neuromuscular experts, hematologists and immunologists. We greatly appreciate the collaboration and their expert input. The committee aligned on the regimen with sirolimus. We are proposing to test this in a clinical trial setting in non-ambulatory patients as cohort 8 in our 103 study. We are also considering a number of submissions we've received to support investigator-initiated trials to study ambulant patients in the real-world setting.

Next slide, please. The proposed study design for Study 103 cohort 8 is a 6-month study to evaluate the addition of sirolimus in non-ambulatory Duchenne patients. Sirolimus will be given pretreatment 14 days prior to infusion and continue for approximately 12 weeks. This is in addition to our standard protocol for steroids. The primary outcomes include incidence of acute liver injury and 9001-dystrophin expression. Following 6 months of follow-up, patients will be enrolled in our long-term extension study, Study 305. If we are clear to proceed by the FDA, this study will be the fastest path to generating data with sirolimus and will be in addition to the amendment of Study 303 or our ENVISION study. We are deeply committed to the safety of Duchenne patients and look forward to continuing to serve this community.

Next slide, please. Now as Ian just outlined, we've reduced our R&D expenses and sharpened our focus on our pipeline. Our work as a genetic medicines company includes significant opportunities in siRNA. The targeted RNAi molecule or TRiM platform is applicable across a wide variety of tissue types and capable of deep and durable target gene knockdown. The strength of this technology has been demonstrated in preclinical studies across multiple tissue types. This foundational validation is why we have confidence that our TRiM-based therapies have the potential to be truly differentiated and best-in-class approaches.

To overcome delivery challenges, we often see with RNA therapies, the TRiM technology employs proprietary tissue targeting ligands. This combination of siRNA chemistry and its ligand delivery platform

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

enables us to achieve robust knockdown of over-expressed proteins and reach areas of the body that are traditionally difficult to penetrate.

Next slide, please. To remind you, the potential of our siRNA portfolio is important to Sarepta and to patients affected by diseases that currently have no treatment. This importance stems from several key factors. First, we are addressing large unmet needs with chronically administered therapies to treat patients who suffer from neurodegenerative diseases. Second, we're developing technologies where the foundational science is well understood. The proof of concept is established and the mechanism of action is validated. Third, these programs are generating numerous near-term catalysts that will accelerate our pipeline. And finally, we are employing Sarepta's competitive advantage and expertise in neuromuscular diseases.

Today, I'll focus on our key siRNA programs: FSHD, DM1, SCA2 and Huntington's disease. Next slide, please. FSHD is a rare, progressive and debilitating muscle disease causing weakness in skeletal muscles with no disease-modifying therapies available. It's being studied in patients with the abnormal activation of the DUX4 gene, leading to the production of DUX4 protein, which is myotoxic and causes muscle degeneration. SRP-1001 is designed to reduce the production of DUX4 protein in skeletal muscle. This approach should also be therapeutic in type 2 FSHD, which we intend to explore in subsequent studies.

Next slide, please. Based on the data we've generated to date, we believe SRP-1001 has the potential to be differentiated and best-in-class. Our preclinical studies have shown that robust muscle penetration achieved with SRP-1001 leads to significant dose-dependent knockdown of DUX4 mRNA in FSHD patients have shown on the left. This deep knockdown then effectively reduces the downstream expression of DUX4-related genes, which you see on the right. This comprehensive reduction of the underlying pathological driver along with the observed robust tissue penetration directly supports our expectation for improvements in both biomarkers and functional outcomes in patients.

Next slide, please. Further illustrating its potential in an engineered FSHD mouse model, DUX4 was induced leading to an increase in DUX4 protein expression. As demonstrated in the blue bars on the left and the right, SRP-1001 treatment was shown to prevent the increase in DUX4 expression indicating its prophylactic potential and effectively reverse existing DUX4 expression, demonstrating its ability to mitigate established pathology. This dual action of prevention and reversal highlights the broad therapeutic potential of SRP-1001.

Next slide, please. A Phase I/II study of SRP-1001 in participants with FSHD 1 is currently underway. We have fully enrolled cohorts 1, 2 and 3 in Part 1, which is our Single Ascending Dose study or SAD study. For these initial cohorts, we are evaluating escalating doses to establish the safety profile and biological activity. We look forward to sharing preliminary data in the second half of 2025. This data will focus on safety, DUX4 mRNA knockdown, DUX4-regulated gene expression and functional assessments. Our objective with these preliminary results is to provide initial proof-of-concept for DUX4 knockdown and to further characterize the safety profile of SRP-1001 in humans.

Next slide, please. Next, I'd like to discuss our SRP-1003 program for myotonic dystrophy type 1, or DM1, which is the most common and severe form of myotonic dystrophy. This disease affects muscles and multiple organs leading to progressive weakness, myotonia and often cardiac and respiratory complications, significantly impacting quality of life and life span. There are currently no disease-modifying treatments.

Next slide, please. DM1 is driven by an expanded CUG trinucleotide repeat and DMPK transcripts causing mutant DMPK mRNA to accumulate to the nucleus and disrupt normal splicing. We are employing an RNAi conjugate, SRP-1003 designed to specifically target and suppress DMPK and skeletal muscle. We believe SRP-1003 has best-in-class potential given its strong preclinical profile. As shown on this slide, SRP-1003 achieved 80% knockdown of DMPK mRNA in the skeletal muscle of nonhuman primates. We anticipate this robust level of knockdown would be translatable into humans, positioning SRP-1003 as a highly effective treatment for DM1.

Next slide, please. Further demonstrating its disease-modifying potential in a DM1 mouse model, SRP-1003 was shown to both reduce pathological DMPK mRNA and importantly, correct the missplicing.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

As seen on the left, we observed nuclear knockdown with greater than 50% reduction in DMPK mRNA at the highest dose. This directly addresses the disease mechanism of the mutant DMPK mRNA accumulates in the nucleus. Further, as depicted on the right, we observed a dose-dependent correction of the mis-splicing, reaching up to 60% repair. This level of mis-splicing correction is critical as it is directly linked to the clinical manifestations of DM1, thus providing strong evidence for SRP-1003's ability to have a direct and meaningful impact on the disease in humans.

