**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE SAREPTA THERAPEUTICS, INC. SECURITIES LITIGATION | Civil Action No. 1:25-cv-13530-BEM |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

I.      INTRODUCTION ............................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................................. 4

        A.  The Gene and Exon-Skipping Therapies were Key to Sarepta's Survival ...................... 4

        B.  Defendants Misled Investors about rh74's Unique Toxicity Risks ................................. 6

        C.  Defendants Misled Investors about the LGMD Program's Progress ............................. 8

        D.  The Truth about rh74's Viability Emerges ..................................................................... 9

        E.  Defendants Misled Investors about the ESSENCE Study ............................................. 10

III.    DEFENDANTS' "PUZZLE PLEADING" ARGUMENT IS MERITLESS ....................... 11

IV.     THE COMPLAINT ADEQUATELY ALLEGES FALSITY ............................................ 12

        A.  Defendants' Statements Touting rh74's Superior Safety Were Misleading ................. 12

        B.  Defendants' LGMD Progress Statements Were Misleading ......................................... 22

        C.  Defendants' ESSENCE Statements Were Misleading ................................................... 23

V.      THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ......................................... 24

VI.     THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ............................ 29

VII.    CONCLUSION ............................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)................................................................................................14

*Baker v. Twitter, Inc.*,
2023 WL 6932568 (C.D. Cal. Aug. 25, 2023)....................................................................11

*Baron v. Smith*,
285 F. Supp. 2d 96 (D. Mass. 2003) ..................................................................................12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)............................................................................................................12

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ........................................................................27

*Blue v. Doral Fin. Corp.*,
123 F. Supp. 3d 236 (D.P.R. 2015).....................................................................................22

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .....................................................................16

*In re Bos. Sci. Corp. Sec. Litig.*,
646 F. Supp. 3d 249 (D. Mass. 2022).................................................................................27

*Brennan v. Zafgen, Inc.*,
196 F. Supp. 3d 444 (D. Mass. 2016).................................................................................12

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002).................................................................................................23

*In re Columbia Sec. Litig.*,
155 F.R.D. 466 (S.D.N.Y.1994) .........................................................................................20

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)........................................................................................15, 21, 27

*In re Credit Suisse-AOL Sec. Litig.*,
465 F. Supp. 2d 34 (D. Mass. 2006) ..................................................................................29

*Dahhan v. OvaScience, Inc.*,
321 F. Supp. 3d 247 (D. Mass. 2018).................................................................................14

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014)..................................................................................14

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005).........................................................................................................29

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ...........................................................................................27

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) ............................................................................26

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ...........................................................................................15

*In re Fibrogen, Inc.*,
  2022 WL 2793032 (N.D. Cal. July 15, 2022)..................................................................16

*Gargano v. Liberty Int'l Underwriters, Inc.*,
  572 F.3d 45 (1st Cir. 2009)..............................................................................................12

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...........................................................................................17

*Hills v. BioXcel Therapeutics, Inc.*,
  2025 WL 2777129 (D. Conn. Sept. 29, 2025)..................................................................24

*Hoff v. Popular, Inc.*,
  727 F. Supp. 2d 77 (D.P.R. 2010)....................................................................................29

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ..................................................................11

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005)..............................................................................26

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) ..........................................................................12, 16

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  639 F. Supp. 3d 350 (E.D.N.Y. 2022) .............................................................................11

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  437 F.3d 588 (7th Cir. 2006) ...........................................................................................21

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................................................................28

iii

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013) ................................................................................4, 6, 7, 29

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................14, 26

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017) ........................................................................16

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
   2015 WL 2250472 (D.N.J. May 13, 2015) ......................................................14, 15, 17, 26

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
   2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012) ...........................................................27

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) .......................................................................................15

*Miller v. Sonus Networks, Inc.*,
   636 F. Supp. 3d 245 (D. Mass. 2022) ........................................................................28

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .........................................................................22

*In re Myriad Genetics, Inc.*,
   2021 WL 977770 (D. Utah Mar. 16, 2021) ...............................................................26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................................................................ *passim*

*In re Pfizer Inc. Sec. Litig.*,
   584 F. Supp. 2d 621 (S.D.N.Y. 2008) .......................................................................25

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ...............................................................................16, 18

*Pizzuto v. Homology Meds., Inc.*,
   2024 WL 1436025 (D. Mass. Mar. 31, 2024) ...........................................................16

*Primo v. Pac. BioSciences*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) .....................................................................11

*Sanders v. AVEO Pharm., Inc.*,
   2015 WL 1276824 (D. Mass. Mar. 20, 2015) ...........................................................14

*In re SCANA Corp. Sec. Litig.*,
   2019 WL 1427443 (D.S.C. Mar. 29, 2019) ...............................................................22

iv

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ............................................................................................17

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) .......................................................................14, 16

*Shash v. Biogen, Inc.*,
    84 F.4th 1 (1st Cir. 2023) .................................................................................18, 25, 29

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014) ....................................................17, 23, 25, 26

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) ..............................................................................22

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) ...........................................................................29

*State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*,
    152 F.4th 1 (1st Cir. 2025) ............................................................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .......................................................................................................24

*Thant v. Karyopharm  Therapeutics Inc.*,
    43 F.4th 214 (1st Cir. 2022) ..........................................................................................21

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ............................................................... *passim*

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    842 F.3d 71 (1st Cir. 2016) ...........................................................................................15

*United States v. Weed*,
    873 F.3d 68 (1st Cir. 2017) ...........................................................................................12

*In re Urb. Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ......................................................................28, 29

*In re Viropharma, Inc. Sec. Litig.*,
    2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ..................................................................15

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ...........................................................................................21

*Wasson v. LogMeIn, Inc.*,
    496 F. Supp. 3d 612 (D. Mass. 2020) ...........................................................................11

v

*Wilson v. MicroFinancial, Inc.*,
2006 WL 1650971 (D. Mass. June 13, 2006) ...........................................................................11

**Statutes**

15 U.S.C. §78u-5 .........................................................................................................24

**Other Authorities**

Fed. R. Civ. P. 15(a) ....................................................................................................30

vi

## I.    INTRODUCTION

This case arises from false and misleading statements made by Sarepta and its senior executives concerning the Company's two most important – indeed, its *only* revenue-producing – products. The first is Sarepta's line of gene therapies, which Defendants and analysts hailed as the key to turning around Sarepta's troubled business. The second is Sarepta's "exon-skippers," a mainstay responsible for more than half of the Company's revenue during the Class Period.

Throughout the Class Period, Defendants trumpeted Sarepta's gene therapies as game-changing for the Company's business and credited its first commercialized gene therapy, a treatment for DMD called Elevidys, with turning Sarepta profitable. While gene therapy is a highly-competitive field, Defendants told investors that the proprietary rh74 vector powering Sarepta's therapies minimized the risk of a toxic immune response, making it far safer than rival treatments and giving the Company a massive advantage in a market where safety drives success. Defendants stated that Sarepta had amassed an "enormous" body of safety data, which demonstrated that rh74 had a "particularly laudable" safety profile compared to competing treatments, "one of the most impressive safety profiles [of any] gene therapy that has ever existed," and "a laudable safety profile not shared by other programs for" DMD. Defendants also told investors that rh74 was just as safe "across ages and across ambulatory status," specifically in non-ambulant patients, who make up much of the muscular dystrophy population.

In truth, however, the "enormous" body of evidence available to Sarepta raised clear red flags that rh74 was uniquely dangerous and far more toxic than competing therapies, particularly in non-ambulant patients. *First*, Defendants knew that Sarepta failed to perform the FDA-mandated preclinical safety testing necessary to support their statements. In their rush to commercialize Elevidys and stave off a host of looming business pressures, Defendants ignored repeated warnings from the preclinical program's leaders – delivered to Sarepta's CEO, Defendant

1

Ingram, and top scientist, Defendant Rodino-Klapac – that testing wholly failed to comply with core regulatory requirements and, moreover, was rife with data fraud, making the program's "voodoo" safety data inaccurate and unreliable. ***Second***, Defendants ignored warnings from Sarepta's consultants and senior scientists that clinical data showed rh74 posed uniquely dangerous safety risks, including (1) the conclusions of a 2021 expert panel, which Rodino-Klapac attended, that rh74's high viral load created a significant danger of unmanageable toxicity, particularly in non-ambulant patients; and (2) reports flagging serious patient injury the FDA considers an "ominous" sign of extreme liver toxicity, which executives pressured scientists to bury. ***Third***, Sarepta's data showed by October 2023 that the risk of liver injury on rh74 was ***many*** times competing therapies and, by June 2024, that it was even more profound in non-ambulant patients.

