<u>PLAINTIFFS' RESPONSE TO DEFENDANTS' APPENDIX A</u>

   Below, Plaintiffs reproduce and respond to Appendix A attached to Defendants' Motion to Dismiss. Where Defendants' Appendix A omitted relevant portions of the alleged misstatements, including analyst questions in response to which alleged misstatements were made, the omitted portions are restored and reflected in redline. Extraneous text Defendants' Appendix A appended to the alleged misstatements is omitted. "DB" refers to Defendants' memorandum of law in support of their Motion to Dismiss, and "Opp." refers to Plaintiffs' memorandum of law in opposition to same.

**rh74 Safety Statements**

| Compl. ¶¶ | Statement | Defendants' Arguments | Plaintiffs' Reply |
|---|---|---|---|
| 212 | **Defendant Sarepta**: "***ELEVIDYS has met the full statutory standards for safety*** and effectiveness and as such is not considered investigational or experimental."<br><br>*June 22, 2023 Press Release* | **Not Misleading**. The FDA approved Elevidys, showing that statutory standards were met. (DB 16)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. Defendants' statement assured investors that Elevidys' safety data had been collected, presented, and evaluated in accordance with "full statutory standards," while omitting that Sarepta had failed to perform FDA-mandated preclinical validation of rh74's safety, and that Elevidys' preclinical program was rife with egregious violations of GLP, including the generation of sham safety data. (Opp. at 13, 20)<br><br>**Not Opinion**. Defendants' statement neither expresses uncertainty nor references the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. Even if the statement were an opinion, it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, their opinion did not "fairly align" with the evidence in his possession that Sarepta's preclinical testing was ***not*** compliant with core FDA regulations and was rife with data fraud. (Opp. at 15-19) |
| 214 | <span style="color:red">**Analyst Question**: "asked Defendants whether Sarepta's safety and efficacy data currently supported expansion of Elevidys' label to cover the critical non-ambulatory</span> | **Not Misleading**. There is no allegation that Defendants had seen any difference in adverse event | **Misleading**. It was misleading to assure investors that there was no reason to limit access to Elevidys based on ambulatory status while omitting that: (1) Sarepta failed to perform FDA- |

| | | |
|---|---|---|
| population, or whether, instead, the Company would have to wait until 'much later' in order to be in a position to do so."<br><br>**Defendants Ingram and Sarepta**: "***There would be no logical basis to assume that ambulation status would be a reason to limit access***. It's not as if this protein is aware that a patient is in a wheelchair or not. So we feel very confident about that."<br><br>*August 2, 2023 Investor Call* | rates by ambulatory status to date. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; and (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity. Further, Defendants' assertion that "[t]here is no allegation Defendants observed a difference in adverse-event rates by ambulatory status" at this point in the Class Period ignores warnings from senior Sarepta scientists, and echoed by an expert panel that included preeminent hepatologists, that rh74 posed particularly dangerous toxicity risks in non-ambulant patients – warnings Defendants did not, and could not, dispute. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statement neither expresses uncertainty nor references the speaker's |

2

| | | | state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statement were an opinion, it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, their opinion did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19) |
|---|---|---|---|
| 215 | **Defendants Ingram, Estepan, and Sarepta**: "We have implemented a compliance program, which is ***based on industry best practices and is designed to ensure that our activities comply with all applicable laws, regulations and industry standards***. While our compliance program is intended to detect and prevent potential non-compliance, we ***cannot be certain*** that compliance will be assured. ***If*** our operations are found to be in violation of any of the laws described above or any other laws, rules or regulations that apply to us, we will be subject to penalties, including civil and criminal penalties, damages, fines and the curtailment or restructuring of our operations."<br><br>*Q2 2023 Form 10-Q (filed August 2, 2023)* | **Not Misleading**. Allegations about the preclinical program in 2021 cannot contradict a statement about the design of Sarepta's compliance program during the Class Period. (DB 20)<br><br>**Opinion**. Whether a program is based on best practices is an opinion. The FDA's approval of Elevidys despite knowing about some of the discrepancies in preclinical data rendered this opinion *per se* reasonable under *Philip Morris*. (DB 20)<br><br>**Puffery**. Defendants label this statement puffery in their App'x A, but it is not argued as such in their brief. | **Misleading**. It was misleading for Defendants to claim to have a compliance program based on best practices, and to warn that the risk of noncompliance was purely hypothetical, when Defendants knew that preclinical violations that fundamentally undermined the safety of Elevidys had in fact taken place due to preclinical noncompliance. Defendants' Class Period-statements about compliance were premised on the performance of legitimate preclinical safety validation. (Opp. at 13, 17)<br><br>**Not Opinion**. Defendants' statement neither expresses uncertainty nor references the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. Even if the statement were an opinion, it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, their opinion did not "fairly align" with the evidence in his possession that Sarepta's preclinical testing |

| | | | was ***not*** compliant with core FDA regulations and was rife with data fraud. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the supposedly favorable safety and risk-benefit profile of Elevidys. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and was echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 216 | **Defendants Ingram and Sarepta**: Ingram touted Elevidys' safety profile, acknowledging that it is one of "the most important two metrics for us." <span style="color:red">Ingram stated that</span> "the safety profile for ELEVIDYS, as it has been for some time now. It's ***a laudable safety profile given its potential benefit***."<br><br>*September 11, 2023 Morgan Stanley Global Healthcare Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive risk-benefit profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading to assure investors that Elevidys had a "laudable safety profile" while omitting that: (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; and (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statement neither expresses uncertainty nor references his state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of |

| | | | rh74's unique toxicity severely undercutting those statements. Even if the statement were an opinion, it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, this statement did not "fairly align" with the evidence of liver toxicity in Sarepta's possession. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the supposedly favorable safety and risk-benefit profile of Elevidys.   Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and was echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 218 | **Defendants Ingram and Sarepta**: "[T]here are no new safety signals that have emerged confirming the *laudable profile* upon which Elevidys was approved in June."

*October 30, 2023 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive risk-benefit profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)

**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)

**Puffery**. Courts have held similar "buzzy" language about safety | **Misleading**. It was misleading for Defendants to state that Sarepta's data "confirm[ed]" Elevidys' safety profile was "laudable" and free from "new safety signals," while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity;; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage |

| | | immaterial corporate optimism. (DB 18) | was likely five to ten times higher than competing treatments. Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20) |
| | | | |
| | | | **Not Opinion**. Defendants' statement neither expresses uncertainty nor references his state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements.. Even if the statement were an opinion, it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19) |
| | | | |
| | | | **Not Puffery**. Defendants' statements make concrete, verifiable assertions about the supposedly favorable safety and risk-benefit profile of Elevidys. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important |

6

| | | | products and was echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 218 | **Defendants Rodino-Klapac and Sarepta**: "***Benefit risk is favorable*** and strengthened by this additional data from EMBARK." *October 30, 2023 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive risk-benefit profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17) **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) **Forward-Looking**. Defendants identify this statement as forward-looking in their App'x A but do not provide explanation there or in their brief. | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed rh74's risk/benefit profile was "favorable," while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20) **Not Opinion**. Defendants' statement neither expresses uncertainty nor references his state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what |

7

| | | | the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statement were an opinion, it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the supposedly favorable safety and risk-benefit profile of Elevidys. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and was echoed in analyst reports. (Opp. at 20-21)

**Not Forward-Looking**. The statement purports to describe what the data available to Sarepta *then* showed about Elevidys' safety profile. It is not forward-looking. Even if this statement could somehow be considered forward-looking, it is ineligible for safe harbor protection because it was unaccompanied by meaningful cautionary language and was made knowingly. (Opp. at 24) |
| 219 | **Defendant Sarepta**: "There were no new safety signals in the EMBARK study, reinforcing the *favorable and manageable safety profile observed with ELEVIDYS to* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. FDA | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed Elevidys' safety profile was "favorable," free from "new safety signals," and that safety testing had satisfied "statutory standards for safety," while failing to |

| | | |
|---|---|---|
| *date*. . . . ELEVIDYS has met the *full statutory standards for safety*."<br><br>*October 30, 2023 Press Release* | approval meant Elevidys met statutory safety standards. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | disclose: (1) that Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statement neither expresses uncertainty nor references his state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statement were an opinion, |

9

| | | | |
|---|---|---|---|
| | | | it is actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the supposedly favorable safety and risk-benefit profile of Elevidys. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and was echoed in analyst reports. (Opp. at 20-21) |
| 220 | **Defendants Ingram and Sarepta**: "[T]he results of EMBARK confirm that ELEVIDYS stabilizes muscles, slows or entirely arrest decline, ***does so across the ages*** and does so ***with a laudable safety profile not shared by other programs for Duchenne***."<br><br>*November 1, 2023 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. There is no allegation Defendants observed a difference in adverse-event rates by ambulatory status. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed Elevidys had "a laudable safety profile not shared by other programs for Duchenne," and that its safety profile was remained superior to competing therapies across the DMD population, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, ***especially in non-ambulatory patients***; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug- |

10

| | | | |
|---|---|---|---|
| | | **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Further, Defendants' assertion that "[t]here is no allegation Defendants observed a difference in adverse-event rates by ambulatory status" at this point in the Class Period ignores warnings from senior Sarepta scientists, and echoed by an expert panel that included preeminent hepatologists, that rh74 posed particularly dangerous toxicity risks in non-ambulant patients – warnings Defendants did not, and could not, dispute. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20) |

11

| | | | |
|---|---|---|---|
| | | | **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions about Elevidys' supposedly superior safety to competing therapies and safety across the DMD population. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and was echoed in analyst reports. (Opp. at 20-21) |
| 221 | **Analyst Question**: "asked Defendants whether Sarepta was concerned about competing gene therapies and, in particular, about any 'trade-off between efficacy and safety.'"<br><br>**Defendants Ingram and Sarepta**: "[W]ith the benefit of many years of experience, we are exceptionally proud of [a]nd frankly, | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a significant body of evidence that showed Elevidys had a "particularly laudable safety profile" and that "rh74 has been a standout" compared to other gene therapy vectors, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's |

nothing less than thrilled with the particular capsid and construct that we have. It's shown not only [that] it is able to intervene, protect these muscles of these children and arrest the decline that *it can do that with a particularly laudable safety profile* given the amount of therapy required here and the fact that it's full body infusions. *rh74 has been a standout*. And we're quite confident that anyone who is rational who had an opportunity to make a decision today about what capsid they would use and what construct they would develop. I'm sure they would do their best to try to copy us."