Next slide, please. A Phase I/II study of SRP-1003 in patients with DM1 is currently underway. We have fully enrolled cohorts 1 and 2 in the single ascending dose arm of the study. The planned dosing interval for subsequent studies is 12 weeks. We look forward to sharing preliminary Phase I data in the second half of this year. The primary endpoint for this study is safety with key secondary endpoints, including DMPK knockdown, DMPK mediated splice and disease, and functional assessments such as vHOT or Video Hand Opening Time, a method for assessing hand myotonia and finger extension.

Next slide, please. Spinocerebellar Ataxia Type 2 or SCA2, is a progressive neurodegenerative disorder for mutations in the ATXN2 gene. As SCA2 progresses, patients experience severe loss of balance, difficulty walking, swallowing and slurred speech, often requiring a wheelchair within 10 to 20 years of onset. There are approximately 2,000 diagnosed SCA2 patients in the United States, and there are currently no disease-modifying treatments available. Our SRP-1004 program is designed to target the ATXN2 protein in the CNS.

Next slide, please. We're excited by the strong preclinical results we've observed for SRP-1004, which we believe position it as a potential first disease-modifying therapy for SCA2. The data presented here clearly show that SRP-1004 reduces both Ataxin mRNA and protein levels. As indicated by each of the blue bars, this reduction is observed across various dose levels compared to control, demonstrating a dose responsive effect. This signifies the robust and specific target knockdown achieved by SRP-1004 in this preclinical model. The ability to reduce ATXN2 the causative protein in SCA2 is a critical step in addressing the underlying pathology of the disease.

Next slide, please. These data further underscore SRP-1004's potential and are important to understand. You can clearly see that SRP-1004 significantly reduces ATXN2 in regions of the non-human primate brain that are most impacted by the disease, such as the cerebellum, frontal cortex and the cervical spinal cord. This robust reduction of the disease-causing protein in key brain regions provides critically important signals into SRP-1004's potential for meaningful impact in humans.

Next slide, please. The Phase I study of SRP-1004 and patients with SCA2 is currently underway as a randomized placebo-controlled single ascending dose study. Cohort 1 of this in this arm of the study has been fully enrolled. We are on track for first participant in for Cohort 2 in Q3 2025, and we look forward to sharing data when it becomes available.

Next slide, please. Huntington's Disease, or HD, affects over 40,000 U.S. patients. It's a progressive neurodegenerative disorder caused by a mutation in the Huntington gene. Patients typically develop motor, symptoms in their 40s and 50s, but subtle changes can emerge much earlier. As the disease progresses, individuals face severe problems with swallowing, balance and voluntary motor tests, often becoming nonverbal and bedridden in late stages. There is currently no cure or disease-modifying treatment available. We look forward to filing our clinical trial application by the end of 2025 and initiating this trial in the first half of 2026.

Next slide, please. To effectively treat Huntington's disease, it's important to show that you can target deep into the brain. Our proprietary technology enables a subcutaneous route of administration to deliver siRNA across the blood-brain barrier to the source of the disease deep in the brain, offering the potential for a truly differentiated approach. As shown here, SRP-1005 linked to an antibody fragment targeting TfR1 or the Transferrin Receptor 1 successfully delivers siRNA via subcutaneous injection into the mouse brain. This results in a significant reduction of Huntington protein levels 1 month after delivery in deep brain regions, including the cortex and striatum, highlighting its potential for best-in-class CNS penetration.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Next slide, please. On this slide, we present data from a more clinically relevant nonhuman primate model. SRP-1005 successfully reduces Huntington protein levels in these models by binding to nonhuman primate TfR1, enabling effective access to the brain. Critically, this reduction of the pathologic protein is observed in key regions of the brain, highly relevant to the manifestation and progression of Huntington's Disease, such as a temporal cortex and the frontal cortex. In some of these regions, we observed up to 80% Huntington protein knockdown. These data provide strong evidence for the potential of SRP-1005 to impact the disease by reducing the causative protein in areas crucial for disease pathology.

Next slide, please. Now in addition to our key programs, as mentioned today, we are also excited about our clinical stage program, SRP-1002 to treat idiopathic pulmonary fibrosis or IPF. IPF is a chronic progressive and irreversible lung condition affecting approximately 60,000 diagnosed patients in the United States. Patients with IPF passed away approximately 5 years from diagnosis. SRP-1002 is designed to inhibit fibrotic development by silencing MMP 7, a key driver of fibrosis, offering a novel therapeutic approach.

Our preclinical programs in development, which are depicted on this slide, include therapies to treat spinocerebellar ataxia type 1 and spinocerebellar ataxia type 3. These are also rare genetic neurodegenerative disorders, and we plan to leverage our existing learnings from our SCA2 program to inform and accelerate development for SCA1 and SCA3, aiming to bring urgently needed therapies to these patient populations.

Lastly, we plan to pursue up to 6 discovery targets and muscle, encompassing both skeletal and cardiac or in the essential nervous system. To advance these efforts, we've agreed to work exclusively with Arrowhead to develop therapeutics targeting skeletal muscle diseases.

In summary, I'd like to reiterate our excitement for these programs and the tremendous progress we've made. We believe we have the science, the data and expertise to advance could be best-in-class therapies to address vast unmet need in patients with FSHD, DM1, SCA and Huntington's, along with our earlier stage siRNA pipeline.

Next slide, please. As you can see from this slide, we have numerous value-building program milestones and clinical data readouts expected in the near term and into 2026.

Next slide, please. I'll now turn the call over to Doug to open up for the Q&A session. Doug?

**Douglas S. Ingram**
*President, CEO & Director*
Thank you very much, Louise. Lisa, let's open the call for Q&A.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question for today will come from Andrew Tsai of Jefferies.

**Lin Tsai**
*Jefferies LLC, Research Division*

My question is around the ELEVIDYS side. I mean, for you to agree with the FDA to include a black box warning for the ambulatory and then FDA to continue to be open to discussing the pathway for nonambulatory and then maybe based on your other FDA interactions so far, too, possibly with [indiscernible], is it fair to assume that the FDA at this juncture has no attention -- intention to pull ELEVIDYS from the market at this juncture even on the nonambulatory side? I just wanted to gauge your confidence about that.