Defendants also touted Sarepta's progress in developing a portfolio of rh74-based gene therapies for LGMD to follow on Elevidys' success, telling investors that this lucrative portfolio was "rapidly progressing" towards commercialization. In reality, key LGMD assets were beset by major manufacturing problems that prevented Sarepta from developing a safe, viable infusion. Forced to freeze the program, Ingram and Rodino-Klapac kept it in "a loop of study design." Sarepta terminated key personnel, dropped study sites, and halted funding and patient outreach. The LGMD program did not make "rapid progress" during the Class Period, it moved backwards.

Through a series of disclosures between March and July 2025, investors finally learned the truth about rh74's severely limited viability. News that rh74 had caused ***three patients*** to die from liver failure in just ***three months***, as well as the ensuing regulatory and financial fallout, caused Sarepta stock to plummet by ***more than 85%***. Moreover, Defendants ultimately admitted that as rh74's death toll was mounting, they had falsely denied that the gene therapy had caused liver failure in LGMD patients. Investors and analysts said they were "***appalled by [Sarepta's] lack of***

2

*transparency around*' rh74 and the "*lack of disclosure of real-world safety risk with use*."

Finally, in November 2025, investors learned that the ESSENCE trial – a trial on which continued marketing of Sarepta's exon-skipping drugs depended – had failed due to insufficient data. Defendants knew about this massive data deficit by no later than 2021, but nevertheless assured investors the trial was "fully enrolled" and "on track." Sarepta's stock fell by another 34%.

Defendants' blunderbuss motion – premised on an array of improper (and incorrect) factual assertions – ignores the Complaint and misstates the law. *First*, Defendants argue that none of the alleged misstatements are actionable (DB 15-26), but their arguments are belied by a mountain of authority from across the country, including the Supreme Court, holding statements just like those at issue here actionable. *Infra*, 12-24. Defendants' sweeping characterization of almost *every single one* of their misstatements as "opinion" fundamentally misunderstands *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, which defines an opinion as an expression of the speaker's subjective and uncertain belief using qualifying language, such as 'I think' or 'I believe.' 575 U.S. 175, 183-85 (2015). None of Defendants' misstatements express such subjectivity and uncertainty. *Infra*, 15. And even if Defendants' misstatements *were* opinions, the Complaint plausibly alleges they are actionable. Defendants' claim opinions are actionable only if they are not "sincerely held," but *Omnicare* holds *the opposite*: they are actionable, *regardless* of subjective belief, if: (1) the defendant "lacked the basis for making those statements that a reasonable investor would expect," or (2) the opinion did not "fairly align[] with the information in [their] possession." 575 U.S. at 188-89, 196. The Complaint alleges both. *Infra*, 17-19.

*Second,* Defendants argue that the Complaint fails to plead scienter. DB 27-30. Not so. The Complaint alleges a litany of facts that, when considered collectively as they must be, easily plead a strong inference of scienter: (1) Defendants *admitted* that they knew an rh74 patient had

3

died from liver failure at the time they denied it and that ESSENCE was fatally underpowered at the time they assured investors it was "fully enrolled" and "on track"; (2) Ingram, Rodino-Klapac, and other senior executives received numerous warnings from consultants and scientists that rh74 was uniquely dangerous, which Defendants did not dispute and, indeed, sought to conceal; (3) Defendants assured investors they were carefully monitoring patient safety data, but those data showed that rh74's risk of liver injury was far higher than competing therapies and even higher in non-ambulant patients; and (4) Defendants' misstatements concerned Sarepta's only two revenue-producing products and were contradicted by major business decisions or events that could not have escaped management's notice. *Infra*, 24-29. Defendants claim Plaintiffs plead no motive, but, putting aside that none is required, the Complaint alleges Defendants had powerful incentives to conceal problems with Sarepta's only money-making products for as long as possible. *Infra*, 28.

***Finally***, Defendants' argument that the Complaint fails to plead loss causation (DB 20-22, 26-27) can be swiftly rejected.  Loss causation is subject only to Rule 8's notice pleading standard, and is a highly fact-intensive issue that requires expert testimony to resolve. Moreover, the First Circuit explains that a corrective disclosure need not be a "mirror image" of the alleged fraud, but only "relate to the same subject matter." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013). The five disclosures in March through July 2025 concern the occurrence and commercial implications of rh74-induced adverse events; as market commentary makes clear, this plainly "relate[s] to the same subject matter" as the truth about rh74's safety profile and commercial viability concealed by Defendants' safety and LGMD misstatements. Disclosure that ESSENCE failed because of insufficient patient data likewise "relate[s] to the same subject matter" as the truth concealed by Defendants' misstatements about the trial's status. *Infra*, 29-30.

II.    **STATEMENT OF FACTS**

    A.    **The Gene and Exon-Skipping Therapies were Key to Sarepta's Survival**

4

Sarepta is a pharmaceutical company that sells high-cost treatments for muscular dystrophy. ¶8.[1] In the run-up to the Class Period, Sarepta was under massive commercial pressure: it was unprofitable, carried a huge debt load, and faced spiraling costs. ¶44. The Company's *only* revenue-generating products were its "exon-skippers." ¶¶44, 54. However, Sarepta had secured only *conditional* FDA approval for the exon-skippers, and its ability to continue to sell them hinged on the outcome of the ESSENCE trial. ¶58. In a bid to diversify, Sarepta sought to break into the lucrative gene therapy market, despite having no experience in this complex and highly competitive field. ¶¶ 38, 43. The need for speed further complicated Sarepta's entry into gene therapies. Sarepta's desperate need for cash and competition from larger, more-experienced rivals put enormous pressure on the Company to bring its gene therapy to market as quickly as possible, notwithstanding its inexperience. ¶44.

Sarepta, however, told investors that it had developed a proprietary "vector" called rh74 that was safer and more efficient than the standard vectors used in most gene therapies, giving the Company a key competitive advantage over its more experienced rivals. ¶37. Safety is the driver of a gene therapy's success in securing approval and adoption. ¶50. Therapies most often fail to secure approval or are abandoned where the vector causes an overwhelming immune response, particularly in the liver, which can result in serious organ damage. ¶52. Approved and successfully adopted therapies, of which there are many, avoid triggering this toxic response. ¶97.[2] Accordingly, Defendants' statements touting rh74's superior safety drove enormous investor

---

[1] "¶_" refers to the Complaint, ECF No. 47; "DB _" and "DX _" refer to Defendants' Motion and exhibits thereto, ECF Nos. 50, 52. Emphasis is added and quotations and citations are omitted.

[2] In an effort to justify their statements touting rh74's superior safety, Defendants suggest that approved and successful gene therapies are nevertheless highly toxic and that deaths are common. DB 19. This is wildly untrue. Therapies with even a *single* death in trials have been abandoned in development. ¶52. Even therapies with relatively mild immunogenic risk (including *no* deaths) – far milder than rh74's – face hurdles in physician adoption and onerous regulatory burdens. *Id.*

enthusiasm. Analysts hailed rh74 as "ushering in a new era for Sarepta," and projected billions of dollars in annual revenue tied to rh74-based therapies for DMD (i.e., Elevidys) and LGMD. ¶47.

Indeed, Elevidys' FDA approval at the start of the Class Period turned Sarepta profitable overnight and rapidly doubled its product revenue. ¶45. However, that approval was also *conditional*: Sarepta needed to confirm rh74's safety in larger ongoing studies. ¶53. So, investors remained particularly focused on rh74's safety during the Class Period. *Id*. Defendants assured investors that they were "diligent[ly]" and "continuously" monitoring "all" rh74 safety data, and would disclose developments in real-time and "keep the market abreast along the way." ¶191.