*November 1, 2023 Investor Call*

opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)

**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18)

senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their

| | | | |
|---|---|---|---|
| | | | possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about rh74's supposedly superior safety to competing therapies. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. This statement was made in direct response to an analyst question and was echoed in analyst reports. (Opp. at 20-21) |
| 222 | **Analyst Question**: "asked whether Defendants had observed any signals of immunogenicity-related risk, like myocarditis."<br><br>**Defendants Rodino-Klapac and Sarepta**: "[W]e did not see any differences in the types of SAEs or the frequency of those SAEs that was one of the most reassuring things about EMBARK was *the continued safety profile* and now taken together all of the previous trials, we have a *large safety data base that's consistent* on those trials."<br><br>*November 1, 2023 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed "a large safety data base" and that this database was "consistent" in demonstrating rh74's "continued" safety profile, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' |

| | | | plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about rh74's safety, including that Sarepta's "large safety data base" was "consistent" in demonstrating its safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an |
|---|---|---|---|

15

| | | | analyst question and were echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 224 | **Defendants Ingram and Sarepta**: "[Elevidys] is working equally well across ages as its mechanism of action would have suggested. *Its safety and tolerability has been stable and laudable across many studies, across ages and across ambulatory status.*"<br><br>*January 8, 2024 J.P. Morgan Healthcare Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. There is no allegation Defendants observed a difference in adverse-event rates by ambulatory status. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed Elevidys had a "laudable" safety profile "across ambulatory status, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments.<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Further, Defendants' assertion that "[t]here is no allegation Defendants observed a difference in adverse-event rates by ambulatory status" at this point in the Class Period ignores warnings from |

16

|  |  |  | senior Sarepta scientists, and echoed by an expert panel that included preeminent hepatologists, that rh74 posed particularly dangerous toxicity risks in non-ambulant patients – warnings Defendants did not, and could not, dispute. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19) |

17

| | | | |
|---|---|---|---|
| | | | **Not Puffery**. Defendants' statements make concrete, verifiable assertions about rh74's safety, including that Sarepta's "large safety data base" was "consistent" in demonstrating its safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 19-20) |
| 225 | **Analyst Question**: "analyst asked Ingram about rh74's competing gene vectors and who Sarepta was 'keep[ing] an eye on.'"<br><br>**Defendants Ingram and Sarepta**: "We are thrilled with the *product quality* of ELEVIDYS, the amount of expression, the functional results, *the safety profile relative to other AAVs that have been used*. So I'm thrilled where we are. . . . I think with the benefit of hindsight now, years after the fact, I think we now have learned empirically *that AAV9 has significant issues from a safety perspective*. So that's – it's not a criticism for the choices made. But *we are very pleased that we chose rh74* with the benefit of scientific hindsight."<br><br>*March 11, 2024 Leerink Partners Global Biopharma Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed rh74 had a superior "safety profile relative to other AAVs that have been used," including AAV9, and to tout its "product quality," while failing to disclose  (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74's high viral load, *a function of poor, hastily scaled-up manufacturing*, posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments, including marketed AAV9 vector-based treatments. |

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions about rh74's supposedly superior safety profile relative to competing vectors and product quality. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These

19

| | | | statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 226 | **Analyst Question**: "asked Defendants about Sarepta's prospects for getting 'non-ambulatory patients in the [Elevidys] label.'"<br><br>**Defendants Ingram and Sarepta**: "We have dosed *a number of non-ambulant patients. [We have] dosed patients that are very old*, 26 years old, and [have been] non-ambulant for a very long time. *We dosed very large patients*. 80 kgs I believe the largest patient and the most gene therapy ever received. *We have not to date seen any differences in the AE rates*, . . . ."<br><br>*March 12, 2024 Barclays Global Healthcare Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. There is no allegation that Defendants to this point had observed a different AE rate based on age or ambulation. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a large and robust body of data, including in non-ambulant patients, and that these data showed no difference in rh74's safety based on ambulatory status, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Further, Defendants' assertion that "[t]here is no |

allegation Defendants observed a difference in adverse-event rates by ambulatory status" at this point in the Class Period ignores warnings from senior Sarepta scientists, and echoed by an expert panel that included preeminent hepatologists, that rh74 posed particularly dangerous toxicity risks in non-ambulant patients – warnings Defendants did not, and could not, dispute. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA

| | | | |
|---|---|---|---|
| | | | even reviewed, let alone considered. (Opp. at 15-19) |
| 227 | **Analyst Question**: "asked 'how many non-ambulatory patient safety data' were supporting Sarepta's safety claims."<br><br>**Defendants Ingram and Sarepta**: "So a pretty significant amount of data and data that relates to some of the most potentially compromised patients, and they've done very well. And as I've said before, *some of the largest patients, which from a viral load perspective, are probably the greatest viral load that perhaps anyone has ever received with the gene therapy. And again, I would repeat, so far, we've seen no difference in the safety profile*."<br><br>*March 12, 2024 Barclays Global Healthcare Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. There is no allegation that Defendants had observed a difference in safety profile at this time. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a large and robust body of data in non-ambulant patients and that these data showed no difference in rh74's safety based on ambulatory status, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13) |

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Further, Defendants' assertion that "[t]here is no allegation Defendants observed a difference in adverse-event rates by ambulatory status" at this point in the Class Period ignores warnings from senior Sarepta scientists, and echoed by an expert panel that included preeminent hepatologists, that rh74 posed particularly dangerous toxicity risks in non-ambulant patients – warnings Defendants did not, and could not, dispute. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. (Opp. at 15-19)

| | | | |
|---|---|---|---|
| | | | **Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data showed rh74 was equally superior to competing therapies in non-ambulant patients. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 229 | **Analyst Question**: asked whether "clinical benefit still looks pretty variable in patients."<br><br>**Defendants Ingram and Sarepta**: "[T]he *amount of data that supports the benefit, the safety*, and the efficacy of this therapy [Elevidys] *is enormous*. We've dosed hundreds of kids in clinical trials. And now between clinical trials and commercial, we've dosed many hundreds of kids, over 400 kids and young men. We've dosed the broadest range of patients from very, very young to, in the context of Duchenne, very, very old."<br><br>*June 21, 2024 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed an "enormous" body of data and that these data demonstrated Elevidys was safe across the spectrum of DMD patients, including non-ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by |

the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the **scientific evidence** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this

| | | | |
|---|---|---|---|
| | | | statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta had amassed an "enormous" and robust body evidence and that this body of evidence demonstrated rh74's superior safety, including in non-ambulant patients. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 230 | **Defendants Ingram and Sarepta**: "Confirming the strong biological rationale and preclinical evidence for ELEVIDYS are four studies, covering 218 patients spanning the broadest range of both weights and ages of any Duchenne therapy approved to date. In fact, we have dosed more nonambulatory patients to support our approval than the trials for all other approved Duchenne therapies to date."<br><br>*June 21, 2024 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a large and robust body of data in non-ambulant patients, *including preclinical data*, and that these data showed no difference in rh74's safety based on ambulatory status, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; and (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to |

ten times higher than competing treatments; (5) *by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients*; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on

| | | | |
|---|---|---|---|
| | | | fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta had amassed a large and robust body evidence and that this body of evidence demonstrated rh74's superior safety, in non-ambulant patients. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 231 | **Analyst Question: "**asked Defendants if Sarepta had 'see[n] any meaningful differences in the patient journey for ambulatory versus nonambulatory patients?'"<br><br>**Defendants Ingram and Sarepta:** "[T]he biggest first issue is safety. We see a very | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed "a very similar safety profile between the nonambulatory and ambulatory patients," while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely |

| | | |
|---|---|---|
| similar safety profile between the nonambulatory and ambulatory patients." <br><br> *June 21, 2024 Investor Call* | opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) <br><br> **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | dangerous risk of liver toxicity, ***especially in non-ambulatory patients***; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) ***by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients***; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13) <br><br> Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative |

| | | | |
|---|---|---|---|
| | | | statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's superior safety in non-ambulant patients. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 233 | **Analyst Question:** "asked Defendants to discuss rh74's safety data as commercial | **Not Misleading**. It was fair to tout Elevidys' positive safety profile | **Misleading**. It was misleading for Defendants to state that Sarepta's expanded safety database, |

treatment in the expanded DMD population had ramped up over the previous quarter."