**Douglas S. Ingram**
*President, CEO & Director*

Yes. I mean, first of all, as you note, the FDA recently requested of us that we include a black box safety warning and we frankly think that was imminently reasonable and we have agreed to that. So that is resolved. So on the general question about whether ELEVIDYS as a therapy will remain on the market? The answer is, I think, pretty clear, yes, there's no good reason to believe it wouldn't and frankly, it would be unreasonable to consider it otherwise.

As it relates to the non-ambulant patient population, we have more work to do and more discussion to be had. Remember, we have proposed an immunosuppression regimen, and that's based on expert panel that we held with experts with deep knowledge and understanding of these areas. That just concluded. I don't believe we've even submitted that information yet, but we will before the end of this week, submit that information to the agency. Our plan and protocol is to use this sirolimus protocol as a prophylactic measure, our preclinical data justifies our conviction that this may very well significantly reduce signals of elevated liver enzymes and other liver biomarkers, which could greatly enhance this therapy and reduce risk.

As you also know, we voluntarily not required by the one, but voluntarily chose in the ultimate interest of patients to pause shipments for dosing of nonambulatory patients. That was a very painful decision on our part because I think, as we all know, any of us who have worked with Duchenne muscular dystrophy, time is never on the side of patients with Duchenne muscular dystrophy and that is particularly true of nonambulatory patients.

So we have a lot more work to do. We obviously don't even have a response yet from the FDA on this issue because we are just submitting it after having just concluded our expert panel but we certainly have a lot of conviction to get and gather the necessary data on this immunosuppression protocol to provide it to the FDA as fast as possible and work with the FDA to get back to shipping ELEVIDYS for nonambulatory patients. So more to come there. We have more work to do and more dialogue to be had with the FDA there.

**Operator**

And the next question is coming from the line of Ellie Merle of UBS.

**Eliana Rachel Merle**
*UBS Investment Bank, Research Division*

Thanks for the update. Just to clarify, when you say that you expect a floor of $500 million for ELEVIDYS, do you mean for this year or the remainder of the year, just how should we think about the second half of the year in terms of sales? Specifically, I guess, can you elaborate on what you've seen in terms of dosing

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

since the update in June in the ambulatory patients? How we should think about revenues for the second half? Any color on sort of how new start trends have been looking?

**Douglas S. Ingram**
*President, CEO & Director*

So a couple of thoughts on that. First, just to absolutely remind everyone, we're not providing updated guidance right now. We'll continue to monitor. And when we have more information, we can consider whether to guide that likely would be a 2026 event -- for full year 2026, but we'll look at that again at Q3 and make a decision about where we are. There's lots of uncertainty in all of this, given that we need to really assess the impact that's occurred from hesitancy associated with these events and the ability to get information out and fact-based information.

And second of all, of course, we need to have a better understanding of when that day will come when we can begin to ship for these weighting nonambulatory patients. So when you think of this $500 million number, don't think of that as a guidance. It is not guidance. It is a stress test. One of the things we had to do when we thought about updating our strategic plan, cutting costs and really focusing our pipeline is to ensure that on the other side of that, we were a very financially strong and very viable organization. And one of the ways to do that is to take very conservative assumptions and use them as a stress test to determine even in the very conservative situation would we be profitable, cash flow positive, able to maintain our revolver, able to drive our programs and able to retire our 2027 debt. And the answer is at $500 million, we can do that. So I don't want to suggest I'm giving you any guidance on the rest of the year or that you should consider that $500 million is some sort of reasonable estimate of the rest of the year. It's really a downside stress test to ensure that we're in a good place.

Now generally speaking, I can tell you that there -- as a result of these 2 events, there has been some hesitancy. You can see that people are still getting dosed. We had, I think, reasonable in light of where we are reasonable Q2 but we saw a significant hesitancy afterwards in a drop and as a result of that, we have work to do there. And Patrick -- Dr. Moss and his team are very well positioned to do that work along with our medical affairs organization and to start getting the right kinds of information out to patients. So they're properly armed as well as, of course, to physicians. So they're properly informed to have those discussions and that's what we're going to do over the course of this year.

So apologies, we're not in a position to provide forward guidance at this point. We would love to be in a place to do that, but we need more information and more work needs to be done there.

**Operator**

And the next question will be coming from the line of Brian Abrahams of RBC.

**Brian Corey Abrahams**
*RBC Capital Markets, Research Division*

I appreciate the updates and congrats to the team members who have increased responsibilities. I'm curious what you guys are looking for in the ENDEAVOR Cohort 8 to reestablish ELEVIDYS used to nonambulatory patients. Any sense of the timelines it will take to generate sufficient safety data to ensure that this immunosuppressive protocol is mitigating the risk? And I know you haven't specifically discussed this with the FDA yet, but just wondering, have you had any initial signals from them as to whether something like this could be sufficient or whether they would need functional data out of ENVISION?

**Douglas S. Ingram**
*President, CEO & Director*

Well, a couple of thoughts. First, on the answer of dialogue with the agency, we're not in a position to have that dialogue yet. We haven't even submitted the protocol yet and that will happen. Again, as I said, this week, I can't provide you with any clear timelines right now for a number of reasons. One, we're just submitting the protocol to the agency to get their blessing. We'll have to have some dialogue there. And number two, we'll have to think about the pace of enrollment and the like.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

What we're looking for in all of this is to look for signals of reductions in elevated liver enzymes and other biomarkers. We obviously can't look for this ALF because that is an unbelievably rare signal that would take years and years. But if you can significantly reduce even liver stress and liver injury through things like liver enzymes, bilirubin and the like, one would obviously pause it, you've done a significant -- you've reduced that risk very, very significantly. What it will look like is something will -- and the timing of all that, we'll talk about later, but you should remember that if you see elevated liver enzymes, you tend to see it fairly rapidly. This is an event that occurs really in the first 4, 6 maybe as long as 7 or 8 weeks, and that's it. So this should be a very efficient approach.