**B.    Defendants Misled Investors about rh74's Unique Toxicity Risks**

Defendants told investors that Sarepta had amassed an "enormous" body of data regarding rh74, which demonstrated its safety profile was superior to competing gene therapies and DMD treatments. ¶¶62, 211-68. Defendants stated, for instance, that rh74 had an "extraordinarily positive" and "particularly laudable" safety profile compared to competing vectors and "one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed." *Id*. Indeed, as Defendants *admit* (DB 8), they assured investors that rh74's toxicity risk was exceedingly mild, no more than mere transient "elevated liver enzymes" that come "down to baseline" without organ damage. ¶248. Moreover, while Elevidys' conditional approval at the start of the Class Period had been limited to a subset of ambulant patients, Sarepta stated that it would also seek to sell Elevidys to the non-ambulant patients comprising half the DMD population. ¶¶63, 211-68. Sarepta stated that its data showed rh74 was just as safe in those older, heavier patients, notwithstanding the higher doses required to treat them. ¶53. For instance, Defendants stated that rh74's "safety and tolerability has been stable and laudable across . . . ambulatory status" and that "we've seen no difference in the safety profile" in non-ambulatory patients. ¶¶63, 211-68. These assurances not only buoyed investor confidence in Elevidys, but in the LGMD program as well,

since those patients are also predominantly older and heavier than ambulant DMD patients. ¶42.

In truth, the evidence available to Sarepta raised clear red flags that rh74 posed a uniquely dangerous risk of immunogenic toxicity and severe liver damage relative to competing therapies, particularly in non-ambulant patients. ***First***, Defendants' statements never had requisite support because Sarepta failed to conduct FDA-mandated preclinical validation of rh74's safety. ¶¶67-78. The senior personnel responsible for overseeing preclinical testing repeatedly warned that Sarepta's program wholly failed to comply with core regulatory requirements and that data generated by the program was inaccurate and unreliable as, among other things, Sarepta committed pervasive data fraud in order to generate favorable-looking "voodoo" results. *Id*. FE 1, a former leader of the program, and his colleagues detailed these profound failures in reports to Ingram and Rodino-Klapac, including extensive "deviation reports," and raised them in meetings with Rodino-Klapac and others. *Id*. But in its desperate rush to commercialize Elevidys, Sarepta ignored these warnings and insisted it would "assume the risk to push" its key product through. ¶74.

***Second***, Defendants ignored warnings from Sarepta's expert consultants and scientists that clinical data confirmed rh74's safety risks. Sarepta scientists, including program heads, repeatedly told Defendants that rh74's large viral load posed a uniquely dangerous risk of liver toxicity, particularly in non-ambulant patients. ¶¶79-83. In the fall of 2021, an expert panel that included several hepatologists echoed these concerns and warned that highly aggressive measures would likely be required to manage rh74's toxicity, if it could be managed at all. ¶¶84-86. Rodino-Klapac personally attended the panel and minutes were distributed across Sarepta's C-suite. ¶86.

Senior safety scientists reported data underscoring the panel's warnings. ¶¶88-92. Together with an independent hepatologist, the scientists confirmed that rh74 had caused a Hy's Law event, liver injury so severe that the FDA considers even a single occurrence in ***thousands of patients*** to

7

be "an ominous indicator" of the treatment's toxicity and a strong predictor that it will cause fatal liver failure, just as rh74 did. *Id*. That a Hy's Law signal emerged so early in the data showed that rh74's toxicity was particularly severe. *Id*. Sarepta's safety and regulatory leadership understood that the Hy's Law case was a "big deal," and were "very concerned about its implications"; indeed, Defendants ***specifically*** stated they were watching for any Hy's Law cases. ¶¶89-92, 191. Rather than come clean, Sarepta's executives pressured the scientists to change their assessment. ¶92.

**Third**, by no later than October 2023, Sarepta's data showed that rh74's risk of liver damage (***not*** transient "elevated liver enzymes") was likely ***five to ten times worse*** than competing treatments. ¶¶93-102. By June 2024, these data showed that rh74 likely posed an even greater risk, as much as a doubling, in non-ambulant patients. ¶¶103-106. Ingram and Rodino-Klapac repeatedly assured investors they were closely monitoring these safety data, which were routinely shared with Sarepta management in multiple reports and were available in real time electronic "dashboards." ¶¶95-96. Sarepta even corresponded with the FDA about cases of serious organ damage caused by rh74, including ***<u>multiple</u>*** Hy's Law events and cases of drug-induced hepatitis. ¶102. Contrary to their claims in litigation (DB 17-18), Sarepta privately acknowledged that public labeling did ***not*** disclose the risk of organ damage evinced by these serious injuries. ¶102.

C.    **Defendants Misled Investors about the LGMD Program's Progress**

Defendants also told investors that Sarepta was successfully developing a portfolio of rh74 gene therapies for LGMD worth billions of dollars in annual revenue, and that this lucrative portfolio was "rapidly progressing***"*** towards commercialization and was "relatively late stage" ¶¶107, 111, 269-87. Defendants further stated Sarepta achieved certain milestones, including (1) development of a "dual-vector" needed to treat many LGMD patients; and (2) rapid progress of therapies targeting the 2A, B, and C subtypes comprising ***90%*** of the portfolio's value. *Id*.

In truth, however, the LGMD program was paralyzed. The key 2A, B, and C assets were

8

beset by severe manufacturing difficulties, including Sarepta's inability to manufacture a "dual vector" infusion. ¶¶112-13. These issues cast serious doubt on the program's viability, and, at a minimum, necessitated a redo of preclinical work for the two most lucrative therapies. ¶114. These problems also stymied clinical progress, and Ingram, Rodino-Klapac, and others kept clinical in "a loop of study design." ¶115. During the Class Period, Sarepta lost key personnel; pulled back on trials; dropped study sites; froze grant funding; and halted patient outreach. ¶116-19.

### D. The Truth about rh74's Viability Emerges

Investors finally learned the truth concealed by Defendants' statements touting rh74's superior safety and the LGMD program's progress through a series of corrective disclosures revealing the magnitude of rh74's toxicity risks, flawed design, and limited value. ¶135-77. ***First***, on March 18, 2025, Sarepta belatedly disclosed that a non-ambulant Elevidys patient had died from liver failure. ¶135. Sarepta's stock fell by 27%, as investors began to understand that rh74's risk/benefit profile was not as favorable as Defendants had led them to believe. ¶136-39. ***Second***, news on: (1) April 2, 2025 that safety concerns led European regulators to halt all shipments of Elevidys caused a 13% drop in Sarepta stock; and (2) May 6, 2025 that doctors' safety concerns had driven a massive decline in Elevidys sales caused a 21.5% drop in Sarepta stock. ¶¶142-52. Regulators' and doctors' reaction to the safety risks Defendants concealed allowed investors to appreciate the effect those risks could have on approval and adoption. ¶¶136, 143.

***Third***, on June 15, 2025, Sarepta belatedly disclosed that a second non-ambulant DMD patient died from liver failure, and that the Company had agreed to suspend drug shipments to non-ambulant patients and discuss additional warnings in Elevidys' label. ¶153. These disclosures further revealed rh74's toxicity risks, including particularly severe risk in non-ambulant patients. ¶152-63. While investors, buoyed by Defendants' misstatements, continued to believe that rh74 remained viable in lightweight patients with serious disease, they understood that the LGMD

program was untenable, given LGMD's heavier population and milder progression. *Id*. This news revealed the truth concealed by Defendants' LGMD statements, i.e., that the program was dead in the water, and investors fully discounted it. *Id*. Sarepta stock fell a further 42%. ¶158.

*Fourth*, on July 18, 2025, Sarepta disclosed: (1) an LGMD patient had suffered fatal liver failure the prior month, contrary to their statements weeks earlier falsely denying any liver failure "signal" in LGMD; and (2) FDA revoked rh74's platform designation. ¶¶164-65, 170. Investors understood that rh74's toxicity was a function of its core design and so adoption would be far more limited than Defendants' misstatements led them to believe. ¶¶166-69. Sarepta stock fell 36%. *Id*. Moreover, investors were incredulous at Defendants' efforts to hide rh74's safety risks, with analysts stating they were "***appalled by [Sarepta's] lack of transparency***." ¶¶171-75.