**Defendants Ingram and Sarepta:**
"[W]e're seeing a very *stable safety profile* as well based on that monitoring" in the expanded patient population (including non-ambulatory patients).

*August 7, 2024 Investor Call*

because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)

**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)

**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18)

including commercial data, showed a "stable" picture of rh74's safety profile as superior to competitors, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was

31

"relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's superior safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned

32

| | | | |
|---|---|---|---|
| | | | the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 233 | **Analyst Question:** "asked Defendants to discuss rh74's safety data as commercial treatment in the expanded DMD population had ramped up over the previous quarter."<br><br>**Defendants Rodino-Klapac and Sarepta:** "That's exactly right, sir. That's it." [Confirming Ingram's statement above]<br><br>*August 7, 2024 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta's growing safety database showed a "stable" picture of rh74's safety profile as superior to competitors, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere |

even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this

34

| | | | |
|---|---|---|---|
| | | | statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's superior safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 234 | **Defendants Ingram and Sarepta**: "ELEVIDYS has had *a very good safety profile relative to other programs* . . . ."<br><br>*September 6, 2024 Morgan Stanley Global Healthcare Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed rh74 had a "very good safety profile relative" to competing therapies, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, |

including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statement is not an opinion. The phrase "I think" modifies the unchallenged phrase "I'm very proud of"; it does not modify the challenged phrase, "very good safety profile relative to other programs." With respect to the challenged statement, Defendants neither express uncertainty nor reference the speaker's state of mind. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this

36

| | | | |
|---|---|---|---|
| | | | statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
| 236 | **Defendants Ingram and Sarepta**: "And one of the things that we're really benefiting [from] right now is [that] *the amount of evidence and data that we have that supports bringing ELEVIDYS to a broad group of Duchenne patients is great* and gives us a lot to talk about."<br><br>*November 6, 2024 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendant to tout the "amount of evidence and data" it had amassed demonstrating rh74's safety in non-ambulatory patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) *by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients*; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's |

Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because,

38

| | | | |
|---|---|---|---|
| | | | regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
| 236 | **Defendants Ingram and Sarepta**: Ingram further touted the "extraordinarily positive safety and efficacy profile that we have today with ELEVIDYS . . . ."<br><br>*November 6, 2024 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed Elevidys' safety profile was "extraordinarily positive" relative to competing therapies, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing |

39

| | | immaterial corporate optimism. (DB 18) | treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what |

| | | | the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
| 237 | **Defendants Rodino-Klapac and Sarepta:** "In addition to the EMBARK data, we've also presented safety and expression data from Study 103 or ENDEAVOR, *demonstrating consistent safety* and expression *data across ambulatory and non-ambulatory patients*. As at the end of October 2024, we have dosed over 80 late ambulatory and non-ambulatory patients within our clinical program and *continue to see a consistent safety profile*."<br><br>*November 6, 2024 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders | **Misleading.** It was misleading for Defendants to state that all of Sarepta's data, including accumulating commercial data, showed that rh74's safety profile was superior to competing therapies, including in non-ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data |

| | | Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the |

| | | | Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
| 238 | **Defendants Ingram and Sarepta**: "We have an extraordinary amount of experience with ELEVIDYS. Louise will have mentioned to you that we've already dosed between clinicals and some commercial 80 or so, probably more than that by now, | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed an "extraordinary amount" of data and that these data demonstrated Elevidys' superior safety across the spectrum of DMD patients, including non-ambulant patients, while failing to disclose that (1) Sarepta failed to |

| | | |
|---|---|---|
| about 80 patients that are either late ambulatory or non-ambulatory in addition to all of the other patients who dose. And as you know, *we've not seen a difference in any safety metrics*. So the things that look great, *the profile of the therapy looks great*, and the launch is going great.<br><br>* * *<br><br>I think that as more information comes out about the number of patients that have been dosed in the late-ambulatory, non-ambulatory setting and *the safety profile that we're seeing there, which is the same as the ambulatory patients*, it's only going to increase that awareness and excitement. We've already dosed kids in the mid-20s who are obviously non-ambulatory and we have start forms of men in their late 30s, which is very, very advanced for Duchenne muscular dystrophy."<br><br>*November 6, 2024 Investor Call* | **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) *by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients*; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its |

understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the **scientific evidence** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement **post-dates** the reviews on which Defendants rely. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta had amassed a large, robust body and that these data demonstrated rh74's superior safety across the DMD population. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important

| | | | products and were echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 240 | **Defendants Ingram and Sarepta**: "Elevidys when it was approved, was approved not only for ambulatory patients, for non-ambulatory patients. At the time of its approval, we had dosed more non-ambulatory patients with Elevidys than any other Duchenne therapy ever approved at the time of its approval. And as we sit here today, we've dosed, going on, 100 non-ambulatory patients . . . . We've dosed children as young as two years old with Elevidys. We've dosed men in their mid-20s with Elevidys. We've dosed children as light as 26 pounds with Elevidys. We've dosed men that are 290-plus pounds with Elevidys. And I did not misspeak, over 290 pounds, and across that entire continuum of ambulatory, non-ambulatory, young, older, lighter, heavier. ***The profile of Elevidys, both from safety and efficacy, remains consistent and the same . . . and we understand the safety and efficacy of Elevidys very well***." *January 13, 2025 J.P. Morgan Healthcare Conference Presentation* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17) **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a large, robust body of evidence, including commercial data, and that these data demonstrated Elevidys' superior safety across the spectrum of DMD patients, including non-ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, ***especially in non-ambulatory patients***; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) ***by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients***; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13) Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the |

| | | | Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20) |
|---|---|---|---|
| | | | **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19) |

| | | | **Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta had amassed a large, robust body and that these data demonstrated rh74's superior safety across the DMD population. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 241 | **Analyst Question:** "asked Defendants about the 'competitive landscape for gene therapy' and how Sarepta's rh74 data stacked up and whether it created a 'barrier to entry' for those competitors."<br><br>**Defendants Ingram and Sarepta:** "We've dosed over 600 patients. We've dosed children as young as two years old. We dosed young men in their mid-20s. We've dosed very light children, 26 pounds. We dosed literally men that are almost 300 pounds. We've dosed a significant number of non-ambulatory patients. *So we've got this enormous amount of wealth of data showing the safety and efficacy of this therapy*. . . . [T]here is an *enormous amount of data* already supporting the *safe and efficacious use of Elevidys across a very broad patient population* of Duchenne muscular dystrophy."<br><br>*January 27, 2025 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed an "enormous amount" of data, including commercial data, and that these data demonstrated Elevidys' superior safety across the spectrum of DMD patients, including non-ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) *by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients*; and (6) these |

data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of

49

| | | | |
|---|---|---|---|
| | | | rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement **post-dates** the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's superior safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 243 | **Analyst Question:** "about the development of Sarepta's rh74 gene therapy platform, and its performance across indications."<br><br>**Defendants Ingram and Sarepta:** "*We understand . . . the safety profile*, and we understand the power, of our [gene therapy] constructs and our promoter [i.e., rh74] to get really good expression and *get it safely*."<br><br>*February 26, 2025 Investor Call* | **Not Misleading**. It was fair to tout Elevidys' positive safety profile because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to tout the evidence of rh74's safety Sarepta had amassed and to state that it showed rh74 "safely" delivered "really good expression," while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA |

| | | | |
|---|---|---|---|
| | | **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20) |

51

| | | | |
|---|---|---|---|
| | | | **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that Sarepta's data demonstrated rh74's superior safety. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 245 | **Defendant Sarepta**: "[A]cute liver injury is a known possible side effect of ELEVIDYS ***and other AAV-mediated gene therapies*** . . . ."<br><br>Further, Defendants assured investors that this adverse event did not represent a "new safety signal [relative to the character and | **Not Misleading**. It was fair to claim that the first death was a unique case because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is | **Misleading**. It was misleading for Defendants to state that Elevidys' risk of serious liver injury was no worse than other gene therapies (i.e., that Elevidys' liver risk was limited to transient elevations in aminotransferase levels), that Sarepta had not previously observed cases of severe clinical liver injury, and that Elevidys' risk-benefit profile "remains positive," while failing to |

| | | |
|---|---|---|
| magnitude of the risk that had already been disclosed] and the benefit-risk of ELEVIDYS remains positive." <span style="color:red">In addition, Defendants assured investors that this life-threatening case of liver injury meeting Hy's Law criteria</span> "represents a severity of acute liver injury not previously reported for Elevidys."<br><br>*March 18, 2025 Press Release* | thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of ***fatal drug-induced liver toxicity***; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events (***a significant predictor of fatal liver failure***) – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both |

| | | | |
|---|---|---|---|
| | | | Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19) |
| 247 | **Defendants Ingram and Sarepta**: "The case of acute liver failure was "so ***markedly different*** than all other experience with Elevidys.<br><br>* * * | **Not Misleading**. It was fair to claim that the first death was a unique case because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17) | **Misleading**. It was misleading for Defendants to state that rh74 had not previously caused severe clinical liver injury and that the reported liver failure was "so markedly different than all other experience with Elevidys," while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety |

| | | |
|---|---|---|
| [T]his *one incident is unique*, not only in its outcome, but even in the sort of the course of it." <br><br> *May 6, 2025 Investor Call* | **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) <br><br> **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused a Hy's Law event - serious liver injury that the FDA describes as an "ominous indicator" of *fatal drug-induced liver toxicity*; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events (*a significant predictor of fatal liver failure*) – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13, 17, 19-20) <br><br> **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their |