And finally, while we haven't had discussions with the agency, there is no logical basis using any form of critical thinking to ENVISION that you would need functional data because this isn't about functional data. This is dealing with a very specific issue, which is with respect to older patients and we're using nonambulatory is kind of the marker for that. We have seen a very rare, but very unfortunate situation where we've seen out of more than 150 patients. We've seen 2 very serious acute liver failures, and the goal here is to reduce that risk. We have preclinical data that would strongly suggest that the prophylactic use of sirolimus in connection with the infusion of an AAV-mediated gene therapy. And in the case of our data, it was, of course, rh74 would very significantly reduce that risk. And so we're going to pause as painful as that is for patients. We're going to take a look at that, and we're going to get comfortable that this, in fact, significantly reduces that risk. And assuming that it does, we're going to -- with the blessing of the FDA begin to ship ELEVIDYS for the treatment of nonambulatory patients.

**Operator**

And our next question is coming from the line of Tazeen Ahmad of Bank of America.

**Unknown Analyst**

This is Daniel on for Tazeen. We had a question on the siRNA platform. So you had mentioned you were planning to host an R&D Day later this year. Is that still the plan? And is that where we should expect to see the updates for FSHD and DM1? And maybe more broadly, given the reduction in OpEx you're expecting, how many programs do you think could move forward at the same time if you see positive data earlier this year?

**Douglas S. Ingram**
*President, CEO & Director*

Let me answer the latter question first. We are planning for success. Our plans for these development programs assume that we can move at speed with all of these programs. Now there -- we also have a bunch of research programs as well. And in the event that we are successful with all those research programs, we're going to have to find the budgets for them. I'd love to believe that we're going to have a significant problem with our research programs.

But -- so we're fully funded with all of our research, and we're fully funded with our development programs. We are not going to pump the brakes on the pipeline. Our goal is to go as fast and as hard as possible to gather data. So the way we looked at this pipeline was not to slow things down, but rather to get focused. And we've had to make a lot of very painful choices and that it goes without saying that it was an extraordinarily painful decision for instance, to not proceed with these limb-girdle programs that we're not proceeding with them and instead to find, hopefully, if all goes well, partners for those programs that can advance them.

So our goal is to really get narrow, really get focused, focus on really high-end PV, high-impact programs, dealing with disease-modifying therapies that are going to bring a better life to patients that have no disease-modifying therapies available to them today and to go as hard as possible on those. And that's the way we're funding this budget. We're not fiddling around or going at half pace with these programs are going to go as fast as possible.

On the issue of data updates and R&D Day, I will turn the call over to Louise, who can provide an update.

**Louise Rodino-Klapac**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

We do not plan to hold the R&D Day, but we will plan to update you as soon as the data is available, which will be the second half of this year.

**Operator**

And the next question will come from the line of Gena Wang of Barclays.

**Huidong Wang**
*Barclays Bank PLC, Research Division*

Thanks for the update. I know there is still tough path down the road, but at least ELEVIDYS is still on the market. So regarding the Cohort-8, given it's only 25 patient study, so Doug, you just mentioned 2 patients out of 150, that translated to 1.33% death rate. So with 25 patients, like how can we learn from this outcome? Like what kind of data or what percentage of patients show what kind of ball market because 25 patients death will not be able to -- sufficient to show the death benefit or the survival benefit there, safety benefit there, but then what will be the data you'll be looking for so that you think it will satisfy FDA to put the nonambulatory patients back on the market?

**Douglas S. Ingram**
*President, CEO & Director*

Yes, it's a great question, Gena. Let me explain. Your point is very well taken. The signal for this ALF is extraordinarily small. If you take the entire population, it's a small fraction of a percent if you just limit it to the nonambulatory patients to your population, to your point, it's a little over 1%, which by the way, that's lower than really most other full-body infusion gene therapies. You would see a higher rate of fatal events and other ones. So your points are very well taken there, but that's not what we're going to be looking for. In fact, what we're going to be looking for is elevated liver biomarkers, liver enzymes and bilirubin and obviously, it goes without saying, if you can avoid even stressing significantly the liver or causing liver injury, then you have not only probably greatly reduced the risk of ALF. You probably just completely eliminated the risk that you would have an ALF if you don't even have liver injury. So that's what we're going to look for.

And what you'll find with AAV-mediated gene therapies and certainly ELEVIDYS is no different than others, is that when you dose these full-body infusions you will see something in the range of 30% to 40% significant increased elevated liver enzymes. Most of the time, almost all of the time, in fact, until this year, 100% of the time, they didn't have any long-term impact. They responded very rapidly to modest increases in steroids. Now we've seen that there are ones that can go beyond that. But if you can knock those down, you can knock that 30% to 40% down to a much smaller percent, you clearly have increased the safety margin of the therapy, and that's what we're going to look for.

And when you think about that and you consider you're going to see 30% or more typically than in 25 patients, you should have an ample data, at least our preclinical data, which would predict and rely on preclinical data only up to so much and then you need to see it in patients. But a preclinical model would predict that we will see a very significant reduction in elevated liver enzymes in 25 patients in -- give us a lot more comfort as we begin to dose and ship for dosing nonambulatory patients.

**Operator**

Our next question will be coming from the line of Mike Ulz of Morgan Stanley.

**Michael Eric Ulz**
*Morgan Stanley, Research Division*

Maybe just a follow-up on ELEVIDYS. You mentioned some hesitancy there to prescribe post the second event. Just curious if maybe you can provide a little bit more color on the types of feedback you've gotten from physicians more recently?

**Douglas S. Ingram**
*President, CEO & Director*

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.
spglobal.com/marketintelligence

Well, some of it is in direct feedback. It's just we see hesitancy in start forms. We saw some canceled appointments after the second event, and that obviously results in some hesitancy. And it is more of what we've talked about before, which is with a disparate patient population across the United States and different levels of information and sophistication and the same with the physicians, we've got these very sophisticated well understood -- very in the no physicians and then you've got a lot of other secondary referrers and the like that have less information and need more information.

There's just hesitancy. And there was clearly some additional hesitancy. There's hesitancy after the first event, there was clearly an additional hesitancy after the second. You can still see through our performance that patients are still getting dosed and we're still doing generally well, but we need to do more work there and fully assessing that and understanding the needs of the physician community and getting the right kinds of information to the physician community and supporting the patient communities work really need to do over the course of this year. And hopefully that will all put us in a great position to begin to provide guidance for 2026 and beyond.