### E.    Defendants Misled Investors about the ESSENCE Study

Both Sarepta management and investors were laser focused on the ESSENCE study, the confirmatory trial that would determine whether Sarepta could continue selling its exon-skippers. ¶¶57-60. Throughout the Class Period, Defendants assured the public that ESSENCE was "fully enrolled" and "remain[ed] on track," and, in SEC-mandated risk disclosures, presented the risk that operational problems "***could***" impact study results as entirely hypothetical. ¶¶288-295.

In truth, and as they ***admitted***, Defendants knew, before the Class Period even started, that Sarepta had failed, ***by a wide margin***, to collect enough patient data for the trial to succeed. ¶¶125-28. Defendants admitted that years earlier, "[d]uring the pandemic, the rate of missed doses was ***unusually high*** with nearly all patients missing doses." ¶125. Prior to the start of the Class Period, Sarepta was keenly aware of this problem and had tried to mitigate it by opening additional study sites, ***but those efforts were unsuccessful***. ¶126. As their statements show, Defendants personally tracked the accumulation of patient data in Sarepta's clinical trials in real time (¶¶123-24), and, tellingly, delayed releasing the ESSENCE results for years on end (¶127). On November 3, 2025,

10

Sarepta announced ESSENCE had failed and, in response, Sarepta stock dropped 34%. ¶182.

### III.    DEFENDANTS' "PUZZLE PLEADING" ARGUMENT IS MERITLESS

Defendants' assertion that the Complaint is a "puzzle pleading" that fails to adequately identify each alleged misstatement and why it is actionable (DB 14-15), is meritless. Defendants' counsel has recycled, and repeatedly lost, this same argument in securities class actions across the country. *See, e.g.*, *Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612, 627 (D. Mass. 2020) (argument "misrepresents the complaint, which sets forth background facts concerning what Defendants were doing during the time of the relevant class allegations that elucidate the allegations of falsity"); *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *2-3 (C.D. Cal. Aug. 25, 2023) (same); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *6-7 (N.D. Cal. Feb. 23, 2023) (same); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022) (same).

As in these cases, the alleged misstatements here are organized topically, and, for each misstatement, the Complaint identifies the portions being challenged and the reasons why they are false. *See, e.g.*, ¶¶214-17, 269-71, 288-91. The Complaint's scienter allegations detail the omitted information that each Defendant received or had access to and when. *See, e.g.*, ¶¶69-74, 83-104, 112-16, 125-28 (summarized at ¶¶183-210). The loss causation allegations identify how each corrective disclosure revealed facts concealed by Defendants' misstatements. *See, e.g.*, ¶¶134-82 (summarized at ¶¶296-308). This is more than sufficient. *See, e.g.*, *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 154 (D. Mass. 2009) (no puzzle pleading even where complaint relied on a single paragraph to explain falsity). By contrast, Defendants' cases involved complaints that included multi-page block quotes, unidentified speakers, and no explanation of falsity. *See Wilson v. MicroFinancial, Inc.*, 2006 WL 1650971, at *3 (D. Mass. June 13, 2006); *Primo v. Pac. BioSciences*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013). Defendants' argument is belied by the appendix (improperly) attached to their brief, which purports to catalog each

misstatement and the reasons it is false. *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) ("As evidenced by Exhibit A to their Motion to Dismiss, Defendants can parse out with relative ease the statements at issue [and] why they are alleged to be false.").

## IV.   THE COMPLAINT ADEQUATELY ALLEGES FALSITY

In evaluating a motion to dismiss, a court must "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs." *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009). Accordingly, Defendants' efforts to substitute incorrect and cherry-picked assertions for the Complaint's allegations are improper. A statement or omission is "misleading as to a material fact" when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Accordingly, a statement is misleading if it would "leave a reasonable investor with [an] impression" that differed materially from the truth. *State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*, 152 F.4th 1, 11 (1st Cir. 2025). For this reason, "[s]ome statements, although literally accurate, can [nevertheless] mislead investors." *Baron v. Smith*, 285 F. Supp. 2d 96, 102 (D. Mass. 2003). When an issuer speaks on a subject – like the safety of a drug or the progress of drug development – "it must disclose ***the whole truth***," even if it would otherwise have "no duty to do so." *Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 463 (D. Mass. 2016). Importantly, questions of falsity "***may only*** be resolved as a matter of law where the relevant misstatements are ***so obviously important or unimportant*** to an investor that ***reasonable minds cannot differ*** on the question." *United States v. Weed*, 873 F.3d 68, 73 (1st Cir. 2017).

### A.   Defendants' Statements Touting rh74's Superior Safety Were Misleading

Knowing investors were focused on the risk of immunogenic toxicity associated with gene therapy, Defendants repeatedly stated that Sarepta had amassed an "enormous amount of data"

demonstrating that rh74 had an "extraordinarily positive" and "particularly laudable" safety profile compared to competing therapies. ¶¶62, 212-68. Defendants stated that rh74 had a "very good safety profile relative to other programs" (¶234), "one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed" (¶252), and "a laudable safety profile not shared by other programs for Duchenne" (¶220). Moreover, knowing that rh74's safety in the non-ambulant population was critically important to investors, Defendants stated that its safety was "stable and laudable . . . across ambulatory status," and that there was "no difference in the safety profile" in non-ambulant patients. ¶¶63, 212-68. Further, Defendants assured investors rh74 had undergone rigorous, FDA-compliant testing that "met the full statutory standards for safety," and that any risk of regulatory non-compliance was purely hypothetical. ¶¶212, 215.

Contrary to these statements, the evidence available to Sarepta repeatedly raised clear red flags that rh74 was uniquely toxic relative to its competitors, particularly in non-ambulant patients. First, Defendants' safety claims *never* had legitimate scientific support because Sarepta failed to perform FDA-mandated safety testing and, instead, manufactured sham results. ¶¶69-77. Second, Defendants ignored, and even pressured scientists to conceal, warnings from Sarepta's expert consultants and scientists that rh74's large viral load posed unique toxicity risks, especially in non-ambulant patients (¶¶79-92). Third, Sarepta's data showed by October 2023 that rh74's liver injury risk was *many times* competing therapies' and particularly dire in non-ambulant patients. ¶¶93-106. Sarepta privately admitted to the FDA that labeling did not disclose the serious risk evinced by these events. ¶102. Finally, Sarepta falsely denied a liver failure death. ¶¶64, 170.

Courts across the country, including the Supreme Court, have repeatedly held that a drug maker's statements touting the safety of its product – including statements favorably comparing the product's safety to competing therapies, mirroring Defendants' statements here – are actionable

13

where undisclosed evidence available to the company materially undercuts them. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45-47 (2011) (statements that drug's "safety" was "well established" were misleading where drug maker failed to disclose adverse event data undercutting that claim); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 344 (3d Cir. 2009) (statements that drug had an "exceptional safety profile" that was superior "versus NSAIDs" misleading); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018) (statements that drug's safety profile was superior to prior formulation and equivalent to competitors misleading where issuer "failed to disclose the countervailing [safety] evidence"); *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2015 WL 2250472, at *8-12 (D.N.J. May 13, 2015) (statements drug had superior "safety profile" misleading where issuer failed to disclose evidence, including consultant warnings, undercutting claims); *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *6, 9 (D. Mass. Mar. 20, 2015) (statements touting drug's "superior" safety over competing drug misleading where issuer omitted data showing "potential increase in the risk of death"); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331-32 (S.D.N.Y. 2014) (statements drug "caused side effects 'similar' to" competitors misleading).

Likewise, courts across the country, including the Supreme Court, have repeatedly held that a drug maker's statements touting safety are actionable where it failed to perform testing sufficient to support those claims, like Sarepta's failure to perform FDA-mandated preclinical validation here. *See, e.g.*, *Matrixx*, 563 U.S. at 49 (safety statements misleading where issuer failed to perform testing such that data "was insufficient to determine whether Zicam [caused] anosmia"); *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 253-54 (D. Mass. 2018) (statements "suggesting [treatment] was effective" misleading "where Defendants had no meaningful information" supporting them); *Merck*, 2015 WL 2250472, at *17, *22 (D.N.J. 2015) (safety claims misleading

14

where there was insufficient data to support them); *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6, 9 (E.D. Pa. Apr. 7, 2003) (statements drug was "effective for all adults" misleading where issuer "lacks sufficient data to make any conclusions" across populations).