55

| | | | |
|---|---|---|---|
| | | | possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that rh74 had not previously caused severe liver injury. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 248 | **Analyst Question:** "asked Defendants about the risk that Elevidys 'is pulled from the market.'"<br><br>**Defendants Ingram and Sarepta:** "*[I]n the context of AAV-mediated gene therapy*. It's in the context of the understanding that *there is always a risk of elevated liver enzymes* in the vast majority of cases, [a]nd with *this one case being the only exception*, they respond very rapidly to a modest increase in steroids and come back down to baseline."<br><br>*May 6, 2025 Investor Call* | **Not Misleading**. It was fair to claim that this risk was known but rare because liver toxicity is a known risk of AAV-mediated gene therapies and, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to state that Elevidys' risk of serious liver injury was no worse than other gene therapies, that Elevidys' liver risk was limited to transient elevations in aminotransferase levels that always "come back down to baseline," and that Sarepta had not previously observed cases of severe clinical liver injury, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of *fatal drug-induced liver toxicity*; (4) by October 2023, Sarepta's data showed that |

<table>
<tr><td></td><td></td><td></td><td>Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events (*a significant predictor of fatal liver failure*) – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 19-20)

Defendants' further assertion that "some level of liver toxicity is a known risk of AAV-mediated</td></tr>
</table>

gene therapies" ignores that they materially misled investors about the magnitude of rh74's immunogenic toxicity risk. Specifically, Defendants led investors to believe that while rh74 was associated with the same transient AT elevations as other gene therapies, the risk of actual liver damage was *more* favorable than rivals. (Opp. at 13, 17, 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)

| | | | |
|---|---|---|---|
| 249 | **Defendants Rodino-Klapac and Sarepta**: "The totality of our data in over 800 patients support safety of ELEVIDYS weight-based dosing across the label population of patients with Duchenne, *regardless of ambulatory status*." <br><br> *May 6, 2025 Investor Call* | **Not Misleading**. It was fair to claim that there was no difference in safety profile by ambulatory status because, unlike other gene therapies, there were no deaths in Elevidys clinical trials and there was relatively little non-ambulatory data. (DB 17) | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a large, robust body of evidence, including commercial data, and that those data demonstrated Elevidys' safety across the spectrum of DMD patients, including non-ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's |

| | | **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, ***especially in non-ambulatory patients***; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) ***by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients***; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too |

| | | | |
|---|---|---|---|
| | | | few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19) |
| 250 | **Analyst Question:** "asked whether there had been a 'shift . . . . in the ambulatory status of those patients being treated,' given that the Elevidys-induced liver failure had been observed in a non-ambulatory patient."<br><br>**Defendants Ingram and Sarepta:** "[T]here is *no difference* between ambulatory and non-ambulatory and for instance, risk of elevated liver enzymes or *liver injury*." | **Not Misleading**. It was fair to claim that there was no difference in safety profile by ambulatory status because, unlike other gene therapies, there were no deaths in Elevidys clinical trials and there was relatively little non-ambulatory data. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is | **Misleading**. It was misleading for Defendants to state that there was no difference in the risk of liver injury associated with rh74 in non-ambulant vs. ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, *especially in non-ambulatory patients*; (3) Sarepta's |

| | | | |
|---|---|---|---|
| | *May 6, 2025 Investor Call* | thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) *by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients*; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the |

| | | | |
|---|---|---|---|
| | | | Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19) |
| 251 | **Analyst Question:** "asked if there was any safety data that Sarepta could share with 'possibly the older non-ambulatory patients to get more confidence there for them?'"<br><br>**Defendants Ingram and Sarepta:** "We dosed well over 800 patients. So generally speaking, we know the safety profile of this therapy . . . . Is there something about being ambulatory versus non-ambulatory that plays a role? And the answer to that is *no*. We looked at *all the signals*, there is *no reason to believe that at all*." | **Not Misleading**. It was fair to claim that there was no difference in safety profile by ambulatory status because, unlike other gene therapies, there were no deaths in Elevidys clinical trials and there was relatively little non-ambulatory data. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The | **Misleading**. It was misleading for Defendants to state that Sarepta had amassed a large, robust body of evidence, including commercial data, and that those data demonstrated Elevidys' safety across the spectrum of DMD patients, including non-ambulant patients, while failing to disclose that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, ***especially in non-ambulatory patients***; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed |

| | *May 6, 2025 Investor Call* | FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) **by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients**; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that there was "relatively little" non-ambulant patient data is contradicted by their own statements touting both Sarepta's large, robust dataset and its understanding of rh74's profile in that population. Moreover, even if the Court accepted Defendants' unsupported factual assertion that there were too few data to draw conclusions about rh74's safety in non-ambulant patients, their affirmative statements assuring investors about its safety in that population would still be misleading, as the Supreme Court explained in *Matrixx*. (Opp. at 13, 17, 19-20) |
|---|---|---|---|

| | | | Not Opinion. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the ***scientific evidence*** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement ***post-dates*** the reviews on which Defendants rely. (Opp. at 15-19) |
|---|---|---|---|
| 252 | **Defendants Ingram and Sarepta**: "Elevidys has ***one of the most impressive safety profiles in the context of AAV-mediated gene therapy that has ever existed***." *May 6, 2025 Investor Call* | **Not Misleading**. It was fair to claim that Elevidys' safety profile was superior to other gene therapies because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17)  **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to state that rh74's safety profile "had one of the most impressive safety profiles" of any gene therapy, while failing to disclose that, in truth, it was associated with the worst immunogenic toxicity risk of any competing vector, by far, and that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes |

| | | **Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)<br><br>Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 13, 17, 19-20)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their |
|---|---|---|---|

| | | | possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that rh74's safety profile was superior to competing gene therapy vectors. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 253 | **Defendants Ingram and Sarepta**: "We use the same vector, rh74, in both Elevidys and our LGMD programs, which has a *differentiated safety profile* and high transduction efficiency."<br><br>*May 6, 2025 Investor Call* | **Not Misleading**. It was fair to claim that the safety profile was differentiated because, unlike other gene therapies, there were no deaths in Elevidys or LGMD clinical trials. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that rh74's safety profile was superior to, and positively "differentiated" from, competing therapies, while failing to disclose that, in truth, it was associated with the worst immunogenic toxicity risk of any competing vector, by far, and that (1) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (2) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (3) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (4) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (5) by June 2024, that the risk was |

significantly higher in non-ambulatory patients than ambulatory patients; and (6) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)

| | | | **Not Puffery**. Defendants' statements make concrete, verifiable assertions that rh74's safety profile was superior to competing gene therapy vectors. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products and were echoed in analyst reports. (Opp. at 20-21) |
|---|---|---|---|
| 255 | **Defendant Sarepta**: "*no new safety signals were observed* in the EMBARK study over the two-year duration . . . ." <br><br> *May 16, 2025 Press Release* | **Not Misleading**. It was fair to claim that no new safety signals were observed in EMBARK two-year data because, unlike other gene therapies, there were no deaths in Elevidys clinical trials. (DB 17) <br><br> **Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to tout that Sarepta observed "no new safety signals" in the EMBARK data, while failing to disclose that (1) at the time this statement was made, *two additional* non-ambulatory patients treated with rh74 (an Elevidys patient in the companion ENDEAVOR study and an LGMD patient) had been hospitalized with serious and life-threatening liver failure meeting Hy's Law criteria; (2) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (3) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (4) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (5) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (6) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (7) these data |

| | | | included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13) |
| | | | |
| | | | Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. (Opp. at 19-20) |
| | | | |
| | | | **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the **scientific evidence** available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement **post-dates** the reviews on which Defendants rely. (Opp. at 15-19) |
| 259 | **Analyst Question: "**asked, 'any thoughts on why the signal only started emerging | **Not Misleading**. It was fair to claim that Elevidys' safety profile | **Misleading**. It was misleading for Defendants to state that rh74's safety profile was equal or |

after you've treated 100-plus nonambulatory patients? Any changes in manufacturing or any other factors that you could think of? Because *it feels quite unusual to not have seen this in 100-plus patients,* [and then, suddenly], within [just] three months, [to see] two patients' not only experience, but die from, serious drug-induced liver injury."

**Defendants Ingram and Sarepta:**
Ingram assured investors that rh74's safety profile was no worse than any other gene therapy platform's, stating, "it's *no greater signal*, I should note, *than other full-body gene therapy infusions* that are commercially available today."