But what we did, again, for purposes of this call and purpose of our strategy was to say, okay, you've got to have a target to look at -- to know what you're going to do, both from a focus perspective, a prioritization perspective, a cost-cutting perspective and the like. And what we did is take a very conservative view. So essentially, think of this as a sort of a theoretical stress test. I don't think of this as guidance. And we said even at $500 million, what would it take for us to be comfortable that we would meet our revolver, we could satisfy our 2027 obligations. We could drive these programs and that's where we got to.

And how do we get the $500 million? We back into it just looking at the really conservative approach. We've got -- the incident population alone is about 420 patients a year, that would more than cover this, but we won't get all that every incident patients. So -- but we'll get a significant number of them. And of course, we're going to get the prevalent population. And one would assume that you could use $500 million very comfortably to act as a stress test, we did that, and that's how we got to our strategy.

And that's why we -- as painful as it is, frankly, to lose programs that we really were committed to and also even more painfully to lose some colleagues of ours that really talented human beings that we're very committed, we feel very, very good about our strategy. We feel great about our forward performance as an organization, and we have a vibrant future and a very viable future with this strategic point.

**Operator**

And our next question will be coming from the line of Salveen Richter of Goldman Sachs.

**Tommie M. Reerink**
*Goldman Sachs Group, Inc., Research Division*

This is Tommie on for Salveen. At this point, what are your updated thoughts behind the driver of this being only in nonambulatory patients so far? And why it could remain and not affect ambulatory? And wondering if the expert committee spoke about potential effects in the ambulatory patients or if you've had any FDA feedback to this end?

**Douglas S. Ingram**
*President, CEO & Director*

On the feedback, we haven't had feedback to that effect from the FDA. I'm going to turn this call over to Louise to comment. But broadly speaking, you should understand -- we've seen it in non-ambulant patients. It's really a continuum issue. The ambulatory status by itself is very likely not the issue. The real issue is just level of debilitation. And there may be other elements to this that explains why out of 950 or more patients, we've seen it in these 2 and none others. But Louise, you can touch on that more if you'd like.

**Louise Rodino-Klapac**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. You captured most of it. The ambulatory status is really just a surrogate for disease progression and the nonambulatory patients have more significant comorbidities. The expert committee -- I agree with that in terms of the severity of the disease being the likely factor in these patients as well.

**Operator**

And our next question will be coming from the line of Uy Ear of Mizuho.

**Uy Sieng Ear**
*Mizuho Securities USA LLC, Research Division*

Maybe just help us understand, in 2027, you have about more than $1 billion of debt that's due and based on your not guidance, but your lower threshold, it seems that you'll probably generate something about $300 million a year, like help us understand how you would sort of may repay that or find a way to be not in default of the debt? And just a housekeeping question, what proportion of the 2Q ELEVIDYS sales was in nonambulatory versus ambulatory?

**Douglas S. Ingram**
*President, CEO & Director*

On the last one, it looks like it's a small fraction of Q2. And then Ian, I'll turn it to you.

**Ian Estepan**

I'm sorry, can you repeat that?

**Douglas S. Ingram**
*President, CEO & Director*

Basically, what's the way to satisfy the 2027 obligations?

**Ian Estepan**

Yes. Obviously, we're not going to necessarily outline our exact pathway. I mean I think we spent a significant amount of time on the call showing our stress test that Doug has reiterated several times. And so we're going to look to be proactive as we manage it prior to the maturity.

**Operator**

And our next question will be coming from the line of Yanan Zhu of Wells Fargo Securities.

**Yanan Zhu**
*Wells Fargo Securities, LLC, Research Division*

Just wondering, sorry, just to further clarify. For the $282 million in the second quarter, how much is nonambulatory? And also, I was wondering when you provide this stress test floor level of $500 million, I think you depicted it as through 2027. And I was wondering, so for this hesitancy and potential impact, when do you think is the labor level? Is it fairly near term? And you would have go back to growth for an ambulatory population? Or is it really it could go as far as 2027?

**Douglas S. Ingram**
*President, CEO & Director*

Well, again, we're not providing guidance. So obviously, we're much more aspirational than our stress tests are. And Patrick and his team have great plans and a lot of work to do to get the right information in front of the right folks. And at the same time, Louise and her team have some important work to do with the use of immunosuppression so we can support getting the nonambulatory patient population dose. So certainly, we have many goals there.

And then on the first question, I don't have the exact number, but a minority of patients, it was under 50% of the patients would have been nonambulatory in this sector.

**Ian Estepan**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. The reason why it's not 100% clear, historically, we did not track by ambulatory status. We track by age. So to Doug's point, the best we can back into is around 30% to 40%.

**Operator**

Our next question will be coming from the line of Biren Amin of Piper Sandler.

**Biren N. Amin**
*Piper Sandler & Co., Research Division*

On the last call, I think the company mentioned that the FDA was proactive in its communications to the company regarding potentially adding sirolimus as part of the enhanced immunosuppression regimen. So given these communications, do you believe your proposal for nonambulatory are aligned with those communications with the FDA? And if I could ask, were those communications with FDA team members that continue in their position at the agency currently?

**Douglas S. Ingram**
*President, CEO & Director*

Well, the first set of questions came when [ Dr. Berdan ] was running the division. So I don't know with precision who precisely change. The short answer is, I can't speculate nor can Louise speculate on the FDA's response to our submission because we haven't even submitted it yet in fairness to the FDA. We'll be submitting that protocol on Friday. I certainly think I can editorialize and say, I think it's a very reasonable, thoughtful approach informed by some of the best experts that are hepatologists, neuromuscular specialist immunologists and the like. It's supported by both anecdotal dosing that's occurred in the real-world setting in other places, but also supported by our own preclinical work in the nonhuman primate, the use of sirolimus prophylactically is done, at least in the non-neuro primate, just fantastic work in both knocking down signals of liver stress and elevated liver enzymes. And also, interestingly enough, enhanced expression dramatically, which would be another potential benefit.

But with all of that said, I can't speculate on the FDA's response to it because we -- in fairness to them, we haven't even provided it. We just completed the expert panel and compiled the protocol and we will submit it again this week. And I'm very hopeful that given that patients are waiting that the FDA will respond with rapidity and we could get moving on this, and then we'll provide an update than we are.

**Operator**

And the next question will come from the line of Gil Blum of Madam Company.