Courts also routinely hold actionable an issuer's statements touting regulatory compliance efforts, including statements presenting the risk of non-compliance as hypothetical when it has already materialized. *See, e.g.*, *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 90-92 (1st Cir. 2016) (warnings about market liquidity risk misleading where risk was "one step away" from materializing); *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (warnings about data misuse risks misleading when breaches had already occurred); *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements touting compliance efforts misleading where they omitted regulatory violations).

**Defendants' statements are not inactionable opinions.** Ignoring this mountain of authority, Defendants argue their statements describing what Sarepta's data showed about rh74's safety are all opinions and are not actionable because, however unmoored from the objective evidence available to the Company, Sarepta supposedly subjectively believed them. DB 3, 16-20. But Defendants misstate the law and disregard the facts alleged in the Complaint.

*First*, Defendants' safety statements are not opinions. As the Supreme Court explains, an opinion expresses uncertainty by referencing the speaker's subjective mental state using qualifying language such as "I believe" or "I think." *Omnicare*, 575 U.S. at 183-85; *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 7 (1st Cir. 2021). None of the challenged statements include such qualifying language. Instead, these statements make objectively verifiable assertions of fact about rh74's propensity to cause harm, including relative to competing products. *See id.* at 183 (explaining that "[t]he TVs we manufacture have the highest resolution available on

15

the market"—a statement touting product superiority, like those here—is a statement of ***fact***). The rules are no different for drug makers simply because their statements are based on "clinical data." DB 15-16, 18-20. Quite the opposite. A drug maker's statements purporting to describe the ***scientific evidence*** available to it ***epitomize*** fact statements. Defendants' assertion to the contrary defies common sense and is inconsistent with the numerous cases above holding that statements mirroring those here are actionable statements of fact. *See supra*, 13-15; *In re Fibrogen, Inc.*, 2022 WL 2793032, at *2, 10 (N.D. Cal. July 15, 2022) (statements drug's safety was "comparable to placebo" and "better than" competitors are "objective statements"); *SEB*, 351 F. Supp. 3d at 898 (statements "there was sufficient clinical data to support" claims of superior safety "did not express opinions"); *Clovis*, 215 F. Supp. 3d at 1123 (statements "comparing [drug's] safety profile to a rival" are not opinions; they "are objectively verifiable"); *Intuitive Surgical*, 65 F.Supp.3d at 834 (statements touting device's safety not opinions, as they "could be objectively assessed").[3]

Defendants cite *In re Philip Morris Sec. Litig.* and *Pizzuto v. Homology Meds., Inc.* for the claim that all statements regarding a drug's efficacy or safety are opinions. DB 15-16, 20. But the issuers in those cases were commenting on published studies that ***fully disclosed all available data***; their statements were ***explicitly*** "interpretations" of those fully-disclosed data. *Philip Morris*, 89 F.4th 408, 420 (2d Cir. 2023); *Pizzuto*, 2024 WL 1436025, at *9, *12 (D. Mass. Mar. 31, 2024). Here, Defendants purported to describe what the evidence ***available to Sarepta*** showed about rh74's safety, while ***failing to disclose*** evidence of toxicity severely undermining those statements. *SEB*, 351 F. Supp. 3d at 900 (statement touting drug's superior safety was "not a subjective interpretation or expression of belief. It is an affirmative statement that painted a favorable picture

---

[3] Statements regarding the safety of ***non***-pharmaceutical products are also actionable statements of fact. *See, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *5-6 (N.D. Cal. Aug. 7, 2020) (ride share service). There is no special exemption for drug makers in the Exchange Act.

16

without including the details that would have presented a complete and less favorable one.").

***Second***, even if considered opinions, Defendants' misstatements are actionable. Defendants assert that opinion statements are actionable only in the "rare circumstance" they are not "sincerely held." DB 1, 3. Not true. As *Omnicare* explains, opinion statements are actionable, ***regardless*** of subjective belief, where the defendant: (1) "lacked the basis for making those statements that a reasonable investor would expect," or (2) the opinions expressed did not "fairly align[] with the information in [their] possession." 575 U.S. at 188-89, 196. Though Defendants suggest otherwise, this objective standard is only "***slightly different***" from the traditional falsity analysis. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023).

The Complaint plausibly alleges falsity under *Omnicare*'s objective standard. For instance, a reasonable investor would expect that Defendants' safety statements were supported, at a minimum, by FDA-mandated preclinical testing; because Sarepta failed to perform this testing, its statements "lacked the basis" a reasonable investor would expect. ¶¶69-77.[4] Likewise, Defendants' statements touting rh74's superior safety did not "fairly align" with the information in Sarepta's possession, including data showing rh74 was associated with ***far*** greater liver risk than competitors, reports of life-threatening Hy's Law events, and warnings from expert hepatologists that rh74 posed unique toxicity risks. ¶¶88-106; *see, e.g.*, *Merck*, 2015 WL 2250472, at *21

---

[4] Defendants ask the Court to disregard FE 1's report detailing Sarepta's failure to perform preclinical validation because the events described precede the Class Period. DB 20, 29. But the truth of Defendants' safety statements ***during*** the Class Period was predicated on the performance of legitimate FDA-mandated testing. *See, e.g.*, *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014) ("A witness need not have been at the company for [the] entire, or indeed any, of an asserted class period to have probative information."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period information "that sheds light on whether class period statements were false or materially misleading is relevant"). Defendants make the same argument regarding FEs 2 and 3. But these witnesses reported entrenched problems in the LGMD program that shed light on Defendants' misstatements made just months later, and which FEs 4, 6, and 7 – who remained at Sarepta during the Class Period – confirmed persisted thereafter. ¶¶112-19.

17

(summary judgment denied as to statements about the "likeliest" explanation for trial results, where explanation "did not 'fairly align' with other information in [company's] possession").

Defendants do not dispute that they received, but ignored, these warnings. Nevertheless, Defendants ask this Court to find, ***as a matter of law***, that their safety statements "aligned with the information" available to Sarepta and, in support, seek to substitute a bevy of extrinsic "facts" for the Complaint's allegations. Defendants' argument is not only procedurally improper, it rests on an array of factual inaccuracies. First, again relying on *Phillip Morris*, Defendants argue that the FDA's ***conditional*** approval of Elevidys makes their statements "per se reasonable." DB 16. As an initial matter, Defendants' "per se" rule that later FDA action immunizes past securities fraud is inconsistent with First Circuit precedent holding opinion statements about a drug actionable ***notwithstanding*** later FDA approval. *Shash v. Biogen, Inc.*, 84 F.4th 1, 12-13 (1st Cir. 2023). Even putting this aside, unlike *Phillip Morris*, there is no evidence that the FDA even reviewed the facts Defendants withheld from investors, including Sarepta's failure to perform preclinical validation of rh74, its manufacturing of sham results, Hy's Law events that Sarepta management pressured scientists to hide from regulators, and data ***post-dating*** the FDA reviews that showed rh74 was far more toxic than competitors.[5] Also unlike *Phillip Morris*, the FDA ***never*** endorsed the statements at issue here: that rh74's safety profile was superior to competitors, including in non-ambulant patients. In fact, the FDA did not "approve" rh74 as even a general matter following disclosure of its severe liver toxicity; instead, it revoked rh74's platform designation, halted rh74 trials, ordered Sarepta to stop shipments of the drug, and added Black Box warnings. ¶¶163, 165. Finally, unlike *Phillip Morris*, the "approvals" here did not represent agency consensus; they were effectuated by

---

[5] Neither the 2023 or 2024 FDA reviews included the data described in the Complaint at ¶¶93-105, but looked only at earlier-dated data Sarepta provided.

a *single* department head *against* the scientific staff's unanimous recommendations. ¶¶75, 87.