*June 16, 2025 Investor Call*

was equal or superior to other gene therapies because, unlike other gene therapies, there were no deaths in Elevidys clinical trials, and some level of liver toxicity is a known risk of AAV-mediated gene therapies. (DB 17)

**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)

**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18)

superior to other gene therapies, while failing to disclose  while failing to disclose that, in truth, it was associated with the worst immunogenic toxicity risk of any competing vector, by far, and that (1) at the time this statement was made, a *third* non-ambulatory rh74 patient had experienced liver failure; (2) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (3) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (4) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (5) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (6) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (7) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the

only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that "some level of liver toxicity is a known risk of AAV-mediated gene therapies" ignores that they materially misled investors about the magnitude of rh74's immunogenic toxicity risk. Specifically, Defendants led investors to believe that while rh74 was associated with the same transient AT elevations as other gene therapies, the risk of actual liver damage was *more* favorable than rivals. (Opp. at 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions that rh74 had not previously caused severe liver injury. Courts have repeatedly held virtually identical misstatements

71

| | | | |
|---|---|---|---|
| | | | actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 260 | **Analyst Question: "**asked, 'any thoughts on why the signal only started emerging after you've treated 100-plus nonambulatory patients? Any changes in manufacturing or any other factors that you could think of? Because *it feels quite unusual to not have seen this in 100-plus patients,* [and then, suddenly], within [just] three months, [to see] two patients' not only experience, but die from, serious drug-induced liver injury."<br><br>**Defendants Ingram and Sarepta:** "[O]n manufacturing, my tech ops team have looked carefully at all of this. *[W]e've seen no signals that there's anything in manufacturing that would explain this*. Very likely this is the result of the fact that this signal is a *very rare one*."<br><br>*June 16, 2025 Investor Call* | **Not Misleading**. It was fair to claim that poor manufacturing could not explain the two patient deaths because, there were no deaths in Elevidys clinical trials, and some level of liver toxicity is a known risk of AAV-mediated gene therapies. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16)<br><br>**Puffery**. Courts have held similar "buzzy" language about safety immaterial corporate optimism. (DB 18) | **Misleading**. It was misleading for Defendants to state that there was no evidence rh74's manufacturing played a role in the newly disclosed adverse events, while failing to disclose that (1) Defendants had received numerous warnings from senior Sarepta scientists and consultants that rh74's high-viral load, exacerbated by poor, hastily-scaled up manufacturing, posed posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (2) at the time this statement was made, a *third* non-ambulatory rh74 patient had experienced liver failure; (3) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (4) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of fatal drug-induced liver toxicity; (5) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (6) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (7) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events – a risk |

Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that "some level of liver toxicity is a known risk of AAV-mediated gene therapies" ignores that they materially misled investors about the magnitude of rh74's immunogenic toxicity risk. Specifically, Defendants led investors to believe that while rh74 was associated with the same transient AT elevations as other gene therapies, the risk of actual liver damage was *more* favorable than rivals. (Opp. at 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their

| | | | |
|---|---|---|---|
| | | | possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement **post-dates** the reviews on which Defendants rely. (Opp. at 15-19)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions that rh74 had not previously caused severe liver injury. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the most important aspect of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 20-21) |
| 262 | **Analyst Question:** "asked, 'why should investors feel confident ALF will only be limited to the no ambulatory population? And are you aware of any other patients being hospitalized for serious cases of liver injury right now?'"<br><br>**Defendants Ingram and Sarepta:** "What we can say is that the signal for ALF is obviously exceptionally rare and has only emerged in the non-ambulatory patient population right now. To remind you, we have dosed well over 900 patients. We've been dosing for seven years. At the time of our first approval and our broader approval, *we had no signal of this serious ALF concept*. We had elevated liver enzymes in a minority of patients. They responded very rapidly to modest increases in steroids."<br><br>*June 16, 2025 Investor Call* | **Not Misleading**. It was fair to claim that Sarepta had seen no signal of serious ALF before the first two patient deaths because, unlike other gene therapies, there were no deaths in Elevidys clinical trials, and some level of liver toxicity is a known risk of AAV-mediated gene therapies. (DB 17)<br><br>**Opinion**. This statement interprets the results of clinical studies and is thus an inactionable statement of opinion. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. The FDA's approval of Elevidys renders Defendants' views *per se* reasonable. (DB 16) | **Misleading**. It was misleading for Defendants to state that Sarepta's data showed no liver failure "signal" associated with rh74 prior to June 2025, that Sarepta's data showed that Elevidys' liver risk was limited to transient elevations in aminotransferase levels resolved without injury after "modest steroids," and that there were no patients hospitalized with "serious cases of liver injury," while failing to disclose that (1) at the time this statement was made, a **third** non-ambulatory rh74 patient had experienced liver failure; (2) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (3) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (4) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed |

that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of *fatal drug-induced liver toxicity*; (5) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than competing treatments; (6) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (7) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events (*a significant predictor of fatal liver failure*) – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that "some level of liver toxicity is a known risk of AAV-mediated gene therapies" ignores that they materially misled investors about the magnitude of rh74's immunogenic toxicity risk. Specifically, Defendants led investors to believe that while rh74 was associated with the same transient AT elevations as other gene therapies, the risk of actual liver damage was *more* favorable than rivals. (Opp. at 19-20)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's

| | | | |
|---|---|---|---|
| | | | state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession, which there is no evidence the FDA even reviewed, let alone considered. Indeed, this statement *post-dates* the reviews on which Defendants rely. (Opp. at 15-19) |
| 263 | **Analyst Question:** "asked Defendants about rh74's safety in the LGMD program and, specifically, whether aggressive prophylaxis with sirolimus would be required for those treatments as well."<br><br>**Defendants Rodino-Klapac and Sarepta:** "*We have not seen a signal of ALF in this* [LGMD] *population*."<br><br>*June 16, 2025 Investor Call* | **Not Misleading**. It was fair to claim that Sarepta had seen no signal of ALF in LGMD patients because, unlike other gene therapies, there were no deaths in Elevidys or LGMD clinical trials before this point, some level of liver toxicity is a known risk of AAV-mediated gene therapies, and Sarepta's communications with the FDA show the LGMD patient's case was not life-threatening at this time. (DB 19-20)<br><br>**Opinion**. There is no allegation that Defendants lacked a sincere belief in the truth of this statement. (DB 16) | **Misleading**. It was misleading for Defendants to state that Sarepta had not "seen a signal of" acute liver failure in LGMD patients, while failing to disclose that (1) at the time this statement was made, a non-ambulatory rh74 LGMD patient *had* experienced liver failure; (2) Sarepta failed to perform FDA-mandated preclinical validation of Sarepta's safety and, instead, generated sham safety data; (3) Sarepta's senior scientists and external experts warned Defendants in 2021 that rh74 posed a uniquely dangerous risk of liver toxicity, especially in non-ambulatory patients; (4) Sarepta's Pharmacovigilance scientists and an outside hepatologist warned that clinical data confirmed the expert panel's warnings and showed that rh74 caused serious liver injury that the FDA describes as an "ominous indicator" of *fatal drug-induced liver toxicity*; (5) by October 2023, Sarepta's data showed that Elevidys' risk of liver damage was likely five to ten times higher than |

competing treatments; (6) by June 2024, that the risk was significantly higher in non-ambulatory patients than ambulatory patients; and (7) these data included numerous reports of extremely serious immunogenic/liver injury, including multiple Hy's Law events (*a significant predictor of fatal liver failure*) – a risk Sarepta admitted was not reflected in public labeling. (Opp. at 13)

Defendants' effort to rewrite their statements as solely concerning mortality risk is contradicted by the statements' plain language (which nowhere even mentions mortality), unsupported by the Complaint's allegations (or any other evidence), and incorrectly assumes that (a) mortality is the only, or even the most salient, measure of safety risk – it isn't; and (b) that rh74's mortality risk was superior to competing therapies – it wasn't. Defendants' further assertion that "some level of liver toxicity is a known risk of AAV-mediated gene therapies" ignores that they materially misled investors about the magnitude of rh74's immunogenic toxicity risk. Specifically, Defendants led investors to believe that while rh74 was associated with the same transient AT elevations as other gene therapies, the risk of actual liver damage was *more* favorable than rivals. (Opp. at 19-20)

Finally, Defendants' improper factual assertion that "Sarepta's communications with the FDA show the LGMD patient's case was not life-threatening at this time" is unsupported by the only (extrinsic) document they cite – a Sarepta press release – which says nothing about when the event occurred. The Complaint alleges, and

| | | |
|---|---|---|
| | | Defendants' statements make clear, that, at the time the statement was made, this patient was, at a minimum, hospitalized "with serious liver injury (which, as with the first patient death, included astronomically high bilirubin and liver enzyme values meeting Hy's Law criteria)." Defendants' (inaccurate) characterization of the patient's condition as "not life-threatening" – a phrase that does not actually appear in this challenged statement – cannot be accepted at the motion to dismiss stage. (Opp. at 21-22)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession. (Opp. at 15-19) |
| 267 | **Analyst Question:** "asked, 'was there any thoughts [sic] on your part about *AAV safety risk* in the context of a less severe disease *motivating this decision?* And is there *anything you've seen there so far*?'"<br><br>**Defendants Ingram and Sarepta:** "On the first limb-girdle, the process we went through with respect to the strategic | **Not Misleading**. [*Neither Defendants' brief nor their appendix provides an explanation for their claim that this statement is not misleading*].<br><br>**Opinion**. There is no allegation that Defendants lacked a sincere belief | **Misleading**. It was misleading for Defendants to deny that Sarepta had observed any safety signals associated with rh74 in the LGMD population and that the Company's only concerns with the program were related to "the cost and the ultimate opportunity," when, in truth, and as Defendants would be forced to admit to outraged analysts just two days later, an LGMD patient taking rh74 had |

| | | |
|---|---|---|
| plan was to do essentially a risk-adjusted net present value, *considering all the costs and the ultimate opportunity*, . . . . So it was on — it was really on the viability issue and *the cost issue for them*."<br><br>*June 16, 2025 Investor Call* | in the truth of this statement. (DB 16) | already died from drug-induced liver failure, after being hospitalized for weeks. (Opp. at 21-22)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe what the *scientific evidence* available to Sarepta shows, while failing to disclose significant evidence of rh74's unique toxicity severely undercutting those statements. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with the evidence of rh4's immunogenic/liver toxicity in their possession. (Opp. at 20-21) |