**Gil Joseph Blum**
*Needham & Company, LLC, Research Division*

I hope not to spend a ton of time on this going back to the -- you mentioned increasing the safety margin on the additional study here. And I mean you guys have some feedback from the committee that you just conveyed. How much would be enough of a reduction in enzyme the elevations to kind of make you feel comfortable or at least what I'm asking what the experts said?

**Douglas S. Ingram**
*President, CEO & Director*

Louise, do you have any comment on that? Or is that too difficult to answer at this point?

**Louise Rodino-Klapac**

I mean, we're looking for a significant reduction in liver enzymes in comparison to historical. I think we have, as Doug mentioned, 30% to 40% of patients have elevated liver enzymes. And so with 25 patients, we should be able to see a significant reduction there, and that's what we're looking for. As we've mentioned, AOI and the incidence of ALI leads to ALF. And so if we show a meaningful reduction there, that's what we're looking for in terms of improving the safety margin in nonambulatory patients.

**Douglas S. Ingram**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

*President, CEO & Director*

And maybe one of the challenges with that answer is we're trying to do what's right for patients by enhancing the risk benefit of this therapy even more than it already exists. But I do want to point out that we're starting from a place where the actual signal is very, very low. I mean you look at CAR-Ts -- you look at CAR-Ts and you're more in the -- you're a few multiples higher than this as a risk profile. You look at other full-body infusion gene therapies, you're at a higher risk. So we're going from a very rare risk, but we want to reduce it even further so that we are doing the most we can for patients. And we're doing it in particular because we have available to this really fabulous preclinical data that gives us a lot of conviction that we can actually do that and actually enhance even more the safety margin of a therapy that's shown historically a good safety margin.

**Operator**

Our next question will be coming from the line of Anupam Rama of JPMorgan.

**Anupam Rama**
*JPMorgan Chase & Co, Research Division*

I was wondering if you could dig in a little bit more on that $500 million year floor for ELEVIDYS based on the ambulant population. What are the key assumptions going into that by -- based on what you already know from -- by age or functional status or are you assuming patients in the decline phase or more likely to go on therapy? Any more color on that?

**Douglas S. Ingram**
*President, CEO & Director*

Honestly, there's no more color to be had because you're kind of -- to be fair, Anupam, I understand why you're over-indexing on the $500 million and assuming that that's our guidance. It's not our guidance. That is a number that says, okay, what would be a number that, frankly, I'd be livid at Patrick for? But if you want to know the truth. But what would be a number that would be kind of the basement that we could use as a stress test so that we could do work.

Like remember, we have to go through a strategic planning process, and we have to determine what programs can we afford? What should we focus on and what expenses should we reduce? And so we use this $500 million number. And you can back into sort of how one would see this as a baseline number by just looking at the first look at the incident population. There's 420 patients. You're not going to get all 420, but you're going to get a lot of them. That alone might get you pretty close to the $500 million, and then you've got the prevalent population. And even if one assumes a fairly significant hesitancy, you're not getting 100% hesitancy. So you would assume that you should comfortably be -- $500 million would be a very comfortable number.

And then we use that as the basis for driving a strat plan. Again, we're not providing a guidance right now and don't consider either $500 million, even our conservative guidance. It's not guidance. It's a stress test to put ourselves in a position so that we can feel comfortable executing forward that we have a really strong strategic plan. We can continue to focus on the highest NPV programs that we have, ones that will change the lives of patients that we can remain viable that our revolver will remain in place and that we'll be able to comfortably address our 2027 convertible and be a long-term viable independent organization. That's it.

**Ian Estepan**

And just to add, obviously, this is not the traditional way that we typically would position the opportunity. That said, the reason why we're doing it is because our bonds are trading at distressed levels. And we wanted to make sure the bondholders saw a clear pathway to be able to repay the notes. I know everyone is able to run the calculations based off of a $1.4 billion run rate and see a very achievable path for us to pay that off. So this is the reason why we did it to assure the bond markets that we are able to meet our requirements and access to the revolver and have liquidity.

**Operator**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And the next question will be coming from the line of Ritu Baral of TD Cowen.

**Ritu Subhalaksmi Baral**
*TD Cowen, Research Division*

A question on supporting ambulatory sales and boosting ambulatory sales going forward. Maybe this is for Louise. How do you think about the potential for maybe off-label use or independent use of sirolimus in the ambulatory patient population or clinical studies around reduction of mobile events or liver enzyme elevation in that sort of stage cohort to, I guess, support safety and comfort of ambulatory and other diseases? And just given our discussions with experts suggest that they are very familiar with sirolimus, they've used it for a lot of things. Is that something that can be explored to support those. And then a quick housekeeping follow-up. As we think about the headcount reduction, can you give the breakout between R&D and any impact on the commercial force?

**Douglas S. Ingram**
*President, CEO & Director*

Yes. I'm going to handle both of those just because -- the issue on the sirolimus for ambulatory, you need to understand that we cannot promote the use of sirolimus in ambulatory patients. So I want to be careful about that issue. It's not our goal to be promoting its use. We are aware, as you are also aware, the anecdotal opportunities that physicians have found to explore the use of sirolimus. We actually have in our possession, some requests from physicians for investigator-initiated trials to explore the use of sirolimus in the ambulatory patient population.

And we're considering them and actually we're very actually interested in seeing what that might look like in a controlled investigator-initiated clinical trial. But I don't want to speak too much about that because we have to be very careful that it is not our goal to be out promoting that use with physicians. That really is something that physicians are going to have to consider in their expert medical judgment and they can have their own dialogue on 1 other on that. On the cuts, so it's 80-20. It's 80% R&D, which is R&D and tech ops R&D, and 20% G&A-ish, according to the gentleman sitting to my left.

**Ian Estepan**

The ultimate point in question, though, is any cuts that were across the entire -- the customer across the entire organization, to Doug's point, heavily weighted to R&D. Ultimately, what I think you're trying to get at, though, is, are we making cuts that could impact our sales efforts, and that's absolutely all of the initiatives that we -- all the initiatives that we have outlined last quarter are fully funded. We have all -- Patrick have all the resources available to support patients getting on both ELEVIDYS and our PMOs.