Second, Defendants assert that their claims of superior safety "fairly aligned" with Sarepta's data because (a) until February 2025, no rh74 patients had died; and (b) Sarepta supposedly believed, and the FDA supposedly agreed, that neither Hy's Law nor hepatobiliary adverse events – universally-accepted as key measures of liver toxicity – were relevant to evaluating rh74's safety. DB 17. Neither fact-laden argument can be accepted as a matter of law, and, in any event, they are both incorrect. Defendants' first argument attempts to rewrite their statements: that when they told investors rh74's "safety profile" was superior to competitors, they really only meant mortality risk. There is no support for this assertion, which incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't (¶¶89, 98); and (b) that rh74's mortality risk was superior to competing therapies – it wasn't (¶¶93-106). Defendants' second argument undermines their claims. The FDA never agreed that bedrock measures of hepatotoxicity, like Hy's Law, were irrelevant, or even less important, in evaluating rh74's safety, and nothing in Defendants' extrinsic record shows otherwise.[6] And with good reason. Defendants premise this argument on the claim that baseline aminotransferase ("AT") is elevated in DMD patients, but they ignore that the driver of Hy's Law is dramatically elevated *bilirubin* – a glaring marker of liver, not muscle, damage. ¶89. Likewise, hepatobiliary events include only cases of actual liver injury, *not* transient AT elevations. ¶98. By contrast, *Sarepta's* public reporting of liver safety *combined* actual injury with transient AT elevations, washing out rh74's liver signal (¶99); Defendants' *own argument* shows Sarepta knew this. Nor did Sarepta

---

[6] Defendants cite only remarks by *Sarepta employee* Eddie Darton at an FDA Advisory Committee meeting. DB 17 (citing DX 4 at 53). Darton merely said that damaged muscle from DMD can increase baseline aminotransferase. DX 4 at 53. Not even Darton, let alone the FDA, stated that Hy's Law was unimportant in evaluating rh74's safety.

19

believe these core measures of risk were unimportant: it closely monitored them (¶98), panicked when they occurred (¶¶90-92), and acknowledged their importance (¶191).[7]

**Defendants' "Truth on the Market" Argument Fails**. Defendants argue that investors were fully aware that rh74 was uniquely toxic, particularly in non-ambulatory patients. DB 17-18. But this "truth on the market" defense is for the jury to weigh. *See, e.g.*, *In re Columbia Sec. Litig.,* 155 F.R.D. 466, 482–83 (S.D.N.Y.1994) (burden of proof "*is extremely difficult, perhaps impossible,* to meet [even] at the *summary judgment stage*."). In any event, Defendants told investors the opposite during the Class Period (*e.g.*, ¶¶63-64) and investors believed them (*e.g.*, ¶65). Defendants insist that investors knew there was *some* liver risk associated with rh74, just as there is with any gene therapy. DB 17-18. That is precisely the point. As their brief admits, Defendants led investors to believe that while rh74 was associated with the same transient AT elevations as other gene therapies, the risk of actual liver damage was *more* favorable than rivals and that this was true even for non-ambulant patients. *See, e.g.*, DB 8 (Ingram falsely stated, "there is always a risk of elevated liver enzymes" with all gene therapies, but that rh74 patients always came "down to baseline" without liver injury). While Defendants claim Elevidys' label – which was identical to or more favorable than other gene therapies (¶50) – was curative, their own correspondence with the FDA admits that this label did not then reflect rh74's true risk.[8]

**Defendants' "Puffery" Argument Fails**. Defendants' argue their statements are "puffery," but elide text making concrete claims about rh74's superiority to competitors and its

---

[7] Defendants argue their LGMD and ESSENCE statements are also opinions (DB 23, 25-26), but, again, they do not include the qualifying language *Omnicare* explains is the hallmark of an opinion, and, in any event, did not "fairly align" with the information in Defendants' possession: that the LGMD program was mired in setbacks and ESSENCE was fatally underpowered. ¶¶110, 125-26.
[8] Defendants claim investors knew there was massive uncertainty about rh74's safety in non-ambulant patients because *the FDA* reviewed a "modest" amount of data. DB 17. But Defendants repeatedly stated that *Sarepta* had an "enormous" amount of data supporting its claims. ¶63

safety in non-ambulant patients.[9] DB 18. Again, courts repeatedly hold statements mirroring those here actionable. *Supra*, 13-15. Additional factors underscore the misstatements' materiality: (1) they concerned Sarepta's most important product (*Carbonite*, 22 F.4th at 8 ("no trouble finding" statements about development of "important" product were material)); and (2) many were responses to analyst questions and were cited in reports (*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (responses to analysts are material); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (analyst reliance supports materiality)). Defendants rely on *Thant v. Karyopharm Therapeutics Inc.*, but the statements there were nothing like here. 43 F.4th 214, 223 (1st Cir. 2022) (trial "important milestone" and "significant step in establishing" efficacy).[10]

**Defendants Lied About Liver Failure in LGMD Patients**. On July 18, 2025, Defendants admitted that they had known "for at least a month" that rh74 had caused fatal liver failure in a patient with LGMD. ¶170. Defendants further admitted that "the course in terms of LF was similar" to the two previous DMD deaths – i.e., liver failure occurred approximately one month before death. Nevertheless, on June 15, 2025 investor call – at the same time this patient was, at a minimum, hospitalized for liver failure – Defendants falsely denied seeing any "signal of ALF" in LGMD patients. ¶160-61.[11] Citing only a Sarepta press release nowhere referenced in the Complaint, Defendants ask the Court to ignore the Complaint and accept their alternative timeline. DB 20. Putting aside that the Court cannot accept the release for its truth, it claims only that Sarepta *notified the FDA* on June 20 about the liver failure; it does not say the event occurred on that date

---

[9] For instance, Defendants stated that rh74 had a "very good safety profile *relative to other programs*" and was a "standout" relative to competing "*capsid[s] [and] construct[s]*." ¶¶231, 234.

[10] Defendants repeat this argument in connection with the LGMD and ESSENCE statements (DB 22, 25), but, again, courts have repeatedly sustained virtually identical misstatements. *Infra*, 22-24. Further, the indicia of materiality cited above apply to those statements. ¶¶269-95.

[11] Even if this patient died on July 3, 2025, as Defendants speculate, the "similar course" of the event entails that he was hospitalized with liver failure at the beginning of June at the latest.

21

or otherwise contradict Defendants' statements on the July investor call. DX 21.

### B. Defendants' LGMD Progress Statements Were Misleading

Defendants repeatedly assured investors that Sarepta's LGMD program was "rapidly progressing" and "relatively late stage." ¶¶107, 269-87. Defendants further touted the achievement of major milestones, including: (1) development of the "dual-vector" rh74 needed to treat many LGMD patients; and (2) the most lucrative assets' rapid clinical progress. *Id*. In truth, the program's key assets were beset by severe manufacturing difficulties and made virtually no clinical progress, as Sarepta froze patient enrollment and funding, pulled back on clinical commitments, and never replaced departed personnel. ¶¶112-19. As the FEs explained, Defendants' statements touting LGMD's "rapid" progress were "disingenuous," "deceitful," and a "myth." ¶¶118-19.

Courts have repeatedly held that an issuer's statements touting the progress of product development are actionable where, as here, progress has stalled due to significant difficulties. *See, e.g.*, *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 519 (D. Md. 2022) ("nearly all of the major challenges have been overcome" misleading where drug company "faced significant manufacturing concerns"); *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019) (statements touting "great progress" misleading where issuer was working to "troubleshoot" deficiencies); *Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236, 257 (D.P.R. 2015) ("'expeditiously' implementing [] 'remedial efforts'" misleading where "deficiencies were far more systematic" than disclosed); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 959-68 (N.D. Cal. 2014) (project was "on track" misleading where former employees detailed lack of progress).