**LGMD Progress Statements**

| Compl. ¶ | Statement | Defendants' Arguments | Plaintiffs' Reply |
|---|---|---|---|
| 269 | **Defendants Rodino-Klapac and Sarepta**: "We remain committed to advancing our LGMD portfolio across a variety of subtypes . . . . We also continue to make progress in manufacturing for all LGMD candidates in our pipeline.<br><br>* * *<br><br>[W]e have fully enrolled Journey, our LGMD natural history study."<br><br>*August 2, 2023 Investor Call* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24) | **Misleading**. It was misleading for Defendants to state that Sarepta was "committed to advancing" its LGMD program; that it was making "progress in manufacturing for all LGMD candidates in our pipeline"; that Sarepta's LGMD "natural history study" had been "fully enrolled," while failing to disclose that: (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) serious manufacturing challenges prevented the Company from even producing infusions for these key assets, including fundamental issues with the construction of the |

| | |
|---|---|
| **Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)<br><br>**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | "dual vector" for Sarepta's 2B therapy; (3) Defendants kept the clinical development program was in a "loop of study design"; (4) Journey enrollment had been reduced below necessary levels; (5) management had stood down all patient outreach and recruitment for the program; and (6) many senior LGMD personnel left Sarepta by the start of the Class Period, and their positions were never backfilled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's |

| | | | |
|---|---|---|---|
| | | | allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 21 n.10) |
| 270 | **Defendants Rodino-Klapac and Sarepta**: Sarepta's "innovative dual vector strategy allows us to deliver the full length dysferlin gene, the sole cause of LGMD 2B."<br><br>*August 2, 2023 Investor Call* | **Not Misleading**. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | **Misleading**. It was misleading for Defendants to state that Sarepta had already successfully developed a "dual vector" that currently "***allows*** us to deliver" a full length dysferlin gene, while failing to disclose that Sarepta had ***not*** been able to manufacture a viable dual-vector infusion and that its efforts to do so were beset by severe manufacturing issues that entailed lengthy delays, at a minimum. (Opp. at 22-23)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress, namely that Sarepta had already developed a dual-vector infusion. Courts have repeatedly held such misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 22) |

| | | | |
|---|---|---|---|
| 272 | **Defendants Rodino-Klapac and Sarepta**: "First, limb-girdle muscular dystrophy or LGMD. We remain committed to advancing our LGMD portfolio across a variety of subtypes . . . . *[W]e completed dosing in our systemic pilot study*, NAVIGENE for SRP-6004 dual vector rh74-mediated gene therapy to treat individuals with LGMD2B." <br><br> *November 1, 2023 Investor Call* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24) <br><br> **Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24) <br><br> **Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | **Misleading**. It was misleading for Defendants to state that Sarepta was "committed to advancing" its LGMD program; and that it had "completed dosing in our systemic pilot study" for the dual-vector mediated 2B therapy, while failing to disclose that: (1) in truth, there was no meaningful progress towards commercialization across the LGMD program's key assets, including for the 2A, 2B, and 2C therapies representing the vast majority of the program's economic opportunity; (2) Sarepta recognized it would have to redo its preclinical work for the 2B asset NAVIGENE purported to study in light of serious manufacturing problems and had not dosed a single patient with viable material; (3) contrary to Defendants' statements touting its commitment to the LGMD program, Sarepta diverted resources away from the program, as protocols were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22) <br><br> The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23) |

| | | | **Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 21 n.10) |
| 273 | **Analyst Question:** "asked, 'What are the next updates we're going to get on the limb-girdle program? Just walk us through those.'"<br><br>**Defendants Estepan and Sarepta:** "*So limb-girdle, obviously making good progress*.<br><br>\* \* \*<br><br>[W]e're going to engage with the agency to discuss what would be necessary from a post-marketing commitment that would enable an accelerated approval for the | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they | **Misleading**. It was misleading for Defendants to state that the LGMD program was "obviously making good progress," and, indeed, so much progress that Sarepta was positioned to discuss post-marketing commitments for LGMD therapies with the FDA, while failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) Sarepta's clinical development of the LGMD program was stalled as, among other things, protocols and budgets were never approved, projects were not funded, and Sarepta |

| | | |
|---|---|---|
| limb-girdle. So *very pleased with the way that's progressing*." <br><br> *November 9, 2023 UBS Biopharma Conference Presentation* | were committed to the LGMD program's progress. (DB 23) <br><br> **Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24) <br><br> **Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22) <br><br> The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23) <br><br> **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22) <br><br> **Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, |

| | | | as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to an analyst question and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|
| 275 | **Defendants Rodino-Klapac and Sarepta**: "*[W]e are very pleased with the progress of our LGMD portfolio*, . . . . We are *maximizing the synergies* across this platform from both an R&D and manufacturing perspective, and our sights are firmly set on *accelerating the remainder of the LGMD assets to the clinic*."<br><br>*August 7, 2024 Investor Call* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23) | **Misleading**. It was misleading for Defendants to tout the LGMD program's progress and to state Sarepta was "accelerating" the program into the clinical stage while failing to disclose that: (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) there was *no meaningful clinical development* progress made on the LGMD program's key assets, as, among other things, protocols and budgets were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22) |

| | | **Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of |
|---|---|---|---|

| | | | resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|
| 276 | **Defendants Rodino-Klapac and Sarepta**: "[W]e are also *rapidly progressing* our program for SRP-9005 for the treatment of limb-girdle muscular dystrophy type 2C . . . ." <br><br> *August 7, 2024 Investor Call* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24) <br><br> **Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23) <br><br> **Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24) <br><br> **Puffery**. "[V]ague proclamations of progress" have been held to be | **Misleading**. It was misleading for Defendants to state the program was "rapidly progressing" while failing to disclose that: (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity, including 2C; (2) Sarepta had not even approved *plans* for a clinical trial in the 2C program, made no meaningful effort to recruit patients, and, indeed, had not even managed to manufacture a viable infusion with which to dose said patients; (3) Defendants kept the program in a "loop of study design," as protocols and budgets were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22) <br><br> The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity |

| | | inactionable statements of corporate optimism. (DB 22-23) | or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|

88

| | | | |
|---|---|---|---|
| 277 | **Analyst Question:** "asked Defendants to describe the steps Sarepta was taking 'to accelerate the development of the LGMD gene therapies.'"<br><br>**Defendants Rodino-Klapac and Sarepta:** [Sarepta was] "using the ELEVIDYS experience to help accelerate the LGMD platform" and "pulling on every lever possible with FDA to *make sure that we're moving in the fastest speed possible*."<br><br>*August 7, 2024 Investor Call* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)<br><br>**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | **Misleading**. It was misleading for Defendants to state that Sarepta was working with the FDA to leverage its work on Elevidys and "accelerate the LGMD platform," while failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) far from being positioned to work with the FDA to leverage Elevidys development and testing, serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) far from being positioned to work with the FDA to leverage Elevidys clinical "experience," by the beginning of 2024, patient outreach across almost the entire LGMD portfolio ground to a halt; (4) far from being positioned to work with the FDA to leverage Elevidys clinical "experience," by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites (at which patients were to be observed), and freezing grant funding for LGMD; and (5) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23) |

| | | | |
|---|---|---|---|
| | | | **Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10) |
| 279 | **Defendants Ingram and Sarepta**: [LGMD program was] "*mov[ing] rapidly into* | **Not Misleading**. The LGMD program was making progress, as | **Misleading**. It was misleading for Defendants to state that Sarepta's LGMD program was "moving |

| | | |
|---|---|---|
| *late-stage clinical*," and the Company was poised [for] "commencement of our trials for SRP-9005 to treat LGMD type 2C in early 2025, . . . ."<br><br>*November 6, 2024 Investor Call* | illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)<br><br>**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | rapidly into late-stage clinical" and that the Company was poised to commence its Type 2C trial, while failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity, including 2C; (2) Sarepta had not even approved *plans* for a clinical trial in the 2C program, made no meaningful effort to recruit patients, and, indeed, had not even managed to manufacture a viable infusion with which to dose said patients; (3) far from "moving rapidly into late-stage clinical," Defendants kept the program in a "loop of study design," as protocols and budgets were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on |

<table>
<tr><td></td><td></td><td></td><td>fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under <em>Omnicare</em> because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10)</td></tr>
<tr><td>280</td><td>**Defendants Rodino-Klapac and Sarepta**: [Sarepta was] "very pleased with *the progress of our LGMD portfolio* and expect to have three of our LGMDs in the clinic in less than six months. We are *maximizing the synergies* across this platform from both</td><td>**Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The</td><td>**Misleading**. It was misleading for Defendants to tout the manufacturing and clinical progress of the LGMD program and to state that the Type 2C was "rapidly progressing" to clinical development, while failing to disclose that (1) there was no meaningful progress in the three assets</td></tr>
</table>

| | | |
|---|---|---|
| an R&D and *manufacturing perspective*, and our sites are firmly set on *accelerating the remainder of the LGMD assets to the clinic*.<br><br>* * *<br><br>[W]e are also rapidly progressing our program for SRP-9005 for the treatment of limb-girdle muscular dystrophy type 2C, . . . .”; the program was “progressing to the clinic.”<br><br>*November 6, 2024 Investor Call* | fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program’s progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)<br><br>**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. “[V]ague proclamations of progress” have been held to be inactionable statements of corporate optimism. (DB 22-23) | representing the vast majority of the program’s commercial opportunity, including 2C; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) Sarepta had not even approved *plans* for a clinical trial in the 2C program, made no meaningful effort to recruit patients, and, indeed, had not even managed to manufacture a viable infusion with which to dose said patients; (4) far from “accelerating” the LGMD assets to clinical development, Defendants kept the program in a “loop of study design,” as protocols and budgets were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program’s progress. Defendants’ assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants’ statements neither express uncertainty nor reference the speaker’s state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while |

| | | | failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|
| 281-82 | **Analyst Question:** "asking Defendants to provide "more details on your internal pipeline focus here in the near term.'"<br><br>**Defendants Ingram and Sarepta:** "The second big effort of this organization right now is advancing our internal pipeline. *We're getting a lot of great traction* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not | **Misleading**. It was misleading for Defendants to state that Sarepta was "really starting to make traction and move fast on our limb-girdle portfolio"; that Sarepta's progress on the LGMD program was "really beginning to accelerate"; and to state that Sarepta was devoting significant resources to development and was "focused on [the program] as an organization right now," while |

*there* . . . . But even in the near term, in the late stage, you can see we are in the next few months really will be in clinical trials on three of our limb-girdle program. *So that's really beginning to accelerate and we're very, very excited about that. That's what we're focused on as an organization right now*."