**Douglas S. Ingram**
*President, CEO & Director*

We're not impacting customer-facing parts of the organization at all, of course.

**Operator**

And our next question will be coming from the line of David Hoang of Deutsche Bank.

**David Timothy Hoang**
*Deutsche Bank AG, Research Division*

I just wanted to ask on the PMO franchise, your level of confidence that you would deliver $900 million in revenues this year? And then any insight you can provide on how that franchise might evolve going forward? I know in the past, there were some thoughts about cannibalization of the PMOs. And then obviously, there are some competitor programs on the horizon as well.

**Douglas S. Ingram**
*President, CEO & Director*

Yes. So we're generally very comfortable with our broad guidance of $900 million. On a go-forward basis, we had always said that there was -- there might be some modest cannibalization associated with

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

ELEVIDYS. Obviously, with lower forecasting ELEVIDYS than we had envisioned at the beginning of this year, you would see less of that, not more of it. So actually, it's not a significant issue right now. And part of that comes from the fact that we have ex U.S. sales that tend to do very well. So we feel good about where we are. And from a competitor perspective, we'll see when we get a competitor, whether that has any meaningful impact or not. But right now, we feel very good about where we are.

**Operator**

[Operator Instructions] And our next question will be coming from the line of Mitchell Kapoor of H.C. Wainwright.

**Mitchell Swaroop Kapoor**
*H.C. Wainwright & Co, LLC, Research Division*

I wanted to ask on ELEVIDYS. You mentioned the hesitancy and the canceled appointments in start forms. Are you seeing this hesitancy from the patient side or the physician side primarily. And with the black box warning update, can you talk about any new ways your sales force is communicating the new risk benefit profile with physicians?

**Douglas S. Ingram**
*President, CEO & Director*

On the canceled appointments, and I think it's driven mostly by the patient community. So I think we need to get to the patient community and make sure they're armed with the right information to have discussions with their physicians. And by the way, let me be very clear. The hesitancy doesn't surprise us nor do I think it's irrational at all. You hear about a piece of news. You don't have tons of additional information. It makes sense that a family might reflect on that issue. We just need to make sure that everyone has the right information so that when physicians sit down with their patients, they can have thoughtful, intelligent discussions. On the black box warning, I mean one of the reasons I think the black box warning will not have a significant impact as we're already communicating what's in the black box warning. That's already part of all of our communications.

So we -- long before there will be a black box warning. We're already getting that information out. We're making sure that physicians and their patients have the right kinds of information so they can make intelligent thoughtful decisions for these patients. So I don't think the black box warning will have a significant impact for no other reason than we already provide that information to the world, and we're very careful about that.

**Operator**

And our next question will come from the line of Kostas Biliouris of BMO.

**Unknown Analyst**

This is [ Yuri ] on for Kostas. Congrats on the update. I have 2 questions. First, as part of your expert committee discussion, have you discussed a recent report of SAEs linked immunosuppressive regimen that included sirolimus in a gene therapy trial with AAV-rh74 vector. If so, what lessons can be learned in the case of ELEVIDYS? And then the second question if we may, what kind of clinical data have you seen to guide prioritization of your DM1 and FSHD programs?

**Douglas S. Ingram**
*President, CEO & Director*

Louise, are you aware of what this gentleman is asking?

**Louise Rodino-Klapac**

I'm not. I don't -- not that I'm aware of anything with our program. I'm assuming that with another program, but I'm not aware of it.

**Unknown Analyst**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Sorry if I was not clear. It was a different program, but it was using the same vector as ELEVIDYS.

**Douglas S. Ingram**
*President, CEO & Director*

We're not aware. We can look into it, but we're not aware of this issue.

**Ian Estepan**

That being said, I mean -- and Louise obviously can speak to it, but there has been long-term exposure of patients being dosed with sirolimus and obviously, there are risks associated with an immunosuppressive regimen. But with the proper protocols, we have seen very good outcomes associated with it.

**Operator**

And our next question will come from the line of Kristen Kluska of Cantor.

**Unknown Analyst**

This is [ Ianne ] on the line for Kristen. First, regarding the more than $100 million in cost savings that's guided through the year-end '25, should we be expecting that to be weighed more in the third quarter? And then second, if you could just provide any color around the timeline around the LGMD2 in data readouts ahead of the guided BLA submission?

**Douglas S. Ingram**
*President, CEO & Director*

I'll send the first question to Ian, and then I'll turn the second question to Louise.

**Ian Estepan**

Obviously, just because we're midway through -- we're already in the third quarter, obviously, where you're going to see those savings are obviously going to be back-end loaded, right, as we get closer to the end of the year.

**Douglas S. Ingram**
*President, CEO & Director*

Louise, any update on the timing of limb-girdle data?

**Louise Rodino-Klapac**

Yes. So the IIa data will be scheduled for presentation at the World Muscle Society. It will be included in the BLA. We did guide that we did meet the primary endpoint for the study in terms of expression.

**Operator**

And our next question will be coming from the line of Sami Corwin of William Blair.

**Caleb Kawun Stubbs**
*William Blair & Company L.L.C., Research Division*

This is Caleb on for Sami. We just had one quick one. We were sort of wondering how you were thinking about ELEVIDYS peak sales going forward now? I know it's kind of early, but any color on that, that would be helpful.

**Douglas S. Ingram**
*President, CEO & Director*

Yes. Thank you for your question. I'm sorry, we're -- it's premature, we're going to have to do more work before we can provide that. We need to get back to being able to provide guidance before we can give you peak year sales. But thank you.

**Operator**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And the next question will come from the line of Brian Skorney of Baird.

**Charles Anderson Moore**
*Robert W. Baird & Co. Incorporated, Research Division*

This is Charlie on for Brian at Baird. We just wanted to dive more into the LGMD franchise. So in terms of pausing that, it sounds like that was mostly a financial motivation, but was there any thoughts on your part about AAV safety risk in the context of a less severe disease motivating this decision? And is there anything you've seen there so far? And then just quickly on 9003, if that gets approved, is that an asset you would plan on launching yourself?