**Defendants' Objections to the FE Reports Fail.** Defendants urge the Court to disregard the reports of FEs 2, 3, 4, 6, and 7. DB 24. They ignore that FE allegations are sufficient where the complaint describes the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," which courts

assess by looking to their detail, corroboration, plausibility, and number of sources. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002). The Complaint includes mutually-corroborative reports from *five* FEs whose jobs gave them direct insight into the LGMD program's progress: a Medical Director (FE 2) and Director of Clinical Development (FE 3) who oversaw the LGMD program; a senior MSL executive (FE 4), whose job required knowledge of the program's safety and manufacturing challenges; a Patient Affairs Manager responsible for patient outreach, enrollment, and site status (FE 6); and a competitive intelligence Director, whose job required knowledge of the program's progress (FE 7). ¶¶83-85, 95, 112, 115. The FEs independently and consistently describe severe manufacturing problems in the value-driving 2A, 2B, and 2C assets, the dual-vector's failure, the "loop of study design," the suspension of funding and outreach, and the failure to backfill key personnel. ¶¶112-18. Defendants rely on *Abiomed*, but the complaint there failed to plead the role-specific connections alleged here. 778 F.3d at 245.

**Defendants' Argument Their Statements Were True Fails**. Defendants argue their statements are true because "the 2E program" was progressing. DB 24. But 2E comprised just 5% of the LGMD portfolio's value, while the stymied 2A, B, and C programs comprised *close to 90%*. ¶111. At a minimum, it was misleading for Defendants to tout the LGMD program's "rapid progress" when assets representing the vast majority of its value made virtually no progress at all.

### C.    Defendants' ESSENCE Statements Were Misleading

Defendants told investors that ESSENCE was "*fully enrolled*" and "*remain[ed] on track*." ¶¶292-95. In truth, the study failed, by a wide margin, to collect enough patient data to succeed. ¶¶122-29. Further, Sarepta's SEC-mandated "risk warnings" misleadingly stated only that operational issues "*could* undermine" results and that patients "*may* be unable or unwilling" to participate; in truth, these "risks" had materialized by the start of the Class Period. ¶¶288-91.

Courts have repeatedly held actionable statements touting a clinical trial's "full enrollment"

23

and that its progress was "on track" where they failed to disclose enrollment problems hindering the study's ability to generate adequate results. *See, e.g.*, *Hills v. BioXcel Therapeutics, Inc.*, 2025 WL 2777129, at \*7-8 (D. Conn. Sept. 29, 2025) (statements that trial was "fully enrolled" were misleading where they omitted that several participants may have been improperly enrolled and "may have needed to be excluded"); *supra*, 15 (misleading risk disclosures actionable).

**Defendants' Statements are not Protected by the Forward-Looking Safe Harbor**. The PSLRA's "safe harbor" applies to *wholly* forward-looking statements that are either accompanied by meaningful cautionary language or made without actual knowledge. 15 U.S.C. §78u-5. Defendants' statements that ESSENCE "*is* fully enrolled" and "*remains* on track" are *not* "forward-looking"; they purport to describe the present state of affairs at Sarepta. Moreover, even forward-looking statements do not qualify for the safe harbor where, as here, the "cautionary language" misleadingly presents materialized risks as purely hypothetical. *Supra*, 15. Nor do misstatements qualify where, as here, they were made knowingly. 15 U.S.C. §78u-5.

**Defendants' "Truth on the Market" Argument Fails**. Citing a May 2020 risk disclosure, Defendants claim investors were fully aware that ESSENCE was fatally underpowered. DB 25. Defendants do not explain how a statement in 2020 could cure misstatements about the trial's status *three years later*. In any event, this risk warning did *not* disclose that ESSENCE *was* fatally underpowered, it characterized the risk that COVID "*could*" impact study results as hypothetical.

## V.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

A complaint pleads scienter if it alleges "facts sufficient to create a strong inference [of] knowing or reckless disregard of the defendant's obligation to disclose." *Marblehead*, 55 F. Supp. 3d at 230. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322-23 (2007). A strong

24

inference of scienter exists where defendants "knew facts or had access to information suggesting their public statements were not accurate." *Pfizer*, 584 F. Supp. 2d at 630. The scienter inference "need not be irrefutable" or even the "most plausible of competing inferences," but merely ***as likely*** as any other. *Id.* That is, a "***draw is awarded to the Plaintiff***." *Abiomed*, 778 F.3d at 241.

***First***, Defendants' admissions raise a strong inference of scienter. *Shash*, 84 F.4th at 15 ("admissions" suggesting defendants knew or had access to information undermining statements allege scienter). Here, Defendants' admissions raise a strong inference that they knew: (1) rh74 had caused liver failure in an LGMD patient at the time they denied "any signal" in that population; (2) rh74 caused numerous cases of serious liver damage and this risk was not reflected in public labeling; and (3) ESSENCE was fatally underpowered. ¶¶184-86. Defendants dispute only the first of these allegations (DB 19-20), but again, their alternative timeline for that liver failure cannot be accepted as a matter of law and is contradicted by their own statements. *Supra*, 21.

***Second***, Ingram, Rodino-Klapac, and other senior executives received numerous warnings from expert consultants and Company scientists severely undermining Sarepta's statements touting rh74's superior safety. *Shash*, 84 F.4th at 15 (scienter alleged where defendants "***were warned by others***" about information undermining their statements). The leaders of the rh74 preclinical program delivered detailed reports to Ingram, Rodino-Klapac, and other senior officers warning that the program failed to comply with core regulatory requirements, was rife with data fraud, and churned out unreliable "voodoo data." Defendants did not dispute the reports' accuracy; they insisted Sarepta was "going to assume the risk to push" Elevidys. ¶¶187-89. Defendants were ***again*** warned that their statements were unsupported when an expert panel told them that rh74's large viral load posed uniquely dangerous toxicity risks. Rodino-Klapac attended the panel and minutes were distributed across Sarepta's C-suite. *Id*. Defendants were warned ***yet again*** when

Sarepta scientists told executives that rh74 exhibited "ominous" signs of extreme liver toxicity; Sarepta pressured the scientists to change their report. *Id*. And ***again***, as Defendants received reports that rh74 caused numerous cases of severe liver damage throughout the Class Period. *Id*.

Courts have repeatedly held similar warnings from a drug maker's scientists and consultants undercutting its public statements give rise to a strong scienter inference. *See, e.g.*, *Matrixx*, 563 U.S. at 46–47 (scienter where experts warned drug company of "a plausible causal relationship" that undermined safety statements); *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *23 (D. Utah Mar. 16, 2021) (issuer's scientists "raised the lack of data" supporting efficacy with executives "on multiple occasions"); *Merck*, 2015 WL 2250472, at *17, *22 (consultants and "scientists within the company warned" of facts undercutting claims); *In re Immune Response*, 375 F. Supp. 2d 983, 1020 (S.D. Cal 2005) (consultants warned data did not show efficacy); *see also* *Omnicare*, 575 U.S. at 188-89 (scienter for opinions made despite "lawyers' contrary advice").[12]

***Third***, Defendants had access to patient data demonstrating by no later than October 2023 that rh74's risk of immunogenic toxicity was ***five to ten times*** higher than competing therapies and, by June 2024, was significantly higher in non-ambulant patients. ¶¶189-92. These data were disseminated through regular reports and "openly available" to Sarepta senior management through internal "dashboards." *Id*. Defendants repeatedly assured investors that they were "diligent[ly]" and "continuously" "looking at all" rh74 safety data and so understood its safety

---

[12] Defendants claim the FEs' reports cannot speak to their "mental state." DB 29. Not so. The FEs detail reports and meetings conveying these warnings to Ingram, Rodino-Klapac, and other executives. To the extent Defendants suggest the Complaint must allege they subjectively agreed with these warnings, that is also untrue and, as courts have explained, inconsistent with *Omnicare*. *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1237 (N.D. Ga. 2019) ("Plaintiff need not allege that [CEO] agreed subjectively with [consultant's] concerns to establish scienter."). Besides, Defendants' reactions to these warnings, including directing employees to bury damning data, raises a strong inference that they subjectively understood they were legitimate.

profile "very well." *Id.*; *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) (scienter as to misstatements concerning sales drivers where defendant stated he was "closely monitoring sales data"); *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (scienter where defendants stated "they closely monitored" the subject of misstatements). Defendants' own data-laden responses to analyst questions demonstrate that they *did* closely monitored those data. *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 289 (D. Mass. 2022) (scienter where omitted data "was documented in internal company records" and defendants "made specific statements" about the subject). Defendants further assured investors that Sarepta would disclose safety data in real-time and "*keep the market abreast along the way . . . so that people can make informed investment decisions*." ¶¶191-92. Accordingly, Defendants either monitored these data, as they claimed – in which case they knew their statements were unsupported – or failed to do so – in which case their statements were severely reckless, at a minimum. *Carbonite*, 22 F.4th at 10 (defendants "either inquired about [product efficacy] before deciding to promote it to investors or were reckless in failing to do so").