\* \* \*

**Analyst Question:** "discuss 'the time of these [LGMD] launches and how we should be thinking about that market opportunity.'"

**Defendants' Ingram and Sarepta:** "[I]t's a particularly poignant question now because *we're really starting to make traction and move fast on our limb-girdle portfolio*."

*November 6, 2024 Investor Call*

mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)

**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)

**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)

**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23)

failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) by the beginning of 2024, patient outreach across almost the entire LGMD portfolio ground to a halt; (4) by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites, and freezing grant funding for LGMD; and (5) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)

The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective

| | | | belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22) **Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24) **Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|
| 283 | **Analyst Question:** "asked whether the deal meant Sarepta was now 'prioritiz[ing] the Arrowhead partner programs over your limb-girdle programs in the pipeline.'" **Defendants Ingram and Sarepta:** Ingram flatly denied this, assuring investors that Sarepta remained "***very, very committed to driving our limb-girdle programs*** . . . . I don't want anyone to get the false impression that this [Arrowhead acquisition] is a deprioritization of | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24) | **Misleading**. It was misleading for Defendants to state that Sarepta was devoting significant resources to developing the LGMD portfolio and Remained "very, very committed to driving our limb-girdle programs," while failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) by the beginning of 2024, patient outreach across almost the entire LGMD portfolio |

| | | |
|---|---|---|
| programs like our limb-girdle gene therapy programs, *which it isn't*."<br><br>*November 6, 2024 Investor Call* | **Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)<br><br>**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | ground to a halt; (4) by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites, and freezing grant funding for LGMD; and (5) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward- |

| | | | |
|---|---|---|---|
| | | | looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10) |
| 285 | **Defendants Ingram and Sarepta**: LGMD therapies were "significantly derisked, and *they are relatively late stage*."<br><br>*January 13, 2025 J.P. Morgan Healthcare Conference Presentation* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23) | **Misleading**. It was misleading for Defendants to state that the LGMD portfolio was "relatively late stage," while failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) by the beginning of 2024, patient outreach across almost the entire LGMD portfolio ground to a halt; (4) by the summer of 2024, Sarepta was pulling back on existing clinical trial enrollment commitments, dropping study sites, and freezing grant funding for LGMD; and (5) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually |

| | | **Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | corroborative, and come from individuals whose jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. |

99

| | | | Moreover, these statements concerned the development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|
| 286 | **Defendants Ingram and Sarepta**: "[W]e are now *moving rapidly* with our LGMD platform. . . . and we have initiated our registration study for SRP-9005 to treat LGMD type 2C."<br><br>*February 26, 2025 Investor Call* | **Not Misleading**. The LGMD program was making progress, as illustrated by Defendants' statements and other releases during the Class Period. FE allegations to the contrary are conclusory. The fact that the program was eventually mainly canceled does not mean it was not reaching the milestones Defendants claimed during the Class Period. (DB 10-11, 24)<br><br>**Opinion**. There is no allegation that Defendants did not believe they were committed to the LGMD program's progress. The statement also interprets clinical data which is an inactionable opinion under *Philip Morris*. (DB 23)<br><br>**Forward-Looking**. The statement came with meaningful cautionary language and relates to potential progress in the future. (DB 23-24)<br><br>**Puffery**. "[V]ague proclamations of progress" have been held to be inactionable statements of corporate optimism. (DB 22-23) | **Misleading**. It was misleading for Defendants to tout the manufacturing and clinical progress of the LGMD program, to state that the program was "moving rapidly," and Sarepta had "initiated [the Type 2C] registration study," while failing to disclose that (1) there was no meaningful progress in the three assets representing the vast majority of the program's commercial opportunity, including 2C; (2) serious manufacturing challenges prevented the Company from even producing viable infusions for these key assets; (3) while Defendants stated that Sarepta had "initiated" its registration study for the Type 2C program, the Company had done no more than file preliminary paperwork with a registration database and, in truth, had made no meaningful clinical progress in that program (or in any of the other key LGMD assets); (4) Defendants kept the program in a "loop of study design," as protocols and budgets were never approved, projects were not funded, and Sarepta management had ordered patient outreach and recruitment for the LGMD clinical program to stand down; and (4) senior LGMD personnel departed Sarepta, but their positions and responsibilities were never back-filled. (Opp. at 22)<br><br>The FE reports meet First Circuit criteria for reliability: the five reports are detailed, mutually corroborative, and come from individuals whose |

jobs gave them direct insight into the LGMD program's progress. Defendants' assertion about the cancellation of the LGMD program is a non-sequitur, as the Complaint does not allege falsity or scienter on the basis of that cancellation. (Opp. at 22-23)

**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the progress of a drug development program, while failing to disclose that progress has stalled due to significant difficulties. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 22)

**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the LGMD program's progress and Sarepta's allocation of resources to it; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language and was made with knowledge of its falsity. (Opp. at 24)

**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the LGMD program's progress and Sarepta's allocation of resources to it. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the

| | | | development of Sarepta's most important products. These statements were made in direct response to analyst questions and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|

**ESSENCE Statements**

| Compl. ¶¶ | Statement | Defendants' Arguments | Plaintiffs' Reply |
|---|---|---|---|
| 288-89 | **Defendants Ingram, Estepan, and Sarepta**: "Responses to COVID-19 by healthcare providers and regulatory agencies *could* delay the commencement of clinical trials, site initiation, protocol compliance, or the completion of clinical trials, including the completion of post-marketing requirements and commitments, slow down enrollment, and make the ongoing collection of data for patients enrolled in studies more difficult or intermittent."<br><br>"[T]he COVID-19 pandemic may impact patient ability and willingness to travel to clinical trial sites as a result of quarantines and other restrictions, which *may negatively impact enrollment in our clinical trials*."<br><br>*Forms 10-K: 2023, 2024*<br>*Forms 10-Q: Q2 2023 – Q2 2025* | **Not Misleading**. Sarepta warned that "COVID-19 has caused disruptions," and, in a 2020 SEC filing, the Company warned that the pandemic had caused "disruption" in "confirmatory trials" for the exon-skipping therapies. These concrete disclosures of present disruptions mean investors were not misled by other, hypothetical disclosures. (DB 25) | **Misleading**. It was misleading for Defendants to state that the pandemic "*may* negatively impact enrollment in our clinical trials" and "*could*" disrupt the enrollment, execution, and the collection of patient data, when, in truth, they knew that the COVID-19 pandemic *did* fatally impact ESSENCE enrollment, leaving the study vastly underpowered and virtually certain to fail. (Opp. at 23-24)<br><br>Defendants' single reference in May 2020 to "disruptions" of unspecified nature, magnitude, and impact did *not* disclose that *three years later* ESSENCE *was* fatally underpowered and virtually certain to fail. Indeed, even the "disclosure" on which Defendants rely characterizes the risk that COVID "could" impact study results as hypothetical. In any event, the fact-intensive question of whether the "truth was on the market" as a result of this "disclosure" cannot be resolved as a matter of law. (Opp. at 23-24) |
| 290 | **Defendants Ingram, Estepan, and Sarepta**: "*Missing data could undermine data integrity and probability of success.* | **Not Misleading**. Sarepta warned that "COVID-19 has caused disruptions," and, in a 2020 SEC | **Misleading**. It was misleading for Defendants to state merely that the COVID-19 pandemic that "[m]issing data *could* undermine" the "probability |