**Douglas S. Ingram**
*President, CEO & Director*

Yes, on the last question, 9003, we certainly would launch it ourselves and we have the sales force to do that. On the first limb-girdle, the process we went through with respect to the strategic plan was to do essentially a risk-adjusted net present value, considering all the costs and the ultimate opportunity, some of the most painful decisions that we had to make. In fact, I would argue probably the most painful decisions we had to make was deciding that we couldn't justify continuing with the limb-girdle program. So it was on -- it was really on the viability issue and the cost issue for them.

So our goal, our hope is that we can find partners for these limb-girdle programs. I'm quite confident that they have a great hope of bringing a better life to patients with these various limb-girdles, all of whom are in need of therapeutic intervention. But unfortunately, we aren't going to be able to pursue them ourselves.

**Operator**

And the next question will be coming from the line of Brandon Frith of Wolfe Research.

**Brandon Richard Frith**
*Wolfe Research, LLC*

In regards to PMO's post-marketing studies, can you remind us what should we expect for those readouts? Or were they agreed upon endpoints with the FDA? And is there any risk here for the PMOs being pulled from the market?

**Douglas S. Ingram**
*President, CEO & Director*

The ESSENCE program, which covers AMONDYS and VYONDYS, we'll have a readout late this year or early next year. And then once we have it, Louise can remind us of the primary endpoint or the collection of endpoints in that study. Once we have it, then the goal is to look at the totality of evidence and in connection with that evidence and all of the other evidence that exists, including real-world evidence, one would evaluate the therapies on that basis.

I say that because I would remind you even before we unblind ESSENCE and look at it, we have a significant amount of real-world evidence on the use of these therapies and the impact of these therapies over time. With respect to EXONDYS, which obviously can read through to AMONDYS and VYONDYS. We've seen in the real world after 6-plus years of use a very rigorous look at the real-world evidence, we see significant additional years out of a wheelchair, reductions in contractures, reductions in emergency room visits, the Kaplan-Meier on mortality is pushed off by a year. So there is a lot of great real-world evidence.

It didn't surprise us that much because one of the interesting things you'll know after 8 -- almost 9 years with these therapies is that physicians and their families who have used them have seen them as so valuable that the compliance rate is extraordinarily high, over 90%. But in addition to that, we'll have the readout of ESSENCE. We'll have to look at the trends in ESSENCE and what we see there. And then it will be the totality of evidence that will explain where we're going from there and whether we can turn those accelerated approvals into traditional approvals.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ian Estepan**

And maybe just one thing to add. Obviously, NS Pharma recently released results and their study wasn't successful. The agency has asked them for -- to do an additional study. We haven't seen any impact on prescribing with their therapy. And I think the reason is exactly what Doug just outlined, there's a lot of real-world evidence supporting these therapies. Remember this is a week infusion and the compliance rate is over 95%, patients wouldn't be going through this level of burden if they weren't driving benefits. So obviously, in heterogeneous rare diseases, it's not always straightforward from an endpoint perspective. But the wealth of data that supports these therapies and certainly the support within both the patient and physician community, certainly shows strong support for the efficacy of the therapies.

**Douglas S. Ingram**
*President, CEO & Director*

And one final thing I didn't mention, I should mention that there is a post-marketing commitment with respect to EXONDYS. EXONDYS which is the largest of the 3 therapies by population has a post-marketing commitment, but it's not a post-marketing confirmatory trial. It is a post-marketing dose ranging study. For those who don't know the history, actually, interestingly enough that Sarepta had proposed a post-marketing confirmatory trial, the FDA rejected it and wanted instead just a dose ranging study. So with respect to EXONDYS, in particular, the outcome of that study will determine whether we continue to use the 30 mg per kg dose, which we do now or whether we should do a higher one -- higher dose, either 100 or even 200, we'll have the results of that next year, I believe.

**Operator**

And the next question will be coming from the line of Joseph Schwartz of Leerink.

**Will Devroe Soghikian**
*Leerink Partners LLC, Research Division*

This is Will on for Joe. So back to ELEVIDYS, we've heard that another patient was hospitalized due to liver injury following treatment. And so could you just talk a little bit about what this overall situation looks like now? How many patients have had ALF cases? And how have these been managed? And what's the management entailed? And then maybe more broadly, how many patients have been hospitalized due to liver injury and how has that figure been trending over the past few quarters?

**Douglas S. Ingram**
*President, CEO & Director*

I don't have that -- I mean, we don't have that number available to us right now. I mean, if you're dehydrated, you get hospitalized, and that's considered hospitalization. The short answer is that the current prescribing information and the data that we have is consistent with the risk benefit of this therapy. We've seen 2 ALFs resulting in death, and we've reported them there haven't been any others with respect to ELEVIDYS. And so the risk benefit remains exactly as we have talked about before.

**Ian Estepan**

We know that there were a couple of cases that were on social media, which seem to have resolved. So that's what you might be referring to.

**Operator**

And there are no more questions in the queue, and I would like to turn the call back to management for closing remarks. Please go ahead.

**Douglas S. Ingram**
*President, CEO & Director*

All right. Thank you very much, Lisa, and thank you all this evening for spending time with us and for your very thoughtful questions. As I will just say again, what we've had to do with our strategic plan in many ways, is very painful, both because we've trimmed very promising programs that we need to find

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

homes for. And by necessity, we've lost really valuable colleagues that I think are going to go off to do great things elsewhere. But we are left with a very focused strategy, focused on what I believe to be fantastic approved therapies. They're going to do a lot of good for Duchenne patients. And then using that performance, we're going to drive very high NPV, very impactful therapies, disease-modifying therapies for rare diseases that desperately need these treatments. And so I feel very good about where we're heading. We're going to be a lean, fast-moving and very viable organization going forward. I look forward to updating you as we move forward.

But I would also note the following that we will have a Q2 announcement, of course, in our Q2 earnings release in August, in early August, but you will note today that we've gone into a lot of detail. We provided all of the financials here. We've provided all material information in this call. And so in our continuing efforts at efficiency, we will issue an earnings release in early August, but we won't burden you all with another earnings call in early August. And I look forward to updating you if something comes up earlier. But otherwise, I'll look forward to updating you on our performance towards our strategic goals at our Q3 earnings call. Thank you very much and have a good evening.

**Operator**
Thank you all for joining. This concludes today's conference call. You may now disconnect.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2025 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2025 S&P Global Market Intelligence.