*Fourth*, that Defendants' misstatements concerned Sarepta's only two revenue-producing products, and were contradicted by major decisions or events that could not have escaped management's notice, further supports scienter. *Carbonite*, 22 F.4th at 9 (the "importance of a particular item to a defendant" supports scienter); *In re BioMarin Pharm. Sec. Litig.,* 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022) (scienter where drug "was going to be a significant and lucrative product"). Elevidys was a lifeline that Sarepta needed to relieve the significant business pressures it faced prior to approval, and rh74's safety was essential to the drug's success. ¶¶195-99. Likewise, the exon-skippers accounted for at least half Sarepta's revenue during the Class Period and its continued ability to sell them depended on ESSENCE. *Id*. Moreover, the notion that

Sarepta could wind-down the entire LGMD drug portfolio or make major changes to the critical ESSENCE study without senior management's knowledge, let alone approval, beggars belief. *Id*.

*Fifth*, while the Complaint need not allege *any* motive to plead scienter, *see, e.g.*, *Miller v. Sonus Networks, Inc.*, 636 F. Supp. 3d 245, 253 n. 1 (D. Mass. 2022), Defendants had powerful incentives to conceal problems with rh74 and the exon-skippers during the Class Period. These were Sarepta's *only* revenue-generating products and the Company depended on the *$4.5 billion* in sales they generated for survival. ¶¶193-99. That dependence was exacerbated by the significant pressures Sarepta faced before and during the Class Period, including: an enormous debt load; intense competition; ballooning expenses; and access to vital capital. *Id*. Accordingly, Defendants had enormous incentives to conceal the problems with its only money-making products for as long as possible (including by concealing problems with the LGMD program that would impugn the entire rh74 platform), so that Sarepta could to continue to generate essential cash while attempting to work out a solution behind the scenes. Indeed, that is exactly what happened as – just *months* before the truth emerged – Sarepta paid a hefty price to acquire a new line of therapies. *Id*.

Defendants argue that no plausible motive exists since the truth would inevitably be discovered. DB 28. In rejecting this same argument, Judge Posner explained that the defendants "may have thought that there was a chance that the situation regarding the two key products would right itself. If so, the benefits of concealment might exceed the costs . . . . The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). Defendants also assert that the absence of insider trading allegations is fatal. DB 27. But motive allegations are not required *at all*, let alone insider trading allegations. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655

28

(E.D. Pa. 2015) ("While insider sales can support an inference of scienter, they are not required.").

## VI.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Loss causation is subject **only to Rule 8's notice pleading requirements**, *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 94 (D.P.R. 2010), and, as the Supreme Court has explained, a "short and plain statement" providing notice of a "causal connection" between the misrepresentation and the loss is sufficient. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (noting this "should not prove burdensome"); *see also Shash*, 84 F.4th at 19 (complaint need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind"). Corrective disclosures need not be a "mirror image" of the alleged fraud, but need only "relate to the same subject matter as the alleged misrepresentation." *CVS*, 716 F.3d at 240. Loss causation is "more suited to summary judgment" because it is a highly fact-intensive issue and requires expert testimony to resolve. *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 (D. Mass. 2006).

**The Complaint Alleges Loss Causation for the Safety Statements**. Defendants argue that the alleged corrective disclosures could not have revealed the truth regarding rh74's safety because, they assert, investors were already well aware of the "exact risk" that emerged. DB 21. Again, not only is this "truth on the market" argument premature, Defendants offer no support for their claim that investors knew all along that rh74 was far less safe than its rivals or posed heightened risk in non-ambulant patients. Defendants rely on boilerplate risk disclosures that Sarepta, like any other drug company, **might** face regulatory headwinds. This does not cure the misstatements of "current or historical fact" at issue here. *Supra*, 15; *see also Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 245 (D. Mass. 2011) (risk disclosures cannot defeat loss causation where they do not disclose the specific facts concealed).

**The Complaint Alleges Loss Causation for the LGMD Statements**. The Complaint alleges that the truth regarding Sarepta's inability to develop a safe and viable rh74 treatment for

29

LGMD was revealed through the March, April, May, and June 2025 corrective disclosures concerning rh74's unique toxicity, particularly in heavier non-ambulant patients, like the vast majority of the LGMD population. ¶¶136, 140, 143, 148, 152, 154, 156, 304. Citing market reaction, the Complaint alleges that "these disclosures allowed investors to understand that the LGMD program was simply not viable . . . as rh74's safety risks in that older, heavier population would create significant hurdles for approval and severely limit adoption." ¶154. Thus, culminating with the June 2025 disclosure, investors learned the truth concealed by Defendants' LGMD misstatements: "the LGMD program was dead in the water." *Id*.

Defendants claim Sarepta's stock rose a month later on Sarepta's July 16 announcement that it was discontinuing the LGMD program. DB 22. Putting aside that Defendants offer no support for their claim that Sarepta's stock rose *in response to this specific news*, as opposed to general market movement or any of the other news Sarepta announced that same day (including positive earnings and workforce restructuring), Defendants ignore the Complaint's allegations, supported by market commentary, that investors had already *fully discounted* the LGMD program *by June 2025*, as news of rh74's true safety risks emerged. *See, e.g.*, ¶156. When Defendants announced they were jettisoning the program, investors already understood it was worthless.[13][14]

## VII.    CONCLUSION

This Court should deny Defendants' motion to dismiss. In the alternative, Plaintiffs request leave to amend the Complaint, which should be "freely given." Fed. R. Civ. P. 15(a).

---

[13] Defendants assert that the market was fully aware that ESSENCE was fatally underpowered, but, again, point only to their generic risk disclosure that COVID-19 "***could***" impact study results. DB 26-27. Again, such disclosures are *not* curative; they are affirmatively misleading where, as here, the risk described has already materialized. *Supra*, 15.

[14] The Complaint also alleges control person claims under Section 20(a). Defendants' only argument that this claim should be dismissed is that the Complaint does not allege a primary Section 10(b) violation. DB 30. As discussed above, Defendants' argument fails.

Dated: April 24, 2026

Respectfully submitted,

/s/ Abe Alexander
Karin E. Fisch (*pro hac vice*)
Abe Alexander (*pro hac vice*)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
kfisch@gelaw.com
aalexander@gelaw.com


Brian J. Schall (*pro hac vice)*
Andrew J. Brown (*pro hac vice*)
William M. Brody (*pro hac vice*)
Adam L. Rosen (*pro hac vice*)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Fax: (310) 388-0192
brian@schallfirm.com
andrew@schallfirm.com
wbrody@schallfirm.com
adam@schallfirm.com

*Counsel for Lead Plaintiffs the Investor Group and Lead Counsel for the Proposed Class*

W. Mark Conover
Lucas F. Olts
**ROBBINS GELLER RUDMAN & DOWD LLP**
Tel.: (619) 231-1058
655 West Broadway Unit 1900
San Diego, CA 92101
mconover@rgrdlaw.com
lolts@rgrdlaw.com

*Counsel for Additional Plaintiff City of Pontiac Reestablished General Employees' Retirement System*

31

Theodore M. Hess-Mahan
**HUTCHINGS BARSAMIAN**
**MANDELCORN, LLP**
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Tel.: (781) 431-2231
thess-mahan@hutchingsbarsamian.com

*Local Counsel for Lead Plaintiffs the*
*Investor Group*

## CERTIFICATE OF SERVICE

I, Abe Alexander, hereby certify that this document, filed on April 24, 2026, through the CM/ECF system, will be sent electronically to the registered participants as identified on their respective notices of electronic filing, and that paper copies will be sent to those non-registered participants, if any.

*/s/ Abe Alexander*
Abe Alexander