| | | | |
|---|---|---|---|
| | The response to COVID-19 by healthcare providers and regulatory agencies ___*could*___ . . . make the ongoing collection of data for patients enrolled in studies more difficult or intermittent. In addition, as COVID-19 continues to spread, some participants and clinical investigators ___*may be*___ unable or unwilling to *comply with clinical trial protocols*. For example, quarantines or other travel limitations (whether voluntary or required) were implemented in many countries during the pandemic, and may impede participant movement, affect sponsor access to study sites, or interrupt healthcare services, which *may* negatively impact the execution of clinical trials."<br><br>*Form 10-K: 2023*<br>*Forms 10-Q: Q2 2023 – Q3 2024* | filing, the Company warned that the pandemic had caused "disruption" in "confirmatory trials" for the exon-skipping therapies. These concrete disclosures of present disruptions mean investors were not misled by other, hypothetical disclosures. (DB 25) | of success" in Sarepta's trials, "*could* . . .make the ongoing collection of data difficult," and that patients "*may be*" unable to comply with clinical trial protocols, when, in truth, they knew that the COVID-19 pandemic *did* fatally impact ESSENCE enrollment, leaving the study vastly underpowered and virtually certain to fail. (Opp. at 23-24)<br><br>Defendants' single reference in May 2020 to "disruptions" of unspecified nature, magnitude, and impact did *not* disclose that *three years later* ESSENCE *was* fatally underpowered and virtually certain to fail.  Indeed, even the "disclosure" on which Defendants rely characterizes the risk that COVID "could" impact study results as hypothetical. In any event, the fact-intensive question of whether the "truth was on the market" as a result of this "disclosure" cannot be resolved as a matter of law. (Opp. at 23-24) |
| 293 | **Defendants Rodino-Klapac and Sarepta**: "In regard to our post-marketing studies for the PMO, as mentioned last quarter, we completed enrollment in the ESSENCE trial, our post-marketing requirement for Golodirsen and casimersen, and continue to make good progress with our MIS51ON study, which is on track to be fully enrolled this year."<br><br>*August 2, 2023 Investor Call* | **Not Misleading**. Sarepta warned that "COVID-19 has caused disruptions," and, in a 2020 SEC filing, the Company warned that the pandemic had caused "disruption" in "confirmatory trials" for the exon-skipping therapies. Plaintiffs do not plead that Rodino-Klapac knew about the alleged issues with ESSENCE. (DB 25-26)<br><br>**Opinion**. Statements that a trial is "on track" or "fully enrolled" are inactionable interpretations of clinical data and proper clinical | **Misleading**. It was misleading for Defendants to state that Sarepta "completed enrollment in the ESSENCE trial" while failing to disclose that, far from being fully enrolled, ESSENCE was severely underpowered and highly unlikely to meet to its primary endpoint. (Opp. at 23-24)<br><br>Defendants' single reference in May 2020 to "disruptions" of unspecified nature, magnitude, and impact did *not* disclose that *three years later* ESSENCE *was* fatally underpowered and virtually certain to fail.  Indeed, even the "disclosure" on which Defendants rely characterizes the risk that COVID "could" impact study results as hypothetical. In any event, the fact-intensive |

| | | methodology. Plaintiffs also do not plead that Rodino-Klapac lacked a sincere belief in the truth of these statements. (DB 25-26).<br><br>**Forward-Looking**. Even if the statement does not use future tense, it is forward-looking in its underlying assumptions of events that must happen in the future. (DB 26)<br><br>**Puffery**. Courts have held statements that a trial is "on track" to be inactionable expressions of corporate optimism. (DB 25) | question of whether the "truth was on the market" as a result of this "disclosure" cannot be resolved as a matter of law. (Opp. at 23-24)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the current enrollment and data collection status of a clinical trial. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 24)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the enrollment and data collection status ESSENCE; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language (which was itself affirmatively misleading) and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the enrollment and data collection status ESSENCE. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 21 n.10) |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 293 | **Defendants Rodino-Klapac and Sarepta**: "Regarding our post-marketing studies for the PMOs as mentioned last quarter, *we completed enrollment in the ESSENCE trial*, a post-marketing requirement for golodirsen [i.e., Vyondys] and casimersen [i.e., Amondys]." <br><br> *November 1, 2023 & February 28, 2024 Investor Calls* | **Not Misleading**. Sarepta warned that "COVID-19 has caused disruptions," and, in a 2020 SEC filing, the Company warned that the pandemic had caused "disruption" in "confirmatory trials" for the exon-skipping therapies. Plaintiffs do not plead that Rodino-Klapac knew about the alleged issues with ESSENCE. (DB 25-26) <br><br> **Opinion**. Statements that a trial is "on track" or "fully enrolled" are inactionable interpretations of clinical data and proper clinical methodology. Plaintiffs also do not plead that Rodino-Klapac lacked a sincere belief in the truth of these statements. (DB 25-26). | **Misleading**. It was misleading for Defendants to state that Sarepta "completed enrollment in the ESSENCE trial" while failing to disclose that, far from being fully enrolled, ESSENCE was severely underpowered and highly unlikely to meet to its primary endpoint. (Opp. at 23-24) <br><br> Defendants' single reference in May 2020 to "disruptions" of unspecified nature, magnitude, and impact did *not* disclose that *three years later* ESSENCE *was* fatally underpowered and virtually certain to fail.  Indeed, even the "disclosure" on which Defendants rely characterizes the risk that COVID "could" impact study results as hypothetical. In any event, the fact-intensive question of whether the "truth was on the market" as a result of this "disclosure" cannot be resolved as a matter of law. (Opp. at 23-24) <br><br> Defendants are also wrong that the Complaint does not plead Rodino-Klapac's knowledge *or recklessness* regarding ESSENCE's fatal underpowering. The Complaint alleges, among other things, that: (1) Rodino-Klapac's own statements show that she closely monitored study power and data collection in ongoing trials; (2) that, as the most senior clinical executive at Sarepta, major study decisions – including enrolling multiple additional international study sites at significant expense and repeatedly delaying the release of results – in the key confirmatory trial of the Company's most lucrative franchise could not reasonably have escaped her notice; and (3) given her knowledge of major "disruptions" in ESSENCE (which Defendants do not dispute), it would be severely |

| | | | |
|---|---|---|---|
| | | | reckless at a minimum to fail to inquire about enrollment status before telling investors that enrollment was "complete" and the study was "on track." (Opp. at 21 n.10)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the current enrollment and data collection status of a clinical trial. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 24) |
| 294 | **Defendants Rodino-Klapac and Sarepta**: "[T]he ESSENCE trial, our post-marketing requirement for golodirsen and casimersen . . . [is] *fully enrolled and remain[s] on track*."<br><br>*May 1, 2024, August 7, 2024, November 6, 2024, February 26, 2025 & May 6, 2025 Investor Calls* | **Not Misleading**. Sarepta warned that "COVID-19 has caused disruptions," and, in a 2020 SEC filing, the Company warned that the pandemic had caused "disruption" in "confirmatory trials" for the exon-skipping therapies. Plaintiffs do not plead that Rodino-Klapac knew about the alleged issues with ESSENCE. (DB 25-26)<br><br>**Opinion**. Statements that a trial is "on track" or "fully enrolled" are inactionable interpretations of clinical data and proper clinical methodology. Plaintiffs also do not plead that Rodino-Klapac lacked a sincere belief in the truth of these statements. (DB 25-26). | **Misleading**. It was misleading for Defendants to state that ESSENCE was "fully enrolled and remain[s] on track," while failing to disclose that, far from being fully enrolled, ESSENCE was severely underpowered and highly unlikely to meet to its primary endpoint. (Opp. at 23-24)<br><br>Defendants' single reference in May 2020 to "disruptions" of unspecified nature, magnitude, and impact did *not* disclose that *three years later* ESSENCE *was* fatally underpowered and virtually certain to fail.  Indeed, even the "disclosure" on which Defendants rely characterizes the risk that COVID "could" impact study results as hypothetical. In any event, the fact-intensive question of whether the "truth was on the market" as a result of this "disclosure" cannot be resolved as a matter of law. (Opp. at 23-24) |

| | | | **Forward-Looking**. Even if the statement does not use future tense, it is forward-looking in its underlying assumptions of events that must happen in the future. (DB 26)<br><br>**Puffery**. Courts have held statements that a trial is "on track" to be inactionable expressions of corporate optimism. (DB 25) | Defendants are also wrong that the Complaint does not plead Rodino-Klapac's knowledge *or recklessness* regarding ESSENCE's fatal underpowering. The Complaint alleges, among other things, that: (1) Rodino-Klapac's own statements show that she closely monitored study power and data collection in ongoing trials; (2) that, as the most senior clinical executive at Sarepta, major study decisions – including enrolling multiple additional international study sites at significant expense and repeatedly delaying the release of results – in the key confirmatory trial of the Company's most lucrative franchise could not reasonably have escaped her notice; and (3) given her knowledge of major "disruptions" in ESSENCE (which Defendants do not dispute), it would be severely reckless at a minimum to fail to inquire about enrollment status before telling investors that enrollment was "complete" and the study was "on track." (Opp. at 23-24)<br><br>**Not Opinion**. Defendants' statements neither express uncertainty nor reference the speaker's state of mind; therefore, it is not an opinion under *Omnicare*. The statement is not commentary on fully-disclosed data; it purports to describe the current enrollment and data collection status of a clinical trial. Even if the statements were opinion, they are actionable under *Omnicare* because, regardless of Defendants' subjective belief, the statement did not "fairly align" with information available to Sarepta. (Opp. at 24)<br><br>**Not Forward-Looking**. Defendants' statements purport to describe then-existing facts about the |

| | | | |
|---|---|---|---|
| | | | enrollment and data collection status ESSENCE; it does not make any prediction about the future. Even if forward-looking, it is ineligible for safe harbor protection, as it was unaccompanied by meaningful cautionary language (which was itself affirmatively misleading) and was made with knowledge of its falsity. (Opp. at 24)<br><br>**Not Puffery**. Defendants' statements make concrete, verifiable assertions about the enrollment and data collection status ESSENCE. Courts have repeatedly held virtually identical misstatements actionable. Moreover, these statements concerned the development of Sarepta's most important products and were echoed in analyst reports. (Opp. at 21 n.10) |